1    J. JONATHAN HAWK (SBN 254350)
     jhawk@whitecase.com
2    WHITE & CASE LLP
     555 South Flower Street, Suite 2700
3    Los Angeles, CA  90071-2433
     Telephone:  (213) 620-7700
4    Facsimile:  (213) 452-2329

5    Attorneys for Plaintiff X CORP.

6

7

8                **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   X CORP., a Nevada corporation, | **Case No.** |
| 12              Plaintiff, | **COMPLAINT FOR:** |
| 13       v. | |
| 14   CENTER FOR COUNTERING DIGITAL |    **(1) BREACH OF CONTRACT** |
| 15   HATE, INC., a Washington, D.C. non-profit corporation; CENTER FOR COUNTERING |    **(2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT** |
| 16   DIGITAL HATE LTD., a British non-profit organization; and DOES 1 through 50, |    **(3) INTENTIONAL INTERFERENCE WITH CONTRACTUAL** |
| 17   inclusive, |       **RELATIONS; AND** |
| 18            Defendants. |    **(4) INDUCING BREACH OF CONTRACT** |
| 19 | |
| 20 | **DEMAND FOR JURY TRIAL** |
| 21 | |

22

23

24

25

26

27

28

                                               

# INTRODUCTION

1.      Defendants Center for Countering Digital Hate, Inc. ("**CCDH US**") and Center for Countering Digital Hate Ltd. ("**CCDH UK**," collectively "**CCDH**") -- activist organizations masquerading as research agencies, funded and supported by unknown organizations, individuals and potentially even foreign governments with ties to legacy media companies -- have embarked on a scare campaign to drive away advertisers from the X platform.  CCDH has done this by engaging in a series of unlawful acts designed to improperly gain access to protected X Corp. data, needed by CCDH so that it could cherry-pick from the hundreds of millions of posts made each day on X and falsely claim it had statistical support showing the platform is overwhelmed with harmful content.

2.      CCDH intentionally and unlawfully accessed data it sought regarding the X platform in two ways.  CCDH US, as a registered user of X, scraped data from X's platform in violation of the express terms of its agreement with X Corp.  CCDH also convinced an unknown third party -- in violation of that third party's contractual obligations -- to improperly share login credentials to a secured database that CCDH then accessed, and retrieved information from, on multiple occasions without authorization.  CCDH, in turn, selectively quoted data it obtained via those methods.  It did so out of context in public reports and articles it prepared to make it appear as if X is overwhelmed by harmful content, and then used that contrived narrative to call for companies to stop advertising on X.

3.      CCDH's underhanded conduct is nothing new.  It has a history of using similar tactics not for the goal of combating hate, but rather to censor a wide range of viewpoints on social media with which it disagrees.  CCDH's efforts often rely on obtaining and intentionally mischaracterizing data in "research" reports it prepares to make it appear as if a few specific users (often media organizations and high profile individuals) are overwhelming social media platforms with content that CCDH deems harmful.  CCDH uses those reports to demand that platform providers kick the targeted users off of their platforms, thus silencing their viewpoints on broadly debated topics such as COVID-19 vaccines, reproductive healthcare, and climate change.  In this manner, CCDH seeks to prevent public dialogue and the public's access to free

COMPLAINT

1   expression in favor of an ideological echo chamber that conforms to CCDH's favored

2   viewpoints.

3       4.      CCDH's methodologies in preparing its "research" reports have been widely

4   criticized as "flawed" for using inappropriately small sample sizes and quoting data out of

5   context, and CCDH has been accused of using those methodologies to create "faulty narratives"

6   about the type and volume of harmful content on platforms.  CCDH nonetheless continues to

7   prepare its incorrect reports and articles, including those against X Corp., in efforts to silence

8   users it disagrees with on topics of public debate, and now to cause serious financial harm to X

9   Corp.

10      5.      In direct response to CCDH's efforts, some companies have paused their

11  advertising spend on X.  CCDH's unlawful conduct as alleged herein has directly and

12  proximately damaged X Corp. in an amount to be proven at trial, but in any event at least tens of

13  millions of dollars that X Corp. estimates it has lost in advertising revenues and other costs

14  incurred.  More fundamentally still, CCDH's scare campaign to global advertisers and its on-

15  going pressure on brands is an attempt to stifle freedom of speech on the X platform.

16      6.      X Corp. brings this lawsuit to vindicate its rights against CCDH, as well as any

17  presently unknown supporters and funders who have, among other things, directed, instructed,

18  acted as agents of or in concert with, and/or who have participated in meaningful ways in

19  CCDH's unlawful conduct as alleged herein.  As below, the identities of such supporters and

20  funders of CCDH, which has been referred to by a United States Senator as a "[f]oreign dark

21  money group," are presently unknown, but X Corp. has named Doe Defendants and will amend

22  the Complaint to assert their true names and capacities once they are ascertained through

23  discovery.

