1
2
3
4

J. JONATHAN HAWK (SBN 254350)
jhawk@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329

5

Attorneys for Plaintiff X CORP.

6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10
11

X CORP., a Nevada corporation,

12

            Plaintiff,

13

      v.

14
15
16
17
18

CENTER FOR COUNTERING DIGITAL
HATE, INC., a Washington, D.C. non-profit
corporation; CENTER FOR COUNTERING
DIGITAL HATE LTD., a British non-profit
organization; STICHTING EUROPEAN
CLIMATE FOUNDATION; and DOES 1
through 50, inclusive,

19

            Defendants.

**Case No. 3:23-cv-03836-LB**

**AMENDED COMPLAINT FOR:**

**(1) BREACH OF CONTRACT**

**(2) VIOLATION OF THE COMPUTER
    FRAUD AND ABUSE ACT**

**(3) INTENTIONAL INTERFERENCE
    WITH CONTRACTUAL
    RELATIONS; AND**

**(4) INDUCING BREACH OF
    CONTRACT**

**DEMAND FOR JURY TRIAL**

20
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.      Defendants Center for Countering Digital Hate, Inc. ("**CCDH US**") and Center for Countering Digital Hate Ltd. ("**CCDH UK**," collectively "**CCDH**") -- activist organizations masquerading as research agencies, funded and supported by unknown organizations, individuals and potentially even foreign governments with ties to legacy media companies -- have embarked on a scare campaign to drive away advertisers from the X platform.  CCDH has done this by engaging in a series of unlawful acts designed to improperly gain access to protected X Corp. data, needed by CCDH so that it could cherry-pick from the hundreds of millions of posts made each day on X and falsely claim it had statistical support showing the platform is overwhelmed with harmful content.

2.      CCDH intentionally and unlawfully accessed data it sought regarding the X platform in two ways.  CCDH US, as a registered user of X, scraped data from X's platform in violation of the express terms of its agreement with X Corp.  CCDH also conspired with Defendant Stichting European Climate Foundation ("**ECF**") -- in knowing and intentional violation of its contractual obligations, and knowing of CCDH's intended use of the X Corp. data -- to improperly share login credentials with CCDH US to a secured database that CCDH then accessed, and retrieved information from, on multiple occasions without authorization. The servers that CCDH targeted to retrieve data via this method included servers in the United States that were not publicly accessible, and that CCDH accessed without authorization.  This was enabled by ECF knowingly and intentionally reaching into the United States, and thus targeting the United States, in wrongfully sharing its login credentials with CCDH US as part of the series of tortious acts alleged herein.  CCDH, in turn, selectively quoted data it obtained via those methods.  It did so out of context in public reports and articles it prepared to make it appear as if X is overwhelmed by harmful content, and then used that contrived narrative to call for companies to stop advertising on X.

3.      CCDH's underhanded conduct is nothing new.  It has a history of using similar tactics not for the goal of combating hate, but rather to censor a wide range of viewpoints on social media with which it disagrees.  CCDH's efforts often rely on obtaining and intentionally

mischaracterizing data in "research" reports it prepares to make it appear as if a few specific users (often media organizations and high profile individuals) are overwhelming social media platforms with content that CCDH deems harmful.  CCDH uses those reports to demand that platform providers kick the targeted users off of their platforms, thus silencing their viewpoints on broadly debated topics such as COVID-19 vaccines, reproductive healthcare, and climate change.  In this manner, CCDH seeks to prevent public dialogue and the public's access to free expression in favor of an ideological echo chamber that conforms to CCDH's favored viewpoints.

4.      CCDH's methodologies in preparing its "research" reports have been widely criticized as "flawed" for using inappropriately small sample sizes and quoting data out of context, and CCDH has been accused of using those methodologies to create "faulty narratives" about the type and volume of harmful content on platforms.  CCDH nonetheless continues to prepare its incorrect reports and articles, including those against X Corp., in efforts to silence users it disagrees with on topics of public debate, and now to cause serious financial harm to X Corp.

5.      In direct response to CCDH's efforts, some companies have paused their advertising spend on X.  CCDH's unlawful conduct as alleged herein has directly and proximately damaged X Corp. in an amount to be proven at trial, but in any event at least tens of millions of dollars that X Corp. estimates it has lost in advertising revenues and other costs incurred.  More fundamentally still, CCDH's scare campaign to global advertisers and its on-going pressure on brands is an attempt to stifle freedom of speech on the X platform.

6.      X Corp. brings this lawsuit to vindicate its rights against CCDH, ECF, as well as any presently unknown supporters and funders who have, among other things, directed, instructed, acted as agents of or in concert with, conspired with, and/or who have participated in meaningful ways in CCDH's and ECF's unlawful conduct as alleged herein.  As below, the identities of such additional supporters and funders of CCDH, which has been referred to by a United States Senator as a "[f]oreign dark money group," are presently unknown, but X Corp. has named Doe Defendants and will further amend the Amended Complaint to assert their true

2

1    names and capacities once they are ascertained through discovery.

2    **PARTIES**

3        7.      Plaintiff X Corp. is a corporation organized and existing under the laws of the

4    State of Nevada, with its principal place of business in San Francisco, California.  X Corp. is

5    successor in interest to Twitter, Inc.  X Corp. provides the X service ("**X**," formerly referred to

6    as Twitter).  X is a real-time, open, public conversation platform, where people can see every

7    side of a topic, discover news, share their perspectives, and engage in discussion and debate.  X

8    allows people to create, distribute, and discover content and has democratized content creation

9    and distribution.  X allows users to create and share ideas and information instantly through

10   various product features, including public posts.

