Roberta A. Kaplan*
John C. Quinn*
Matthew J. Craig (SBN 350030)
Amit Jain*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
mcraig@kaplanhecker.com
ajain@kaplanhecker.com
*admitted pro hac vice*

*Attorneys for Defendants Center for
Countering Digital Hate, Inc. and
Center for Countering Digital Hate Ltd.*

[ADDITIONAL COUNSEL ON SIGNATURE PAGE]

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| X CORP.,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>CENTER FOR COUNTERING DIGITAL HATE, INC., et al.,<br><br>　　　　　　　　Defendants. | Case No. 3:23-cv-03836-CRB<br><br>**DEFENDANTS CENTER FOR COUNTERING DIGITAL HATE, INC. AND CENTER FOR COUNTERING DIGITAL HATE LTD.'S MOTION TO DISMISS, ANTI-SLAPP MOTION TO STRIKE, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 23, 2024<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor<br>Judge: Hon. Charles R. Breyer |

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 3

III.   LEGAL STANDARD ............................................................................................. 5

IV.   SUMMARY OF ARGUMENT .............................................................................. 6

V.    ARGUMENT ......................................................................................................... 8

    A.    The Alleged Conduct at Issue Was Newsgathering Activity in Furtherance of the CCDH Defendants' Protected Speech and Reporting ................................. 8

    B.    X Corp. Fails to State a Claim for Breach of Contract (Count 1) ........................... 9

        1.    X Corp. has not pleaded a breach of its Terms of Service ........................ 10

        2.    If the anti-scraping provision applies, enforcement violates public policy ....................................................................................................... 13

        3.    X Corp. does not allege recoverable damages ........................................... 15

    C.    X Corp. Fails to State a Claim Under the CFAA (Count 2) ................................ 18

        1.    X Corp. cannot allege access "without authorization" .............................. 19

        2.    X Corp. has not pleaded the requisite technological loss ........................... 21

        3.    X Corp. fails to specify the CFAA subsection it alleges was violated .................................................................................................... 22

    D.    X Corp. Fails to State a Claim in Tort (Counts 3 and 4) ...................................... 23

        1.    X Corp.'s pleading shows the CCDH Defendants did not cause a breach .......................................................................................................... 23

        2.    X Corp. has not pleaded any disruption or breach .................................... 24

        3.    X Corp. fails to plausibly allege the CCDH Defendants' knowledge ....... 25

        4.    X Corp. again fails to allege recoverable damages .................................... 25

    E.    X Corp. Fails to State Any Claim Against the Doe Defendants ........................... 26

VI.   CONCLUSION ..................................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                    **Page(s)**

*1-800 Contacts, Inc. v. Steinberg*,
    132 Cal. Rptr. 2d 789 (Cal. Ct. App. 2003) ....................................................................... 23

*A.H.D.C. v. City of Fresno*,
    No. 97 Civ. 5498, 2000 WL 35810722 (E.D. Cal. Aug. 31, 2000) .................................... 12

*Am. Alt. Ins. Corp. v. Super. Ct. of L.A. Cnty.*,
    37 Cal. Rptr. 3d 918 (Cal. Ct. App. 2006) ........................................................................ 11

*Andrews v. Sirius XM Radio Inc.*,
    932 F.3d 1253 (9th Cir. 2019) ...................................................................................... 21, 22

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ............................................................................................ 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 6, 24, 26

*AtPac, Inc. v. Aptitude Sols., Inc.*,
    730 F. Supp. 2d 1174 (E.D. Cal. 2010) ........................................................................ 20, 21

*Bank of N.Y. v. Fremont Gen. Corp.*,
    523 F.3d 902 (9th Cir. 2008) .............................................................................................. 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................... 26

*Blatty v. N.Y. Times Co.*,
    728 P.2d 1177 (Cal. 1986) .................................................................................................. 12

*Bovard v. Am. Horse Enters., Inc.*,
    247 Cal. Rptr. 340 (Cal. Ct. App. 1988) ............................................................................ 14

*Cariveau v. Halferty*,
    99 Cal. Rptr. 2d 417 (Cal. Ct. App. 2000) ........................................................................ 14

*Chegg, Inc. v. Doe*,
    No. 22 Civ. 7326, 2023 WL 4315540 (N.D. Cal. July 3, 2023) ........................................ 13

*City & Cnty. of S.F. v. Tutor-Saliba Corp.*,
    No. 02 Civ. 5286, 2005 WL 645389 (N.D. Cal. Mar. 17, 2005) ........................................ 17

*Coffee v. Google, LLC,*
    No. 20 Civ. 390, 2021 WL 493387 (N.D. Cal. Feb. 10, 2021)...........................................20

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991).......................................................................................................17

*Craigslist, Inc. v. 3taps, Inc.,*
    No. 12 Civ. 3816, 2015 WL 5921212 (N.D. Cal. Oct. 11, 2015)....................................13

*Delacruz v. State Bar of Cal.,*
    No. 16 Civ. 6858, 2018 WL 3077750 (N.D. Cal. Mar. 12, 2018) ...................................22

*Domain Name Comm'n Ltd. v. DomainTools, LLC,*
    449 F. Supp. 3d 1024 (W.D. Wash. 2020)......................................................................22

*Facebook, Inc. v. Power Ventures, Inc.,*
    844 F.3d 1058 (9th Cir. 2016).........................................................................................20

*First Nat'l Bank of Bos. v. Bellotti,*
    435 U.S. 765 (1978).......................................................................................................12

*Fish v. Tesla, Inc.,*
    No. 21 Civ. 60, 2022 WL 1552137 (C.D. Cal. May 12, 2022)........................................19

*Flores v. Emerich & Fike,*
    No. 5 Civ. 291, 2006 WL 2536615 (E.D. Cal. Aug. 31, 2006) .......................................27

*Food Lion, Inc. v. Capital Cities/ABC, Inc.,*
    194 F.3d 505 (4th Cir. 1999)...........................................................................................17

*Frangipani v. Boecker,*
    75 Cal. Rptr. 2d 407 (Cal. Ct. App. 1998) ......................................................................16

*Fraser v. Mint Mobile, LLC,*
    No. 22 Civ. 138, 2022 WL 2391000 (N.D. Cal. July 1, 2022)........................................22

*Highwire Promotions, LLC v. Legend Marketing LLC,*
    263 F. App'x 564 (9th Cir. 2008) ....................................................................................15

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) ...............................................................................*passim*

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    639 F. Supp. 3d 944 (N.D. Cal. 2022) ............................................................................13

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988)..........................................................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Iloh v. Regents of Univ. of Cal.,*
   312 Cal. Rptr. 3d 674 (Cal. Ct. App. 2023) ................................................................. 6, 8, 9

*In re Finjan Holds., Inc.,*
   58 F.4th 1048 (9th Cir. 2023) ................................................................................................ 3, 6

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons,*
   44 Cal. Rptr. 3d 517 (Cal. Ct. App. 2006) ....................................................................... 11, 12

*Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.,*
   249 Cal. Rptr. 3d 122 (Cal. Ct. App. 2019) ..................................................................... 24, 26

*Kasky v. Nike, Inc.,*
   45 P.3d 243 (Cal. 2002) ........................................................................................................ 17

*King v. Facebook, Inc.,*
   572 F. Supp. 3d 776 (N.D. Cal. 2021) ..................................................................................... 16

*Lesnik v. Eisenmann SE,*
   374 F. Supp. 3d 923 (N.D. Cal. 2019) ..................................................................................... 23

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.,*
   102 P.3d 257 (Cal. 2004) ............................................................................................. 7, 15, 16

*Lieberman v. KCOP Television, Inc.,*
   1 Cal. Rptr. 3d 536 (Cal. Ct. App. 2003) .................................................................................. 8

*Lopez v. Smith,*
   203 F.3d 1122 (9th Cir. 2000) (en banc) ............................................................................. 27

*Lucky Leather, Inc. v. Mitsui Sumitomo Ins. Grp.,*
   No. 12 Civ. 9510, 2013 WL 12139116 (C.D. Cal. Feb. 26, 2013) ...................................... 20

*LVRC Holdings LLC v. Brekka,*
   581 F.3d 1127 (9th Cir. 2009) ............................................................................................. 19

*Makaeff v. Trump Univ., LLC,*
   715 F.3d 254 (9th Cir. 2013) ............................................................................................. 8, 9

*Meta Platforms, Inc. v. BrandTotal Ltd.,*
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) .............................................................................. 13

*Mindys Cosmetics, Inc. v. Dakar,*
   611 F.3d 590 (9th Cir. 2010) .................................................................................................. 8

*Moser v. Encore Cap. Grp., Inc.,*
　　455 F. App'x 745 (9th Cir. 2011) .................................................................. 24

*Navellier v. Sletten,*
　　52 P.3d 703 (Cal. 2002) ............................................................................... 8

*Nowak v. Xapo, Inc.,*
　　No. 20 Civ. 3643, 2020 WL 6822888 (N.D. Cal. Nov. 20, 2020).................... 23

*O'Handley v. Padilla,*
　　579 F. Supp. 3d 1163 (N.D. Cal. 2022) ......................................................... 4

*O'Handley v. Weber,*
　　62 F.4th 1145 (9th Cir. 2023) ...................................................................... 4

*Oasis West Realty, LLC v. Goldman,*
　　250 P.3d 1115 (Cal. 2011) ..................................................................... 10, 15

*Oracle Am., Inc. v. Service Key, LLC,*
　　No. 12 Civ. 790, 2012 WL 6019580 (N.D. Cal. Dec. 3, 2012) ....................... 23

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.,*
　　791 P.2d 587 (Cal. 1990) ............................................................................ 23

*Packingham v. North Carolina,*
　　582 U.S. 98 (2017)....................................................................................... 14

*Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress,*
　　402 F. Supp. 3d 615 (N.D. Cal. 2019) ................................................ 7, 17, 18

*Planned Parenthood Fed. of Am., Inc. v. Newman,*
　　51 F.4th 1125 (9th Cir. 2022) ............................................................... 17, 18

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
　　890 F.3d 828 (9th Cir. 2018).................................................................... 6, 9

*Religious Tech. Ctr. v. Wollersheim,*
　　971 F.2d 364 (9th Cir. 1992)........................................................................ 15

*Rice v. Cmty. Health Ass'n,*
　　203 F.3d 283 (4th Cir. 2000)........................................................................ 16

