# EXHIBIT F

## Sections

1. Definitions

2. Services

3. Use of the Services

4. Fees

5. Confidential Information and intellectual property

6. Term and termination

7. Limitations of liability

8. Indemnity

9. General

10. Archived terms and conditions



## Language

English

### Human readable summary

## 1. Definitions

**"Affiliates"** means with respect to a party, the entities within its corporate group that are under common control.

"**Agreement**" means these terms and conditions, any appendices and addenda referenced herein or on an Order, and any Order.

"**Applicable Law**" means any legally binding obligation on a party, including statutes, rules, regulations, codes, court rulings, or any other binding requirement.

"**Claim**" means any claim, action, suit, dispute, or proceeding.

"**Confidential Information**" means any information that a party discloses to the other party that is marked as confidential or that a reasonable person would understand to be confidential (including trade secrets).

"**Customer**" means the party identified as the customer on an Order.

"**Customer Data**" means data that Customer makes available to Supplier for the purpose of Supplier processing that data on Customer's behalf.

**"Data Processing Addendum"** or **"DPA"** means the Data Processing Addendum available at https://www.brandwatch.com/legal/data-protection-addendum/.

"**Indemnitees**" means with respect to a party, that party, its Affiliates, and its own and its Affiliates' own directors, officers, employees, agents, and other representatives.

"**Losses**" means any losses, damages, liabilities, awards, and costs (including court costs and reasonable attorneys' fees) related to a Claim.

"**Order**" means an ordering document that sets out the products or services that Supplier or a third party is to provide to Customer.

**"Publishing Guidelines"** means a set of instructions available at https://www.brandwatch.com/legal/publishing-guidelines/, that Customers must follow when publicizing the Services or the results of the Services, including Supplier Data.

"**Resold Services**" means the products or services that a third party is to provide to Customer as set out on an Order.

"**Services**" means the services that Supplier provides to Customer as set out on an Order.

**"Service Appendix"** or **"SA"** means the service appendix available at https://www.brandwatch.com/legal/service-appendix/

"**Supplier**", "**we**" "**us**", or "**our**" means the selling party on an Order.

"**Supplier Data**" means any data in Supplier's platform that Supplier uses in providing the Services, including third-party content, but excluding Customer Data.

"**Term**" is defined in section 6.

"**User**" means an individual from the entities within the Customer's corporate group that Customer has authorized to use the Services and/or the Resold Services.

**"User privacy statement"** means a document available at https://www.brandwatch.com/legal/user-privacy-policy/ that outlines how the Supplier processes User data.

---

## 2. Services

2.1. **Services:** This Agreement sets out the terms of the contract between Customer and its Affiliates, and Supplier and the Services that Supplier provides, including any Supplier Data that Customer accesses.

2.2. **Supplier Responsibility:** During the Term, Supplier will: (a) provide the Services with reasonable skill and care; (b) not make a material adverse change to the functionality of the Services; (c) provide the Services in material accordance with any descriptions of the Services set forth on an Order and/or Service Appendix; and (d) process any personal data in accordance with the Data Processing Addendum.

2.3. **Customer Data Use:** Supplier may use aggregated or anonymized versions of Customer Data to improve its Services. Except for Supplier's Sub-Processors, Supplier will not share Customer Data with any other customer or third parties.

2.4. **Resold Services:** Where an Order specifies Services and Resold Services: (a) Supplier will provide Services to Customer subject to the terms of this Agreement; and (b) the third party will provide Resold Services to Customer subject to the third party's terms stated in the Order. Supplier is only responsible for its own Services and not any Resold Services.

## 3. Use of the Services

3.1. **Customer Responsibility:** Customer: (a) is responsible for its compliance with the Agreement, including Service Appendix and Data Processing Addendum, and will ensure that each User complies with the terms of this Agreement as if that User were Customer; and (b) has the right, title, permissions, and interest in the Customer Data to make it available to Supplier for processing; (c) is responsible for any business decisions made on the basis of information derived from using the Services.

