EXHIBIT C



| | | |
|---|---|---|
| **Order #** | Q-28791-1 | Runtime Collective Limited (trading as Brandwatch). |
| **Order Created** | 11-Jan-2023 14:29 | Sovereign House, Church Street |
| **Expires On** | 25-Jan-2023 | Brighton, East Sussex BN1 1UJ |
| | | United Kingdom |
| | | +44 (0) 1273 448 800 |

| **Sold To** | | **Bill To** | |
|---|---|---|---|
| **Customer Name** | Stichting European Climate Foundation | **Customer Name** | Stichting European Climate Foundation |
| **Contact Name** | Almuth Wardemann | **Contact Name** | Almuth Wardemann |
| **Address** | Riviervismarkt 5, 2513 AM Den Haag, , Netherlands | **Address** | Riviervismarkt 5, 2513 AM Den Haag, , Netherlands |
| **Email** | stratcomms.ops@europeanclimate.org | **Email** | stratcomms.ops@europeanclimate.org |

| **Order Information** | | | |
|---|---|---|---|
| **Services Start Date** | 26-Jan-2023 | **PO Required (Y/N)** | |
| **Initial Term** | 12.00 months | | |
| **Invoice Frequency** | Annual | **PO Number** | |
| **Payment Terms** | Net 30 from date of invoice | | |
| | | **EU VAT Number** | |

This Order auto-renews for successive periods equal to the longer of: (1) 12 months or (2) the initial Term, unless a party gives at least 90 days written notice to terminate the Order prior to the expiration of the then-current term.
For each automatic renewal period, the fees for the services set forth above shall automatically increase by 10.000%

| Services Description | Quantity | Units | Description | Fee Type | Total Fees over Initial Term |
|---|---|---|---|---|---|
| Brandwatch Premium Research | 30.00 | Queries | Access to the following modules: Brandwatch Consumer Research Features: Configurable Dashboards, Dashboard Exports, Signals and Alerts, Search Within, Basic Smart Reporting, Rules, Categories, Brightview machine learning, Basic API (Metrics and Analysis) 2 year query save history Data per query saved for rolling 2 year period Up to 50 Twitter channel queries Up to 50 Facebook and Instagram channel queries Users: 20 Users + unlimited view-only Users Mentions exports (CSV) up to 10,000 mentions per day | Recurring | GBP 56,000.00 |
| Mentions Exports (Upgrade to 100k per day) | 1.00 | Licence | Remove mentions export cap in the Premium Package, allowing a total of 100k exports per day into CSV (up to 50,000 Twitter mentions) | Recurring | GBP 4,800.00 |



| Services Description | Quantity | Units | Description | Fee Type | Total Fees over Initial Term |
|---|---|---|---|---|---|
| Influencer Discovery | 1.00 | Package | Access to the following module: Influencer Discovery<br>Users: 3 Lite-Users with access to Brandwatch Influence modules only. Access also included for any Users of Brandwatch Standard, Pro, Premium, Enterprise<br>Features: Search for influencers on YouTube, Instagram and TikTok with filters such as follower size, growth, engagement rate, audience demographics, brand affinity, keywords, lookalikes. Generate estimated influencer data such as contact details, audience demographics, lookalikes, sponsored posts. Exportable in PDF<br>500 monthly searches (up to 100 results per search)<br>50 monthly reports | Recurring | GBP 4,800.00 |
| | | | | **TOTAL:** | GBP 65,600.00 |

**Terms and Conditions**

This Agreement consists of this Order, the Listening Service Appendix ("LSA") which is available at https://www.brandwatch.com/legal/listening-service-appendix/, the Management Service Appendix ("SA") which is available at https://www.brandwatch.com/legal/management-service-appendix/, and the Master Subscription Agreement ("MSA") (dated 15 October 2022) which is available at https://www.brandwatch.com/legal/terms-and-conditions/, each of which are expressly incorporated into this Order. This Order is an offer by Brandwatch to provide Customer with the Services. By signing this Order, Customer agrees that it has read and understood the LSA, SA and MSA. Capitalised terms used but not defined in this Order are defined elsewhere in this Agreement. The parties agree to be bound.

Stichting European Climate Foundation

Name   Mayta Villafane

Signature

Job Title   ECF COO

Date   20/01/2023



**Master Subscription Agreement**

## 1. Definitions

**"Affiliates"** means with respect to a party, the entities within its corporate group that are under common control.

**"Agreement"** means these terms and conditions, any service appendices attached to an Order, and any Order.

**"Applicable Law"** means any legally binding obligation on a party, including statutes, rules, regulations, codes, court rulings, or any other binding requirement.

**"Claim"** means any claim, action, suit, dispute, or proceeding.

**"Confidential Information"** means any information that a party discloses to the other party that is marked as confidential or that a reasonable person would understand to be confidential (including trade secrets).

