Esha Bhandari (*pro hac vice application pending*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org
*Attorney for* Amici Curiae

Matthew T. Cagle (SBN 286101)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 293-6336
mcagle@aclunc.org
*Attorney for* Amici Curiae

Cindy Cohn (SBN 145997)
Andrew Crocker (SBN 291596)
Aaron Mackey (SBN 286647)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
cindy@eff.org
*Attorneys for* Amicus Curiae *Electronic Frontier Foundation*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| X CORP.,<br><br>                    Plaintiff,<br><br>         v.<br><br>CENTER FOR COUNTERING DIGITAL HATE, INC., et al.,<br><br>                    Defendants. | Case No. 3:23-CV-03836-CRB<br><br>BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, ELECTRONIC FRONTIER FOUNDATION, AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF DEFENDANT CENTER FOR COUNTERING DIGITAL HATE, INC. |

Case No. 3:23-CV-03836-CRB
BRIEF OF *AMICI CURIAE* IN SUPPORT OF
DEFENDANT CENTER FOR COUNTERING DIGITAL HATE, INC.

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. IDENTITY AND INTEREST OF *AMICI CURIAE* ........................................... 1

III. SUMMARY OF ARGUMENT ............................................................................. 3

IV. ARGUMENT ........................................................................................................ 4

    A. Contracts that Chill or Stifle Speech on Matters of Public Interest Are Void for Public Policy in California. ..................................................................... 4

        i. California law establishes a strong void for public policy defense to contract enforcement. ................................................................... 4

        ii. The First Amendment, California Constitution, and California anti-SLAPP law enshrine a firm public policy of protecting speech on matters of public interest. .............................................................. 5

    B. Researchers and Journalists Use Scraping to Enable Speech in the Public Interest and Hold Power to Account. ...................................................... 7

    C. Allowing X Corp. to Enforce Its Term of Service Prohibiting Scraping Against Researchers Like CCDH US Would Be Contrary to California's Public Policy. 11

V. CONCLUSION ................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Blatty v. N.Y. Times Co.*, 728 P.2d 1177 (Cal. 1986) ................................................................. 6, 13

*Cariveau v. Halferty*, 99 Cal. Rptr. 2d 417 (Cal. Ct. App. 2000) ......................................................... 5

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) ................................................................................. 5

*Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390 (9th Cir. 1991) ..................................... 5

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ............................................. 2

*Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97 (Cal. 1986) .............................................................. 13, 14

*Geiser v. Kuhns*, 515 P.3d 623 (Cal. 2022) ........................................................................................ 6

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .............................................................................. 5

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ................................................................ 3, 7

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) .................................................. 2, 10

*hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944 (N.D. Cal. 2022) ......................................... 10

*hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) ......................................................... 2

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) ............................................................................ 13

*McPhearson v. Michaels Co.*, 117 Cal. Rptr. 2d 489 (Cal. Ct. App. 2002) ........................................ 5

*Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092 (Cal. 1988) .................................................................. 13

*Muschany v. United States*, 324 U.S. 49 (1945) ................................................................................ 4

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................................... 3, 5, 12

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .............................................................. 13

*Navellier v. Sletten*, 52 P.3d 703 (Cal. 2002) ..................................................................................... 7

*Olson v. Doe*, 502 P.3d 398 (Cal. 2022) ............................................................................................. 7

*Packingham v. North Carolina*, 582 U.S. 98 (2017) .................................................................... 8, 13

*Paul v. Watchtower Bible Tract Soc'y*, 819 F.2d 875 (9th Cir. 1987) .......................................... 13

*People v. Glaze*, 614 P.2d 291 (Cal. 1980) ........................................................................... 3, 6

*Reader's Digest Ass'n v. Superior Ct.*, 37 Cal. 3d 244 (Cal. 1984) ............................................ 13

*S.C. State Conf. of NAACP v. Kohn*, No. CV 3:22-01007-MG2023, 2023 WL 144447 (D.S.C. Jan. 10, 2023) ............................................................................................................. 1

*Safeway Stores, Inc. v. Retail Clerks Int'l Ass'n*, 261 P.2d 721 (Cal. 1953) ................................. 5

*Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020) ................................................................... 1

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ...................................................... 4, 9, 11

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) ....................................................................... 7

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 425 P.3d 1 (Cal. 2018) ............. 3, 4

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ..................................................................................... 13

