KENDRA K. ALBERT (SBN 314839)
kalbert@law.harvard.edu
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, 4th Floor
Cambridge, MA 02138
Telephone: 617-998-1558

Attorney for *Amicus Curiae*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>vs.<br><br>CENTER FOR COUNTERING DIGITAL HATE, INC., a Washington, D.C. non-profit corporation; CENTER FOR COUNTERING DIGITAL HATE LTD., a British non-profit organization; STICHTING EUROPEAN CLIMATE FOUNDATION; and DOES 1 through 50, inclusive | Case Number: 3:23-cv-03836-LB<br><br>***AMICUS* BRIEF IN SUPPORT OF DEFENDANTS CENTER FOR COUNTERING DIGITAL HATE, INC. AND CENTER FOR COUNTERING DIGITAL HATE LTD.** |

***AMICUS* BRIEF BY PUBLIC PARTIPATION PROJECT IN SUPPORT OF DEFENDANTS CENTER FOR COUNTERING DIGITAL HATE, INC. AND CENTER FOR COUNTERING DIGITAL HATE LTD.**

## **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ..................................................................................................1

INTERESTS OF *AMICUS* ......................................................................................................2

ARGUMENT ..........................................................................................................................3

    I.    X CORP.'S STATE LAW CLAIMS AGAINST CCDH SATISFY THE REQUIREMENTS UNDER CALIFORNIA'S ANTI-SLAPP LAW ..................3

        A.    X Corp.'s state law claims arise from CCDH's protected activity, researching and publishing reports. ............................................................4

        B.    CCDH's speech and underlying conduct were made in connection with an issue of public interest. ..................................................................6

        C.    X Corp.'s legal theories pose grave First Amendment risks. ...................7

    II.    FAILURE TO APPLY THE ANTI-SLAPP STATUTE WILL ALLOW COMPANIES LIKE X CORP. TO SILENCE AND INTIMIDATE CRITICS OF THEIR PLATFORMS ..................................................................................9

CONCLUSION .....................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**
*Baral v. Schnitt*, 376 P.3d 604 (Cal. 2016).................................................................................3, 4
*Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006) .................................................................................4
*Bonni v. St. Joseph Health System*, 491 P.3d 1058 (Cal. 2021) .......................................................5
*Collondrez v. City of Rio Vista*, 275 Cal. Rptr. 3d 895 (Cal. Ct. App. 2021) ......................4, 5, 6
*Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999)..........................................8
*Garrison v. Louisiana*, 379 U.S. 64 (1964) ........................................................................................3
*Gordon v. Marrone*, 155 Misc. 2d 726 (N.Y. Sup. Ct. 1992) ......................................................3, 9
*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ..................................................5, 9
*Klocke v. Watson*, 936 F.3d 24 (5th Cir. 2019) ................................................................................10
*Lee v. Silveira*, 211 Cal. Rptr. 3d 705 (Cal. Ct. App. 2016) ..............................................................7
*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013) ...........................................................3
*Park v. Bd. of Trustees of California State Univ.*, 393 P.3d 905 (Cal. 2017) ................................4
*Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*, 946 F. Supp. 2d 957 (N.D. Cal. 2013) ................................................................................................6
*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828 (9th Cir. 2018), ..................................................................................................3
*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ......................................................................5
*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) ......................................................................8
*X Corp. v. Media Matters for America*, No. 4:23-cv-01175-P (N.D. Tex. Nov. 20, 2023).....................................................................................................................10

**Statutes**
Cal. Civ. Proc. Code § 425.16 ........................................................................................................1, 3, 6