24                              **PARTIES**

25      7.      Plaintiff X Corp. is a corporation organized and existing under the laws of the

26  State of Nevada, with its principal place of business in San Francisco, California.  X Corp. is

27  successor in interest to Twitter, Inc.  X Corp. provides the X service ("**X**," formerly referred to

28  as Twitter).  X is a real-time, open, public conversation platform, where people can see every

COMPLAINT

side of a topic, discover news, share their perspectives, and engage in discussion and debate.  X allows people to create, distribute, and discover content and has democratized content creation and distribution.  X allows users to create and share ideas and information instantly through various product features, including public posts.

8.      Defendant CCDH US is a non-profit corporation organized and existing under the laws of Washington, D.C., with its principal place of business in Washington, D.C.  CCDH US is a user of X.  It created an account on the platform in 2019, and currently has the handle @CCDHate, accessible at https://twitter.com/CCDHate:



9.      Defendant CCDH UK is a non-profit organization formed under English law and headquartered in London.  X Corp. is informed and believes, and on that basis alleges, that CCDH US and CCDH UK are affiliated corporate entities, work together in a coordinated fashion, including on matters alleged herein, and even share the same CEO, Imran Ahmed.

10.      CCDH and DOES 1 through 50 (collectively, "**Defendants**") are responsible for the harm caused.  All of them knew, or should have known, that CCDH US's breach of contract with X Corp., and its unlawful efforts to gain access to data from X Corp. -- which CCDH then selectively quoted out of context to facilitate its demands for companies to stop advertising on X -- would cause financial harm to X Corp.

11.      Defendants were in some manner responsible for the acts alleged herein and the harm, losses and damages suffered by X Corp. as alleged herein.  X Corp. is informed and

COMPLAINT

believes, and on that basis alleges, that while participating in such acts, each Defendant was the agent, alter ego, conspirator, and aider and abettor of the other Defendants and was acting in the course and scope of such agency and/or acted with the permission, consent, authorization or ratification of the other Defendants.

12. Defendants, Does 1 through 50, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to X Corp. at this time.  When their true names and capacities are ascertained, X Corp. will amend this Complaint by asserting their true names and capacities herein.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the Parties and the amount in controversy exceeds $75,000.  This Court also has jurisdiction over this proceeding under 28 U.S.C. §§ 1331 and 1367(a), as this Complaint asserts a claim arising under the laws of the United States and the remaining claims asserted by X Corp. form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the acts, events, and omissions giving rise to X Corp.'s claims occurred in this judicial district, and because X Corp. and CCDH US agreed in their contract that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States."

**COMMON FACTUAL ALLEGATIONS**

I.      **CCDH Advocates for Internet Censorship**

15. CCDH has a history of advocating for censorship on the internet.  One of CCDH's tactics in this regard is to prepare and publish what it refers to as "research" reports and articles.  Those reports and articles openly target organizations and individuals -- including publishers, current and former politicians, and political commentators -- who express viewpoints via social media platforms that differ from CCDH's own views on widely debated topics, including COVID-19 vaccinations, reproductive healthcare, and climate change.  CCDH makes

these materials publicly available and free.

16.    CCDH prepares its "research" reports and articles using flawed methodologies to advance incorrect, misleading narratives.  CCDH's methodologies use, for example, inappropriately small and cherry-picked, non-randomized data samples that focus on only the social media accounts of organizations and people expressing viewpoints contrary to CCDH's own views.  They also use rudimentary tactics like labeling as "hate speech" content that merely does not conform to CCDH's ideological views, and counting the number of mentions of selectively chosen keywords on a platform while ignoring the context in which those words were mentioned.   CCDH's reports and articles do <u>not</u> include meaningful discussion or analysis of the billions of posts that comport with CCDH's viewpoints.  As such, they fail to include context that shows the true breadth and totality of viewpoints that participate in open discussion on social media platforms regarding topics covered in CCDH's reports and articles.  And in measuring the reach of certain content, CCDH's reports and articles ignore an industry-standard metric referred to as "impressions," which reflects the total number of times a piece of content has been seen, and represents the total exposure it has received.  CCDH's methodologies thus would assign the same weight to a post viewed by only one user as to a post seen by hundreds of millions of users.

17.    Using its flawed "research" methodologies, CCDH prepares and publishes its "research" reports and articles to create the incorrect narrative that certain viewpoints, which CCDH deems wrong and harmful, are rampant on social media platforms, and that the targeted organizations and people who do not share CCDH's views are responsible for the majority of that content.  CCDH's reports and articles then call for social media platforms, including X, to remove those organization's and people's accounts entirely, i.e., "de-platforming," to silence their speech.

18.    CCDH's reports and articles, coupled with its demands to entirely remove certain users from platforms, are transparent efforts to censor viewpoints that CCDH disagrees with, and reveal CCDH's goal of leaving on the platforms only viewpoints that CCDH supports.  CCDH's reports and articles, to this end, seek to present an extremely distorted picture of what

is actually being discussed and debated, and seek to undermine platforms serving as digital town squares, where a wide range of beliefs can and should be debated in a healthy manner.