11       8.      Defendant CCDH US is a non-profit corporation organized and existing under

12   the laws of Washington, D.C., with its principal place of business in Washington, D.C.  CCDH

13   US is a user of X.  It created an account on the platform in 2019, and currently has the handle

14   @CCDHate, accessible at https://twitter.com/CCDHate:

15
16
17   
18
19
20
21
22

23       9.      Defendant CCDH UK is a non-profit organization formed under English law and

24   headquartered in London.  X Corp. is informed and believes, and on that basis alleges, that

25   CCDH US and CCDH UK are affiliated corporate entities, work together in a coordinated

26   fashion, including on matters alleged herein, and even share the same CEO, Imran Ahmed.

27       10.     Defendant ECF is a non-profit foundation formed under Dutch law and

28

3

headquartered in The Hague, Netherlands.  X Corp. is informed and believes, and on that basis

alleges, that ECF, each year, targets individuals and entities in California for donations to ECF,

and receives millions of dollars in donations from California sources and as a result of its

solicitations directed towards this State.

11.    X Corp. is further informed and believes, and on that basis alleges, that ECF

conspired with CCDH to commit acts which constitute violations of the CFAA so that CCDH

could illegally access data from X Corp. to prepare its purported "research" reports as alleged

herein.  X Corp. is informed and believes, and on that basis alleges, that ECF was aware that

CCDH did not have authorization to access the data from X Corp., was aware that its agreement

with Brandwatch prohibited ECF from sharing its login credentials with CCDH, and agreed

nonetheless with CCDH to help it unlawfully access the X Corp. data on protected servers in the

United States.  In furtherance of that agreement, ECF intentionally and knowingly provided

CCDH US with ECF's login credentials, thus targeting its conduct at the United States.  ECF's

contacts with the United States, including by sharing information with a US entity

headquartered in Washington, D.C. as part of the tortious conduct alleged herein, are anything

but fortuitous.

12.    CCDH, ECF and DOES 1 through 50 (collectively, "**Defendants**") are

responsible for the harm caused.  All of them knew, or should have known, that CCDH US's

breach of contract with X Corp., and CCDH's unlawful efforts to gain access to data from X

Corp. -- which CCDH then selectively quoted out of context to facilitate its demands for

companies to stop advertising on X -- would cause financial harm to X Corp.

13.    Defendants were in some manner responsible for the acts alleged herein and the

harm, losses and damages suffered by X Corp. as alleged herein.  X Corp. is informed and

believes, and on that basis alleges, that while participating in such acts, each Defendant was the

agent, alter ego, conspirator, and aider and abettor of the other Defendants and was acting in the

course and scope of such agency and/or acted with the permission, consent, authorization or

ratification of the other Defendants.   X Corp. is informed and believes, and on that basis

alleges, that, among other things, CCDH UK knowingly participated in all of CCDH US's

4

unlawful acts as alleged herein, particularly in instructing CCDH US, and aiding in its efforts, to obtain login credentials from ECF to the Brandwatch applications, to allow CCDH to illegally access X Corp. data.

14.     Defendants, Does 1 through 50, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to X Corp. at this time.  When their true names and capacities are ascertained, X Corp. will further amend this Amended Complaint by asserting their true names and capacities herein.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the Parties and the amount in controversy exceeds $75,000.  This Court also has jurisdiction over this proceeding under 28 U.S.C. §§ 1331 and 1367(a), as this Amended Complaint asserts a claim arising under the laws of the United States and the remaining claims asserted by X Corp. form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the acts, events, and omissions giving rise to X Corp.'s claims occurred in this judicial district, and because X Corp. and CCDH US agreed in their contract that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States."

## COMMON FACTUAL ALLEGATIONS

### I.     CCDH Advocates for Internet Censorship

17.     CCDH has a history of advocating for censorship on the internet.  One of CCDH's tactics in this regard is to prepare and publish what it refers to as "research" reports and articles.  Those reports and articles openly target organizations and individuals -- including publishers, current and former politicians, and political commentators -- who express viewpoints via social media platforms that differ from CCDH's own views on widely debated topics, including COVID-19 vaccinations, reproductive healthcare, and climate change.  CCDH makes these materials publicly available and free.

5

18.     CCDH prepares its "research" reports and articles using flawed methodologies to advance incorrect, misleading narratives.  CCDH's methodologies use, for example, inappropriately small and cherry-picked, non-randomized data samples that focus on only the social media accounts of organizations and people expressing viewpoints contrary to CCDH's own views.  They also use rudimentary tactics like labeling as "hate speech" content that merely does not conform to CCDH's ideological views, and counting the number of mentions of selectively chosen keywords on a platform while ignoring the context in which those words were mentioned.   CCDH's reports and articles do <u>not</u> include meaningful discussion or analysis of the billions of posts that comport with CCDH's viewpoints.  As such, they fail to include context that shows the true breadth and totality of viewpoints that participate in open discussion on social media platforms regarding topics covered in CCDH's reports and articles.  And in measuring the reach of certain content, CCDH's reports and articles ignore an industry-standard metric referred to as "impressions," which reflects the total number of times a piece of content has been seen, and represents the total exposure it has received.  CCDH's methodologies thus would assign the same weight to a post viewed by only one user as to a post seen by hundreds of millions of users.

19.     Using its flawed "research" methodologies, CCDH prepares and publishes its "research" reports and articles to create the incorrect narrative that certain viewpoints, which CCDH deems wrong and harmful, are rampant on social media platforms, and that the targeted organizations and people who do not share CCDH's views are responsible for the majority of that content.  CCDH's reports and articles then call for social media platforms, including X, to remove those organization's and people's accounts entirely, i.e., "de-platforming," to silence their speech.

20.     CCDH's reports and articles, coupled with its demands to entirely remove certain users from platforms, are transparent efforts to censor viewpoints that CCDH disagrees with, and reveal CCDH's goal of leaving on the platforms only viewpoints that CCDH supports.  CCDH's reports and articles, to this end, seek to present an extremely distorted picture of what is actually being discussed and debated, and seek to undermine platforms serving as digital town

6

1    squares, where a wide range of beliefs can and should be debated in a healthy manner.