*Russomanno v. Fox Child.'s Network,*
　　No. B143105, 2004 WL 2137405 (Cal. Ct. App. Sept. 24, 2004)................... 23

*Saffron Rewards, Inc. v. Rossie,*
　　No. 22 Civ. 2695, 2022 WL 2918907 (N.D. Cal. July 25, 2022) ................... 22

*Sandquist v. Lebo Automotive, Inc.*,
  376 P.3d 506 (Cal. 2016) ................................................................................ 12

*Sandvig v. Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018) ..................................................................... 12

*Savage v. Pac. Gas & Elec. Co.*,
  26 Cal. Rptr. 2d 305 (Cal. Ct. App. 1993) ...................................................... 24

*SCEcorp v. Super. Ct. of San Diego Cnty.*,
  4 Cal. Rptr. 2d 372 (Cal. Ct. App. 1992) ........................................................ 24

*Scott v. Pac. Gas & Elec. Co.*,
  904 P.2d 834 (Cal. 1995) ................................................................................ 11

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*,
  425 P.3d 1 (Cal. 2018) .................................................................................... 13

*Simmons v. Allstate Ins.*,
  112 Cal. Rptr. 2d 397 (Cal. Ct. App. 2001) .................................................... 27

*Smith v. Santa Rosa Democrat*,
  No. 11 Civ. 2411, 2011 WL 5006463 (N.D. Cal. Oct. 20, 2011) ..................... 27

*Song v. Drenberg*,
  No. 18 Civ. 6283, 2019 WL 1998944 (N.D. Cal. May 6, 2019) ...................... 22

*Sprewell v. Golden State Warriors*,
  275 F.3d 1187 (9th Cir. 2001) ........................................................................... 6

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ...................................................................... 6, 25

*Taus v. Loftus*,
  151 P.3d 1185 (Cal. 2007) ................................................................................. 8

*United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*,
  766 F.3d 1002 (9th Cir. 2014) .................................................................. 23, 25

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) (en banc) ........................................................... 21

*United States v. Nosal*,
  844 F.3d 1024 (9th Cir. 2016) ......................................................................... 23

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ................................................................... 7, 19, 21, 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Constitutional Provisions**

Cal. Const. art. I, § 2 ........................................................................ 12

U.S. Const. amend. I ............................................................. 2, 10, 12, 27

**Statutes**

15 U.S.C. § 45b ................................................................................. 14

15 U.S.C. § 1125 ................................................................................. 3

18 U.S.C. § 1030 ............................................................... 19, 21, 22, 23

Cal. Bus. & Prof. Code § 22675 ........................................................ 14

Cal. Civ. Code § 1641 ........................................................................ 11

Cal. Civ. Code § 1643 ........................................................................ 11

Cal. Civ. Code § 1667 ........................................................................ 14

Cal. Civ. Proc. Code § 425.16 ..................................................... *passim*

**Rules**

Fed. R. Civ. P. 9 ..................................................................... 1, 17, 23

Fed. R. Civ. P. 12 ...................................................................... 1, 6, 9

**Other Authorities**

1 Witkin, Summary of Cal. Law—Contracts § 780 (11th ed. 2023) ........................................... 12

14 Cal. Jur. 3d Contracts § 171 ........................................................ 14

Brandwatch, *How Much Do Social Media Ads Cost on Facebook, Instagram, Twitter, and LinkedIn?* (Feb. 22, 2022), https://www.brandwatch.com/blog/how-much-do-social-media-ads-cost-on-facebook-instagram-twitter-and-linkedin/............................................ 18

CCDH, *Letters from the Lawyers* (July 31, 2023), https://counterhate.com/blog/letters-from-the-lawyers-musk-threatens-ccdh-with-brazen-attempt-to-silence-honest-criticism/............ 4

Complaint, *X Corp. v. Bonta*, No. 23 Civ. 1939 (E.D. Cal. Sept. 8, 2023), Dkt. 1 ................................................................ 14

Complaint, *X Corp. v. Bright Data Ltd.*, No. 23 Civ. 3698
(N.D. Cal. July 26, 2023), Dkt. 1 ........................................................................ 13

Elon Musk, X (July 18, 2023, 8:26 a.m.), https://twitter.com/elonmusk/status/
1681279195253551104.......................................................................................... 3

Elon Musk, X (July 18, 2023, 8:30 a.m.), https://twitter.com/elonmusk/status/
1681280344870342657.......................................................................................... 3

Original Petition, *X Corp. v. John Doe 1,* No. DC-23-09157
(Tex. Dist. Ct. July 6, 2023)................................................................................ 13

Steven Lee Myers, Stuart A. Thompson, & Tiffany Hsu, *The Consequences of Elon Musk's
Ownership of X*, N.Y. Times (Oct. 27, 2023), https://www.nytimes.com/interactive/
2023/10/27/technology/twitter-x-elon-musk-anniversary.html ........................... 3

## <u>NOTICE OF MOTION AND RELIEF SOUGHT</u>

PLEASE TAKE NOTICE that at 10:00 a.m. on February 23, 2024, or as soon thereafter as the matter may be heard, in Courtroom 6 of the above-captioned Court, Defendants Center for Countering Digital Hate, Inc. ("CCDH US") and Center for Countering Digital Hate Ltd. ("CCDH UK," and, together with CCDH US, the "CCDH Defendants") will and hereby do move to dismiss Plaintiff X Corp.'s Amended Complaint, Dkt. 10, with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9, and move to strike Counts 1, 3, and 4 of the Amended Complaint as legally deficient pursuant to Cal. Civ. Proc. Code § 425.16. This motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Roberta A. Kaplan and attached exhibits; the pleadings, papers, and records on file in this case; and any further argument or evidence that may be received by the Court at the hearing.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I.    INTRODUCTION

Despite all the window dressing, this is fundamentally a case about speech. Plaintiff X Corp. is a multibillion-dollar, privately-held corporation that operates "X," formerly known as Twitter—one of the world's largest and most influential social media platforms. The CCDH Defendants are nonprofit organizations with the mission of protecting human rights and civil liberties online, founded after a white supremacist (radicalized online) murdered a colleague of their founder and CEO. The CCDH Defendants and other nonprofit groups have researched, authored, and published reports and articles documenting how major social media companies, including X Corp., protect or fail to protect against hate speech and false narratives relating to public health, climate change, and other topics of public concern. In turn, the companies, including X Corp., and their respective executives have spoken to defend their policies and critique these reports' methodologies. Users, advertisers, and the public are obviously free to compare the arguments marshaled by both sides. And after evaluating each side's speech, users and advertisers can decide for themselves whether and how to continue using the companies' platforms.

Apparently unhappy with how it is faring in the marketplace of ideas, X Corp. asks this Court to shut that marketplace down—to punish the CCDH Defendants for their speech and to

silence others who might speak up about X Corp. in the future. Thus, X Corp. seeks "at least tens of millions of dollars" in damages based on how advertisers reacted to what the CCDH Defendants said about X Corp. in their public reports. Conspicuously, X Corp. has not asserted a defamation claim—understandably so, since it cannot allege that the CCDH Defendants said anything knowingly false, nor does it wish to invite discovery on the truth about the content on its platform. Instead, X Corp. has ginned up baseless claims purporting to take issue with how the CCDH Defendants gathered data that formed the basis for their research and publications. Each theory is flimsier and more absurd than the last. More specifically, X Corp.'s Amended Complaint asserts a claim for breach of contract against CCDH US (Count 1, claiming that CCDH US breached Twitter's Terms of Service when it used Twitter's own search function to collect publicly available information); a federal Computer Fraud and Abuse Act (CFAA) claim against the CCDH Defendants and unnamed Doe Defendants who are supposedly their "funders, supporters, and other entities" (Count 2, asserting that the CCDH Defendants' use of a data analytics platform called Brandwatch somehow amounted to a federal hacking violation); and tort claims for intentional interference with contractual relations and inducing breach of contract against the same Defendants (Counts 3 and 4, arising out of the Brandwatch data collection and its use in three CCDH reports).

X Corp.'s claims are riddled with legal deficiencies on their own terms. They also all share one fundamental flaw: at its core, X Corp.'s grievance is not that the CCDH Defendants gathered public data in violation of obscure (and largely imagined) contract terms, but that they criticized X Corp. (forcefully) to the public. In essence, X Corp. seeks to dodge the requirements that the First Amendment imposes on defamation claims by asserting other claims that are no less entwined with the CCDH Defendants' speech.

Fortunately, state and federal free speech protections cannot be so easily evaded. X Corp.'s attempted end-run falls flat, not only due to these vital protections, but also because it fails to state any plausible claim upon which relief can be granted. And, under California's anti-SLAPP statute, X Corp. cannot establish a probability of prevailing on its state-law causes of action. For the reasons below, X Corp.'s complaint must be stricken or dismissed, with prejudice and in its entirety.

1    ## II.    BACKGROUND

2           The CCDH Defendants are nonprofit organizations with the mission of protecting human

3    rights and civil liberties online. They conduct research and publish "publicly available and free"

4    reports about major social media platforms. Amended Complaint ("AC"), Dkt. 10, ¶ 17.[1] Their

5    reports concern the major platforms' content moderation policies and practices relating to "widely

6    debated topics" of "paramount public concern" such as "hate speech," "COVID-19 vaccinations,

7    reproductive healthcare, and climate change." AC ¶¶ 17, 26, 72. These reports have garnered

8    attention from, and sparked debate among, both the press and the public at large. AC ¶ 56.

9           The CCDH Defendants' reports have also prompted responses from the social media

10   companies themselves, who have at times critiqued the reports as having "flawed . . .