3.2. **Restrictions:** Customer will not: (a) sell, resell, license, sublicense, or otherwise make the Services available to anybody other than its Users; (b) distribute the results of the Services, including Supplier Data to any non-User for any reason other than Customer's (or User's) business purpose or as permitted in Section 9.4; (c) subject to Applicable Law, attempt to reverse-compile, disassemble, reverse engineer, or otherwise reduce to human-perceivable form any part of the Services; (d) use the Services or any Supplier Data in a manner that violates Applicable Law, including Applicable Law about data protection, privacy, or information security; or (e) interfere with or disrupt the performance of the Services, including spamming, hacking, and violating Supplier's API rate limits.

3.3. **Affiliate use.** Customer's Affiliates may serve as Users under this Agreement. Alternatively, Customer's Affiliates may enter into their own Orders as mutually agreed with Supplier, which creates a separate agreement between each such Affiliate and Supplier incorporating this Agreement with the Affiliate treated as "Customer". Neither Customer nor any Customer Affiliate has any rights under each other's separate agreement with Supplier, and breach or termination of any such separate agreement affects only that agreement.

3.4. **Password protection:** Each party will use reasonable efforts to ensure that any User IDs and passwords to use Services are kept confidential. Subject to Applicable Law, each party will promptly notify the other party upon discovery if the security of a User ID or password may be or is compromised.

## 4. Fees

4.1. **Fees:** Customer will pay Supplier the fees for the Services and any Resold Services set out in an Order. The fees for the Services are exclusive of legally applicable taxes, levies, duties, or similar governmental assessments, including goods and services, value-added, withholding, and sales taxes. Customer will provide Supplier with the information it reasonably requires to send an invoice. Unless stated otherwise in an Order or these terms and conditions, all fees are subject to an annual price increase of 10%, are non-cancellable and non-refundable and invoiced annually in advance.

## 5. Confidential Information and intellectual property

5.1. **Confidential Information:** Confidential Information does not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the disclosing party; (b) the receiving party knew prior to its disclosure by the disclosing party without breach of any obligation owed to the disclosing party; (c) a third party made available to the receiving party without breach of any obligation owed to the disclosing party; or (d) the receiving party independently developed.

5.2. **Keep in confidence:** The receiving party will keep the Confidential Information of the disclosing party confidential using the same degree of care that it uses to protect its own confidential information of like kind (but not less than reasonable care). Upon termination, each party shall delete or destroy the other party's Confidential Information, unless deletion or destruction is not legally permitted, in which case the Confidential Information shall continue to be protected for two (2) years after the end of the Term; provided that any disclosed trade secrets within Confidential Information will remain confidential until they are no longer trade secrets. The receiving party will only use the disclosing party's Confidential Information for performing its obligations under this Agreement or using the Services. Nothing in this section 5 prevents the receiving party from disclosing the disclosing party's Confidential Information: (a) to its Affiliates, data licensors, third party vendors, legal advisers, accountants, potential investors, or other professional advisers who have a need to know such information (collectively, "**Permitted Recipients**"), provided that the receiving party remains responsible for its obligations and for the Permitted Recipients' use and disclosure of the Confidential Information; or (b) if required to disclose it under Applicable Law, provided that the receiving party will inform the disclosing party of the disclosure requirement, if legally permitted, as soon as reasonably practicable.

5.3. **Intellectual property rights:** Supplier or its licensors owns all intellectual property rights in the Services and the Supplier Data. Customer owns all intellectual property rights in the Customer Data. Except as set out in the Service Appendix, Customer is not granted any rights to Supplier's intellectual property rights, or Supplier Data.

5.4. **Injunctive relief:** A breach of this section 5 may cause substantial and irreparable damage. If either party breaches or threatens to breach this section 5, the disclosing party will have the right to seek injunctive and equitable relief in addition to any other remedies available to it.

5.5. **User feedback:** Supplier may use, incorporate into the Services, or otherwise exploit any suggestion, feature request, recommendation, correction, or other feedback ("**Feedback**") that Customer or its Users provide related to the use of the Services.