**"Customer"** means the party identified as the customer on an Order.

**"Customer Data"** means data that Customer makes available to Supplier for the purpose of Supplier processing that data on Customer's behalf.

**"Indemnitees"** means with respect to a party, that party, its Affiliates, and its own and its Affiliates' own directors, officers, employees, agents, and other representatives.

**"Losses"** means any losses, damages, liabilities, awards, and costs (including court costs and reasonable attorneys' fees) related to a Claim.

**"Order"** means an ordering document that sets out the products or services that Supplier or a third party is to provide to Customer.

**"Services"** means the services that Supplier provides to Customer as set out on an Order.

**"Supplier"**, **"we"** **"us"**, or **"our"** means the selling party on an Order.

**"Supplier Data"** means any data in Supplier's database that Supplier uses in providing the Services, excluding Customer Data.

**"Term"** is defined in section 6.

**"Resold Services"** means the products or services that a third party is to provide to Customer as set out on an Order.

**"User"** means an individual that Customer (directly or indirectly) has authorised to use the Services and/or the Resold Services.

## 2. Services

2.1.    **Services:** This Agreement sets out the terms of the contract between Customer and Supplier and the Services that Supplier provides, including any Supplier Data that Customer accesses.

2.2.    **Responsibility:** During the Term, Supplier will: (a) provide the Services with reasonable skill and care; (b) not make a material adverse change to the functionality of the Services; (c) provide the Services in material accordance with any descriptions of the Services on an Order; and (d) process any personal data in accordance with the Data Processing Addendum available at https://www.brandwatch.com/legal/data-protection-addendum/.Except as expressly stated in section 2.2, all other warranties, conditions, and representations, whether express or implied, are excluded, subject to Applicable Law.

2.3.     **Resold Services:** Any Services and Resold Services will be set out on an Order. Where an Order specifies Services and Resold Services: (i) Supplier will provide Services to Customer subject to the terms of this Agreement; and (ii) the third party will provide Resold Services to Customer subject to the terms of the separate contract in place between Customer and the third party. Supplier is only responsible for its own Services and not any Resold Services.

## 3.   Use of the Services

3.1.     **Responsibility:** Customer: (a) is responsible for its compliance with this Agreement and will procure that each User complies with the terms of this Agreement as if that User were Customer; and (b) has the right, title, permissions, and interest in the Customer Data to make it available to Supplier for processing.

3.2.     **Restrictions:** Customer will not: (a) sell, resell, license, sublicense, distribute, or otherwise make the Services (or the results of the Services, including Supplier Data) available to anybody other than its Users for their own internal use, unless stated otherwise on an Order; (b) subject to Applicable Law, attempt to reverse-compile, disassemble, reverse engineer, or otherwise reduce to human-perceivable form any part of the Services; (c) use the Services or any Supplier Data in a manner that violates Applicable Law, including Applicable Law about data protection, privacy, or information security; or (d) interfere with or disrupt the performance of the Services, including spamming, hacking, and violating Supplier's API rate limits.

3.3.     **Password protection:** Each party will use reasonable efforts to ensure that any User IDs and passwords to use Services are kept confidential. Subject to Applicable Law, each party will promptly notify the other party upon discovery if the security of a User ID or password may be or is compromised.

## 4.   Fees

4.1.     **Fees:** Customer will pay the fees for the Services set out in an Order. The fees for the Services are exclusive of legally applicable taxes, levies, duties, or similar governmental assessments, including goods and services, value-added, withholding, and sales taxes. Customer will provide Supplier with the information it reasonably requires to send an invoice. All fees are subject to an annual price increase stated on an Order and invoiced annually in advance.

4.2.     **Orders and Resold Services:** Customer will pay: (a) Supplier the fees for the Services and any Resold Services set out on an Order which Supplier sends to Customer (for Resold Services, Supplier collects the fees for Resold Services on the third party's behalf); and (b) the fees for the Services set out on an Order that a third party sends to Customer, and in such case, the third party collects the amounts due to Supplier on Supplier's behalf.

## 5.   Confidential Information and intellectual property

5.1.     **Confidential Information:** Confidential Information does not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the disclosing party; (b) the receiving party knew prior to its disclosure by the disclosing party without breach of any obligation owed to the disclosing party; (c) a third party made available to the receiving party without breach of any obligation owed to the disclosing party; or (d) the receiving party independently developed.