*Timothy W. v. Julie W.*, 301 Cal. Rptr. 3d 294 (Cal. Ct. App. 2022) ............................................ 7

*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) ............................................................ 2, 14

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) ............................................................... 2

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ................................................................... 2

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ............................................................... 1, 2

**Statutes**

Cal. Civ. Code § 1667 (West 2023) .......................................................................................... 3, 4

Cal. Civ. Proc. Code § 425.16 (West 2023) ......................................................................... 6, 7, 12

**Other Authorities**

Alan Luscombe, Kevin Dick & Kevin Walby, *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023 (2022) .................................................................. 8

Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372 (2018) ................................................................................ 8, 9

Benjamin Edelman et al., *Racial Discrimination in the Sharing Economy: Evidence From a Field Experiment*, 9 Am. Econ. J. Applied Econ. 1 (2017). ........................................... 8

Brian X. Chen, *Tech Fix: This Is a Reminder that You're Probably Oversharing on Venmo*, N.Y. Times (Aug. 9, 2023) ........................................................................ 11

Emillie de Keulenaar, João C Magalhães & Bharath Ganesh, *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023) ........................................................................ 9

Hang Do Thi Duc, *Public by Default* (July 2018) ........................................................... 9

Katie Benner, Glenn Thrush & Mike Isaac, *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019) ........................................... 9

Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021) ................................................................ 8, 9

Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Computer Interaction 1 (2019) ........................................................................ 8

Sam Levin & Johana Bhuiyan, *Exclusive: LAPD Partnered with Tech Firm that Enables Secretive Online Spying*, Guardian (Nov. 17, 2021) ........................................... 11

Samuel Levine, Letter from Acting Director of the Bureau of Consumer Protection Samuel Levine to Facebook (Aug. 5, 2021) ........................................... 10

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023) ........................................... 14

*Terms of Service*, X (effective Sept. 29, 2023) ........................................... 4

## I. INTRODUCTION

Plaintiff X Corp. attempts to disguise a nonviable defamation claim as a breach of contract claim to retaliate against a nonprofit that provided the public with information critical of X Corp. *Amici* write in support of Defendant Center for Countering Digital Hate, Inc. (CCDH US) in asking this Court to grant CCDH US's motion to dismiss and motion to strike X Corp.'s first cause of action for breach of contract. This dispute has implications beyond the parties to this case. Allowing X Corp. to succeed here will not only hurt CCDH US's ability to continue research in the public interest but will also create significant dangers for others seeking to use basic digital tools—like scraping—to provide the public with insight into the powerful platforms that we all now rely upon for news and information.

## II. IDENTITY AND INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles of liberty and equality embodied in the Constitution. The ACLU was counsel for the plaintiffs in *Sandvig v. Barr*, a lawsuit claiming researchers' First Amendment right to engage in digital journalism techniques to study online platforms. 451 F. Supp. 3d 73 (D.D.C. 2020). The American Civil Liberties Union Foundation of Northern California is an affiliate of the national ACLU. The ACLU and its affiliates share a longstanding commitment to freedom of speech and digital rights and have served as counsel or *amicus curiae* in multiple cases concerning the rights of academic researchers and data journalists to conduct critical investigative work about online platforms that is essential to inform the public. *See, e.g.*, *Van Buren*, 141 S. Ct. 1648 (*amicus*); *S.C. State Conf. of NAACP v. Kohn*, No. CV 3:22-01007-MG2023, 2023 WL 144447 (D.S.C. Jan. 10, 2023) (counsel).

The Electronic Frontier Foundation (EFF) is a nonprofit, member-supported civil liberties organization working to protect rights in the digital world. With nearly 30,000 active donors and dues-paying members, EFF represents the interests of technology users in court cases and broader policy debates surrounding the application of law in the digital age. EFF's interest in this case is in the principled and fair application of laws, including terms of service and computer crime laws, to online activities like research and journalism. Additionally, as part of its Coders' Rights Project, EFF offers pro bono legal services to researchers engaged in cutting-edge exploration of technology whose work in the public interest may be unjustly chilled by overzealous application of contract law. EFF has also served as counsel or *amicus curiae* in key cases addressing the application of computer crime statutes, including *Van Buren v. United States*, 141 S. Ct. 1648 (2021) (*amicus*); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) (*amicus*); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) (*amicus*); *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) ("Nosal I") (en banc) (*amicus*); *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) ("Nosal II") (*amicus*); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) (*amicus*); *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) (*amicus*).