**Other Authorities**
ADL Statement on X/Twitter, ADL (Sep. 5, 2023) ........................................................................10
Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 AM)..............................................................2, 10
Elon Musk (@elonmusk), X (Sep. 4, 2023, 7:04 PM) ......................................................................6
Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi Content*, MEDIA MATTERS FOR AMERICA (Nov. 16, 2023) .............................................10
*Guarding Against The Chill: A Survival Guide for SLAPP Victims,* THE FIRST AMENDMENT PROJECT, ........................................................................................................9
Joseph Menn, *Attacks on U.S. Jews and Gays Accelerate as Hate Speech Grows on Twitter*, WASHINGTON POST (Jan. 23, 2023), ......................................................................7
Kate Conger & Ryan Mac, *X Sues Media Matters Over Research on Ads Next to Antisemitic Posts*, NEW YORK TIMES (Nov. 21, 2023).................................................................2
Leadership Conference on Civil and Human Rights, *Letter for the Record: Hearing on "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation"* (Mar. 25, 2021) ......................................................................7
Rebecca Falconer, *Elon Musk Threatens to Sue Anti-Defamation League after Blaming It for X Ad Sales Slump*, AXIOS (Sep. 4, 2023) .........................................................10
Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, NEW YORK TIMES (Dec. 2, 2022) ....................................7

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, REUTERS (Nov. 6, 2023) ...................................................... 9, 10
Steven Lee Myers, *Free Speech vs. Disinformation Comes to a Head*, NEW YORK TIMES (Feb. 9, 2023) ................................................................................................ 7
Taylor Lorenz, *Extremist Influencers Are Generating Millions for Twitter, Report Says*, WASHINGTON POST (Feb. 9, 2023) .................................................................. 7

# SUMMARY OF ARGUMENT

By suing the Center for Countering Digital Hate ("CCDH"), X Corp. (formerly Twitter), seeks to silence critique rather than to counter it. X Corp.'s claims may sound in breach of contract, intentional interference with contractual relations, and inducing breach of contract (hereinafter "state law claims"), rather than being explicitly about CCDH's speech. But its arguments and its damages calculations rest on the decisions of advertisers to no longer work with X Corp. as a result of CCDH's First Amendment protected activity. In brief, this is a classic Strategic Lawsuit Against Public Participation (SLAPP). X Corp. aims not to win but to chill.

Fortunately, the California anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, provides protection against abuse of the legal system with the goal of suppressing speech. X Corp.'s claims arise from CCDH's protected activity and relate to a matter of public interest, making it appropriate for the anti-SLAPP statute to apply. Indeed, the anti-SLAPP statute's purpose requires its application to these claims.

No doubt recognizing this, X Corp. seeks to do through haphazardly constructed contractual claims what the First Amendment does not permit it to do through speech torts. The harm that the anti-SLAPP statute aims to prevent will be realized if this court allows X Corp.'s claims to continue. The statute provides little help if plaintiffs can easily plead around it.

Indeed, X Corp.'s legal theories, if accepted by this court, could chill broad swathes of speech. If large online platforms can weaponize their terms of service against researchers and commentators they dislike, they may turn any contract of adhesion into a "SLAPP trap." Organizations of all types could hold their critics liable for loss of revenue from the organization's own bad acts, so long as a contractual breach might have occurred somewhere in the causal chain.

X Corp.'s behavior has already substantially chilled researchers and advocates, and it shows no signs of stopping. Since this litigation was filed, its Chief Technology Officer has threatened organizations with litigation because they have commented on X Corp.'s policies in

**1**

a way that he dislikes.[1] And on November 20, 2023, X Corp. filed another lawsuit against a non-profit organization for reporting its findings about hate speech on X.[2] Organizations and individuals must be able to engage in research around the harms and benefits of social media platforms and they must be able to publish that research without fear of a federal lawsuit if their message is too successful.

To avoid that chill, this court should apply the anti-SLAPP statute to X Corp.'s claims and critically evaluate their legal sufficiency. It is not enough that CCDH might prevail at some point later in this litigation. Without early dismissal, the free speech interests that the California legislature sought to protect will vanish in piles of discovery motions. The Public Participation Project ("PPP") advocates for the passage and application of statutes like the California anti-SLAPP statute—which provides for the filing of motions to strike and offers other procedural protections—precisely because SLAPP lawsuits work by wearing down defendants and saddling them with needlessly burdensome legal costs. This is especially true where, as here, the questionable claims have been asserted by a well-resourced party against a smaller one.