19.     CCDH, for example, published a report on March 24, 2021, titled "The Disinformation Dozen," targeting twelve high-profile individuals known for opposing COVID vaccines and pro-vaccination messaging.  This report is publicly accessible on CCDH's website at https://counterhate.com/research/the-disinformation-dozen/.  The report concludes that "[j]ust twelve anti-vaxxers are responsible for almost two-thirds of anti-vaccine content circulating on social media platforms," and that platforms should kick those specific users off of social media entirely, thus removing them from the digital town square and censoring their viewpoints.  As stated by the report's "key findings," "[d]e-platforming repeat offenders is the most effective way of stopping the proliferation of dangerous misinformation."

20.     That report was criticized by at least one of the major social media platforms it purportedly analyzed  for creating a "faulty narrative" without "any evidence" to support its conclusion.  According to that platform provider, CCDH's report relied on a small sample size that did not properly represent the volume of content that people had shared about COVID vaccines in the preceding months.

21.     On November 2, 2021, CCDH engaged in similar tactics in a report called "The Toxic Ten," claiming that ten specific publishers critical of climate change theories were responsible for 69% of interactions with climate change denial content on social media platforms, and that those publishers, funded by advertising revenues, "creat[e] the sense that there is a more extensive debate than there really is."  This report is publicly accessible on CCDH's website at https://counterhate.com/research/the-toxic-ten/.

22.     CCDH's November 2, 2021 report was criticized by a major social media platform it mentioned, calling the methodology "flawed" for (again) focusing on a very small sample size that was not representative of the hundreds of millions of pieces of content that people were sharing on the platform on the topic of climate change more generally.

6

**II.    CCDH Engages in Unlawful Conduct to Target X Corp. as Part of CCDH's Campaigns to Censor Contrary Viewpoints and to Financially Harm X Corp.**

23.    Within the last year, CCDH has used similar schemes to repeatedly create faulty narratives regarding X Corp. and the X service, with the express goal of seeking to harm X Corp.'s business by driving advertisers away from the platform.  To enable and facilitate those efforts, CCDH has engaged in a series of unlawful acts to secure data regarding X that CCDH could then mischaracterize in its reports and articles alongside calls for companies not to advertise on X.

24.    As set forth in detail below, CCDH, on several occasions since at least March 2021, has intentionally sought and obtained unauthorized access to data sets regarding X that were provided by X Corp. to Runtime Collective Ltd., T/A Brandwatch ("**Brandwatch**") pursuant to written agreements.  Those data sets were and are accessible only via secure login credentials that Defendants (except for the third party who is included as a Doe Defendant and improperly shared its login credentials with CCDH) were never authorized to have.  CCDH, in turn, and on at least two occasions after accessing that data without authorization, quoted the unlawfully accessed data incompletely and out of context to create unsubstantiated and incorrect assertions about the presence of hate speech on X.

25.    CCDH, as a registered user of the X service, also breached its agreement with X Corp., i.e., the Terms of Service ("**ToS**"), which expressly prohibit "scraping" without X's "prior consent."  CCDH's February 9, 2023 report admits to scraping X to obtain data for the report, in which CCDH uses its manufactured and inaccurate narrative to openly call for companies to not advertise on X, claiming they would otherwise be "bankrolling the spread of hate and disinformation on Twitter."

**A.    X Corp.'s Agreements With Brandwatch**

26.    Brandwatch, a trusted partner of X, provides SaaS products that enable its customers to conduct brand monitoring on social media, customer research on opinions and trends, campaign planning and campaign effectiveness measurement, competitive analysis and risk management, influencer identification and market research, and audience segmentation and

1    analysis.

2         27.    X Corp. entered into a written contract with Brandwatch on May 1, 2020, titled

3    the "Master License Agreement" (the, "**2020 MLA**").[1]  Pursuant to that agreement, X Corp.

4    agreed that Brandwatch could access certain data regarding X, referred to as "Licensed

5    Materials" including Tweets (i.e., posts on the X platform), to enable Brandwatch's customers

6    to use its SaaS products to analyze posts and X/Twitter users.  Brandwatch's products could

7    facilitate analysis of, for example, posts for features such as sentiment or topics, and users for

8    features such as influence or expertise.  They could also analyze data at the aggregate level,

9    combining data points to show trends, themes, changes over time, segments, breakdowns, and

10   similar outputs.  Brandwatch's products could then display data to Brandwatch's customers at

11   both the individual and aggregate level.

12        28.    The 2020 MLA provides, among other things, that Brandwatch agrees that it will

13   "not attempt to (and will not allow others to): … (c) copy, sell, lease, sublicense, distribute,

14   redistribute, syndicate, create derivative works of assign or otherwise transfer or provide access

15   to, in whole or in part, the Licensed Material to any third party."  It defines "Licensed Material"

16   as including "Twitter Content," i.e., "any and all content, media, information and data (and

17   copies and derivative works thereof) made available to Customer through the Twitter

18   Technology or by other means authorized by Twitter."  The 2020 MLA also provides that

19   Brandwatch will keep "Twitter Content" secure.

20        29.    On April 27, 2023, X Corp. and Brandwatch entered into a second written

21   agreement, titled the "Twitter Customer Order Form" (the "**2023 Order Form**," together with

22   the 2020 MLA, the "**Brandwatch Agreements**").  The 2023 Order Form again governs X

23   Corp.'s provision of certain data to Brandwatch, to be used in connection with Brandwatch's

24   SaaS products.

25        30.    The 2023 Order Form, similar to the 2020 MLA, contains a provision providing

26   _____

27   [1] The 2020 MLA was signed by Twitter International Unlimited Company, a company organized and existing under
     the laws of Ireland with its headquarters in Dublin ("**TIUC**").  TIUC is a subsidiary of X Corp., and the 2020 MLA
     expressly provides that TIUC entered into the 2020 MLA "on behalf of itself and its affiliates," collectively defined
28   as "Twitter."