2          21.    CCDH, for example, published a report on March 24, 2021, titled "The

3    Disinformation Dozen," targeting twelve high-profile individuals known for opposing COVID

4    vaccines and pro-vaccination messaging.  This report is publicly accessible on CCDH's website

5    at https://counterhate.com/research/the-disinformation-dozen/.  The report concludes that "[j]ust

6    twelve anti-vaxxers are responsible for almost two-thirds of anti-vaccine content circulating on

7    social media platforms," and that platforms should kick those specific users off of social media

8    entirely, thus removing them from the digital town square and censoring their viewpoints.  As

9    stated by the report's "key findings," "[d]e-platforming repeat offenders is the most effective

10   way of stopping the proliferation of dangerous misinformation."

11         22.    That report was criticized by at least one of the major social media platforms it

12   purportedly analyzed  for creating a "faulty narrative" without "any evidence" to support its

13   conclusion.  According to that platform provider, CCDH's report relied on a small sample size

14   that did not properly represent the volume of content that people had shared about COVID

15   vaccines in the preceding months.

16         23.    On November 2, 2021, CCDH engaged in similar tactics in a report called "The

17   Toxic Ten," claiming that ten specific publishers critical of climate change theories were

18   responsible for 69% of interactions with climate change denial content on social media

19   platforms, and that those publishers, funded by advertising revenues, "creat[e] the sense that

20   there is a more extensive debate than there really is."  This report is publicly accessible on

21   CCDH's website at https://counterhate.com/research/the-toxic-ten/.

22         24.    CCDH's November 2, 2021 report was criticized by a major social media

23   platform it mentioned, calling the methodology "flawed" for (again) focusing on a very small

24   sample size that was not representative of the hundreds of millions of pieces of content that

25   people were sharing on the platform on the topic of climate change more generally.

26   **II.    CCDH Engages in Unlawful Conduct to Target X Corp. as Part of CCDH's**

27   **        Campaigns to Censor Contrary Viewpoints and to Financially Harm X Corp.**

28         25.    Within the last year, CCDH has used similar schemes to repeatedly create faulty

7

narratives regarding X Corp. and the X service, with the express goal of seeking to harm X Corp.'s business by driving advertisers away from the platform.  To enable and facilitate those efforts, CCDH has engaged in a series of unlawful acts to secure data regarding X that CCDH could then mischaracterize in its reports and articles alongside calls for companies not to advertise on X.

26.     As set forth in detail below, CCDH, on several occasions since at least March 2021, has intentionally sought and obtained unauthorized access to data sets regarding X that were provided by X Corp. to Runtime Collective Ltd., T/A Brandwatch ("**Brandwatch**") pursuant to written agreements.  Those data sets were stored, among other places, on protected servers in the United States, and were accessible only via secure login credentials that Defendants (except for ECF) were never authorized to have.  CCDH, in turn, and on at least two occasions after accessing that data without authorization, quoted the unlawfully-accessed data incompletely and out of context to create unsubstantiated and incorrect assertions about the presence of hate speech on X.

27.     CCDH, as a registered user of the X service, also breached its agreement with X Corp., i.e., the Terms of Service ("**ToS**"), which expressly prohibit "scraping" without X's "prior consent."  CCDH's February 9, 2023 report admits to scraping X to obtain data for the report, in which CCDH uses its manufactured and inaccurate narrative to openly call for companies to not advertise on X, claiming they would otherwise be "bankrolling the spread of hate and disinformation on Twitter."

**A.     X Corp.'s Agreements With Brandwatch**

28.     Brandwatch, a trusted partner of X, provides SaaS products that enable its customers to conduct brand monitoring on social media, customer research on opinions and trends, campaign planning and campaign effectiveness measurement, competitive analysis and risk management, influencer identification and market research, and audience segmentation and analysis.

29.     X Corp. entered into a written contract with Brandwatch on May 1, 2020, titled

8

the "Master License Agreement" (the, "**2020 MLA**").[1]  Pursuant to that agreement, X Corp.

agreed that Brandwatch could access certain data regarding X, referred to as "Licensed

Materials" including Tweets (i.e., posts on the X platform), to enable Brandwatch's customers

to use its SaaS products to analyze posts and X/Twitter users.  Specifically, Licensed Materials

from X Corp.'s protected servers, including in California, would be streamed to servers used by

Brandwatch and located in the United States, which Brandwatch's applications accessed to

enable users with login credentials to analyze the data.

30.     Brandwatch's products could then facilitate a user's analysis of, for example,

posts for features such as sentiment or topics, and users for features such as influence or

expertise.  They could also analyze data at the aggregate level, combining data points to show

trends, themes, changes over time, segments, breakdowns, and similar outputs.  Brandwatch's

products could then display data to Brandwatch's customers at both the individual and aggregate

level.

31.     The 2020 MLA provides, among other things, that Brandwatch agrees that it will

"not attempt to (and will not allow others to): … (c) copy, sell, lease, sublicense, distribute,

redistribute, syndicate, create derivative works of assign or otherwise transfer or provide access

to, in whole or in part, the Licensed Material to any third party."  It defines "Licensed Material"

as including "Twitter Content," i.e., "any and all content, media, information and data (and

copies and derivative works thereof) made available to Customer through the Twitter

Technology or by other means authorized by Twitter."  The 2020 MLA also provides that

Brandwatch will keep "Twitter Content" secure.

32.     On April 27, 2023, X Corp. and Brandwatch entered into a second written

agreement, titled the "Twitter Customer Order Form" (the "**2023 Order Form**," together with

the 2020 MLA, the "**Brandwatch Agreements**").  The 2023 Order Form again governs X

Corp.'s provision of certain data to Brandwatch, to be used in connection with Brandwatch's

---

[1] The 2020 MLA was signed by Twitter International Unlimited Company, a company organized and existing under the laws of Ireland with its headquarters in Dublin ("**TIUC**").  TIUC is a subsidiary of X Corp., and the 2020 Brandwatch Agreement expressly provides that TIUC entered into the 2020 MLA "on behalf of itself and its affiliates," collectively defined as "Twitter."