11   methodologies," using "inappropriately small" sample sizes, defining "hate speech" too broadly,

12   relying on metrics other than "impressions," and not discussing social media posts that are not

13   problematic. AC ¶¶ 18-24. X Corp. has gone a step further, claiming that the CCDH Defendants

14   are "activist organizations masquerading as research agencies." AC ¶ 1.[2] Prior to filing this lawsuit,

15   Elon Musk, X Corp.'s owner, chairman, and CTO, posted on the X platform that the CCDH

16   Defendants are "[t]ruly evil" and that their CEO, Imran Ahmed, is a "rat."[3]

17          On July 20, 2023, X Corp. sent a letter to the CEO of the CCDH Defendants criticizing their

18   reports and threatening litigation under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. The

19   CCDH Defendants responded on July 31, 2023, calling X Corp.'s threat "bogus" and "a transparent

20

21   [1] The factual allegations in the Amended Complaint are accepted as true for purposes of this motion,
22   but not to the extent that they are contradicted by more specific allegations, documents incorporated
     by reference, or matters of public record subject to judicial notice. *See In re Finjan Holds., Inc.*, 58
23   F.4th 1048, 1052 n.1 (9th Cir. 2023).
     [2] Numerous independent sources have reached conclusions that align with those of the CCDH
24   Defendants. *See, e.g.*, Steven Lee Myers, Stuart A. Thompson, & Tiffany Hsu, *The Consequences
     of Elon Musk's Ownership of X*, N.Y. Times (Oct. 27, 2023), https://www.nytimes.com/interactive/
25   2023/10/27/technology/twitter-x-elon-musk-anniversary.html ("[D]ozens of studies from multiple
     organizations . . . demonstrat[e] on issue after issue a similar trend: an increase in harmful
26   content"—including hate speech, antisemitism, climate change misinformation, and COVID-19
     disinformation—"on X during [Elon] Musk's tenure.").
27   [3]    Elon  Musk,  X  (July  18,  2023,  8:26  a.m.),  https://twitter.com/elonmusk/status/
     1681279919253551104; Elon Musk, X (July 18, 2023, 8:30 a.m.), https://twitter.com/elonmusk/
28   status/1681280344870342657.

attempt to silence honest criticism."[4] Later that day, X Corp. filed this lawsuit, asserting altogether different claims and represented by a new lawyer. *See* Dkt. 1. X Corp. subsequently amended its complaint on August 7, 2023. *See* Dkt. 10. The Amended Complaint presents two categories of allegations about three specific reports by the CCDH Defendants dated March 24, 2021, *see* AC ¶¶ 44-45; November 10, 2022, *see* AC ¶¶ 46-48; and February 9, 2023, *see* AC ¶¶ 49-55.

*First*, X Corp. alleges that CCDH US improperly "scraped" data for use in the February 9, 2023 report. AC ¶¶ 49-55. CCDH US, as a user of X, was required to agree to X's Terms of Service (ToS) when it created an account. Although X Corp. does not allege when CCDH US did so, the ToS at all relevant times allowed users to "access or search or attempt to access or search the Services . . . through our currently available, published interfaces that are provided by Twitter" and provided, by contrast, that "scraping the Services without the prior consent of Twitter is expressly prohibited."[5] Although the February 9, 2023 report stated that CCDH US "used the social media web-scraping tool SNScrape, which *utilizes Twitter's search function* to enable data collection," AC ¶ 54 (emphasis added), X Corp. alleges that this constituted a breach of the ToS, AC ¶ 52.

*Second*, X Corp. alleges that the CCDH Defendants gathered data using a tool by Brandwatch, a social media analytics company, for use in all three reports. AC ¶¶ 44-48. X Corp. alleges that X Corp. entered into a written "Master License Agreement" with Brandwatch on May 1, 2020, which prohibited Brandwatch from "allow[ing] others to" access "Licensed Material" and provided that Brandwatch "w[ould] keep 'Twitter Content' secure." AC ¶¶ 29-31.[6] Co-Defendant Stichting European Climate Foundation (ECF) is a subscriber to Brandwatch's analytics tool, and ECF provided login credentials that allowed the CCDH Defendants to access Brandwatch data, in purported violation of ECF's own agreement with Brandwatch. AC ¶¶ 36-38. X Corp. claims that

---

[4] *See* Letter from Alex Spiro to Imran Ahmed at 3 (July 20, 2023); Letter from Roberta A. Kaplan to Alex Spiro at 2-3 (July 31, 2023), both available at https://counterhate.com/blog/letters-from-the-lawyers-musk-threatens-ccdh-with-brazen-attempt-to-silence-honest-criticism/.

[5] Ex. A at 5-6, Twitter Terms of Service (operative June 10, 2022 to May 18, 2023), https://twitter.com/en/tos/previous/version-17; *see* AC ¶ 53 (incorporating the ToS by reference); *see also O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1172 n.3 (N.D. Cal. 2022) (taking judicial notice of Twitter's ToS), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). All "Ex." cites are to the exhibits attached to the accompanying declaration of Roberta A. Kaplan.

[6] X Corp. also alleges that it entered into a second written agreement with Brandwatch on April 27, 2023, after all the CCDH Defendants' reports at issue were published. *See* AC ¶¶ 32-33.

1   neither it nor Brandwatch consented to such access, AC ¶ 40, though of course Brandwatch is not

2   a party to this lawsuit.

3       In their first two reports described above (dated March 24, 2021, and November 10, 2022),

4   the CCDH Defendants said that they had collected underlying data using Brandwatch. AC ¶¶ 45,

5   48. In the third report (dated February 9, 2023), X Corp. alleges that the CCDH Defendants "cite[d]

6   several data points for which non-public Brandwatch sources [we]re quoted." AC ¶ 51.

7       X Corp. does not allege that the CCDH Defendants had actual knowledge of any contracts

8   between X Corp. and Brandwatch. Instead, the Amended Complaint alleges that the CCDH

9   Defendants "knew, based on their experience . . . purporting to analyze data with social media

10  platforms," that Brandwatch must have contracts with X Corp. that contained the terms outlined

11  above. AC ¶ 91. And X Corp. claims that the CCDH Defendants' conduct—namely, using login

12  credentials provided by ECF—intentionally "prevented Brandwatch from performing under" its

13  agreements with X Corp., because "Brandwatch failed to secure the data from X Corp." AC ¶ 93.

14      As a result, X Corp. demands "at least tens of millions of dollars" in damages arising from

15  the CCDH Defendants' *publication* of critiques of the X platform. More specifically, the Amended

16  Complaint alleges that companies that advertise on X viewed the CCDH Defendants' various

17  "reports and articles"; that upon reading the CCDH Defendants' reporting, "at least five" companies

18  paused advertising on X; and that this caused X Corp. to lose an "estimate[d] . . . at least tens of

19  millions of dollars" in revenue, for which X Corp. says Defendants are now liable. AC ¶¶ 65-70,

20  92-93, 97-99. In addition, in pleading its federal hacking claim, X Corp. alleges that it has spent

21  some amount "far exceed[ing] $5,000" on internal investigations, AC ¶¶ 71, 87, though X Corp.

22  does not allege that the CCDH Defendants' conduct imposed server costs, data corruption, service

23  interruptions, or anything like that.

24  **III.   LEGAL STANDARD**

25      Under California's anti-SLAPP statute, where a state-law claim "aris[es] from any act of

26  [the defendant] in furtherance of [the defendant]'s right of . . . free speech . . . in connection with a

27  public issue," the cause of action "shall be subject to a special motion to strike, unless . . . the

28  plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal.

1    Civ. Proc. Code § 425.16(g). Where, as here, "an anti-SLAPP motion to strike challenges only the

2    legal sufficiency of a claim," a federal court applies the Rule 12(b)(6) standard. *Planned*

3    *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

4        To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual

5    allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

6    678 (2009). This Court may consider the complaint, documents incorporated by reference, and

7    matters of public record subject to judicial notice. *See In re Finjan Holds., Inc.*, 58 F.4th at 1052

8    n.1. Although the Court must accept well-pleaded factual allegations as true, it "need not . . . accept

9    as true allegations that contradict matters properly subject to judicial notice or by exhibit," nor those

10   "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*

11   *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *as amended*, 275 F.3d 1187 (9th Cir. 2001).

12   **IV.    SUMMARY OF ARGUMENT[7]**

13       X Corp. complains that the CCDH Defendants gathered information in alleged violation of

14   various contractual provisions, then used that data to publish reporting critical of X Corp. and its

15   platform. Because X Corp.'s state-law claims arise from quintessential newsgathering activity in

16   furtherance of the CCDH Defendants' speech and reporting, they are subject to a special motion to

17   strike under California's anti-SLAPP statute. *See, e.g.*, *Iloh v. Regents of Univ. of Cal.*, 312 Cal.

18   Rptr. 3d 674, 682 (Cal. Ct. App. 2023). And because X Corp. fails to state a claim for relief on any

19   of its causes of action (and cannot establish a probability of prevailing on any of its state-law claims

20   for anti-SLAPP purposes), all of its claims must be stricken or dismissed.

21       With respect to Count 1 (breach of contract), X Corp. fails to plead that small-scale data

22   collection for nonprofit reporting purposes violates its ToS. Although the ToS prohibits "scraping,"

23   X Corp. fails to define that term anywhere in the ToS, instead only contrasting it with data collection

24   through functions made available by X Corp. itself. But that is exactly what X Corp. alleges the

25   CCDH Defendants did—gathered data using a tool relying on the X platform's own search

26   function. Such conduct does not violate X Corp.'s ToS. Independently, X Corp.'s effort to penalize

27

28   ────────────────────
     [7] On November 15, 2023, the Court granted the parties' stipulated request to extend the page limit
     for this motion to 25 pages, exclusive of the required summary of argument. *See* Dkt. 44 at 3, 7.

1   CCDH US for its criticism of the X platform under the guise of a breach of contract claim fails as

2   against public policy, as embodied in constitutional and statutory provisions designed to ensure a

3   robust, unimpeded public debate. And in any event, X Corp. pleads only reputational harm (*i.e.*,

4   lost revenue when advertisers reacted to CCDH US's speech), which it cannot recover under

5   contract law and constitutional free speech protections. *See, e.g.*, *Lewis Jorge Constr. Mgmt., Inc.*

6   *v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 261 (Cal. 2004); *Planned Parenthood Fed. of Am.,*

7   *Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 644 (N.D. Cal. 2019).

8          Next, on Count 2 (a federal hacking claim under the CFAA), X Corp. fails to plead that the

9   CCDH Defendants accessed any Brandwatch data "without authorization," as this criminal and

10   civil statute requires. In fact, X Corp. concedes that ECF authorized CCDH to use Brandwatch on

11   its account, and the Brandwatch terms show ECF's authorization made CCDH a valid Brandwatch

12   "User." And in any event, even unauthorized password-sharing would fall short of the kind of

13   "breaking and entering" this hacking-focused statute proscribes. *hiQ Labs, Inc. v. LinkedIn Corp.*,

14   31 F.4th 1180, 1197 (9th Cir. 2022). X Corp. also fails to plead the requisite technological harm

15   "to computer systems and data," "such as the corruption of files," *Van Buren v. United States*, 141

16   S. Ct. 1648, 1659-60 (2021); it instead alleges only nonrecoverable investigation costs. X Corp.

17   similarly fails to give notice of which of the scores of potential CFAA theories it means to allege.