---

## 6. Term and termination

6.1. **Term:** This Agreement begins when it is signed by the parties or agreed to via an Order, whichever is earlier, and it continues until all Orders have expired or been terminated in accordance with the terms of this Agreement ("**Term**").

6.2. **Mutual termination:** A party may terminate this Agreement at any time on written notice to the other party if: (a) the other party is in material breach and, if remediable, the breach is not remedied within 30 days of being notified in writing of the breach; or (b) the other party begins insolvency

proceedings, becomes the subject of a petition in liquidation, or any other proceeding relating to insolvency, liquidation, bankruptcy, or assignment for the benefit of creditors (including similar proceedings under Applicable Law); or (c) the other party makes an arrangement with its creditors related to concerns about insolvency (including similar proceedings under Applicable Law).

6.3. **Suspension of Services:** Supplier may suspend Services if: (a) Customer fails to pay an undisputed invoice within ten (10) days after Supplier gives Customer notice of such failure (which may be by email or telephone); (b) Customer's use of the Services violates Applicable Law; or (c) Customer's use of the Services breaches this Agreement and threatens the integrity of Supplier's platform.

6.4. **Accrued rights and survival:** A party's accrued rights and liabilities are not impacted by termination of this Agreement. Sections 1, 3.2, 4, 5, 6, 7 and 9 survive termination of this Agreement. At termination or expiration, all licenses granted by either party shall terminate.

---

## 7. Limitations of liability

7.1. **Limitation of liability.** Subject to the exclusions in section 7.2, each party's aggregate liability for Losses that either party may suffer as a direct and reasonably foreseeable result of a party's breach under this Agreement, regardless of the cause of action, will be limited to the amounts payable by Customer under this Agreement as shown in the table below:

| Fees* for the Services in 12 months preceding date of Claim (*USD or local equivalent) | Liability cap |
|---|---|
| Less than $100,000 | 110% of the fees for Services |
| $100,001 - $1,000,000 | Two times the fees for Services |
| $1,000,001 or greater | Three times the fees for Services |

7.2. **Exclusions.**

a) Nothing in this Agreement will exclude or limit a party's responsibility for Losses that cannot be excluded or limited under Applicable Law (including fraud and willful misconduct). If this Agreement is governed by German law, then the Losses that cannot be excluded or limited under Applicable Law are fraud, wilful misconduct, gross negligence, or damages resulting from death, physical injury, breach of cardinal duties or damages to a person's health;

b) Neither party will have liability for any consequential, incidental, special, punitive, exemplary, or indirect damages, including loss of anticipated profits, loss of revenue, economic loss, costs of procurement of substitute goods or services, loss of use of equipment, or interruption of business, regardless of cause of action, and even if a party has been advised of the possibility of such damages.

c) Notwithstanding section 7.1, Customer is responsible for all legal fees and collection costs incurred in connection with collection of the fees for the Services.

7.3. **Disclaimers.** Except as expressly stated in sections 2.2, all other warranties, conditions, and representations, whether express or implied, are excluded, subject to Applicable Law. Supplier makes no warranty that the Services will be uninterrupted or error-free.

---

## 8. Indemnity

8.1. **Supplier's indemnity:** Supplier will indemnify Customer's Indemnitees against Losses arising out of a third party Claim against Customer that Customer's use of the Services, excluding Supplier Data, infringes the intellectual property rights of a third party. The indemnity does not apply if the Claim is based on Customer's use of the Services in violation of its obligations under this Agreement. Where there is an indemnified Claim, Supplier: (i) may secure the right for Customer to continue using the Services; or (ii) replace or modify the Services so that they become non-infringing. If (i) and (ii) are not reasonably available, Supplier may terminate the infringing Services on 30 days' written notice to Customer and provide a pro rata refund of any prepaid fees for the terminated Services that were not provided.

8.2. **Customer's indemnity:** Customer will indemnify Supplier's Indemnitees against Losses arising out of a third-party Claim against Supplier that Customer Data or Customer's use of the Services infringes or misappropriates the intellectual property rights of a third party, including Supplier Data.