5.2.     **Keep in confidence:** The receiving party will keep the Confidential Information of the disclosing party confidential for the Term and for two years after the end of the Term, provided that any trade secrets within Confidential Information will remain confidential until they are no longer trade secrets. The receiving party will only use the disclosing party's Confidential Information for performing its obligations under this Agreement or using the Services. Nothing in this section 5 prevents the receiving party from disclosing the disclosing party's Confidential Information: (a) to its Affiliates, data licensors, third party vendors, legal advisers, accountants, potential investors, or other professional advisers where required (collectively, "**Permitted Recipients**"), provided that the receiving party remains responsible for its obligations and for the Permitted Recipients' use and disclosure of the Confidential Information; or (b) if required to disclose it under

Applicable Law, provided that the receiving party will inform the disclosing party of the disclosure requirement, if legally permitted, as soon as reasonably practicable.

5.3.    **Intellectual property rights:** Supplier or its licensors owns all intellectual property rights in the Services and the Supplier Data. Customer owns all intellectual property rights in the Customer Data. Other than as set out elsewhere in this Agreement, Customer is not granted any rights to Supplier's intellectual property rights.

5.4.    **User feedback:** Supplier may use, incorporate into the Services, or otherwise exploit any suggestion, feature request, recommendation, correction, or other feedback ("**Feedback**") that Customer or its Users provide related to the use of the Services.

## 6.   Term and termination

6.1.    **Term:** This Agreement begins when it is signed by the parties or agreed to via an Order, whichever is earlier, and it continues until all Orders have expired or been terminated in accordance with the terms of this Agreement ("**Term**").

6.2.    **Mutual termination:** A party may terminate this Agreement at any time on written notice to the other party if: (a) the other party is in material breach and, if remediable, the breach is not remedied within 30 days of being notified in writing of the breach; or (b) the other party begins insolvency proceedings, becomes the subject of a petition in liquidation, or any other proceeding relating to insolvency, liquidation, bankruptcy, or assignment for the benefit of creditors (including similar proceedings under Applicable Law); or (c) the other party makes an arrangement with its creditors related to concerns about insolvency (including similar proceedings under Applicable Law).

6.3.    **Accrued rights and survival:** A party's accrued rights and liabilities are not impacted by termination of this Agreement. Sections 1, 3.2, 4, 5, 6, 7 and 9 survive termination of this Agreement. At termination or expiration, all licenses granted by either party shall terminate.

## 7.   Exclusions and limitations of liability

**\*\*\*Please read sections 7.1-7.3 as they exclude/limit each party's liability\*\*\***

7.1.    **What the parties are liable for:** Nothing in this Agreement excludes or limits a party's liability for any Losses that cannot be excluded or limited under Applicable Law (including fraud). If this Agreement is governed by German law, then the Losses that cannot be excluded or limited under Applicable Law are fraud, wilful misconduct, gross negligence, or damages resulting from death, physical injury, breach of cardinal duties or damages to a person's health.

7.2.    **Losses a party is liable for:** Subject to sections 7.1 and 7.3, a party is only liable for Losses that the other party suffers as a direct and reasonably foreseeable result of a party's breach of its obligations under this Agreement. Other than as set out in section 7.1 and the previous sentence, neither party will be liable to the other party for any other Losses of any kind (including lost profits or consequential, incidental, punitive, special or indirect damages related to this Agreement, whether under theory of contract, tort, product liability or otherwise, regardless of whether such a person or entity was advised of such potential damage).

7.3.    **Liability cap:** Subject to section 7.1, each party's total liability, however arising, is capped at the amounts set out in the table below.

| Fees for the Services in 12 months preceding date of Claim | Liability cap |
|---|---|
| Less than $100,000 | 110% of the fees for Services |
| $100,001 - $1,000,000 | Two times the fees for Services |
| $1,000,001 or greater | Three times the fees for Services |

**8. Indemnity**

8.1.    **Supplier's indemnity:** Supplier will indemnify Customer's Indemnitees against Losses arising out of a third party Claim against Customer that Customer's use of the Services infringes the intellectual property rights of a third party. The indemnity does not apply if the Claim is based on Customer's use of the Services in violation of its obligations under this Agreement. Where there is an indemnified Claim, Supplier: (i) may secure the right for Customer to continue using the Services; or (ii) replace or modify the Services so that they become non-infringing. If (i) and (ii) are not reasonably available, Supplier may terminate the infringing Services on 30 days' written notice to Customer and provide a pro rata refund of any prepaid fees for the terminated Services that were not provided.

8.2.    **Customer's indemnity:** Customer will indemnify Supplier's Indemnitees against Losses arising out of a third-party Claim against Supplier that Customer Data infringes the intellectual property rights of a third party.

8.3.    **Indemnity process:** The indemnified party will give the indemnifying party prompt written notice of any Claim and sole control to defend or settle the Claim. The indemnified party will use its commercially reasonable efforts to mitigate its Losses.

**9. General**

9.1.    **Privacy:** Supplier processes User data in accordance with its Privacy Statement available at https://www.brandwatch.com/legal/user-privacy-policy/.