The Knight First Amendment Institute at Columbia University (Knight Institute or Institute) is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is particularly committed to illuminating the forces that are shaping public discourse online. It represents journalists and researchers who fear legal liability for violating the terms of service of Facebook and other major social media platforms in the course of

studying the ways in which these platforms influence public discourse. In an effort to mitigate these fears, the Knight Institute has proposed that Congress establish a legislative safe harbor for privacy-preserving research that is in the public interest.[1]

### III.     SUMMARY OF ARGUMENT

The Court should hold that the term of service prohibiting scraping X Corp.'s platform cannot be enforced against CCDH US as void for public policy because this case involves critical speech in the public interest.[2] Courts cannot, and should not, allow private companies like X Corp. to wield breach of contract claims as a weapon to punish criticism and to secure damages stemming solely from claimed reputational harm resulting from that criticism.

In California, a contract is unenforceable if it is contrary to public policy. *See Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 425 P.3d 1, 8 (Cal. 2018); Cal. Civ. Code § 1667(2) (West 2023). The First Amendment, California Constitution, and California anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) law enshrine a firm public policy of protecting speech on matters of public interest. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (requiring "actual malice" for public officials pleading defamation); *People v. Glaze*, 614 P.2d 291, 293 n.2 (Cal. 1980) (deeming text of article I, section 2 of the California Constitution "more protective of speech than the First Amendment"); *Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010) (construing the California anti-SLAPP law broadly in light of its "stated purpose to encourage participation in matters of public importance or consequence"). Researchers

---

[1] *Amici* would like to thank Rebecca Delaney and Maeve O'Brien, law students in NYU's Technology Law and Policy Clinic, for their significant contributions to this brief.

[2] *Amici* note that whether CCDH US in fact breached X Corp.'s term prohibiting scraping is contested. *See* Defs. CCDH US & CCDH UK's Mot. Dismiss, Anti-SLAPP Mot. Strike & Mem. P. & A. Supp. 10–13, ECF No. 47. *Amici* take no position on that issue, and argue that the term should be held void for public policy even if the Court finds that CCDH US breached the term.

and journalists scrape public information to enable speech in the public interest, and, in the context of public interest research, such scraping is part and parcel of the subsequent speech it produces. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018) (finding, in a case involving public interest research, that "scraping plausibly falls within the ambit of the First Amendment").

Where, as here, a party attempts to use an anti-scraping contract term to bypass the high standard for defamation claims and circumvent public policy protections for speech that contributes to public discourse, a court should decline to enforce the contract term as void for public policy.

## IV. ARGUMENT

### A. Contracts that Chill or Stifle Speech on Matters of Public Interest Are Void for Public Policy in California.

#### i. California law establishes a strong void for public policy defense to contract enforcement.

Under California law, a contract is unlawful, and therefore unenforceable, if it is contrary to public policy. *Sheppard, Mullin, Richter & Hampton, LLP*, 425 P.3d at 8.[3] California has codified its broad void for public policy defense to contract enforcement, which applies not only to contracts that are contrary to express law, but also "contrary to the policy of express law, though not expressly prohibited." Cal. Civ. Code § 1667(2) (West 2023).[4] Any provision that "tends to undermine [a] sense of security for individual rights, whether of personal liberty or private property

---

[3] *Amici* assume that California law applies because X Corp.'s terms of service include a choice of law clause that designates that California law will govern any disputes that arise between X Corp. and its users. *Terms of Service*, X, https://twitter.com/en/tos (effective Sept. 29, 2023).

[4] Even applying the stricter void for public policy standard at federal common law, X Corp.'s term prohibiting scraping is contrary to "definite indications in the law of the sovereignty," namely, the First Amendment, the California Constitution, and California's anti-SLAPP law. *Muschany v. United States*, 324 U.S. 49, 66 (1945).

. . . is against public policy." *Safeway Stores, Inc. v. Retail Clerks Int'l Ass'n*, 261 P.2d 721, 726 (Cal. 1953). Courts interpreting California law have refused to enforce a variety of contract provisions on public policy grounds, including ones that circumscribe a party's ability to speak freely on matters of public interest. *See, e.g.*, *Cariveau v. Halferty*, 99 Cal. Rptr. 2d 417, 421–24 (Cal. Ct. App. 2000) (refusing to enforce agreement not to report securities violation to investigative agency); *McPhearson v. Michaels Co.*, 117 Cal. Rptr. 2d 489, 493 (Cal. Ct. App. 2002) (finding that an agreement not to testify would be contrary to public policy); *cf. Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1397–99 (9th Cir. 1991) (refusing to enforce agreement not to run for public office).