For the reasons set forth herein, *amicus* urges this court to apply the California anti-SLAPP statute and find that CCDH has met its prima facie burden.

## INTERESTS OF *AMICUS*

Public Participation Project is a non-profit organization that works to protect citizens against Strategic Lawsuits Against Public Participation through the enactment of legislation in Congress and the states. Founded in 2008, it educates the public about SLAPPs and how these damaging lawsuits chill free speech. PPP also provides legal resources and referrals to those who are facing litigation aimed at preventing them from speaking out on issues of public

---

[1] Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 AM), https://twitter.com/elonmusk/status/1725771191644758037 [https://perma.cc/K8SZ-M33S] (stating that "[t]he split second court opens on Monday, X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company").

[2] Kate Conger & Ryan Mac, *X Sues Media Matters Over Research on Ads Next to Antisemitic Posts*, NEW YORK TIMES (Nov. 21, 2023), https://www.nytimes.com/2023/11/20/technology/x-sues-media-matters-antisemitic-posts.html.

**2**

interest. PPP is invested in ensuring the California anti-SLAPP statute protects speakers against claims intended to silence speech and is thus moved to provide input on this case.

## ARGUMENT

**I. X CORP.'S STATE LAW CLAIMS AGAINST CCDH SATISFY THE REQUIREMENTS UNDER CALIFORNIA'S ANTI-SLAPP LAW**

"[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). Strategic Lawsuits Against Public Participation interfere with these vital democratic functions. SLAPPs "masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (internal quotations omitted). "Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined." *Gordon v. Marrone*, 155 Misc. 2d 726, 736 (N.Y. Sup. Ct. 1992).

To combat the use of the court system to silence speech rather than pursue justice, many states have created specific procedural protections for defendants. One such state is California, which passed its first anti-SLAPP law in 1992 and has subsequently revised the law to broaden its scope. *See* Cal. Civ. Proc. Code § 425.16, *as amended by* Cal. Legis. Serv. Stats. 1997, Ch. 271 (S.B. 1296) (amending the statute to expand protected conduct).

Under California's anti-SLAPP statute, a defendant must show that a claim arises from conduct or speech that is both in furtherance of the defendant's constitutional right of free speech and in connection with a matter of public interest. Then, the burden shifts to the plaintiff to prove that its claims are both legally and factually sufficient. *See* Cal. Civ. Proc. Code § 425.16; *Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016). In the context of federal court, defendants can use an anti-SLAPP motion to challenge the legal sufficiency under a motion to dismiss, as CCDH has. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended on unrelated grounds,* 897 F.3d 1224 (9th Cir. 2018). Here, X Corp.'s claims concern reports and commentary by CCDH on X's moderation

3

practices. These reports and commentary are written statements made in a public forum on a matter of public interest and, thus, they fall within the scope of the anti-SLAPP statute. *See, e.g.*, Amended Complaint ("AC"), Dkt. 10, ¶¶17; *see also Barrett v. Rosenthal*, 146 P.3d 510, 514 n.5 (Cal. 2006) ("Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute.").

Likely because of this, X Corp. has framed its claims so they focus not on CCDH's speech but on contractual relationships, alleging that CCDH breached the terms of service that it agreed to when it signed up for a Twitter account. X Corp. further argues that CCDH intentionally interfered with contractual relations and induced a breach of contract through its alleged use of a third-party service called Brandwatch to gather data. But, as X Corp. should know, rebranding has its limits. The California Supreme Court has rejected the idea that "artful pleading" allows plaintiffs to shield claims based protected activity—like the research and reporting activities of CCDH at issue here—from an anti-SLAPP motion. *Baral*, 376 P.3d at 615; *see also Park v. Bd. of Trustees of California State Univ.*, 393 P.3d 905, 909 (Cal. 2017) (explaining that claims are covered under the anti-SLAPP statute when speech provides the basis for liability). X Corp. cannot "avoid operation of the anti-SLAPP statute by attempting . . . to characterize an action as a 'garden variety breach of contract or fraud claim' when in fact the liability claim is based on protected speech or conduct." *Collondrez v. City of Rio Vista*, 275 Cal. Rptr. 3d 895, 902 (Cal. Ct. App. 2021) (quoting *Martinez v. Metabolife Int'l Inc.*, 6 Cal. Rptr. 3d 499 (Cal. Ct. App. 2003)). The heart of X Corp.'s claims seek to hold CCDH liable for having engaged in protected activity; as such, the anti-SLAPP statute should apply.