COMPLAINT

that Brandwatch will "not attempt to (and will not allow others to) copy, sell, lease, sublicense, distribute, redistribute, syndicate, create derivative works of assign or otherwise transfer or provide access to, in whole or in part, the Licensed Material to any third party."[2]  The 2023 Order Form also includes a list of Brandwatch's "**Affiliates**" that agree to the terms of the Brandwatch Agreement, and can thus access the data provided by X Corp. "solely through [Brandwatch's] accounts enabled by Twitter under the Agreement."  The 2023 Order Form provides that "any breach of this Agreement by an Affiliate shall be deemed Your [Brandwatch's] breach, for which You and the applicable Affiliate(s) shall be responsible and jointly and severally liable."

31.     The Brandwatch Agreements have governed access to the Licensed Materials via Brandwatch's SaaS products since 2020, including at all times relevant to the allegations in this Complaint.

**B.     CCDH Obtains Unauthorized Access to and Misuses Data Provided By X Corp. Under the Brandwatch Agreement, and Also Breaches the ToS**

32.     The data provided by X Corp. to Brandwatch, to be analyzed using Brandwatch's SaaS products, is compiled in a manner not publicly available.  Only those with login credentials provided by X and/or Brandwatch, including Brandwatch's Affiliates and customers, can access and analyze the data using Brandwatch's SaaS products.

33.     Twitter is informed and believes, and on that basis alleges, that none of the Defendants (except for the third party who is included as  Doe Defendant and improperly shared its login credentials with CCDH) are or ever have been customers of Brandwatch, and have never been provided with login credentials that would enable them to permissibly access the data with authorization.  None of the Defendants (again, except for the third party who improperly shared its login credentials with CCDH) are or ever have been parties to the Brandwatch Agreements.  And neither X nor Brandwatch has ever consented, in any form or in

---

[2] The 2023 Order Form similarly defines "Licensed Material" similar to the 2020 Master License Agreement, i.e., as "Tweets, Tweet IDs, Twitter end user profile information, and any other content of Twitter made available to you through Twitter Technology or by any other means authorized by Twitter, and any copies and derivative works thereof."

COMPLAINT

any way, to any of Defendants (except the third party who provided CCDH with its login credentials and who is named as a Doe Defendant) the data that X Corp. provided to Brandwatch under the Brandwatch Agreements.

34.     In order to prepare and publish the so-called "research" reports and articles about X, CCDH has -- since at least March 2011 -- necessarily obtained access to and accessed the Licensed Materials improperly and without authorization. Indeed, CCDH has admitted as much, citing Brandwatch—a platform it never had any right to access—as a source of its data in its "research" reports, despite that data being accessible only to authorized users via login credentials, which the CCDH was not. These actions were unknown to Brandwatch and to X until recently.

35.     X Corp. is informed and believes, and on that basis alleges, that CCDH knew at all relevant times, and in any event no later than March 2021, that X Corp. and Brandwatch are parties to the Brandwatch Agreements.  CCDH knew at all relevant times that the Brandwatch Agreements prohibit Brandwatch from allowing third parties to, among other things, access, distribute, create derivative works from, or otherwise transfer the Licensed Materials.  CCDH further knew at all relevant times that only X Corp. and Brandwatch, as well as certain of Brandwatch's Affiliates and customers, were permissibly provided with login credentials to access the secured Licensed Materials under the Brandwatch Agreements.  CCDH knew that neither it nor any of the other Defendants (except the third party who provided CCDH with its login credentials and who is named as a Doe Defendant) was authorized to access the Licensed Materials, except perhaps the unknown third party who provided CCD with its login credentials.

36.     X Corp. is informed and believes, and on that basis alleges, that CCDH, knowing these things, and knowing that it was unable to access the Licensed Materials it needed to prepare its reports and articles with CCDH's desired narratives, induced one of Brandwatch's customers, whose identity is presently unknown to X Corp., to provide CCDH with its login credentials in violation of the Brandwatch Agreements.  CCDH then impermissibly and without authorization accessed the Licensed Materials on several occasions, and used limited, selective, and incomplete data from that source (as well as from CCDH's impermissible scraping of X)

10

that CCDH then presented out of context in a false and misleading manner in purported

"research" reports and articles as set forth herein.

### 1.   CCDH's March 24, 2021 Report Admits to Accessing Data Provided Under the Brandwatch Agreement

37.     As above, CCDH published a report on March 24, 2021, titled "Disinformation Dozen," claiming that "[j]ust twelve anti-vaxxers are responsible for almost two-thirds of anti-vaccine content circulating on social media platforms," including Twitter (now X).  CCDH admits in that report that it accessed data from X Corp. via Brandwatch, for use in its report.