AMENDED COMPLAINT;
NO. 3:23-CV-03836-LB

1    SaaS products.

2           33.    The 2023 Order Form, similar to the 2020 MLA, contains a provision providing

3    that Brandwatch will "not attempt to (and will not allow others to) copy, sell, lease, sublicense,

4    distribute, redistribute, syndicate, create derivative works of assign or otherwise transfer or

5    provide access to, in whole or in part, the Licensed Material to any third party."[2]  The 2023

6    Order Form also includes a list of Brandwatch's "**Affiliates**" that agree to the terms of the

7    Brandwatch Agreement, and can thus access the data provided by X Corp. "solely through

8    [Brandwatch's] accounts enabled by Twitter under the Agreement."  The Brandwatch

9    Agreement provides that, "any breach of this Agreement by an Affiliate shall be deemed Your

10   [Brandwatch's] breach, for which You and the applicable Affiliate(s) shall be responsible and

11   jointly and severally liable."

12          34.    The Brandwatch Agreements have governed access to the Licensed Materials via

13   Brandwatch's SaaS products since 2020, including at all times relevant to the allegations in this

14   Amended Complaint.

15          **B.    ECF's Agreement with Brandwatch**

16          35.    X Corp. is informed and believes, and on that basis alleges, that ECF, at all time

17   relevant to the allegations herein, was a subscriber to Brandwatch's applications.  ECF, as such,

18   agreed to the Brandwatch terms of service, similar to those publicly available at

19   https://www.brandwatch.com/legal/terms-and-conditions/, and was provided with login

20   credentials to access the Brandwatch applications.

21          36.    X Corp. is informed and believes, and on that basis alleges, that ECF, at all times

22   relevant to the allegations herein, could use the login credentials to Brandwatch's applications to

23   access "Licensed Materials" streamed from X Corp.'s servers in California to servers used by

24   Brandwatch in the United States.

25          37.    X Corp. is informed and believes, and on that basis alleges, that, ECF's

26

27   _____
     [2] The 2023 Order Form similarly "Licensed Material" similar to the 2020 Master License Agreement, i.e., as "Tweets, Tweet IDs,
28   Twitter end user profile information, and any other content of Twitter made available to you through Twitter Technology or by any
     other means authorized by Twitter, and any copies and derivative works thereof."

1    agreement with Brandwatch provides that, among other things, ECF will not: "(a) sell, resell,

2    license, sublicense, or otherwise make the Services available to anybody other than its Users;

3    (b) distribute the results of the Services, including Supplier Data to any non-User for any reason

4    other than Customer's (or User's) business purpose or as permitted in Section 9.4; (c) subject to

5    Applicable Law, attempt to reverse-compile, disassemble, reverse engineer, or otherwise reduce

6    to human-perceivable form any part of the Services; (d) use the Services or any Supplier Data in

7    a manner that violates Applicable Law, including Applicable Law about data protection,

8    privacy, or information security; or (e) interfere with or disrupt the performance of the Services,

9    including spamming, hacking, and violating Supplier's API rate limits."  ECF agreed that it

10   would ensure that its user ID and password to use the Brandwatch applications were kept

11   confidential.  ECF further agreed that it would "not share Customer Data with any other

12   customer or third parties."

13          38.    X Corp. is informed and believes, and on that basis alleges, that ECF knew

14   CCDH did not have authorized access to the Licensed Materials or the Brandwatch applications,

15   knew that CCDH wanted to access the Licensed Materials to prepare its purported "research"

16   reports and call for censorship and attacks on X Corp. as alleged herein, and on several

17   occasions since at least early 2021 agreed with CCDH to share its login credentials to enable

18   CCDH's illegal access to the X Corp. data.  ECF's sharing of its login credentials with CCDH

19   US, to enable CCDH US to unlawfully access data on servers used by Brandwatch elsewhere in

20   the United States, was conduct targeted at the United States.  ECF knowingly and intentionally

21   chose to unlawfully share its login credentials with a US entity, headquartered and operating

22   from the United States.  ECF's conduct in this regard reached into and targeted the United

23   States, and is directly related to X Corp.'s claims asserted in this proceeding.  On information

24   and belief, CCDH UK further, and through its shared leadership and personnel with CCDH US,

25   instructed CCDH US to secure and use ECF's login credentials, and aided CCDH US in

26   determining how to then utilize the Brandwatch applications to query the X Corp. data and how

27   to mischaracterize that data in the CCDH reports described in this Amended Complaint.

28

1

**C.      CCDH Obtains Unauthorized Access to and Misuses Data Provided By X**

2

**Corp. Under the Brandwatch Agreement, and Also Breaches the ToS**

3       39.      The data provided by X Corp. to Brandwatch, to be analyzed using Brandwatch's

4    SaaS products, is compiled in a manner not publicly available.  Only those with login

5    credentials provided by X Corp. and/or Brandwatch, including Brandwatch's Affiliates and

6    customers, can access and analyze the data using Brandwatch's SaaS products.

7       40.      X Corp. is informed and believes, and on that basis alleges, that none of the

8    Defendants (except for ECF) are or ever have been customers of Brandwatch, and have never

9    been provided with login credentials that would enable them to permissibly access the data with

10    authorization.  None of the Defendants (again, except for ECF) are or ever have been parties to

11    the Brandwatch Agreements.  And neither X nor Brandwatch has ever consented, in any form or

12    in any way, to any of Defendants (except ECF) accessing the data that X Corp. provided to

13    Brandwatch under the Brandwatch Agreements.

14       41.      In order to prepare and publish the so-called "research" reports and articles about

15    X, CCDH has -- since at least March 2011 -- necessarily obtained access to and accessed the

16    Licensed Materials improperly and without authorization. Indeed, CCDH has admitted as much,

17    citing Brandwatch -- a platform it never had any right to access -- as a source of its data in its

18    "research" reports, despite that data being accessible only to authorized users via login