18          As for Counts 3 and 4 (duplicative tort claims), X Corp.'s pleading fails to allege causation

19   or inducement and, in fact, flips the causal chain on its head. X Corp. makes clear that the CCDH

20   Defendants did not cause or induce Brandwatch to breach its agreements with X Corp. to keep data

21   secure—indeed, the CCDH Defendants did not lead Brandwatch to do anything at all. Instead,

22   Brandwatch's alleged failure to keep the data secure constituted a condition precedent to the CCDH

23   Defendants' access. Independently, X Corp. fails to make out any breach by Brandwatch to begin

24   with, as ECF authorized the alleged access; alleges no facts to support its conjecture that the CCDH

25   Defendants were somehow aware of the terms of X Corp.'s agreements with Brandwatch (which

26   the CCDH Defendants have yet to see); and again fails to allege recoverable damages consistent

27   with speech protections and basic principles of proximate cause.

28

Finally, X Corp.'s vague, conspiratorial allegations regarding the Doe Defendants fall woefully short of stating a claim against them. And leave to amend would be inappropriate where, as here, the plaintiff has already had an opportunity to replead; no additional factual allegations could save its claims; and the state-law causes of action are properly stricken under California's anti-SLAPP statute, which exists to ensure a speedy resolution of claims which impinge on speech. Accordingly, the Court should strike Counts 1, 3, and 4, and dismiss Count 2, with prejudice.

## V.   ARGUMENT

### A.   The Alleged Conduct at Issue Was Newsgathering Activity in Furtherance of the CCDH Defendants' Protected Speech and Reporting

X Corp. alleges that the CCDH Defendants gathered information in violation of various contractual provisions, and then used that data to publish reporting critical of X Corp. X Corp.'s state-law claims thus "aris[e] from" quintessential acts "in furtherance of" the CCDH Defendants' speech and reporting on public issues. Cal. Civ. Proc. Code § 425.16(b)(1). A defendant need only make a "prima facie showing" on this point, *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013), and courts must err on the side of construing California's anti-SLAPP statute "broadly," *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 596 (9th Cir. 2010) (quoting § 425.16(a)).

*First*, the CCDH Defendants' reporting activities were self-evidently "in furtherance of" their free speech rights. §§ 425.16(b)(1), (e)(4). The same is true of their data collection. Because "[r]eporting the news usually requires the assistance of newsgathering," newsgathering itself is "undertaken in furtherance of the news media's right to free speech" for anti-SLAPP purposes. *Lieberman v. KCOP Television, Inc.*, 1 Cal. Rptr. 3d 536, 542 (Cal. Ct. App. 2003); *see also, e.g.*, *Taus v. Loftus*, 151 P.3d 1185, 1203-04 (Cal. 2007) ("conducting an investigation with regard to the validity of" a scholarly article "unquestionably" constituted "conduct in furtherance of their right of free speech"); *Iloh*, 312 Cal. Rptr. 3d at 682 (collecting cases). This principle is not limited to traditional journalists (whatever that term means in today's world). *See, e.g.*, *Iloh*, 312 Cal. Rptr. 3d at 682 (applying the principle to a nonprofit corporation that "promotes transparency and integrity in scientific publishing"). And a defendant cannot evade anti-SLAPP protections by alleging some breach of contract or other wrong relating to data collection. *See, e.g.*, *Navellier v.*

*Sletten*, 52 P.3d 703, 712-13 (Cal. 2002) ("[A]ny claimed illegitimacy of the defendant's acts" pertains only to "the plaintiff's secondary burden to provide a prima facie showing of the merits." (cleaned up)).

*Second*, X Corp.'s claims "aris[e] from" the CCDH Defendants' protected newsgathering activity. § 425.16(b)(1). Put another way, "the *principal thrust* or *gravamen* of [the] cause of action," *Iloh*, 312 Cal. Rptr. 3d at 684, is the CCDH Defendants' speech. Indeed, every penny in damages X Corp. seeks on its state-law claims was allegedly "in direct response to" or "[a]s a direct . . . result of" the CCDH Defendants' reports and articles. AC ¶¶ 78, 92, 98. Moreover, the rest of each count is premised on newsgathering activity. *See* AC ¶¶ 77-78 (complaining about CCDH US's "data collection" for "reports and articles"); AC ¶¶ 92-93 (complaining that the CCDH Defendants "prevented Brandwatch from performing" by "unlawfully accessing [Brandwatch] data" for "reports and articles"); AC ¶¶ 97-99 (complaining that the CCDH Defendants "induc[ed] Brandwatch to breach" by "gaining access to . . . data" for "reports and articles").

*Third*, the CCDH Defendants' speech was concededly "in connection with a public issue," § 425.16(b)(1), in that it concerned "broadly debated topics" "of paramount public concern" "such as COVID-19 vaccines, reproductive healthcare, and climate change," AC ¶¶ 3, 72.

Thus, this case is a quintessential SLAPP: it "masquerade[s] as [an] ordinary lawsuit[]," but is really "intended to deter ordinary people from exercising their . . . rights or to punish them for doing so," *Makaeff*, 715 F.3d at 261 (cleaned up), by using this Court to impose significant litigation costs and the threat of ruinous liability in damages. As a result, unless X Corp. establishes a probability of prevailing on its state-law claims—and it cannot—the claims must be stricken.

**B.      X Corp. Fails to State a Claim for Breach of Contract (Count 1)**

Because the anti-SLAPP statute applies to Count 1, the burden shifts to X Corp. to establish a probability of prevailing—*i.e.*, in the context of this motion, that it can state a plausible claim for relief under Rule 12(b)(6). *See* § 425.16(b)(1); *Planned Parenthood*, 890 F.3d at 834.

X Corp. cannot make that showing on its contract claim, which is as breathtaking as it is unprecedented. Its theory proceeds in three steps: *First*, CCDH US's use of a tool that "utilizes Twitter's search function to enable data collection" somehow violates Twitter's vague and

ambiguous ToS. AC ¶¶ 53-54. *Second*, X Corp. can wield its ToS, an adhesion contract that it forces every user to sign, to prohibit and penalize even limited newsgathering activities for First Amendment-protected research and reporting purposes. *See* AC ¶¶ 49-55. *Third*, X Corp. may rely on such supposed violations to demand "at least tens of millions of dollars" of special damages based on the CCDH Defendants' subsequent public speech and third parties' independent decisions to pause advertising. AC ¶¶ 78-79. If any of these propositions are legally deficient, this Court should strike or dismiss Count 1; here, they are all legally deficient.

### 1.    X Corp. has not pleaded a breach of its Terms of Service

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). Even assuming X Corp. has pleaded the first two elements, it fails to allege facts that would show that CCDH US violated its ToS.

In support of its contract claim, X Corp. quotes just twelve words from its ToS: "scraping the Services without the prior consent of Twitter is expressly prohibited." AC ¶¶ 53, 75. The full provision of the ToS actually reads as follows:

> You may not do any of the following while accessing or using the Services: . . . (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the permissions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited) . . . .

Ex. A at 5-6. X Corp. defines certain key terms in its ToS—it even uses the defined term "Services" in this very provision—but X Corp. does not define the term "scraping," nor does it mention it anywhere else in its ToS. As the Ninth Circuit has already recognized, some conceptions of "scraping" can, in theory, include a wide range of innocuous conduct, including even "manually" copying "data from a website . . . into a structured format." *hiQ Labs*, 31 F.4th at 1186 n.4.

1    X Corp. fails to plausibly allege that the conduct at issue here constitutes the sort of

2  "scraping" that its ToS prohibits. Here, the allegation is that CCDH US used a web tool called

3  SNScrape, which employs X's search function, to collect 9,615 tweets from a handful of previously

4  banned user accounts that X reinstated, so that CCDH US could analyze and comment on the tweets

5  in a free, public report dated February 9, 2023. *See* AC ¶ 54; Ex. B at 17, CCDH US & CCDH UK,

6  *Toxic Twitter* (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_

7  FINAL.pdf (incorporated by reference in AC ¶ 49). Such small-scale data collection for nonprofit

8  research purposes using X Corp.'s own functionality cannot constitute prohibited "scraping" under

9  X Corp.'s adhesive ToS. Three familiar principles of contract interpretation—the need to read all

10  terms as a whole, the presumption against waivers of rights, and the rule that ambiguities in

11  adhesion contracts must be construed against the drafter—compel that conclusion here.

12    *First*, it is axiomatic that contractual terms must be interpreted in light of "the contract as a

13  whole" and "in context, rather than . . . in isolation." *Am. Alt. Ins. Corp. v. Super. Ct. of L.A. Cnty.*,

14  37 Cal. Rptr. 3d 918, 922 (Cal. Ct. App. 2006); *see* Cal. Civ. Code §§ 1641, 1643. Here, the ToS

15  uses the term "scraping" in contrast to "access[ing] or search[ing] the Services . . . through our

16  currently available, published interfaces that are provided by Twitter." Ex. A at 5-6. Yet X Corp.

17  recognizes that the tool CCDH US used—however it was described colloquially—"utilize[d]

18  *Twitter's search function* to enable data collection," apparently with no technological cost to X

19  Corp. AC ¶ 54 (emphasis added). Thus, CCDH US's alleged conduct was permitted under any

20  reasonable interpretation of X Corp.'s ToS. At minimum, there clearly could not have been any

21  "meeting of the minds upon the essential features of" X Corp.'s vague ToS clause, as would be

22  necessary to "sufficiently define[]" that clause's scope and "provide a rational basis for the

23  assessment of damages." *Scott v. Pac. Gas & Elec. Co.*, 904 P.2d 834, 841 (Cal. 1995) (internal

24  quotation marks omitted).