8.3. **Indemnity process:** The indemnified party will give the indemnifying party prompt written notice of any Claim and sole control to defend or settle the Claim. The indemnified party will use its commercially reasonable efforts to mitigate its Losses.

---

## 9. General

9.1. **Privacy:** Supplier processes User data in accordance with its User privacy statement.

9.2. **Rules of interpretation:** The words "include" and "including" are deemed to have the words "without limitation" following them; and references to "will" have the same meaning as "shall".

9.3. **Force Majeure:** Neither party is liable for a breach caused by an event beyond its reasonable control, including a natural disaster, disease outbreak, war, riot, terrorist action, civil commotion, malicious damage, government action, industrial action or dispute, fire, flood, storm, or failure of third party telecommunications services.

9.4. **Publicity:** Subject to the Customer's adherence to the Supplier's Publishing Guidelines, each party may disclose the Services provided under this Agreement or the relationship between the parties without prior written consent from the other party.

9.5. **Invalidity:** If any term of this Agreement is found invalid, illegal or unenforceable, the rest of the Agreement remains in effect.

9.6. **No waiver:** Either party's delay or failure to enforce a term of the Agreement is not a waiver of that right and does not prevent that party from later enforcing that term or any other term.

9.7. **Notice:** Each party will deliver notices for legal service or material breach in writing and by a courier service or recorded delivery: for Supplier, to its registered office address as set out on an Order; for Customer, to its address as set out in an Order. Any notices for any other matter may be delivered in accordance with the previous sentence or by email. If sent by email, Customer will send the notice to legal@brandwatch.com with Customer's account manager in copy, and Supplier will send the notice to Customer via an email address listed in any Order. Notice sent by recorded delivery is deemed received three business days after posting; email notice is deemed received 24 hours after it is sent.

9.8. **Assignment:** Neither party may assign, transfer, charge or otherwise encumber, create any trust over, or deal in any manner with this Agreement, or any right, benefit, or interest under it, nor transfer or novate (each an "**Assignment**") without the other party's prior written consent. Any Assignment without the other party's prior written consent is void. Notwithstanding the previous sentence, either party may make an Assignment without the other party's prior written consent (but with notice to the other party) to a successor pursuant to a merger, acquisition (including of all or materially all assets of a party), change in control, change in name, or similar transaction.

9.9. **Anti-bribery:** The parties will: (a) comply with all Applicable Law relating to anti-bribery or anti-corruption; and (b) promptly report to the other party if it receives a request for undue advantage.

9.10. **Entire agreement:** This Agreement is the exclusive statement of agreement and understanding between the parties, and any term or condition stated in a Customer purchase order or portal is void. This Agreement excludes all prior or contemporaneous proposals, understandings, agreements, or representations about its subject matter. Each party agrees that in entering into this Agreement, neither party relies on, and will have no remedy in respect of, any proposal, understanding, agreement, or representation other than as set out in this Agreement. Any waiver, addition, amendment or other modification of this Agreement must be made in writing and signed by both parties.

9.11. **Compliance.** Customer's and its Users use of the Services is subject to compliance with applicable export control and trade sanctions laws, rules and regulations. By using the Services, Customer represents and warrants that neither Customer nor any of its Users: (a) is identified on, or owned or controlled by or acting on behalf of a person identified on, any Canadian, U.S., UK, EU, or other applicable prohibited party list; and (b) is located or resident in a country or territory that is or becomes subject to an embargo by Canada, the U.S., the UK, the EU, or other applicable jurisdictions.

9.12. **Order of priority:** If there is a conflict of this Agreement, the order of priority is: (1) sections 5.3, 7 and 9.10 of these terms and conditions; (2) an Order; (3) any service appendices; and (4) these terms and conditions. The English version of these terms and conditions prevails over any non-English version.

9.13. **Third party rights:** Other than as set out in sections 8.1 and 8.2, this Agreement does not confer any rights in favour of any person, other than the parties to this Agreement. However, the rights of Indemnitees set out in sections 8.1 and 8.2 may only be enforced by the relevant party to this Agreement.