9.2.    **Rules of interpretation:** The words "include" and "including" are deemed to have the words "without limitation" following them; and references to "will" have the same meaning as "shall".

9.3.    **Force Majeure:** Neither party is liable for a breach caused by an event beyond its reasonable control, including a natural disaster, disease outbreak, war, riot, terrorist action, civil commotion, malicious damage, government action, industrial action or dispute, fire, flood, storm, or failure of third party telecommunications services.

9.4.    **Publicity:** Neither party will publicly disclose the relationship between the parties or the Services provided under this Agreement without the other party's prior written consent.

9.5.    **Invalidity:** If any term of this Agreement is found invalid, illegal or unenforceable, the rest of the Agreement remains in effect.

9.6.    **No waiver:** Either party's delay or failure to enforce a term of the Agreement is not a waiver of that right and does not prevent that party from later enforcing that term or any other term.

9.7.    **Notice:** Each party will deliver notices for legal service or material breach in writing and by a courier service or recorded delivery: for Supplier, to its registered office address as set out on an Order; for Customer, to its address as set out in an Order. Any notices for any other matter may be delivered in accordance with the previous sentence or by email. If sent by email, Customer will send the notice to legal@brandwatch.com with Customer's account manager in copy, and Supplier will send the notice to Customer via an email address listed in any Order. Notice sent by recorded delivery is deemed received three business days after posting; email notice is deemed received 24 hours after it is sent.

9.8.    **Assignment:** Neither party may assign, transfer, charge or otherwise encumber, create any trust over, or deal in any manner with this Agreement, or any right, benefit, or interest under it, nor transfer or novate (each an "**Assignment**") without the other party's prior written consent. Any Assignment without the other party's prior written consent is void. Notwithstanding the previous sentence, either party may make an Assignment without the other party's prior written consent (but with notice to the other party) to a successor pursuant to a merger, acquisition (including of all or materially all assets of a party), change in control, or similar transaction.

9.9.    **Anti-bribery:** The parties will: (a) comply with all Applicable Law relating to anti-bribery or anti-corruption; and (b) promptly report to the other party if it receives a request for undue advantage.

9.10.    **Entire agreement:** This Agreement is the exclusive statement of agreement and understanding between the parties. This Agreement excludes all prior or contemporaneous proposals, understandings, agreements, or representations about its subject matter. Each party agrees that in entering into this Agreement, neither party relies on, and will have no remedy in respect of, any proposal, understanding, agreement, or representation other than as set out in this Agreement. Any waiver, addition, amendment or other modification of this Agreement must be made in writing and signed by both parties.

9.11.    **Compliance.** Customer's and its Users use of the Services is subject to compliance with applicable export control and trade sanctions laws, rules and regulations. By using the Services, Customer represents and warrants that neither Customer nor any of its Users: (a) is identified on, or owned or controlled by or acting on behalf of a person identified on, any Canadian, U.S., UK, EU, or other applicable prohibited party list; and (b) is located or resident in a country or territory that is or becomes subject to an embargo by Canada, the U.S., the UK, the EU, or other applicable jurisdictions.

9.12.    **Order of priority:** If there is a conflict of this Agreement, the order of priority is: (1) sections 7 and 9.10 of these terms and conditions; (2) an Order; (3) any service appendices; and (4) these terms and conditions. The English version of these terms and conditions prevails over any non-English version.

9.13.    **Third party rights:** Other than as set out in sections 8.1 and 8.2, this Agreement does not confer any rights in favour of any person, other than the parties to this Agreement. However, the rights of Indemnitees set out in sections 8.1 and 8.2 may only be enforced by the relevant party to this Agreement.

9.14.    **Choice of Language:** The parties confirm that it is their express wish that this Agreement, as well as any other documents relating to this Agreement, including notices, schedules and authorizations, have been and shall be drawn up in the English language only.  Les parties aux présentes confirment leur volonté expresse que cette convention, de même que tous les documents s'y rattachant, y compris tous avis, annexes et autorisations s'y rattachant, soient rédigés en langue anglaise seulement.

9.15.    **Contracting entity, governing law and jurisdiction:** Each party agrees to the applicable governing law and jurisdiction based on Customer's domicile, as follows:

| If Customer is domiciled in: | The governing law is: | The courts that have exclusive jurisdiction are in: |
|---|---|---|
| Any country or geographic region not listed below | English | England |
| Australia or New Zealand | New South Wales | Sydney |
| Countries in Asia or Asia Pacific | Singapore | Singapore |
| Canada | Ontario | Toronto |
| Denmark | Danish | Copenhagen |
| France | French | Paris |
| Germany | German | Berlin |
| Portugal | Portuguese | Lisbon |
| Sweden | Swedish | Stockholm |
| U.S. or Mexico | New York | New York City |