      **ii.** **The First Amendment, California Constitution, and California anti-SLAPP law enshrine a firm public policy of protecting speech on matters of public interest.**

So great is the value of open discourse on matters of public concern—and so grave is the risk that undue self-censorship could chill such expression—that the U.S. Supreme Court has been "especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Accordingly, the Court has interpreted the First Amendment to impose an increasingly high bar for defamation claims, a departure from the tort's strict liability roots at common law. *See, e.g.*, *Sullivan*, 376 U.S. at 279–80 (requiring "actual malice" for public officials pleading defamation); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162, 164 (1967) (Warren, J., concurring) (applying *Sullivan'*s "actual malice" standard to public figures); *Gertz,* 418 U.S. at 345–47 (incorporating into the public figure doctrine those who voluntarily "thrust themselves" into the vortex of public opinion and establishing that private individuals claiming defamation must prove at least negligence).

The California Supreme Court has repeatedly noted that article I, section 2 of the California Constitution creates a more expansive zone of protection than its federal analogue. *See*, *e.g.*, *Glaze*, 614 P.2d at 293 n.2 (deeming the provision "more protective of speech than the First Amendment"); *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986) (same). Though the federal Constitution states only that Congress cannot legislate to constrain speech, its California counterpart couches protection of speech as an affirmative right for "[e]very person." Cal. Const. art. I, § 2(a). But even if the California Constitution's protection for freedom of speech were deemed coextensive with the federal First Amendment, its inclusion in the state constitution provides an additional, express source of public policy protecting speech in the public interest.

Finally, California's anti-SLAPP law manifests the state's decisive public policy in favor of protecting speech on matters of public interest, and confirms that the policy animating the First Amendment and article I, section 2 should be considered in disputes between private parties. The statute allows defendants to move to strike complaints against them if they are sued for "any act . . . in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b) (West 2023). Among the activities protected is any conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with "an issue of public interest," *id.* § 425.16(e)(4), including speech that "concern[s] a person or entity in the public eye[,] . . . conduct that could directly affect a large number of people beyond the direct participants[,] . . . or a topic of widespread, public interest," *Geiser v. Kuhns*, 515 P.3d 623, 630 (Cal. 2022) (citation omitted). The preamble to the statute puts the legislative intent in particularly stark terms, noting the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," and

characterizing such suits as an "abuse of the judicial process." Cal. Civ. Proc. Code § 425.16(a) (West 2023); *see also Geiser*, 515 P.3d at 635 (emphasizing that the California legislature enacted the anti-SLAPP statute to safeguard the legal tradition of recognizing "the importance of speech and other expressive activity even when—perhaps especially when—it is uncomfortable or inconvenient"). To protect against such abuses, the California legislature directed that the statute "shall be construed broadly." Cal. Civ. Proc. Code § 425.16(a) (West 2023); *see also, e.g.*, *Hilton*, 599 F.3d at 906 (construing the statute broadly in light of its "stated purpose to encourage participation in matters of public importance or consequence").

Of particular relevance here, courts have held that the anti-SLAPP statute applies to breach of contract claims, as "conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning," even if it falls short of implicating the public policy concerns presented here. *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002). Courts have dismissed breach of contract claims when they "masquerade as ordinary lawsuits but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016) (citation omitted); *see also, e.g.*, *Olson v. Doe*, 502 P.3d 398, 404–08 (Cal. 2022) (dismissing breach of non-disparagement clause claim); *Timothy W. v. Julie W.*, 301 Cal. Rptr. 3d 294, 308 (Cal. Ct. App. 2022) (dismissing breach of confidentiality agreement claim).

### B. Researchers and Journalists Use Scraping to Enable Speech in the Public Interest and Hold Power to Account.

Contemporary public discourse takes place largely online on platforms operated by private companies. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—

the vast democratic forums of the Internet in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (internal citations omitted). The Supreme Court has emphasized that, for many, social media platforms are the "principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id*. at 107.