### A. X Corp.'s state law claims arise from CCDH's protected activity, researching and publishing reports.

When determining whether claims are subject to an anti-SLAPP motion, the court must determine if the elements of those claims "arise from protected activity," considering both "the actions alleged to establish those elements" and "whether those actions are protected." *Bonni v.*

**4**

*AMICUS* IN SUPPORT OF
DEFENDANTS' ANTI-SLAPP MOTION
CASE NO. 3:23-cv-03836-LB

*St. Joseph Health System*, 491 P.3d 1058, 1069-70 (Cal. 2021). All three of the state law claims rely on CCDH's protected activity, and each is thus subject to California's anti-SLAPP statute.

With regard to X Corp.'s claim that CCDH violated X's terms of service by scraping X, the alleged breach of contract arises directly from protected activity. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 16 (D.D.C. 2018) (holding that the use of scraping by researchers is conduct that is "arguably affected with a constitutional interest"). Use of "data scraping is a common method of gathering information, used by search engines, *academic researchers*, and many others" to obtain data that is otherwise freely available to the public. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (emphasis added). Moreover, CCDH allegedly scraped data from X in furtherance of protected First Amendment speech—i.e., the creation and publication of reports that detailed how X Corp.'s platform handled disinformation and hate speech. AC ¶¶ 51, 54, 56-57.

But even beyond scraping, all of X's state law claims arise from protected conduct because they center harm and, more directly, damages stemming from CCDH's speech. California courts apply the anti-SLAPP statute to these types of claims. For example, in *Collondrez v. City of Rio Vista*, 275 Cal. Rptr. 3d at 899-900, a police officer sued his former employer, the city of Rio Vista, for breach of contract and intentional interference with prospective economic relations, alleging that the city's release of his disciplinary records had led to his firing from his current job. The officer argued that since his claim was based on the city's contractual breach by failing to provide notice of the release of records, the city's conduct was not covered by the anti-SLAPP. *Id.* at 901. Rejecting that argument, the court found that it was the publication of the information, not the failure to abide by the contract, that caused the officer's harm, and thus the claims arose from protected speech. *Id.* at 902.

Likewise, X Corp.'s harm, as expressed by its claimed damages, comes from the publication of information, not the alleged interference with the Brandwatch agreements or the alleged breach of X's terms of service. As set forth in the Amended Complaint, X Corp. alleges millions of dollars in lost revenues, because multinational advertisers decided to pause

5

advertising on X or withdraw from the platform altogether. AC ¶¶ 66-70. X Corp. repeatedly states in the Amended Complaint that CCDH used data acquired via Brandwatch in CCDH reports, such as its February 9, 2023, Toxic Twitter report, and that those reports were relied on by advertisers to limit ad spends and thus decrease X Corp.'s ad revenue.[3] AC ¶¶ 68-70. The "harmful act at the heart of the complaint . . . is the publication" of the reports by CCDH. *See Collondrez*, 275 Cal. Rptr. 3d at 902.

X Corp. could have alleged damages stemming from CCDH's failure to pay on a contract or X Corp.'s inability to gain the benefit of the bargain that it negotiated at the time that the parties entered into the terms of service. On the claims based upon the Brandwatch contract, X Corp. could have sued for the value of the contract with which CCDH allegedly interfered or the direct costs of the breach that CCDH and the other defendants allegedly induced. Instead, X claims damages that are wholly the result of CCDH's speech. These allegations place all three of its state law claims firmly within the reach of the anti-SLAPP statute.