38.     CCDH's March 24, 2021 report admits, in part, that "[w]e collected this sample using Brandwatch, an enterprise social listening tool, to extract anti-vaccine tweets posted between 1 February and 16 March 2021 based on text analysis.  Retweets and quote tweets were also extracted to discover which pieces of anti-vaccine content were shared most frequently."

### 2.   CCDH's November 10, 2022 Article Admits to Accessing Data Provided Under the Brandwatch Agreement

39.     On November 10, 2022, CCDH published an article on its website, titled "Fact check: Musk's claim about a fall in hate speech doesn't stand by to scrutiny", publicly accessible at https://counterhate.com/blog/fact-check-musks-claim-about-a-fall-in-hate-speech-doesnt-stand-up-to-scrutiny/.  The article purports to assess, among other things, a claim by Elon Musk that "hate speech declined to 'below our prior norms.'"  In doing so, CCDH provides what it claims are statistics showing the number of posts and reposts "mentioning" certain slurs during the week beginning October 31, 2022.

40.     CCDH's article claims the statistics refute statements from X Corp. executives issued around the same time regarding hateful conduct, including a statement that X Corp. "not only mitigated the recent surge in harmful behavior, but [has] reduced impressions on this content in Search by ~95% relative to even prior baselines.  We're continuing our work to make Twitter safer every day."  Even putting aside that CCDH's flawed methodology -- e.g., that its purported statistics in the November 10, 2022 article focus merely on the number of posts and reposts containing certain terms and not the number of impressions for those pieces of content --

CCHD's article admits that it obtained its data regarding content on X from Brandwatch's products.

41.     CCHD's November 10, 2022 article admits that CCDH analyzed "data from the social media analytics tool Brandwatch," and admits that its "methodology" includes "[d]ata collected using Brandwatch, which includes original tweets, retweets and quote tweets."

### 3.     CCDH's November 10, 2022 Article Admits to Accessing Data Provided Under the Brandwatch Agreement

42.     CCDH similarly obtained unauthorized access to the data that X Corp. provided to Brandwatch under the Brandwatch Agreements to prepare a report issued on February 9, 2023, titled "Toxic Twitter," publicly accessible on CCDH's website at https://counterhate.com/research/toxic-twitter/.

43.     That report states that CCDH "is a US-headquartered international nonprofit NGO."  It expressly calls for companies to stop advertising on X based on CCDH's incorrect implications in its report that hate speech viewed on X is on the rise, and its incorrect assertions that X Corp. "doesn't care about hate speech" and allows "accounts of homophobes, misogynists, self-professed neo-Nazis, and conspiracy theorists because it's highly profitable."

44.     Importantly, to obtain data that it needed for and mischaracterized in its February 9, 2023 report, CCDH again improperly accessed data that X Corp. provided to Brandwatch under the Brandwatch Agreements.  The February 9, 2023 report cites several data points for which non-public Brandwatch sources are quoted.  And yet again, CCDH was never provided login credentials by Twitter or Brandwatch to lawfully access that data.

45.     CCDH's February 9, 2023 report also admits that CCDH breached the ToS to obtain data included in the report.

46.     Moreover, as a user of X, CCDH necessarily agreed to the ToS when it registered to create an account.  The ToS are, and at all relevant times, have been, accessible at https://twitter.com/en/tos.  At all times relevant to the allegations herein, the ToS prohibit scraping data from X.  Section 4 of the ToS, titled "Using the Services," provides that "scraping the Services without the prior consent of Twitter is expressly prohibited."

12

47.     CCDH's February 9, 2023 report states that "[t]o gather tweets from each of the ten reinstated accounts, [CCDH's] researchers used the social media web-scraping tool SNScrape, which utilizes Twitter's search function to enable data collection."  X Corp. has never given CCDH (or the creators of SNScrape) consent to scrape X.

48.     Further, Twitter is informed and believes, and on that basis alleges, that CCDH has impermissibly and unlawfully scraped X on multiple occasions since at least 2021 in connection with preparing its reports and articles, in clear violation of the ToS to which CCDH US agreed.

### 4.     Major Press Relies on CCDH's Reports and Articles

49.     CCDH's reports and articles, including its February 9, 2023 report and the conclusions therein, have attracted attention in the press, with media outlets repeating CCDH's incorrect assertions that hate speech is increasing on X.

50.     Recently, Bloomberg picked up CCDH's purported "research" in an article released on July 19, 2023.  That article, titled "Twitter's Surge in Harmful Content a Barrier to Advertiser Return," quoted CCDH's Head of Research, Callum Hood, claiming that hate speech is increasing on Twitter.  The article went on to state that CCDH's research claims, for example, that "[d]uring the first three months of Musk's tenure the rate of daily tweets containing slurs against Black Americans more than tripled."  That Bloomberg article expressly recognizes that CCDH acknowledges its "research" was conducted via "social media analysis tool Brandwatch."