19    credentials, which the CCDH was not. These actions were unknown to Brandwatch and to X

20    Corp. until recently.

21       42.      X Corp. is informed and believes, and on that basis alleges, that CCDH knew at

22    all relevant times, and in any event no later than March 2021, that X Corp. and Brandwatch are

23    parties to the Brandwatch Agreements.  CCDH knew at all relevant times that the Brandwatch

24    Agreements prohibit Brandwatch from allowing third parties to, among other things, access,

25    distribute, create derivative works from, or otherwise transfer the Licensed Materials.  CCDH

26    further knew at all relevant times that only X Corp. and Brandwatch, as well as certain of

27    Brandwatch's Affiliates and customers, were permissibly provided with login credentials to

28    access the secured Licensed Materials under the Brandwatch Agreements.  CCDH knew that

1    neither it nor any of the other Defendants, except ECF, was authorized to access the Licensed

2    Materials, and that even ECF's agreement with Brandwatch prohibited ECF from, among other

3    things, sharing its login credentials any of the Licensed Materials with CCDH.

4         43.    X Corp. is informed and believes, and on that basis alleges, that CCDH, knowing

5    these things, and knowing that it was unable to access the Licensed Materials it needed to

6    prepare its reports and articles with CCDH's desired narratives, induced and conspired with

7    ECF to provide CCDH US with its login credentials in violation of the Brandwatch Agreements,

8    and in violation of ECF's agreement with Brandwatch.  CCDH then impermissibly and without

9    authorization accessed the Licensed Materials on several occasions, and used limited, selective,

10   and incomplete data from that source (as well as from CCDH's impermissible scraping of X)

11   that CCDH then presented out of context in a false and misleading manner in purported

12   "research" reports and articles as set forth herein.

13        **1.    CCDH's March 24, 2021 Report Admits to Accessing Data Provided**

14        **Under the Brandwatch Agreement**

15        44.    As above, CCDH published a report on March 24, 2021, titled "Disinformation

16   Dozen," claiming that "[j]ust twelve anti-vaxxers are responsible for almost two-thirds of anti-

17   vaccine content circulating on social media platforms," including Twitter (now X).  CCDH

18   admits in that report that it accessed data from X Corp. via Brandwatch, for use in its report.

19        45.    CCDH's March 24, 2021 report admits, in part, that "[w]e collected this sample

20   using Brandwatch, an enterprise social listening tool, to extract anti-vaccine tweets posted

21   between 1 February and 16 March 2021 based on text analysis.  Retweets and quote tweets were

22   also extracted to discover which pieces of anti-vaccine content were shared most frequently."

23        **2.    CCDH's November 10, 2022 Article Admits to Accessing Data**

24        **Provided Under the Brandwatch Agreement**

25        46.    On November 10, 2022, CCDH published an article on its website, titled "Fact

26   check: Musk's claim about a fall in hate speech doesn't stand by to scrutiny", publicly

27   accessible at https://counterhate.com/blog/fact-check-musks-claim-about-a-fall-in-hate-speech-

28   doesnt-stand-up-to-scrutiny/.  The article purports to assess, among other things, a claim by

13

Elon Musk that "hate speech declined to 'below our prior norms.'"  In doing so, CCDH provides what it claims are statistics showing the number of posts and reposts "mentioning" certain slurs during the week beginning October 31, 2022.

47.     CCDH's article claims the statistics refute statements from X Corp. executives issued around the same time regarding hateful conduct, including a statement that X Corp. "not only mitigated the recent surge in harmful behavior, but [has] reduced impressions on this content in Search by ~95% relative to even prior baselines.  We're continuing our work to make Twitter safer every day."  Even putting aside that CCDH's flawed methodology -- e.g., that its purported statistics in the November 10, 2022 article focus merely on the number of posts and reposts containing certain terms and not the number of impressions for those pieces of content -- CCHD's article admits that it obtained its data regarding content on X from Brandwatch's products.

48.     CCHD's November 10, 2022 article admits that CCDH analyzed "data from the social media analytics tool Brandwatch," and admits that its "methodology" includes "[d]ata collected using Brandwatch, which includes original tweets, retweets and quote tweets."

### 3.     CCDH's November 10, 2022 Article Admits to Accessing Data Provided Under the Brandwatch Agreement

49.     CCDH similarly obtained unauthorized access to the data that X Corp. provided to Brandwatch under the Brandwatch Agreements to prepare a report issued on February 9, 2023, titled "Toxic Twitter," publicly accessible on CCDH's website at https://counterhate.com/research/toxic-twitter/.

50.     That report states that CCDH "is a US-headquartered international nonprofit NGO."  It expressly calls for companies to stop advertising on X based on CCDH's incorrect implications in its report that hate speech viewed on X is on the rise, and its incorrect assertions that X Corp. "doesn't care about hate speech" and allows "accounts of homophobes, misogynists, self-professed neo-Nazis, and conspiracy theorists because it's highly profitable."

51.     Importantly, to obtain data that it needed for and mischaracterized in its February 9, 2023 report, CCDH again improperly accessed data that X Corp. provided to Brandwatch

14

1    under the Brandwatch Agreements.  The February 9, 2023 report cites several data points for

2    which non-public Brandwatch sources are quoted.  And yet again, CCDH was never provided

3    login credentials by X Corp. or Brandwatch to lawfully access that data.

4        52.    CCDH's February 9, 2023 report also admits that CCDH breached the ToS to

5    obtain data included in the report.

6        53.    Moreover, as a user of X, CCDH necessarily agreed to the ToS when it registered

7    to create an account.  The ToS are, and at all relevant times, have been, accessible at

8    https://twitter.com/en/tos.  At all times relevant to the allegations herein, the ToS prohibit

9    scraping data from X.  Section 4 of the ToS, titled "Using the Services," provides that "scraping

10   the Services without the prior consent of Twitter is expressly prohibited."