25    *Second*, under California law, "it is well established that courts closely scrutinize waivers

26  of constitutional rights[] and indulge every reasonable presumption against a waiver." *Integrated

27  Healthcare Holdings, Inc. v. Fitzgibbons*, 44 Cal. Rptr. 3d 517, 529 (Cal. Ct. App. 2006). Applying

28  the ToS's undefined prohibition on "scraping" to prohibit limited "attempts to record the contents

of public websites for [nonprofit] research [and advocacy] purposes," as X Corp. suggests here, would effect a waiver of CCDH US's rights "plausibly within the ambit of the First Amendment." *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15-16 (D.D.C. 2018). After all, the First Amendment protects not just speech, but also access to "the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). As a result, "six courts of appeals have found that individuals have a First Amendment right to record at least some matters of public interest, in order to preserve and disseminate ideas." *Sandvig*, 315 F. Supp. 3d at 15-16 & n.4; *see Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) ("easily" holding recordings of agricultural operations were "speech protected by the First Amendment"). Automation is "merely a technological advance that makes [such] information collection easier," *Sandvig*, 315 F. Supp. 3d at 16—especially here, where only a few thousand public data points were gathered, and admittedly for research and reporting purposes. Moreover, the Liberty of Speech Clause of the California Constitution "independently establishes a zone of protection that is broader still" than its federal counterpart. *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1181-82 (Cal. 1986); *see* Cal. Const. art. I, § 2. "[I]ndulging every reasonable presumption against a waiver" of these rights makes clear that "the phrase ['scraping'] . . . is not sufficiently clear and definite on its face to imply a waiver" by CCDH US. *Integrated Healthcare Holdings, Inc.*, 44 Cal. Rptr. 3d at 529-30; *see also, e.g.*, *A.H.D.C. v. City of Fresno*, No. 97 Civ. 5498, 2000 WL 35810722, at *10-11 (E.D. Cal. Aug. 31, 2000) (possible waiver of First Amendment rights was "entitled to the narrowest construction," especially because it was within a "contract of adhesion").

*Third*, any "ambiguities in written agreements are to be construed against their drafters." *Sandquist v. Lebo Automotive, Inc.*, 376 P.3d 506, 514 (Cal. 2016). This "applies with peculiar force in the case of the contract of adhesion." 1 Witkin, Summary of Cal. Law—Contracts § 780 (11th ed. 2023). Under this principle, the vague terms X Corp. uses in its ToS cannot reach isolated collection of publicly available data, by a nonprofit, using X Corp.'s search function, for research and advocacy purposes, that imposes no direct costs on the platform. If X Corp. wished for its form contract to sweep so broadly, it should have drafted its ToS to say so. At a minimum, it could have defined the term "scraping"; its competitors utilize markedly clearer language to prohibit unwanted

means of data collection.[8] X Corp.'s failure to do the same must be held against it, not CCDH US.

Given these considerations, courts that have sustained contract claims over "scraping" have done so in dramatically different contexts involving private data sold for profit, significant breaches of user privacy, large-scale collection inflicting technological harm, or several of these factors, all of which are absent here.[9] Even X Corp.'s own prior suits over "scraping" involve such fact patterns.[10] Whatever the nature of X Corp.'s complaints with CCDH US's speech, it fails to allege facts sufficient to bring CCDH US's newsgathering activities within the ambit of any plausible understanding of a contractual prohibition on undefined "scraping." And in light of X Corp.'s failure to plead any violation of its ToS under state law, Count 1 should be stricken or dismissed.

## 2. If the anti-scraping provision applies, enforcement violates public policy

Even if X Corp.'s ToS did prohibit efforts to collect small amounts of publicly available data facilitated by X's search feature for nonprofit research and reporting (and it does not), public policy would render any such prohibition unenforceable. "[A] contract is unlawful, and therefore unenforceable, if it is '[c]ontrary to an express provision of law' or '[c]ontrary to the policy of express law, though not expressly prohibited.'" *Sheppard, Mullin, Richter & Hampton, LLP v. J-*

---

[8] *E.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 959 (N.D. Cal. 2022) ("You agree that you will not . . . [s]crape or copy profiles and information of others through any means (including crawlers, browser plugins and add-ons, and any other technology or manual work);" "[u]se manual or automated software, devices, scripts[,] robots, other means or processes to access, 'scrape,' 'crawl,' or 'spider' the Services or any related data or information;" or "[u]se bots or other automated methods to access the Services, add or download contracts, [or] send or redirect messages"); *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1243 (N.D. Cal. 2022).

[9] *See, e.g.*, *BrandTotal Ltd.*, 605 F. Supp. 3d at 1232-33 (collecting public and private data at a large scale and for profit); *hiQ Labs, Inc.*, 639 F. Supp. 3d at 955 (large-scale scraping for profit, using tricks to evade platform barriers and prevent detection); *Chegg, Inc. v. Doe*, No. 22 Civ. 7326, 2023 WL 4315540, at *4 (N.D. Cal. July 3, 2023) (collection of private, paywalled information "in huge quantities" for profit); *Craigslist, Inc. v. 3taps, Inc.*, No. 12 Civ. 3816, 2015 WL 5921212, at *1 (N.D. Cal. Oct. 11, 2015) (scraping Craiglist content, "without authorization, for profit").

[10] *See* Complaint at 2, *X Corp. v. Bright Data Ltd.*, No. 23 Civ. 3698 (N.D. Cal. July 26, 2023), Dkt. 1 (alleging "Bright Data has built an illicit data-scraping business" by "scrap[ing] and sell[ing] millions of records from" the Twitter/X platform); Original Petition at 4, *X Corp. v. John Doe 1*, No. DC-23-09157 (Tex. Dist. Ct. July 6, 2023) ("flooding Twitter's sign-up page with automated requests," "severely tax[ing] X Corp.'s servers," "impair[ing] the user experience for millions of X" users, and "profit[ing] . . . while harming X Corp. and compromising user data").

*M Mfg. Co.*, 425 P.3d 1, 8 (Cal. 2018) (quoting Cal. Civ. Code § 1667). Sources of such law can include constitutions and statutes. *See, e.g.*, *Cariveau v. Halferty*, 99 Cal. Rptr. 2d 417, 420-21 (Cal. Ct. App. 2000). Even absent express law, a provision may be "unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." *Bovard v. Am. Horse Enters., Inc.*, 247 Cal. Rptr. 340, 344 (Cal. Ct. App. 1988). "Whether or not a contract is contrary to public policy is a question of law to be determined from the circumstances of each particular case." 14 Cal. Jur. 3d Contracts § 171.

Allowing X Corp. to ban the conduct alleged here would contravene settled public policy, in several respects. Most fundamentally, it would violate the speech principles underpinning the federal Free Speech Clause and the state Liberty of Speech Clause, and not just because CCDH US's data collection and reporting fall within the protection afforded by those guarantees. Even beyond that, "commonplace social media websites like . . . Twitter" constitute "the modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 101, 107 (2017). Yet X Corp.'s theory would allow it to unilaterally restrict essential forms of newsgathering, speech, and debate both in and about that modern public square. Public policy does not sanction giving X Corp. such broad control over publicly available data that X Corp. does not own, particularly when that data is needed to facilitate free and open debate on issues of public concern.

In addition, X Corp.'s contract claim violates established statutory policies favoring online transparency and a robust public discourse. The State of California has enacted legislation towards these ends, most powerfully in the decades-old anti-SLAPP statute, which is premised on the belief "that it is in the public interest to encourage continued participation in matters of public significance." Cal. Civ. Proc. Code § 425.16(a). X Corp.'s effort to use its ToS to punish nonprofits for their reporting on and criticism of the X platform obviously collides with this public policy.[11]

---

[11] Further evidence of these policy commitments is found in the Social Media Transparency and Accountability Act ("SMTAA"), also known as Assembly Bill No. 587, *see* Cal. Bus. & Prof. Code §§ 22675-22681, which will require social media companies to disclose their content moderation policies and practices, and which X Corp. has sued to enjoin, *see* Complaint at 2, *X Corp. v. Bonta*, No. 23 Civ. 1939 (E.D. Cal. Sept. 8, 2023), Dkt. 1. Congress, too, has acted to shield individuals from contractual retribution for speech that is critical of products or services. Thus, the Consumer Review Fairness Act renders a "form contract[]" that "prohibits or restricts" an individual's ability to "assess[]" or "analy[ze]" the "performance" of a counterparty's "services" void. 15 U.S.C. § 45b.

These foundational policies do not permit enforcement of the ToS against the newsgathering at issue here. Public policy bars enforcement of X Corp.'s ToS against the conduct alleged, which involves an unprecedented confluence of (i) small-scale data collection, (ii) not for sale or for profit, (iii) for research and reporting about matters of public concern, (iv) facilitated by X Corp.'s own search functionality, (v) inflicting no alleged technological harm, and (vi) involving publicly accessible third-party content. Count 1 should be stricken or dismissed.

### 3.    X Corp. does not allege recoverable damages

Even assuming X Corp.'s adhesive ToS prohibits the limited, reporting-oriented conduct alleged here, and that it can be enforced consistent with public policy, the Court should still strike or dismiss Count 1 for yet a third reason: X Corp. fails to allege recoverable damages. *See Oasis West Realty, LLC*, 250 P.3d at 1121 ("[T]he elements of a cause of action of breach of contract . . . [include] damages to the plaintiff.").[12] X Corp. tellingly seeks only reputational damages based on lost revenue from advertisers in response to speech, which it cannot recover for two reasons.

*First*, X Corp.'s lost advertising revenue is not recoverable as a matter of state contract law. "[C]ontractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)." *Lewis Jorge Constr. Mgmt.*, 102 P.3d at 261. General damages are "those that flow directly and necessarily from a breach of contract," while special damages are "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Id.* Importantly, in order to be recoverable, special damages must have been "foreseen or . . . reasonably foreseeable *when the contract was formed*." *Highwire Promotions, LLC v. Legend Marketing LLC*, 263 F. App'x 564, 565 (9th Cir. 2008) (emphasis added); *see also Lewis Jorge Constr. Mgmt.*, 102 P.3d at 261. Moreover, the losses at issue must be those "likely to result from a breach," *i.e.*, "the probable result" of a breach. *Lewis Jorge Constr. Mgmt.*, 102 P.3d at 262 (cleaned up).