9.14. **Choice of Language:** The parties confirm that it is their express wish that this Agreement, as well as any other documents relating to this Agreement, including notices, schedules and authorizations, have been and shall be drawn up in the English language only. Les parties aux présentes confirment leur volonté expresse que cette convention, de même que tous les documents s'y rattachant, y compris tous avis, annexes et autorisations s'y rattachant, soient rédigés en langue anglaise seulement.

9.15. **Governing law and jurisdiction:** Each party agrees to the applicable governing law and jurisdiction based on Customer's domicile, as follows:

| If Customer is domiciled in: | The governing law is: | The courts that have exclusive jurisdiction are in: |
|---|---|---|
| Any country or geographic region not listed below | English | England |
| Australia or New Zealand | New South Wales | Sydney |
| Countries in Asia or Asia Pacific | Singapore | Singapore |
| Canada | Ontario | Toronto |
| Denmark | Danish | Copenhagen |
| France | French | Paris |
| Germany | German | Berlin |
| Portugal | Portuguese | Lisbon |
| Sweden | Swedish | Stockholm |

| If Customer is domiciled in: | The governing law is: | The courts that have exclusive jurisdiction are in: |
|---|---|---|
| U.S. or Mexico | New York | New York City |

Notwithstanding the above, New York General Obligation Law section 5-903 shall not apply to this Agreement. Any attempts to invoke said section shall be deemed null and void.

## 10. Archived terms and conditions

- Service T&Cs  Live from 15 October 2022 to 20 April 2023
- Service T&Cs – Live from 9 August, 2021 to 15 October 2022
- Service T&Cs – Live from 15 April, 2019 to 8 August, 2021 [pdf]
- Service T&Cs – Live from 3 August, 2018 to 14 April, 2019 [pdf]
- Service T&Cs – Live from 30 April, 2017 to 3 August, 2018 [pdf]
- Service T&Cs – Live from 31 March, 2016 to 30 April, 2017 [pdf]
- Service T&Cs – Live from 1 July, 2015 to 31 March, 2016 [pdf]
- Enterprise T&Cs (US) – Live until 1 July, 2015 [pdf]
- Enterprise T&Cs (UK) – Live until 1 July, 2015 [pdf]
- Brandwatch for Agencies T&Cs (UK) – Live until 1 July, 2015 [pdf]

**Falcon.io**

- Falcon.io General Terms and Conditions – Live from 27 May, 2021 to 9 August, 2021  [pdf]
- Falcon.io General Terms and Conditions – Live from 1 February, 2021 to 27 May, 2021 [pdf]
- Falcon.io General Terms and Conditions – Live from 9 October, 2020 to 1 February, 2021 [pdf]
- Falcon.io General Terms and Conditions – Live from 3 April, 2020 to 9 October, 2020 [pdf]
- Falcon.io General Terms and Conditions – Live from 25 November, 2019 to 3 April, 2020 [pdf]
- Falcon_Social_Terms_EU – Live from 3 May, 2016 to 25 November, 2019 [pdf]
- Falcon_Social_Terms_Americas – Live from 3 May, 2016 to 25 November, 2019

### Solutions

Consumer Intelligence

Social Media Management

Influencer Marketing

APIs

### Brandwatch for Education

Students

Classrooms

Research

Administration

### Resources

Blog

Reports

Case Studies

Guides

Webinars

### Company

About Us

Careers

Contact Us

Press

Partnerships

Environmental Commitment

Awards

Our Evolution

### Legal

Legal Hub

User Privacy Statement

Author Privacy Statement

Terms & Conditions

Information Security

Gender Pay Gap Report

Modern Slavery Act Statement

Do Not Sell My Personal Data

### More

Customer Support

Help Center

Platform Status

Data and Network Coverage

Services

### The Brandwatch Bulletin

All our latest data stories and insights straight to your inbox

Sign up

English

Copyright © 2023 Brandwatch. All Rights Reserved. 1st Floor, Sovereign House, Church Street, Brighton, BN1 1UJ
Company number: 03898053 | VAT number: 754 750 710