Researchers and journalists have played a crucial role helping the public understand how our digital lives unfold within these "vast realms." Investigating the effects of social media platforms on public discourse requires techniques suited to the study of digital forums. One technique involves the automated collection of data, a practice often referred to as scraping.[5] The utility of scraping for research in the public interest is well established.[6] Scraping has served as the foundation for research on issues ranging from online discrimination,[7] to misinformation about elections and vaccines,[8] to social media advertising policies.[9] Indeed, systematic collection of public data can serve as an important counterweight to the consolidation of control by large

---

[5] *See* Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372, 373, 414–15 (2018) (noting that scraping often, but not always, involves automation and emphasizing that scraping "should not be thought of as inherently more invasive or dangerous than a person at a web browser").

[6] *See, e.g.*, Alan Luscombe, Kevin Dick & Kevin Walby, *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023, 1024 (2022) ("[I]t is becoming increasingly necessary to turn to innovative tools like scraping to carry the social sciences forward into the twenty-first century.").

[7] *See, e.g.*, Benjamin Edelman et al., *Racial Discrimination in the Sharing Economy: Evidence From a Field Experiment*, 9 Am. Econ. J. Applied Econ. 1, 1–3 (2017).

[8] *See, e.g.*, Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021), https://www.nytimes.com/2021/08/10/opinion/facebook-misinformation.html.

[9] *See, e.g.*, Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Computer Interaction 1, 3–4 (2019).

platforms over information streams, and as a key accountability mechanism to reveal the platforms' content moderation choices[10] and privacy policies and practices.[11]

In the context of public interest research, scraping public information is part and parcel of the subsequent speech it enables. It involves no discrete activity that could not be accomplished manually, though the manual approach would entail greater expense, time, and risk of error.[12] In other words, "[s]craping is merely a technological advance that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions." *Sandvig*, 315 F. Supp. 3d at 16. When scraping public information is done to advance public interest research and journalism, it is a key component of a unified process of engaging in lawful, constitutionally protected speech. The speech of research organizations like CCDH US, as well as academics and journalists—often made possible only by scraping—has shed crucial light on a panoply of concerns that powerful social media platforms have failed to independently monitor and correct,[13] and has provided crucial information for regulators to take enforcement action.[14]

---

[10] *See, e.g.*, Emillie de Keulenaar, João C Magalhães & Bharath Ganesh, *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023) (using scraping techniques to analyze Twitter moderation practices from 2006–22).

[11] *See, e.g.*, Hang Do Thi Duc, *Public by Default* (July 2018), https://publicbydefault.fyi (using scraping to illustrate how transaction information exposed by default via Venmo can reveal intimate details of specific users' daily lives and routines).

[12] *See* Sellars, *supra* note 5, at 386–88.

[13] *See, e.g.*, Edelson & McCoy, *supra* note 8.

[14] *See, e.g.*, Katie Benner, Glenn Thrush & Mike Isaac, *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019), https://www.nytimes.com/2019/03/28/us/politics/facebook-housing-discrimination.html (noting that a Department of Housing and Urban Development lawsuit followed "nearly three years of scrutiny of Facebook's ad-targeting practices that started with a 2016 investigation by ProPublica,

Yet a strict reading and inflexible application of many social media platforms' terms of service would dramatically circumscribe public interest journalism and research, leading to consolidation of information in the hands of platforms in a manner that undermines the public good. Corporations like X Corp. have incentives to prevent research that could portray them negatively or even expose them to liability—as a result, these corporations may see research based on public user posts as adversarial to the platform.[15] But as the Ninth Circuit recently recognized, giving social media platforms "free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." *hiQ Labs, Inc.*, 31 F.4th at 1202.[16]

Recognizing that scraping public information for research in the public interest is foundational to the subsequent speech it enables does not require courts to decline enforcement of the vast majority of platforms' terms of service—only situations where enforcement would threaten a "First Amendment right to record at least some matters of public interest, in order to

---

whose reporters showed that the company made it simple for marketers to exclude specific ethnic groups for advertising purposes").

[15] For example, Meta removed NYU's Ad Observatory from its platform, pointing to Meta's consent decree with the Federal Trade Commission (FTC) to justify the decision. Shortly thereafter, the FTC condemned Meta's actions, noting that the FTC would have carved out exceptions for "good faith research in the public interest." Samuel Levine, Letter from Acting Director of the Bureau of Consumer Protection Samuel Levine to Facebook (Aug. 5, 2021), https://www.ftc.gov/blog-posts/2021/08/letter-acting-director-bureau-consumer-protection-samuel-levine-facebook.