### B. CCDH's speech and underlying conduct were made in connection with an issue of public interest.

In order to meet its burden under step one of the anti-SLAPP statute, CCDH's statements must also be in connection with an issue of public interest. *See* Cal. Code Civ. Proc. § 425.16(e)(3-4). While the statute does not provide a direct definition of "an issue of public interest," courts construe it broadly, covering activities that concern a substantial number of people. *See Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*, 946 F. Supp. 2d 957, 968 (N.D. Cal. 2013), *aff'd*, 609 Fed. Appx. 497 (9th Cir. 2015) (unpublished). An issue is especially likely to be of public interest when, like here, the private entity is a "'large, powerful organization [that] may impact the lives of many individuals.'" *Lee v. Silveira*, 211 Cal. Rptr.

---

[3] Outside of the context of this litigation, X Corp. representatives have suggested that advertiser withdrawal had other causes. A post by X's Chief Technology Officer on September 4, 2023, blamed the Anti-Defamation League for the decline in advertising revenue, stating that the "ADL seems to be responsible for most of our revenue loss." Elon Musk (@elonmusk), X (Sep. 4, 2023, 7:04 PM), https://twitter.com/elonmusk/status/1698834460131651883 [https://perma.cc/BZQ6-259J].

3d 705, 715 (Cal. Ct. App. 2016) (quoting *Damon v. Ocean Hills Journalism Club*, 102 Cal. Rptr. 2d 205, 213 (Cal. Ct. App. 2000)).

CCDH's reports involve matters of disinformation and hate speech on social media platforms, particularly on X. Public debate and interest on matters of disinformation and hate speech on social media platforms have been profound in recent years, including multiple congressional hearings and constant coverage by national media.[4]

Not only is the topic of CCDH's work of national interest, but its reports, the very speech that X Corp.'s claims rest upon, have received significant media coverage. AC ¶¶ 56-57. Major news outlets including the New York Times, shared CCDH's work with their readers.[5] If this combination of the public debate on the topic of the speech, as well as direct media coverage and attention on the speech itself is not sufficient to qualify CCDH's speech as "in connection with an issue of public interest" under the anti-SLAPP statute, it is unclear what would qualify.

## C. X Corp.'s legal theories pose grave First Amendment risks.

As CCDH's activities fall within the scope of the anti-SLAPP statute, X Corp. must show that it can legally substantiate its claims. *Amicus* leaves it to CCDH and its co-defendants to contest the merits. But the legal theory behind X Corp.'s claims risk chilling future speakers. As discussed above, all three state law claims seek to hold CCDH liable for lost advertising revenues that allegedly flow from CCDH's criticism of X's policies. Under X Corp.'s theory, a plaintiff could sue for negative consequence that they face due to speech based on the allegation

---

[4] Leadership Conference on Civil and Human Rights, *Letter for the Record: Hearing on "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformatio*n" (Mar. 25, 2021); Taylor Lorenz, *Extremist Influencers Are Generating Millions for Twitter, Report Says*, WASHINGTON POST (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/; Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, NEW YORK TIMES (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html; Joseph Menn, *Attacks on U.S. Jews and Gays Accelerate as Hate Speech Grows on Twitter*, WASHINGTON POST (Jan. 23, 2023), https://www.washingtonpost.com/technology/2023/01/18/hate-speech-antisemitism-antigay-twitter/; Steven Lee Myers, *Free Speech vs. Disinformation Comes to a Head*, NEW YORK TIMES (Feb. 9, 2023), https://www.nytimes.com/2023/02/09/business/free-speech-social-media-lawsuit.html.