51.     Mr. Hood was also recently quoted in a Time article from July 19, 2023 discussing CCDH's "research" about X Corp. and X.  The Time article quotes Mr. Hood as stating that "[Elon] Musk is not keeping his promises to advertisers, and their ads are appearing next to really harmful content."

52.     This series of events prompted Brandwatch to post a public statement on X, accessible at https://twitter.com/Brandwatch/status/1682129059310862353, clarifying that data from CCDH's report as cited in the press is "used out of context to make unsubstantiated assertions about Twitter:"

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



53.     X Corp.'s CEO, Linda Yaccarino, likewise sought to correct the incorrect and misleading narrative from CCDH's February 9, 2023 report, explaining in connection with a news article that relied on the report, that CCDH relies on "a collection of incorrect, misleading, and outdated metrics. . . . It also lacks extremely important context not to mention critical updates on our progress and actions."  That Tweet is available at https://twitter.com/lindayaX/status/1681656761101479936.

**C.     Doe Defendants' Influence**

54.     Twitter is informed and believes, and on that basis alleges, that CCDH's conduct as described herein is intended to do more than further CCDH's own censorship efforts.

55.     Twitter is informed and believes, and on that basis alleges, that CCDH is being supported by funding from X Corp.'s commercial competitors, as well as government entities and their affiliates.  Indeed, in connection with its "Disinformation Dozen" report discussed above, one United States Senator referred to CCDH as "[a] foreign dark money group."  Other articles have claimed that CCDH is, in part, funded and supported by foreign organizations and entities whose directors, trustees, and other decision-makers are affiliated with legacy media organizations.

56.     Twitter is informed and believes, and on that basis alleges, that CCDH is acting, as alleged herein, with the intent to inflict significant financial harm on X Corp., including at the behest of and in concert with funders, supporters, and other entities.  CCDH is, on information

COMPLAINT

and belief, acting in the course and scope of such agency and/or acting with the permission,

consent, authorization or ratification of these unknown funders, supporters, and other entities,

who are aware of and knowingly participating in the unlawful conduct alleged herein, with the

intent to financially harm X Corp.

57.     X Corp. currently lacks sufficient information to include the identities these

entities, organizations, and persons in this Complaint.  When their true names and capacities are

confirmed through discovery, X Corp. will amend this Complaint by asserting their true names

and capacities herein.

**III.     X Corp. Has Been Harmed By CCDH's Wrongful Conduct**

58.     CCDH widely disseminates its articles and "research" reports for free, often

alongside requests for donations and subscribers.   Those materials prepared by CCDH about X

Corp. are all enabled by CCDH's wrongful conduct in unlawfully gathering data via scraping

and via, but unbeknownst to, Brandwatch, which CCDH has then distorted to prepare its

"research."  CCDH's reports and articles could not have been prepared and disseminated but-for

CCDH's unlawful scraping and unauthorized access to data via Brandwatch.

59.     Those reports and articles have, in turn, caused significant financial harm to X

Corp., including via lost advertising revenues.

60.     CCDH's reports and articles, enabled by CCDH's unlawful conduct, have been

viewed by companies that advertise on social media platforms, including X.  A number of

companies who advertised on X on an ongoing basis immediately paused spending for

advertising on X after viewing CCDH's "research" reports and articles.  X Corp. is aware of at

least eight such specific organizations and companies, including large, multinational

corporations that have historically run paid advertising on X, that in June and July 2023

immediately paused their advertising spend on X based on CCDH's reports and articles.

61.     Separate companies, again including large multinational corporations that were

planning on running future campaigns, have likewise paused those plans in reaction to seeing

CCDH's "research" reports and articles discussing X Corp. as alleged herein.  X Corp. is aware

of at least five such specific companies that, as of November 2022, paused their plans for future

1   advertising spend on X based on CCDH's reports and articles.

2       62.     Still other companies similar to those above have identified CCDH's "research"

3   reports and articles as creating barriers to reactivating their paid advertising campaigns on X.  X

4   Corp. is aware of three such companies.

5       63.     Based on the historical spend of the companies and organizations that have

6   paused paid advertising and/or paused plans for future paid advertising, X Corp. estimates that it

7   has lost at least tens of millions of dollars in lost revenues as of the date of this Complaint, with

8   those amounts subject to increasing as time goes on.  Defendants' and CCDH's breach of the

9   ToS and unauthorized access to data via Brandwatch are a but-for and proximate cause of these

10  lost revenues, as CCDH's conduct to obtain that data (which it then distorted) was necessary for

11  CCDH to make its allegations against X Corp. and X regarding hate speech and other types of

12  content on X.

13      64.     X Corp. has further incurred additional losses caused by CCDH's unauthorized

14  access to data via Brandwatch.  Among other things, X Corp. has conducted internal

15  investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to the

16  data, has allocated significant employee resources and time to participate and assist in those

17  investigations, and has incurred attorneys' fees and other costs in aid of those investigations and

18  in enforcing the relevant agreements, all of which were reasonably incurred in responding to

19  CCDH's offense and/or conducting a damage assessment.  These additional losses far exceed

20  $5,000 and, as of the date of this Complaint, are in excess of tens of thousands of dollars and

21  will continue to increase.