11       54.    CCDH's February 9, 2023 report states that "[t]o gather tweets from each of the

12   ten reinstated accounts, [CCDH's] researchers used the social media web-scraping tool

13   SNScrape, which utilizes Twitter's search function to enable data collection."  X Corp. has

14   never given CCDH (or the creators of SNScrape) consent to scrape X.

15       55.    Further, X Corp. is informed and believes, and on that basis alleges, that CCDH

16   has impermissibly and unlawfully scraped X on multiple occasions since at least 2021 in

17   connection with preparing its reports and articles, in clear violation of the ToS to which CCDH

18   US agreed.

19           **4.    Major Press Relies on CCDH's Reports and Articles**

20       56.    CCDH's reports and articles, including its February 9, 2023 report and the

21   conclusions therein, have attracted attention in the press, with media outlets repeating CCDH's

22   incorrect assertions that hate speech is increasing on X.

23       57.    Recently, Bloomberg picked up CCDH's purported "research" in an article

24   released on July 19, 2023.  That article, titled "Twitter's Surge in Harmful Content a Barrier to

25   Advertiser Return," quoted CCDH's Head of Research, Callum Hood, claiming that hate speech

26   is increasing on X.  The article went on to state that CCDH's research claims, for example, that

27   "[d]uring the first three months of Musk's tenure the rate of daily tweets containing slurs against

28   Black Americans more than tripled."  That Bloomberg article expressly recognizes that CCDH

15

acknowledges its "research" was conducted via "social media analysis tool Brandwatch."

58.     Mr. Hood was also recently quoted in a Time article from July 19, 2023 discussing CCDH's "research" about X Corp. and X.  The Time article quotes Mr. Hood as stating that "[Elon] Musk is not keeping his promises to advertisers, and their ads are appearing next to really harmful content."

59.     This series of events prompted Brandwatch to post a public statement on X, accessible at https://twitter.com/Brandwatch/status/1682129059310862353, clarifying that data from CCDH's report as cited in the press is "used out of context to make unsubstantiated assertions about Twitter:"



60.     X Corp.'s CEO, Linda Yaccarino, likewise sought to correct the incorrect and misleading narrative from CCDH's February 9, 2023 report, explaining in connection with a news article that relied on the report, that CCDH relies on "a collection of incorrect, misleading, and outdated metrics. . . . It also lacks extremely important context not to mention critical updates on our progress and actions."  That Tweet is available at https://twitter.com/lindayaX/status/1681656761101479936.

**D.     Doe Defendants' Influence**

61.     X Corp. is informed and believes, and on that basis alleges, that CCDH's conduct as described herein is intended to do more than further CCDH's own censorship efforts.

62.     X Corp. is informed and believes, and on that basis alleges, that CCDH is being supported by funding from X Corp.'s commercial competitors, as well as government entities and their affiliates.  Indeed, in connection with its "Disinformation Dozen" report discussed

1    above, one United States Senator referred to CCDH as "[a] foreign dark money group."  Other

2    articles have claimed that CCDH is, in part, funded and supported by foreign organizations and

3    entities whose directors, trustees, and other decision-makers are affiliated with legacy media

4    organizations.

5           63.    X Corp. is informed and believes, and on that basis alleges, that CCDH is acting,

6    as alleged herein, with the intent to inflict significant financial harm on X Corp., including at the

7    behest of and in concert with funders, supporters, and other entities.  CCDH is, on information

8    and belief, acting in the course and scope of such agency and/or acting with the permission,

9    consent, authorization or ratification of these unknown funders, supporters, and other entities,

10   who are aware of and knowingly participating in the unlawful conduct alleged herein, with the

11   intent to financially harm X Corp.

12          64.    X Corp. currently lacks sufficient information to include the identities these

13   entities, organizations, and persons in this Amended Complaint.  When their true names and

14   capacities are confirmed through discovery, X Corp. will further amend this Amended

15   Complaint by asserting their true names and capacities herein.

16   **III.    X Corp. Has Been Harmed By CCDH's Wrongful Conduct**

17          65.    CCDH widely disseminates its articles and "research" reports for free, often

18   alongside requests for donations and subscribers.   Those materials prepared by CCDH about X

19   Corp. are all enabled by CCDH's wrongful conduct in unlawfully gathering data via scraping

20   and via, but unbeknownst to, Brandwatch, which CCDH has then distorted to prepare its

21   "research."  CCDH's reports and articles could not have been prepared and disseminated but-for

22   CCDH's unlawful scraping and unauthorized access to data via Brandwatch.

23          66.    Those reports and articles have, in turn, caused significant financial harm to X

24   Corp., including via lost advertising revenues.

25          67.    CCDH's reports and articles, enabled by CCDH's unlawful conduct, have been

26   viewed by companies that advertise on social media platforms, including X.  A number of

27   companies who advertised on X on an ongoing basis immediately paused spending for

28   advertising on X after viewing CCDH's "research" reports and articles.  X Corp. is aware of at

17

least eight such specific organizations and companies, including large, multinational corporations that have historically run paid advertising on X, that in June and July 2023 immediately paused their advertising spend on X based on CCDH's reports and articles.

68.     Separate companies, again including large multinational corporations that were planning on running future campaigns, have likewise paused those plans in reaction to seeing CCDH's "research" reports and articles discussing X Corp. as alleged herein.  X Corp. is aware of at least five such specific companies that, as of November 2022, paused their plans for future advertising spend on X based on CCDH's reports and articles.

69.     Still other companies similar to those above have identified CCDH's "research" reports and articles as creating barriers to reactivating their paid advertising campaigns on X.  X Corp. is aware of three such companies.

70.     Based on the historical spend of the companies and organizations that have paused paid advertising and/or paused plans for future paid advertising, X Corp. estimates that it has lost at least tens of millions of dollars in lost revenues as of the date of this Amended Complaint, with those amounts subject to increasing as time goes on.  Defendants' and CCDH's breach of the ToS and unauthorized access to data via Brandwatch are a but-for and proximate cause of these lost revenues, as CCDH's conduct to obtain that data (which it then distorted) was necessary for CCDH to make its allegations against X Corp. and X regarding hate speech and other types of content on X.