---

[12] In the alternative, because X Corp. does not allege recoverable damages in excess of $75,000 on Count 1, it fails to establish diversity jurisdiction. And because X Corp. additionally fails to state claims on Counts 2-4, requiring that those counts be dismissed or struck, this Court should decline to exercise supplemental jurisdiction over Count 1 even if that count otherwise survives this motion. *See, e.g.*, *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367-68 (9th Cir. 1992).

Here, X Corp.'s claim for damages is that CCDH US breached the ToS by collecting publicly-available data using Twitter's own search tool; that although the breach caused no direct damages, the CCDH Defendants used the publicly available data collected to publish reports criticizing X Corp.; that their speech, in turn, led X Corp.'s advertisers (all non-parties) to pause spending; and that this, in turn, caused X Corp. to lose "at least tens of millions of dollars" in revenue. AC ¶¶ 77-79. Because these remote damages do not flow directly and necessarily from a breach of an anti-scraping provision, they can only be cognizable as special damages (if at all). *See Lewis Jorge Constr. Mgmt., Inc.*, 102 P.3d at 261. Yet X Corp.'s pleading falls triply short of satisfying applicable legal standards for special damages:

No knowledge at time of contracting. X Corp. makes no attempt to tie any alleged knowledge on the part of CCDH US back to *the time of contracting*. And it is facially implausible that CCDH US could have known, at whatever time it accepted the ToS, that (for instance) the Twitter/X platform would abruptly change course to restore accounts that it had banned for spreading hate speech, misogyny, and conspiracy theories, *see* AC ¶ 49; that the CCDH Defendants would collect and review public posts on the platform to shed light on these issues, *see* AC ¶ 77; and that the CCDH Defendants' subsequent reporting based on this data would allegedly affect advertiser revenue to the tune of "at least tens of millions of dollars," AC ¶¶ 78-79. This lack of foreseeability at the time of contracting is precisely why the courts have resoundingly rejected reputational damages in contract actions. *See, e.g.*, *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 790 (N.D. Cal. 2021) (noting "legion of cases" holding that "damages are not recoverable for . . . injury to reputation resulting from breach of contract," as such harms are "generally not foreseeable" (cleaned up)); *Frangipani v. Boecker*, 75 Cal. Rptr. 2d 407, 410 (Cal. Ct. App. 1998) (collecting cases showing that an award "in the nature of a recovery for damages to reputation" is "not recoverable in an action for breach"); *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 287-88 (4th Cir. 2000) (noting reputational damages have been "universally rejected" in contract actions).

Disconnected from alleged breach. Independently, although X Corp. claims that CCDH US intended for advertisers to flee and knew that the CCDH Defendants' *reports* would achieve that result, it never alleges that CCDH US knew that lost advertising revenue was the probable result of

CCDH US's *alleged scraping* (the only actual breach it alleges). Understandably so: X Corp.'s lost advertising revenues have nothing to do with CCDH US's data collection methods. For this reason, too, X Corp.'s theory of contract damages flunks the requirements of state law.

No specific statement. X Corp. also fails to comply with Rule 9(g), which requires that "[i]f an item of special damage is claimed, it must be specifically stated." "A specific statement of special damages requires not just the total lump sum, but a statement of the specific items which make up the lump sum." *City & Cnty. of S.F. v. Tutor-Saliba Corp.*, No. 02 Civ. 5286, 2005 WL 645389, at *17 (N.D. Cal. Mar. 17, 2005). X Corp. alleges neither; it offers only a loose and uncapped "estimate[]" of damages, AC ¶ 70, stretching across all three of its state-law claims.

*Second*, the free speech provisions of the federal and state Constitutions bar X Corp. from using non-defamation "cause[s] of action to avoid the strict requirements for establishing a libel or defamation claim" while seeking its "damages for injury to . . . reputation." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991); *accord Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (holding that a public figure could not recover publication damages on a non-defamation claim without showing actual malice); *cf. Kasky v. Nike, Inc.*, 45 P.3d 243, 255 (Cal. 2002) (state Liberty of Speech Clause is "at least as broad as . . . and in some ways broader than" federal Free Speech Clause). The crucial distinction is between "damages . . . result[ing] . . . from the *direct* acts of defendants" and damages "from the acts of third parties who were motivated by the contents of [defendants' speech]." *Planned Parenthood Fed. of Am.*, 402 F. Supp. 3d at 644. Fundamental speech protections allow X Corp. to recover only the former category of damages—for direct harms it would have suffered "even if Appellants had never published" their speech. *Planned Parenthood Fed. of Am., Inc. v. Newman*, 51 F.4th 1125, 1134 (9th Cir. 2022); *accord Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 523 (4th Cir. 1999) (rejecting supermarket's attempt to recover "compensation for matters such as loss of good will and lost sales" caused by footage aired in a news program, as these were unrecoverable "reputational damages from publication," even where the news program "obtained the videotapes through unlawful acts"). Yet X Corp. has not pleaded *any* direct damages (such as data corruption or server costs). All it seeks on this claim is precisely what the Constitution forbids: damages based on advertisers' reactions to CCDH US's speech.

1    To be sure, "the pursuit of journalism does not give a license to break laws of general

2    applicability." *Planned Parenthood*, 51 F.4th at 1135. But this "well-accepted rule" does not define

3    "where to draw the line between impermissible defamation-like publication damages that were

4    caused by the actions and reactions of third parties [to speech] and permissible damages that were

5    directly caused by the breach[] of contract" and "tortious acts" alleged. *Planned Parenthood*, 402

6    F. Supp. 3d at 643. Here, the answer is clear: because X Corp.'s damages all flow from third parties'

7    reactions to the CCDH Defendants' speech, they constitute impermissible publication damages.

8    Last but not least, permitting Count 1 to proceed would have staggering implications. X

9    Corp. seeks to hold CCDH US liable for at least tens of millions of dollars in damages, the entirety

10   of which allegedly flows from the CCDH Defendants' speech on matters of public concern, based

11   on an instance of small-scale data collection that imposed no technological costs on X Corp. and

12   yielded no profit, purportedly in violation of vague and ambiguous contract language drafted by X

13   Corp. itself. Moreover, even if a jury or this Court subsequently ruled against X Corp. on the merits,

14   the CCDH Defendants would be punished in the interim through the significant costs of enduring

15   discovery and litigation in a federal proceeding against a well-resourced adversary with every

16   incentive to impose crushing burdens on the CCDH Defendants. The chill this manipulation of the

17   judicial process would exert on research and honest criticism cannot be overstated. This Court

18   should not be the first to sanction such an effort.

19   **C.      X Corp. Fails to State a Claim Under the CFAA (Count 2)**

20   X Corp. alleges that the CCDH Defendants violated the CFAA by accessing private

21   Brandwatch data to prepare reports published on March 24, 2021, November 10, 2022, and

22   February 9, 2023. *See* AC ¶¶ 44-48.[13] But the CFAA, a federal criminal hacking statute, provides

23

---

24   [13] Although X Corp. alleges that the CCDH Defendants' February 9, 2023 report "cites several data
     points for which non-public Brandwatch sources are *quoted*," AC ¶ 51 (emphasis added), this is
25   demonstrably false. The allegation is contradicted by the report itself, *see* AC ¶ 49 (linking to
     report), which cites only a *public* blog post by Brandwatch that remains online and available to all.
26   *See* Ex. B at 5, 17 (citing Brandwatch, *How Much Do Social Media Ads Cost on Facebook,*
     *Instagram, Twitter, and LinkedIn?* (Feb. 22, 2022), https://www.brandwatch.com/blog/how-much-
27   do-social-media-ads-cost-on-facebook-instagram-twitter-and-linkedin/). Thus, there can be no
     liability in connection with that report. In any event, X Corp.'s allegations fail regardless of whether
28   this report is somehow relevant to Counts 2-4.

a private right of action only "under very limited circumstances." *Fish v. Tesla, Inc.*, No. 21 Civ. 60, 2022 WL 1552137, at *8 (C.D. Cal. May 12, 2022). To state a claim, X Corp. must allege (1) a violation of one of the statute's substantive provisions, 18 U.S.C. § 1030(g), and (2) cognizable "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value," § 1030(c)(4)(A)(i)(I). X Corp. has failed to satisfy either requirement here and does not even give fair notice of which possible CFAA violation it believes Defendants committed. For each of these reasons, this Court should dismiss Count 2.

### 1.     X Corp. cannot allege access "without authorization"

Unlawful access is a necessary element of any CFAA claim. *See Van Buren*, 141 S. Ct. at 1658. The CFAA specifically prohibits two forms of unlawful access, including (as relevant here) "access without authorization." *Id.* But this prong of the statute is narrow—in part because the CFAA is primarily a criminal statute that is interpreted similarly across criminal and civil contexts. *See, e.g.*, *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009). Moreover, the CFAA was "enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ Labs, Inc.*, 31 F.4th at 1196. Thus, to be prohibited under the CFAA, conduct must be "analogous to 'breaking and entering'" into computers; a mere violation of terms of service is not enough. *Id.* at 1197.

Here, X Corp.'s theory requires the following steps: ECF "was a subscriber to Brandwatch's applications," AC ¶ 35; ECF voluntarily gave the CCDH Defendants, which were not themselves customers of Brandwatch, access to ECF's subscription, AC ¶¶ 38, 43, 84; the CCDH Defendants then used ECF's subscription for research and journalism purposes, AC ¶ 43; and this was all purportedly in violation of Brandwatch's terms and conditions for its users, AC ¶¶ 37, 42. This convoluted theory fails for two independent reasons.

*First*, the Amended Complaint does not plausibly allege a violation of the Brandwatch user terms because it does not allege that ECF's subscription was a single-user license. The Brandwatch terms, including the terms quoted by X Corp., distinguish between a "Customer" (ECF) and a "User" (CCDH) and contemplate *multiple users* for each customer account. *See, e.g.*, AC ¶ 37 (providing distribution permissions for a "Customer's (*or User's*) business purpose" (emphasis

added)). Moreover, the incorporated terms expressly define "User[s]" as anyone whom *ECF*—not X Corp. or Brandwatch—has authorized to use Brandwatch services. *See, e.g.*, Ex. C at 1, Brandwatch Service Terms (Oct. 15, 2022) ("'User' means an individual that Customer (directly or indirectly) has authorised to use the Services."), https://www.brandwatch.com/wp-content/uploads/2023/04/MSA-Brandwatch-Oct-15-2022.pdf.[14] Notably, the terms were amended on April 21, 2023—after the alleged Brandwatch access here took place—to add a new restriction not previously present: "'User' means an individual *from the entities within the Customer's corporate group* that Customer has authorized to use the Services and/or the Resold Services."[15] This only underscores the fact that during the relevant period, Brandwatch "Customers" like ECF *could* authorize "Users" beyond their corporate groups to use the services. And X Corp. actually concedes that ECF permitted the CCDH Defendants to use its subscription. *See* AC ¶¶ 11, 38. Accordingly, X Corp.'s allegation that their access was "in violation of ECF's agreement with Brandwatch" fails on the four corners of the pleading and referenced document. AC ¶ 43.