[16] In the *hiQ Labs* litigation, the district court subsequently found hiQ liable for breach of contract for scraping in violation of LinkedIn's terms of service. *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 962 (N.D. Cal. 2022). But, significantly, hiQ scraped LinkedIn for commercial purposes, not in service of speech in the public interest. *See id.* at 955.

preserve and disseminate ideas." *Sandvig*, 315 F. Supp. 3d at 16.[17] Nor does it mean that platforms and regulators are powerless to protect platform users' privacy. Legislators can codify protections for sensitive data, and there are many tools at a platform's disposal to limit the public exposure of user information, including enabling privacy settings that restrict what information is shared by default.[18]

What a platform cannot do, however, is make information available to users and then punish them for what they say once equipped with that information. Such is the case here, where CCDH US observed content it deemed problematic dis- or misinformation, and is facing liability for what it said about that content.

### C. Allowing X Corp. to Enforce Its Term of Service Prohibiting Scraping Against Researchers Like CCDH US Would Be Contrary to California's Public Policy.

X Corp.'s invocation of its scraping prohibition against CCDH US takes aim at constitutionally protected speech in the public interest that is critical of the company. This tactic runs afoul of a robust body of positive law enshrining California's public policy against litigation that chills speech that contributes to the public discourse. By selectively enforcing its term prohibiting scraping against CCDH US and invoking damages of millions of dollars based on

---

[17] Because CCDH US's alleged scraping activities enable speech critical of the powerful in the public interest, they are distinct from the practices of other entities, including those that may scrape user information for surveillance software products that those entities sell to police and other government agencies, which surveillance raises First Amendment concerns and risks harm to marginalized communities. *See, e.g.*, Sam Levin & Johana Bhuiyan, *Exclusive: LAPD Partnered with Tech Firm that Enables Secretive Online Spying*, Guardian (Nov. 17, 2021), https://www.theguardian.com/us-news/2021/nov/17/los-angeles-police-surveillance-social-media-voyager.

[18] *See, e.g.*, Brian X. Chen, *Tech Fix: This Is a Reminder that You're Probably Oversharing on Venmo*, N.Y. Times (Aug. 9, 2023), https://www.nytimes.com/2023/08/09/technology/personaltech/venmo-privacy-oversharing.htm (noting that technology platforms are constantly adjusting default privacy settings).

reputational harm stemming not from CCDH US's alleged breach, but from its critical speech, X Corp. is attempting to suppress speech that constitutes "participation in matters of public significance." Cal. Civ. Proc. § 425.16(a) (West 2023).

The Amended Complaint reveals that the gravamen of X Corp.'s claim is one of defamation in a contract claim's clothing. The Amended Complaint is centered on the content of CCDH US's reports about X Corp., namely, criticism about the prevalence on X Corp.'s platform of dis- or misinformation related to issues ranging from climate change to the COVID-19 pandemic. *See* Am. Compl. ¶¶ 17–24, ECF No. 10. The damages X Corp. seeks—tens of millions of dollars in lost advertising revenue—are tied to reputational harm only, with no basis in any direct physical, operational or other harm that CCDH US's alleged scraping activities inflicted on X Corp. *See* Am. Compl. ¶¶ 65–70. What's more, X Corp. seeks to hold CCDH US liable for reputational damages—a classic defamation claim—without alleging any specific false statements of fact, let alone that CCDH US satisfied the actual malice standard first established in *Sullivan*, 376 U.S. at 279–80. Rather, the Amended Complaint amounts to a disagreement on the quality and presentation of CCDH US's research, alleging that the organization's methodologies are flawed in that it uses "rudimentary tactics," "do[es] not include meaningful discussion or analysis" of certain posts, and "fail[s] to include context," leading to "misleading narratives." Am. Compl. ¶ 16. Had CCDH US praised rather than criticized X Corp., there would be no damages to claim and therefore no lawsuit.