[5] Frenkel & Conger, *supra* note 4.

that somewhere in the causal chain, a contract was violated.[6] Endorsement of such a theory could have wide-ranging consequences, far beyond CCDH. For example:

>   An academic researcher writes an op-ed that opens with an anecdote about how they see inappropriate advertisements on a social media platform. X's theory would allow the platform to sue the academic for damages flowing from reduced user signups following the op-ed, based on the academic's violation of a contractual term that allowed accountholders to make only "personal" use of the platform.
>
>   A film critic borrows their roommate's username and password for a popular on-demand video platform, streams a movie, and writes a searing review. X's theory would allow the platform to sue the critic for damages flowing from diminished viewership, based on the critic's inducement of the roommate's violation of a contractual term that prohibited sharing of account credentials.
>
>   A journalist provides a fictitious name when downloading a report from a company's website, then writes an article about financial irregularities described in the report. X's theory would allow the company to sue the journalist for damages based on a reduction in its stock price, because the journalist violated a term requiring that people provide truthful information when accessing the company website.

These outcomes would be as absurd as they are untenable. X Corp.'s legal theories would allow it to recover for harms that have nothing to do with the underlying breach, based on contracts of adhesion.

The Ninth Circuit has long recognized that hinging one's legal rights in high stakes matters on compliance with "private agreements and policies that most people are only dimly aware of" creates significant risks. *United States v. Nosal*, 676 F.3d 854, 861-62 (9th Cir. 2012) (en banc) (rejecting argument that allowed for Computer Fraud and Abuse Act liability to turn on violations of terms of service). Giving large tech companies "free rein to decide, on any

---

[6] Such claims would not be possible in the context of an intentional tort without a showing of falsehood and, for a public figure, actual malice. *See, e.g.*, *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 522-524 (4th Cir. 1999) (citing *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988)).

basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." *hiQ Labs*, 31 F.4th at 1202.

X Corp.'s theory amounts to a hunting license for critics. Even if such claims fail at summary judgment, that ultimate disposition would only amount to a "pyrrhic victory." *See Marrone*, 155 Misc. 2d at 736. The SLAPP trap would have already done its job.

## II. FAILURE TO APPLY THE ANTI-SLAPP STATUTE WILL ALLOW COMPANIES LIKE X CORP. TO SILENCE AND INTIMIDATE CRITICS OF THEIR PLATFORMS

SLAPP suits are intended to have a broad silencing impact; rarely are just the public participation rights of the defendants at issue in any one controversy. As The First Amendment Project details,

> Most SLAPPs are ultimately legally unsuccessful. While most SLAPPs lose in court, they "succeed" in the public arena. This is because defending a SLAPP, even when the legal defense is strong, requires a substantial investment of money, time, and resources. The resulting effect is a "chill" on public participation in, and open debate on, important public issues. This "chilling" effect is not limited to the SLAPP target(s): fearful of being the target of future litigation, others refrain from speaking on, or participating in, issues of public concern.[7]

Indeed, X Corp. has already achieved that success in the public arena. A study conducted of 167 academic and civil society researchers by the Coalition for Independent Technology Research showed that "a majority of survey respondents fear being sued by X Corp. over their findings or use of data." The report, authored with Reuters, cites the filing of this very case (in addition to significant API changes) as an explanation why.[8] The report highlighted that the changes in X Corp.'s policies have resulted in "30 canceled projects, 47

---

[7] *Guarding Against The Chill: A Survival Guide for SLAPP Victims,* THE FIRST AMENDMENT PROJECT, https://www.thefirstamendment.org/media/Guarding-Against-the-Chill.pdf.
[8] Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, REUTERS (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06/.

*AMICUS* IN SUPPORT OF
DEFENDANTS' ANTI-SLAPP MOTION
CASE NO. 3:23-cv-03836-LB

stalled projects and 27 where researchers changed platforms."[9] Bond Benton, an assistant professor at Montclair State University, explained that the "move against CCDH" showed that there was "intrinsic liability in publicly disseminating findings."[10] X Corp.'s litigation has already chilled its potential critics.