22      65.     Most fundamentally, X Corp. has been harmed in its mission to provide its users

23  with a platform in which topics of paramount public concern can be discussed and debated free

24  from the censorship efforts of activist organizations advancing narrow ideological agendas

25  through deceitful means.

26                          **FIRST CAUSE OF ACTION**

27                      **(Breach of Contract – Against CCDH US)**

28      66.     X Corp. hereby realleges and incorporates the allegations in paragraphs 1

1 │ through 65, as though fully set forth herein.

2 │     67.    X Corp. and CCDH US are parties to the ToS.

3 │     68.    Section 4 of the ToS, titled "Using the Services," provides that "scraping the

4 │ Services without the prior consent of Twitter is expressly prohibited."

5 │     69.    At all relevant times, X Corp. fully performed its obligations under the ToS.

6 │     70.    CCDH US, however, breached the ToS by scraping X.  As CCDH US admits in

7 │ the February 9, 2023 report, "[t]o gather tweets from each of the ten reinstated accounts,

8 │ [CCDH's] researchers used the social media web-scraping tool SNScrape, which utilizes

9 │ Twitter's search function to enable data collection."  X Corp. is further informed and believes,

10 │ and on that basis alleges, that CCDH US scraped X on numerous occasions, including before

11 │ preparing its February 9, 2023 report discussed herein.  X Corp. has never given CCDH US, or

12 │ any of the Defendants, consent to scrape X.

13 │     71.    CCDH, in turn, mischaracterized the data it obtained by unlawfully scraping in

14 │ its reports and articles, in efforts to claim X is overwhelmed with harmful conduct, and support

15 │ CCDH's call to companies to stop advertising on X.  Indeed, CCDH engaged in its unlawful

16 │ scraping with the intent to improperly obtain data that would be used to cause X Corp. to lose

17 │ significant advertising revenues. As a direct and proximate result of CCDH US's breaches of the

18 │ ToS in scraping X, X Corp. has suffered monetary and other damages in the amount of at least

19 │ tens of millions of dollars, which amount is in excess of the jurisdictional minimum of this

20 │ Court, subject to proof of a greater amount of damages at the time of trial.

21 │     72.    As a direct and proximate result of CCDH US's breaches of the ToS in scraping

22 │ X, X Corp. has suffered monetary and other damages in the amount of at least tens of millions

23 │ of dollars, which amount is in excess of the jurisdictional minimum of this Court, subject to

24 │ proof of a greater amount of damages at the time of trial.

25 │ **SECOND CAUSE OF ACTION**

26 │ **(Breach of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 – Against All**

27 │ **Defendants)**

28 │     73.    X Corp. hereby realleges and incorporates the allegations in paragraphs 1

17

through 72, as though fully set forth herein.

74.     X Corp. brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030(g) (the "**CFAA**").

75.     Defendants, except for the third party who provided CCDH with its login credentials, have violated the CFAA by knowingly, and with intent to defraud X Corp., accessing a protected computer, without authorization, and by means of such conduct furthered the fraud and obtained one or more things of value.

76.     X Corp. provided non-public data to Brandwatch under the Brandwatch Agreements.  That data was then stored on a protected computer, as defined under 18 U.S.C. § 1030(e)(2).  The data was accessible to only those with login credentials, including Twitter, Brandwatch, Brandwatch Affiliates, and certain Brandwatch customers.

77.     Defendants (except for the third party who is included as a Doe Defendant and improperly shared its login credentials with CCDH) were never validly given login credentials to access the data provided under the Brandwatch Agreements. Those Defendants nonetheless, knowing the data was secured pursuant to the Brandwatch Agreements and that those Defendants did not have authorization to access it, convinced an unknown third party, who is likely a Brandwatch customer, to share its login credentials with the remaining Defendants. Those Defendants then accessed that data without authorization, as admitted in CCDH's reports and articles discussed above, in furtherance of obtaining data regarding X that those Defendants could mischaracterize as part of its campaign to call on companies to stop advertising on X.

78.     X has suffered loss as a result of these violations, including, without limitation, amounts expended attempting to conduct internal investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to the data, significant employee resources and time to participate and assist in those investigations, and attorneys' fees in aid of those investigations and in enforcing the relevant agreements.  These losses amount to well over $5,000 aggregated over a one-year period.

79.     Pursuant to 8 U.S.C. § 1030(g), X Corp. is entitled to recover its losses and obtain injunctive relief prohibiting those Defendants from further violations of the CFAA and to

1    prohibit those Defendants from using the data they obtained by accessing the data without

2    authorization.

3    **THIRD CAUSE OF ACTION**

4    **(Intentional Interference with Contractual Relations – Against All Defendants)**

5        80.    X Corp. hereby realleges and incorporates the allegations in paragraphs 1

6    through 79, as though fully set forth herein.

7        81.    X Corp. and Brandwatch are parties to the Brandwatch Agreements.