71.     X Corp. has further incurred additional losses caused by CCDH's unauthorized access to data via Brandwatch.  Among other things, X Corp. has conducted internal investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to the data, has allocated significant employee resources and time to participate and assist in those investigations, and has incurred attorneys' fees and other costs in aid of those investigations and in enforcing the relevant agreements, all of which were reasonably incurred in responding to CCDH's offense and/or conducting a damage assessment.  These additional losses far exceed $5,000 and, as of the date of this Amended Complaint, are in excess of tens of thousands of dollars and will continue to increase.

72.     Most fundamentally, X Corp. has been harmed in its mission to provide its users with a platform in which topics of paramount public concern can be discussed and debated free from the censorship efforts of activist organizations advancing narrow ideological agendas through deceitful means.

**FIRST CAUSE OF ACTION**

**(Breach of Contract – Against CCDH US)**

73.     X Corp. hereby realleges and incorporates the allegations in paragraphs 1 through 72, as though fully set forth herein.

74.     X Corp. and CCDH US are parties to the ToS.

75.     Section 4 of the ToS, titled "Using the Services," provides that "scraping the Services without the prior consent of Twitter is expressly prohibited."

76.     At all relevant times, X Corp. fully performed its obligations under the ToS.

77.     CCDH US, however, breached the ToS by scraping X.  As CCDH US admits in the February 9, 2023 report, "[t]o gather tweets from each of the ten reinstated accounts, [CCDH's] researchers used the social media web-scraping tool SNScrape, which utilizes Twitter's search function to enable data collection."  X Corp. is further informed and believes, and on that basis alleges, that CCDH US scraped X on numerous occasions, including before preparing its February 9, 2023 report discussed herein.  X Corp. has never given CCDH US, or any of the Defendants, consent to scrape X.

78.     CCDH, in turn, mischaracterized the data it obtained by unlawfully scraping in its reports and articles, in efforts to claim X is overwhelmed with harmful conduct, and support CCDH's call to companies to stop advertising on X.  Indeed, CCDH engaged in its unlawful scraping with the intent to improperly obtain data that would be used to cause X Corp. to lose significant advertising revenues. As a direct and proximate result of CCDH US's breaches of the ToS in scraping X, X Corp. has suffered monetary and other damages in the amount of at least tens of millions of dollars, which amount is in excess of the jurisdictional minimum of this Court, subject to proof of a greater amount of damages at the time of trial.

79.     As a direct and proximate result of CCDH US's breaches of the ToS in scraping

19

1  X, X Corp. has suffered monetary and other damages in the amount of at least tens of millions

2  of dollars, which amount is in excess of the jurisdictional minimum of this Court, subject to

3  proof of a greater amount of damages at the time of trial.

**SECOND CAUSE OF ACTION**

**(Breach of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 – Against All**

**Defendants)**

7        80.    X Corp. hereby realleges and incorporates the allegations in paragraphs 1

8  through 79, as though fully set forth herein.

9        81.    X Corp. brings this action under 18 U.S.C. § 1030(g) allowing any injured person

10  to maintain a civil action against the violator of 18 U.S.C. § 1030(g) (the "**CFAA**").

11        82.    Defendants, except ECF, have violated the CFAA by knowingly, and with intent

12  to defraud X Corp., accessing a protected computer, without authorization, and by means of

13  such conduct furthered the fraud and obtained one or more things of value.

14        83.    X Corp. provided non-public data to Brandwatch under the Brandwatch

15  Agreements.  That data was then stored on a protected computer, as defined under 18 U.S.C. §

16  1030(e)(2).  The data was accessible to only those with login credentials, including X Corp.,

17  Brandwatch, Brandwatch Affiliates, and certain Brandwatch customers.

18        84.    Defendants (except for ECF) were never validly given login credentials to access

19  the data provided under the Brandwatch Agreements. Those Defendants nonetheless, knowing

20  the data was secured pursuant to the Brandwatch Agreements and that those Defendants did not

21  have authorization to access it, conspired with ECF, to share its login credentials with CCDH

22  US.  The Defendants other than ECF then accessed that data without authorization, as admitted

23  in CCDH's reports and articles discussed above, in furtherance of obtaining data regarding X

24  that those Defendants could mischaracterize as part of its campaign to call on companies to stop

25  advertising on X.

26        85.    Further, ECF and CCDH conspired under 18 U.S.C. § 1030(b) to commit acts

27  which constitute violations of the CFAA so that CCDH could gain illegal access to X Corp. data

28  that CCDH needed to mischaracterize in its reports.  X Corp. is informed and believes, and on

20

1   that basis alleges, that ECF knew CCDH did not have access to the Licensed Materials or the

2   Brandwatch applications, knew that CCDH wanted to gain access to that content to

3   mischaracterize the data in its reports, and knew that both the Brandwatch Agreements and

4   ECF's own agreement with Brandwatch prohibited ECF from sharing its login credentials with

5   CCDH.  X Corp. is informed and believes, and on that basis alleges, that ECF and CCDH

6   nonetheless agreed to enable CCDH's illegal access to the Licensed Materials, and that in

7   furtherance of that agreement, ECF provided CCDH US with ECF's login credentials.  Indeed,

8   CCDH would not have been able to access the Licensed Materials it mischaracterized in its

9   reports but-for ECF's intentional and wrongful conduct, including ECF's conduct in targeting

10  the United States by sharing its login credentials with a US entity as alleged herein.

11      86.   X Corp. is further informed and believes, and on that basis alleges, that CCDH

12  and ECF knew the Licensed Materials were stored on servers located in the United States that

13  Brandwatch used for its applications.  CCDH and ECF thus knew that, in illegally using ECF's

14  login credentials and querying the Licensed Materials, CCDH was targeting and gaining

15  unauthorized access to servers used by Brandwatch in the United States.