> *Second*, even if X Corp. had alleged a violation of the Brandwatch terms (which it has not), that would at most amount to a violation of a license agreement, not the type of hacking that CFAA subjects to civil and criminal penalties. *See AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1182 (E.D. Cal. 2010) (refusing to "stretch the scope of CFAA" to encompass access-sharing in "violation of [a] license agreement"). As the Ninth Circuit has instructed, "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016); *accord hiQ Labs, Inc.*, 31 F.4th at 1196 (squarely rejecting a "contract-based interpretation of the CFAA's 'without authorization'"). All

---

[14] The Amended Complaint links to and quotes from a version of the Brandwatch terms dated April 21, 2023. AC ¶¶ 35-37. Those terms did not govern the period relevant to X Corp.'s allegations, *i.e.*, March 2021, November 2022, and February 2023. The applicable Brandwatch terms (Exs. C through E), which are available on the webpage linked to in the Amended Complaint, are also incorporated by reference and, in any event, are subject to judicial notice. *See, e.g.*, *Lucky Leather, Inc. v. Mitsui Sumitomo Ins. Grp.*, No. 12 Civ. 9510, 2013 WL 12139116, at *1 (C.D. Cal. Feb. 26, 2013) (collecting cases); *see also Coffee v. Google, LLC*, No. 20 Civ. 390, 2021 WL 493387, at *4 (N.D. Cal. Feb. 10, 2021). The operative language defining a "User" was identical across the relevant time period. *See* Ex. C at 1; Ex. D at 1; Ex. E at 1.

[15] Ex. F, Brandwatch Service Terms 3 (April 21, 2023) (emphasis added), https://www.brandwatch.com/legal/terms-and-conditions/ (incorporated by reference in AC ¶¶ 35-37).

1    the more so here, where X Corp. at worst pleads a case of ordinary—and purely voluntary—

2    password-sharing. Were it otherwise, the CFAA "would attach criminal penalties to a breathtaking

3    amount of commonplace computer activity." *Van Buren*, 141 S. Ct. at 1661. Indeed, countless

4    services—from social media networks to streaming services to news sites—forbid users from

5    sharing accounts. *Cf. United States v. Nosal*, 676 F.3d 854, 861 & n.8 (9th Cir. 2012) (en banc).

6    "Yet it's very common for people to let" others "access their online accounts . . . [and] few imagine

7    they might be marched off to federal prison for doing so." *Id.* at 861. Such run-of-the-mill activity

8    does not come close to the kind of "hacking" punished by the CFAA.

9         Given this reality, X Corp. strains to allege something more than ordinary password-

10   sharing. At most, it claims that the CCDH Defendants used Brandwatch data to speak unfavorably

11   of X Corp. *See, e.g.*, AC ¶ 85 (alleging that the CCDH Defendants wanted access to Brandwatch

12   data "to mischaracterize the data in its reports"). But of course, what the CCDH Defendants *did*

13   with the data is irrelevant to whether they accessed that data *without authorization*. *See Van Buren*,

14   141 S. Ct. at 1659 (noting that even the government would not read "purpose-based limits . . . into

15   the threshold question whether someone uses a computer 'without authorization'"); *AtPac, Inc.*,

16   730 F. Supp. 2d at 1181 ("The CFAA simply does not apply to those who have authority to access

17   specific parts of a computer but do so with an improper purpose."). Nor can X Corp. use the CFAA

18   as another end-run around a defamation claim. *Nosal*, 676 F.3d at 857 (CFAA is "an anti-hacking

19   statute," not a "misappropriation statute").

20                        **2.      X Corp. has not pleaded the requisite technological loss**

21        X Corp.'s CFAA claim fails for yet another reason: X Corp. does not allege loss from

22   *technological* harms. A civil CFAA claim requires "loss to 1 or more persons during any 1-year

23   period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). This "conception

24   of 'loss'" is a "narrow" one. *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262 (9th Cir. 2019);

25   *see* 18 U.S.C. § 1030(e)(11). Specifically, the statute requires "a showing of technological harms."

26   *hiQ Labs, Inc.*, 31 F.4th at 1195 n.12; *see Van Buren*, 141 S. Ct. at 1659-60 ("'Loss' focus[es] on

27   technological harms . . . to computer systems and data," "such as the corruption of files").

28        X Corp. alleges that it expended "well over $5,000" "to conduct internal investigations, . . .

significant employee resources and time to participate and assist in those investigations, and attorneys' fees in aid of those investigations and in enforcing the relevant agreements." AC ¶ 87. But none of this loss "relates to costs caused by harm to computer data, programs, systems, or information services." *Van Buren*, 141 S. Ct. at 1659-60 (citing 18 U.S.C. § 1030(e)(11)). X Corp. does not allege, for example, any "corruption" of the Licensed Materials, *id.* at 1660; necessary "data restoration," *Andrews*, 932 F.3d at 1263; or "interruption of service," *id*. In fact, X Corp. does not even allege that the CCDH Defendants accessed its own—as opposed to Brandwatch's— servers. AC ¶ 36. And X Corp. does not own the public, user-generated content it shares with Brandwatch. *See* Ex. A at 13 (providing that users own their content and grant X Corp. "a worldwide, non-exclusive, royalty-free license"). On these facts, X Corp. clearly has failed to allege any loss "related to remedying technological harms inflicted on the breached computer or system." *Fraser v. Mint Mobile, LLC*, No. 22 Civ. 138, 2022 WL 2391000, at *2 (N.D. Cal. July 1, 2022) (dismissing CFAA claim for this reason).

At a minimum, X Corp.'s attorney's fees for "enforcing [its] agreements" with third parties are clearly not the type of loss recognized by the CFAA. *See Delacruz v. State Bar of Cal.*, No. 16 Civ. 6858, 2018 WL 3077750, at *8 (N.D. Cal. Mar. 12, 2018) ("[L]egal expenses are not a cognizable loss under the CFAA."); *Saffron Rewards, Inc. v. Rossie*, No. 22 Civ. 2695, 2022 WL 2918907, at *9 (N.D. Cal. July 25, 2022). And X Corp. does not allege that, without counting those immaterial attorney's fees, its costs would still amount to at least $5,000. *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1030 (W.D. Wash. 2020) (dismissing CFAA claim where allegations "provide no basis on which to allocate the alleged losses between" the cognizable and non-cognizable). For this reason, too, Count 2 must be dismissed.

### 3.   X Corp. fails to specify the CFAA subsection it alleges was violated

This Court should also dismiss Count 2 because X Corp. does not even specify which subsection of the CFAA the CCDH Defendants supposedly violated. *See Song v. Drenberg*, No. 18 Civ. 6283, 2019 WL 1998944, at *5-6 (N.D. Cal. May 6, 2019) (dismissing a CFAA claim on this basis). Notably, while X Corp. at times seems to allege *fraud-based* access without authorization, *see* AC ¶ 82, such a claim requires unlawful access to a computer with "intent to defraud" and "by

means of such conduct further[ing] the intended fraud," § 1030(a)(4); *see United States v. Nosal*, 844 F.3d 1024, 1032 (9th Cir. 2016), neither of which X Corp. alleges here with even minimal specificity, *see* Fed. R. Civ. P. 9(b); *Nowak v. Xapo, Inc.*, No. 20 Civ. 3643, 2020 WL 6822888, at *3 (N.D. Cal. Nov. 20, 2020) (dismissing a § 1030(a)(4) claim that omitted "the who, what, when, where, and how of the misconduct"); *Oracle Am., Inc. v. Service Key, LLC*, No. 12 Civ. 790, 2012 WL 6019580, at *6-7 (N.D. Cal. Dec. 3, 2012) (similar).

### D.     X Corp. Fails to State a Claim in Tort (Counts 3 and 4)

Counts 3 (intentional interference with contractual relations) and 4 (inducing breach of contract) fare no better. For starters, they are redundant. In California, "inducing breach of [contract]" is merely "a species of intentional interference with contractual relations." *1-800 Contacts, Inc. v. Steinberg*, 132 Cal. Rptr. 2d 789, 802 (Cal. Ct. App. 2003). The sole difference is that inducing breach requires a breach, whereas interference may involve disruption short of a breach. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 592 (Cal. 1990). But here, the only form of "interference" X Corp. pleads in Count 3 is inducement of the breach alleged in Count 4. *See* AC ¶ 93 (alleging that "Defendants' conduct prevented Brandwatch from performing"); *Russomanno v. Fox Child.'s Network*, No. B143105, 2004 WL 2137405, at *21 (Cal. Ct. App. Sept. 24, 2004) (allegation that counterparty "fail[ed] to perform" is "the functional equivalent" of alleging breach). Accordingly, the Court should dismiss Count 4 as duplicative. *See, e.g.*, *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 954 (N.D. Cal. 2019).

In any event, these claims fail for even more basic reasons. X Corp. must adequately plead (among other elements) that the CCDH Defendants' intentional acts *caused* or *induced* the alleged breach by Brandwatch; that Brandwatch actually breached its contracts with X Corp.; that the CCDH Defendants knew of the relevant contractual terms and intended to induce a breach; and that X Corp. suffered resulting damage. *See United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014). As explained below, its pleading does not come close.

### 1.     X Corp.'s pleading shows the CCDH Defendants did not cause a breach

To state a claim for relief in tort, X Corp. must allege that each Defendant *induced* or *caused* any breach by Brandwatch. *See, e.g.*, *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th

1   Cir. 2008); *Moser v. Encore Cap. Grp., Inc.*, 455 F. App'x 745, 748 (9th Cir. 2011). As case after

2   case illustrates, an interference claim lies where the defendant's acts pushed a contracting party to

3   act in a way that disrupted the contract.[16] But here, even if X Corp.'s pleading established a breach

4   by Brandwatch (and, as explained below, it does not), it would not allege facts showing that the

5   CCDH Defendants *induced* that breach. To the contrary, X Corp's allegations show that any breach

6   occurred independently of (and, by necessity, before) the CCDH Defendants' actions.