Likely understanding that a defamation claim against CCDH US would face an uphill battle, X Corp. attempts to punish CCDH US for its speech by enforcing its term prohibiting scraping. But courts have repeatedly rebuffed attempts to plead creatively around the First Amendment by disguising a claim for defamation under an alternative cause of action, noting, for

example, that the First Amendment's protections "apply to all claims whose gravamen is the alleged injurious falsehood of a statement." *Blatty*, 728 P.2d at 1182 (quoting *Reader's Digest Ass'n v. Superior Ct.*, 37 Cal. 3d 244, 265 (Cal. 1984)). Courts have been clear: "[C]onstitutional protection does not depend on the label given the stated cause of action." *Reader's Digest Ass'n*, 37 Cal. 3d at 265. Time and again, they have rejected alternative causes of action "based on the same acts which would not support a defamation action" because they "would allow plaintiffs to do indirectly what they could not do directly." *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 104 (Cal. 1986) (en banc) (citation omitted) (rejecting a claim of invasion of privacy); *see also, e.g.*, *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) (intentional infliction of emotional distress); *Paul v. Watchtower Bible Tract Soc'y*, 819 F.2d 875 (9th Cir. 1987) (same); *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (invasion of privacy); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (malicious interference with business); *Blatty*, 728 P.2d 1177 (intentional interference with prospective economic advantage); *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1114 (Cal. 1988) (fraud).

This tactic of X Corp.'s—attempting to tamp down on critical speech through a breach of contract claim—runs contrary to California's public policy of protecting speech that aims to inform the public or contribute to public discourse. As discussed above, scraping is an essential tool for digital research and journalism in the public interest. *See supra* Section IV.B. If digital researchers and journalists had to abandon this method of digital investigation, we would be left with less insight into the "modern public square," *Packingham*, 582 U.S. at 107—both what it contains and its effect on society broadly.

To allow X Corp. to proceed on this theory would equip it with a tool to suppress the speech of users who scrape in the public interest, creating an end-run around the First Amendment and

allowing X Corp. "to do indirectly what [it] could not do directly." *Fellows*, 721 P.2d 97. This resort to camouflage is contrary to California's public policy, codified explicitly in its anti-SLAPP law, of protecting those who contribute to public discourse from the burdens of costly litigation.[19]

Further, X Corp.'s theory of damages—tens of millions of dollars from lost advertising revenue—will chill other speakers who scrape in service of public interest research. Indeed, such chill has already taken hold. A recent survey of 167 academics and researchers found that over 100 studies about X Corp. have been diverted, stalled, or canceled, with over half of those interviewed citing a fear of being sued by X Corp. over their findings or data. Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06. Affected studies include those about child safety, how the subject of rape is discussed on the platform, and the platform's content moderation decisions. *Id.* Critical research of this nature, often reliant on scraping, is important to understanding how major social media platforms operate and interact with users at scale. Yet it is being stifled by the mere prospect of liability in the millions of dollars. The result is a more opaque internet in which powerful platforms can control what research is done about them.

Even if the Court were inclined to find a breach of contract here, it should not allow a theory of damages that turns solely on the content of the speech that is alleged to have caused reputational harm, with no connection to the alleged scraping violation. Such damages claims

---

[19] Moreover, enforcing X Corp.'s prohibition against scraping against CCDH US is particularly problematic in a context where the contract stems from a unilaterally imposed website term of service. Not only are terms of service generally "lengthy, opaque, subject to change and seldom read," *Nosal I*, 676 F.3d at 860 (en banc), but they are written solely by platforms in their own interest with independent researchers subject to those terms simply in order to access the "modern public square." *Packingham*, 582 U.S. at 107.

1 sound in defamation, with all of the First Amendment limitations that attach to ensure speakers can robustly criticize public figures and entities without fear of liability.

## V. CONCLUSION

This Court should hold that, in this context, where CCDH US's alleged scraping of X Corp.'s platform was done in service of research in the public interest and where the damages claimed stem solely from alleged reputational harm, the term of service prohibiting scraping X Corp.'s platform cannot be enforced as void for public policy.

Dated:  November 24, 2023

Esha Bhandari (*pro hac vice application pending*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org
*Attorney for* Amici Curiae

/s/ Matthew T. Cagle

Matthew T. Cagle (SBN 286101)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 293-6336
mcagle@aclunc.org
*Attorney for* Amici Curiae

Cindy Cohn (SBN 145997)
Andrew Crocker (SBN 291596)
Aaron Mackey (SBN 286647)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
cindy@eff.org
*Attorneys for* Amicus Curiae
*Electronic Frontier Foundation*