      Despite that, X Corp. has not rested on its SLAPP laurels. In September, X Corp. threatened to sue the Anti-Defamation League for criticizing X's moderation of antisemitic content and the threats to Jewish people that kind of content can potentially incite.[11] And mere days before the filing of this brief, Chief Technology Officer Elon Musk threatened a "thermonuclear lawsuit" against Media Matters, a non-profit media watchdog group, for their reporting on ads from major brands appearing next to neo-Nazi content.[12] On November 20, 2023, X Corp. made good on those threats and sued Media Matters, alleging that its reporting caused advertisers to leave the platform. Complaint, *X Corp. v. Media Matters for America*, No. 4:23-cv-01175-P at ¶¶ 39 (N.D. Tex. Nov. 20, 2023). The litigation was filed in the Northern District of Texas, despite the fact that no party to the litigation resides in Texas and that the complaint does not cite any specific events that occurred there. *Id.* at ¶¶ 15, 16. Unlike California's, Texas's anti-SLAPP statute is unlikely to apply in cases like the one filed against Media Matters. *See Klocke v. Watson*, 936 F.3d 240, 242 (5th Cir. 2019) (holding that the Texas anti-SLAPP statute does not apply to diversity cases in federal court).

      X Corp.'s lawsuit against Media Matters, and its choice of venue, demonstrates the importance of anti-SLAPP statutes as a bulwark against litigious actions intended to chill

---

[9] *Id.*
[10] *Id.*
[11] *ADL Statement on X/Twitter*, ADL (Sep. 5, 2023), https://www.adl.org/resources/press-release/adl-statement-xtwitter; *see also* Rebecca Falconer, *Elon Musk Threatens to Sue Anti-Defamation League after Blaming It for X Ad Sales Slump*, AXIOS (Sep. 4, 2023), https://www.axios.com/2023/09/04/elon-musk-anti-defamation-league-x-ad-sales-slump.
[12] Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 AM), https://twitter.com/elonmusk/status/1725771191644758037 [https://perma.cc/K8SZ-M33S] *see also* Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi Content*, MEDIA MATTERS FOR AMERICA (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

speech. It also shows that the resolution of X Corp.'s litigation against CCDH matters not just for CCDH, or for the California anti-SLAPP law's utility against claims with similar legal theories. Application of anti-SLAPP statutes may be one of the few things that deters organizations like X Corp. from further weaponizing the legal system against those who seek to hold them accountable.

Social media companies are among the most valuable and powerful companies on the planet. The public benefits from having a healthy, robust debate on disinformation and hate speech and how social media platforms handle these issues. The public loses when debate is stifled through meritless lawsuits designed to intimidate researchers from being able to independently research disinformation and hate speech on X or other social media platforms. This chilling is precisely what the anti-SLAPP statute was designed to prevent. To forestall any further silencing of researchers, journalists—and yes, critics—it is imperative that this Court find that CCDH's conduct is covered under the anti-SLAPP law.

## **CONCLUSION**

For the foregoing reasons, *amicus* respectfully urges this Court to apply the California anti-SLAPP statute and find that CCDH has met its prima facie burden under the anti-SLAPP statute.

Dated: November 24, 2023

/s/ Kendra K. Albert
_____
Kendra K. Albert (SBN 314839)
Alejandra Caraballo*
kalbert@law.harvard.edu
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, 4th Floor
Cambridge, MA 02138
Telephone: 617-998-1558

*Attorney for Amicus Curiae*

---

* Admitted in New York. Inclusion in the signature block is solely for the purpose of recognition of contribution.

# CERTIFICATE OF SERVICE

I hereby certify that, on November 24, 2023, the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic docket.

Dated: November 24, 2023

/s/ Kendra K. Albert
Kendra K. Albert (SBN 314839)
kalbert@law.harvard.edu
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, 4th Floor
Cambridge, MA 02138
Telephone: 617-998-1558

*Attorney for* Amicus Curiae