8        82.    Defendants knew about the Brandwatch Agreements.  In particular, on

9    information and belief, Defendants knew that Brandwatch had access to X Corp. data that

10   Defendants sought.  Defendants knew that, except for the third party who is included as a Doe

11   Defendant and improperly shared its login credentials with CCDH, they could not access that

12   data because they did not have login credentials to access that data.  Those Defendants knew,

13   based on their experience in purporting to analyze data associated with social media platforms

14   (including via Brandwatch's tools as stated in CCDH's reports and articles) that for Brandwatch

15   to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts

16   with Brandwatch, and that Brandwatch would be prohibited under the terms of the Brandwatch

17   Agreements from providing access to unauthorized parties, or allowing any unauthorized parties

18   to access that data.

19       83.    Defendants were aware of the harm to X Corp. that would result from

20   Defendants accessing the data provided to Brandwatch under the Brandwatch Agreements.

21   Indeed, Defendants intended to cause that harm.  They intended to obtain access to the data,

22   without authorization, by using someone else's login credentials.  They intended to

23   mischaracterize the data regarding X in the various reports and articles discussed above, to

24   support Defendants' demands for companies to stop advertising on X.  They intended that, in

25   direct response to their conduct, advertisers would stop advertising on X.

26       84.    Defendants' conduct prevented Brandwatch from performing under the

27   Brandwatch Agreements.  Brandwatch failed to secure the data from X Corp. according to the

28   terms of the agreements.  As a direct and proximate result of Defendants intentionally

19

interfering with the Brandwatch Agreements as alleged herein, X Corp. has suffered monetary and other damages of at least tens of millions of dollars, which amount is in excess of the jurisdictional minimum of this Court, subject to proof of a greater amount of damages at the time of trial.

## FOURTH CAUSE OF ACTION

### (Inducing Breach of Contract – Against All Defendants)

85.     X Corp. hereby realleges and incorporates the allegations in paragraphs 1 through 84, as though fully set forth herein.

86.     X Corp. and Brandwatch are parties to the Brandwatch Agreements.

87.     Defendants knew about the Brandwatch Agreements.  In particular, on information and belief, Defendants knew that Brandwatch had access to X Corp. data that Defendants sought.  Defendants knew that, except for the third party who is included as a Doe Defendant and improperly shared its login credentials with CCDH, they could not access that data because they did not have login credentials to access that data.  Those Defendants knew, based on their experience in purporting to analyze data associated with social media platforms (including via Brandwatch's tools as stated in CCDH's reports and articles) that for Brandwatch to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of the Brandwatch Agreements from providing access to unauthorized parties, or allowing any unauthorized parties to access that data.

88.     Defendants intended to cause Brandwatch to breach the Brandwatch Agreements. Defendants, except for the third party who is included as a Doe Defendant and improperly shared its login credentials with CCDH, knew they did not have access to the data, and that they could not get access to it without obtaining login credentials from someone who validly had them.  Those Defendants knew, or reasonably should have known, that obtaining login credentials from a valid user to access the data would cause Brandwatch to breach the Brandwatch Agreements, by allowing an unauthorized third party (i.e., Defendants) to gain access to the data without proper permissions or authorizations.  Defendants knew and intended

COMPLAINT

1    that, in direct response to their conduct, advertisers would stop advertising on X.

2            89.      X Corp. was harmed and suffered damages as a result of Defendants' conduct

3    when companies paused or refrained from advertising on X, in direct response to CCDH's

4    reports and articles as discussed above. Defendants' conduct was a substantial factor in

5    Brandwatch's breach of the Brandwatch Agreements.

6            90.      As a direct and proximate result of Defendants inducing Brandwatch to breach

7    the Brandwatch Agreements as alleged herein, X Corp. has suffered monetary and other

8    damages in the amount of at least tens of millions of dollars, which amount is in excess of the

9    jurisdictional minimum of this Court, subject to proof of a greater amount of damages at the

10    time of trial.

11                             **PRAYER FOR RELIEF**

12            **WHEREFORE**, X Corp. prays for judgment against Defendants as follows:

13            a.       Damages according to proof sufficient to compensate X Corp. for damages

14    sustained as a result of Defendants' actions as alleged herein, including, but not limited to,

15    losses under the CFAA;

16            b.       That Defendants, all of their agents, servants, employees, representatives, and all

17    others in active concert or participation with them, either directly or indirectly, be preliminarily

18    and permanently enjoined from:

19                     i.       accessing the Licensed Materials provided by X Corp. to Brandwatch

20                           under the Brandwatch Agreements.

21                     ii.      using or disclosing any data obtained via logging into the Licensed

22                           Materials provided by X Corp. to Brandwatch under the Brandwatch

23                           Agreements.

24            c.       An award of pre- and post-judgment interest on all monetary relief prayed for

25    above, and as may be permitted by law; and

26            d.       All such other and further relief as the Court may deem just and proper.

27                             **JURY DEMAND**

28    In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, X Corp. demands

a trial by jury of all issues triable by a jury.

Dated: July 31, 2023          WHITE & CASE LLP


By:    /s/ *J. Jonathan Hawk*
            J. Jonathan Hawk

Attorneys for Plaintiff X CORP.

22