16      87.   X has suffered loss as a result of these violations, including without limitation,

17  amounts expended attempting to conduct internal investigations in efforts to ascertain the nature

18  and scope of CCDH's unauthorized access to the data, significant employee resources and time

19  to participate and assist in those investigations, and attorneys' fees in aid of those investigations

20  and in enforcing the relevant agreements.  These losses amount to well over $5,000 aggregated

21  over a one-year period.

22      88.   Pursuant to 8 U.S.C. § 1030(g), X Corp. is entitled to recover its losses and

23  obtain injunctive relief prohibiting those Defendants from further violations of the CFAA and to

24  prohibit those Defendants from using the data they obtained by accessing the data without

25  authorization.

26                    **THIRD CAUSE OF ACTION**

27      **(Intentional Interference with Contractual Relations – Against All Defendants)**

28      89.   X Corp. hereby realleges and incorporates the allegations in paragraphs 1

                                21

1    through 88, as though fully set forth herein.

2           90.    X Corp. and Brandwatch are parties to the Brandwatch Agreements.

3           91.    Defendants, including ECF, knew about the Brandwatch Agreements, as well as

4    ECF's agreement with Brandwatch.  In particular, on information and belief, Defendants knew

5    that Brandwatch had access to X Corp. data that Defendants sought.  Defendants knew that,

6    except for ECF, they could not access that data because they did not have login credentials to

7    access that data.  Those Defendants knew, based on their experience in CCDH purporting to

8    analyze data associated with social media platforms (including via Brandwatch's tools as stated

9    in CCDH's reports and articles) that for Brandwatch to have access to X Corp. data for its SaaS

10   products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would

11   be prohibited under the terms of the Brandwatch Agreements from providing access to

12   unauthorized parties, or allowing any unauthorized parties to access that data.

13          92.    Defendants were aware of the harm to X Corp. that would result from

14   Defendants unlawfully accessing the data provided to Brandwatch under the Brandwatch

15   Agreements.  Indeed, Defendants intended to cause that harm.  They intended for CCDH to

16   obtain access to the data, without authorization, by using ECF's login credentials.  They

17   intended for CCDH to mischaracterize the data regarding X in the various reports and articles

18   discussed above, to support Defendants' demands for companies to stop advertising on X.  They

19   intended that, in direct response to their conduct, advertisers would stop advertising on X.

20          93.    Defendants' conduct prevented Brandwatch from performing under the

21   Brandwatch Agreements.  Brandwatch failed to secure the data from X Corp. according to the

22   terms of the agreements.  As a direct and proximate result of Defendants intentionally

23   interfering with the Brandwatch Agreements as alleged herein, X Corp. has suffered monetary

24   and other damages of at least tens of millions of dollars, which amount is in excess of the

25   jurisdictional minimum of this Court, subject to proof of a greater amount of damages at the

26   time of trial.

27

28

**FOURTH CAUSE OF ACTION**

**(Inducing Breach of Contract – Against All Defendants)**

94.     X Corp. hereby realleges and incorporates the allegations in paragraphs 1 through 93, as though fully set forth herein.

95.     X Corp. and Brandwatch are parties to the Brandwatch Agreements.

96.     Defendants knew about the Brandwatch Agreements.  In particular, on information and belief, Defendants knew that Brandwatch had access to X Corp. data that Defendants sought.  Defendants knew that, except for ECF, they could not access that data because they did not have login credentials to access that data.  Those Defendants knew, based on their experience in CCDH purporting to analyze data associated with social media platforms (including via Brandwatch's tools as stated in CCDH's reports and articles) that for Brandwatch to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of the Brandwatch Agreements from providing access to unauthorized parties, or allowing any unauthorized parties to access that data.

97.     Defendants intended to cause Brandwatch to breach the Brandwatch Agreements.  Defendants, except for ECF, knew they did not have access to the data, and that they could not get access to it without obtaining login credentials from someone who validly had them.  Those Defendants knew, or reasonably should have known, that CCDH obtaining login credentials from a valid user such as ECF to access the data would cause Brandwatch to breach the Brandwatch Agreements, by allowing an unauthorized third party (i.e., CCDH) to gain access to the data without proper permissions or authorizations.  Defendants knew and intended that, in direct response to their conduct, advertisers would stop advertising on X.

98.     X Corp. was harmed and suffered damages as a result of Defendants' conduct when companies paused or refrained from advertising on X, in direct response to CCDH's reports and articles as discussed above.  Defendants' conduct was a substantial factor in Brandwatch's breach of the Brandwatch Agreements.

99.     As a direct and proximate result of Defendants inducing Brandwatch to breach

23

the Brandwatch Agreements as alleged herein, X Corp. has suffered monetary and other damages in the amount of at least tens of millions of dollars, which amount is in excess of the jurisdictional minimum of this Court, subject to proof of a greater amount of damages at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, X Corp. prays for judgment against Defendants as follows:

a.      Damages according to proof sufficient to compensate X Corp. for damages sustained as a result of Defendants' actions as alleged herein, including but not limited to losses under the CFAA;

b.      That Defendants, all of their agents, servants, employees, representatives, and all others in active concert or participation with them, either directly or indirectly, be preliminarily and permanently enjoined from:

        i.      accessing the Licensed Materials provided by X Corp. to Brandwatch under the Brandwatch Agreements.

        ii.      using or disclosing any data obtained via logging into the Licensed Materials provided by X Corp. to Brandwatch under the Brandwatch Agreements.

c.      An award of pre- and post-judgment interest on all monetary relief prayed for above, and as may be permitted by law; and

d.      All such other and further relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, X Corp. demands a trial by jury of all issues triable by a jury.

Dated:  August 7, 2023                    WHITE & CASE LLP


By:___/s/ *J. Jonathan Hawk*_____
                                                      J. Jonathan Hawk

                                        Attorneys for Plaintiff X CORP.

24