7   Because inducement and causation are questions of law, this Court need not accept as true

8   X Corp.'s conclusory assertions of causation couched as factual allegations. *See Iqbal*, 556 U.S. at

9   678. Setting aside those assertions, the relevant factual allegations are as follows:

10  - Brandwatch agreed in a contract with X Corp. not to "allow others to . . . transfer or provide
11    access to . . . the Licensed Material" and to generally "keep 'Twitter Content' secure." AC
      ¶ 31.
12

13  - The CCDH Defendants did not cause Brandwatch to undertake any act or omission in
      breach of the contract, nor to change its behavior in any way, as their access was allegedly
14    "unknown to Brandwatch . . . until recently." AC ¶ 41.

15  - Nevertheless, the CCDH Defendants "necessarily obtained access to and accessed the
      Licensed Materials improperly and without authorization," *id.*, and that access, in and of
16    itself, "prevented Brandwatch from performing" because it meant that "Brandwatch failed
      to secure the data." AC ¶ 92.
17

18  The glaring flaw in this logic is that the CCDH Defendants' alleged actions did not induce

19  or cause Brandwatch to do anything at all. In fact, taking X Corp.'s factual allegations as true, the

20  causal chain is precisely backwards: the access did not cause the breach, the breach caused the

21  access. The Court should therefore dismiss or strike Counts 3 and 4.

22              **2.      X Corp. has not pleaded any disruption or breach**

23  Separately, X Corp. does not plead a breach of the "Brandwatch Agreements." AC ¶ 32. To

24  begin with, X Corp. fails to attach the Brandwatch Agreements (which Defendants have never seen)

25  _____

26  [16] *See, e.g.*, *Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*, 249 Cal. Rptr. 3d 122,
    129 (Cal. Ct. App. 2019) (defendant induced counterparty to breach nondisclosure agreement);
27  *Savage v. Pac. Gas & Elec. Co.*, 26 Cal. Rptr. 2d 305, 315 (Cal. Ct. App. 1993) (defendant
    persuaded plaintiff's employer to terminate employment agreement); *SCEcorp v. Super. Ct. of San*
28  *Diego Cnty.*, 4 Cal. Rptr. 2d 372, 373-74, 378 (Cal. Ct. App. 1992) (defendant forced counterparty
    to abandon merger).

to its Amended Complaint, and it quotes only a few phrases purportedly from those agreements. *See* AC ¶¶ 29-33 & n.1. And even X Corp.'s limited quotations of the Brandwatch Agreements do not establish any breach by Brandwatch. According to X Corp., the Brandwatch Agreements prohibit Brandwatch from "allow[ing] others to . . . transfer or provide access to . . . the Licensed Material to any third party." AC ¶¶ 31, 33. But, as noted in Section V.C.1, *supra*, under X Corp.'s allegations and the Brandwatch terms, CCDH was not a "third party," but rather a "User." Because X Corp. fails to plead facts showing that any "Licensed Material" was accessed by a "third party," AC ¶¶ 31, 33, as opposed to a "User," it has not pleaded a breach by Brandwatch.

### 3.      X Corp. fails to plausibly allege the CCDH Defendants' knowledge

Even more obviously, X Corp.'s non-conclusory allegations do not establish the CCDH Defendants' knowledge of the Brandwatch Agreements (which the CCDH Defendants have never seen), nor their intent to cause any breach. X Corp. alleges in conclusory fashion that "CCDH knew at all relevant times that the Brandwatch Agreements prohibit Brandwatch from allowing third parties to . . . access, distribute, create derivative works from, or otherwise transfer the Licensed Materials." AC ¶ 42. But X Corp.'s only purported basis for this allegation is that the CCDH Defendants "knew, based on their experience . . . purporting to analyze data associated with social media platforms," that "X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of [those contracts] from providing access to unauthorized parties." AC ¶ 91. That speculation is facially implausible—particularly because, as explained in Section V.C.1, *supra*, the Brandwatch terms show that the CCDH Defendants could be, and were, a valid "User" on ECF's account, not an "unauthorized part[y]." AC ¶ 91. Because this "deduction[] of fact" is "unwarranted," this Court "need not . . . accept [it] as true." *Sprewell*, 266 F.3d at 988.

### 4.      X Corp. again fails to allege recoverable damages

Counts 3 and 4 also fail because X Corp. once again fails to allege recoverable damages. As with X Corp.'s claim in contract, "resulting damage" is a necessary element of its tort claims. *United Nat'l Maint., Inc.*, 766 F.3d at 1006. And again, the only damages X Corp. seeks are "tens of millions of dollars" in revenue it says it lost based on how advertisers reacted to the CCDH Defendants' speech. AC ¶¶ 92-93, 98-99. But these damages are unrecoverable twice over.

1    *First*, the same constitutional principles that prohibit X Corp. from recovering publication

2    damages on its contract claim, *see* Section V.B.3, *supra*, apply with equal force to its tort claims.

3    Once again, X Corp. seeks damages not for direct costs inflicted by the CCDH Defendants' use of

4    Brandwatch, but for the independent acts of third parties in response to the CCDH Defendants'

5    speech regarding issues of public concern. For the reasons explained above, this is impermissible.

6    *Second*, X Corp. fails to allege that any breach by Brandwatch proximately caused the

7    damages it seeks. Indeed, X Corp.'s attempt to claim damages for lost advertising revenue is utterly

8    disconnected from the specific breach X Corp. alleges: Brandwatch's supposed failure to secure

9    data. After this purported breach, the CCDH Defendants allegedly used the data to publish articles,

10   AC ¶ 65, which non-party advertisers "viewed," AC ¶ 67, after which they decided to "pause[] paid

11   advertising," AC ¶¶ 67, 70, leading X Corp. to lose revenue, AC ¶ 70. Compare that to an individual

12   inducing someone to violate a nondisclosure agreement, entitling the counterparty to seek damages

13   for lost "economic opportunities to publish a book or produce or sell a television show . . .

14   containing the information" that was supposed to be confidential but is now public. *Jenni Rivera*

15   *Enters., LLC*, 249 Cal. Rptr. 3d at 147. By contrast, the supposed causal chain that X Corp. tries to

16   trace here is far too attenuated to constitute proximate cause.

17   **E.    X Corp. Fails to State Any Claim Against the Doe Defendants**

18   Finally, X Corp. does not come close to stating any plausible, non-conclusory claim against

19   the Doe Defendants. "A claim has facial plausibility when the plaintiff pleads factual content that

20   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

21   alleged." *Iqbal*, 556 U.S. at 678. Here, X Corp. alleges that "CCDH is acting . . . at the behest of

22   and in concert with" dozens of Doe Defendants "in the course and scope of . . . agency and/or acting

23   with the permission, consent, authorization or ratification of these unknown funders, supporters,

24   and other entities, who are aware of and knowingly participating in the unlawful conduct alleged

25   herein." AC ¶ 63. This allegation, even vaguer than the attempts to plead conspiracies in *Twombly*

26   and *Iqbal*, is "nothing more than a 'formulaic recitation'" of legal elements and is "disentitle[d] . . .

27   to the presumption of truth" based on its "conclusory nature" (let alone its facial implausibility).

28   *Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

1

\*    \*    \*

2      This Court should not allow X Corp. another opportunity to replead. X Corp. has already

3  exercised an opportunity to amend, yet its pleading remains woefully deficient. Moreover, leave to

4  amend is inappropriate where alleging additional facts would be futile. *Lopez v. Smith*, 203 F.3d

5  1122, 1127 (9th Cir. 2000) (en banc). As explained above, each of X Corp.'s claims suffers fatal

6  deficiencies that cannot be fixed by adding new allegations. In fact, the CCDH Defendants have

7  provided information to X Corp. that squarely disproves its already-insufficient allegations as to

8  unauthorized Brandwatch use, without which Counts 2, 3, and 4 of the Amended Complaint lack

9  any basis at all. Finally, leave is especially unwarranted after a successful motion under the anti-

10  SLAPP statute, "the purpose of which is to eliminate 'sham [or] facially meritless' allegations at

11  the pleading stage," *Flores v. Emerich & Fike*, No. 5 Civ. 291, 2006 WL 2536615, at \*7 (E.D. Cal.

12  Aug. 31, 2006) (quoting *Simmons v. Allstate Ins.*, 112 Cal. Rptr. 2d 397, 400 (Cal. Ct. App. 2001)),

13  and "provide for a speedy resolution of claims which impinge on speech protected by the First

14  Amendment," *Smith v. Santa Rosa Democrat*, No. 11 Civ. 2411, 2011 WL 5006463, at \*7 (N.D.

15  Cal. Oct. 20, 2011). "In these circumstances, leave to amend is not necessary or appropriate." *Id.*

16  ## VI.    CONCLUSION

17      For the foregoing reasons, the Court should grant the undersigned Defendants' special

18  motion to strike Counts 1, 3, and 4 and grant the undersigned Defendants' motions to dismiss Count

19  2 with prejudice. Alternatively, the Court should dismiss the Amended Complaint in full and with

20  prejudice or, at minimum, strike X Corp.'s allegations pertaining to damages based on the

21  undersigned Defendants' speech and reporting.

22

23

24

25

26

27

28

1  Dated: November 16, 2023
2         New York, New York

Roberta A. Kaplan*
John C. Quinn*
3  Matthew J. Craig (SBN 350030)
Amit Jain*
4  KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
5  New York, NY 10118
6  (212) 763-0883
rkaplan@kaplanhecker.com
7  jquinn@kaplanhecker.com
mcraig@kaplanhecker.com
8  ajain@kaplanhecker.com
9  *admitted pro hac vice*

10 Marc S. Williams (SBN 198913)
Neil S. Jahss (SBN 162744)
11 COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
12 Los Angeles, CA 90014
213-232-5160
13 mwilliams@cohen-williams.com
njahss@cohen-williams.com
14

15

16 *Attorneys for Defendants Center for
Countering Digital Hate, Inc. and Center for
17 Countering Digital Hate Ltd.*

18

19

20

21

22

23

24

25

26

27

28