J. JONATHAN HAWK (SBN 254350)
jhawk@mwe.com
**McDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA  90067-3206
Telephone:     1 (310) 277-4110
Facsimile:     1 (310) 277-4730

RICHARD D. SALGADO (*Pro Hac Vice*
Application Forthcoming)
rsalgado@mwe.com
JORDAN KAZLOW (*Pro Hac Vice* Application
Forthcoming)
jkazlow@mwe.com
LUCAS J. HALE (*Pro Hac Vice* Application
Forthcoming)
lhale@mwe.com
**McDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, TX 75201-1664
Telephone:     1 (214) 295-8000
Facsimile:     1 (972) 232-3098

Attorneys for Plaintiff X CORP.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>CENTER FOR COUNTERING DIGITAL HATE, INC., a Washington D.C. non-profit corporation; CENTER FOR COUNTERING DIGITAL HATE LTD., a British non-profit organization; STICHTING EUROPEAN CLIMATE FOUNDATION; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.  3:23-cv-03836-CRB<br><br>**X CORP.'S OPPOSITION TO DEFENDANTS CENTER FOR COUNTERING DIGITAL HATE, INC.'S AND CENTER FOR COUNTERING DIGITAL HATE LTD.'S MOTION TO DISMISS AND ANTI-SLAPP MOTION TO STRIKE**<br><br>Date: February 23, 2024<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor<br>Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.     STATEMENT OF ISSUES ................................................................................3

III.     FACTUAL BACKGROUND ..............................................................................3

IV.     SUMMARY OF ARGUMENT ..........................................................................7

     A.     Anti-SLAPP ...........................................................................................7

     B.     Breach of Contract ................................................................................7

     C.     CFAA .....................................................................................................8

     D.     Intentional Interference with Contractual Relations and Inducing Breach.................9

     E.     Doe Defendants and Leave to Amend ..................................................9

V.     ARGUMENT ...................................................................................................10

     A.     California's Anti-SLAPP Statute Is Inapplicable Here ......................10

     B.     The Amended Complaint Sufficiently Pleads A Claim For Breach of Contract Against CCDH US.................................................................12

         1.     A Breach is Plausibly Alleged Because CCDH US Agreed Not to Scrape X and Has Admitted Scraping X .......................12

         2.     CCDH's Purported Concerns Regarding Public Policy Are Not Valid Bases for Dismissal ...........................................14

         3.     The Arguments of *Amici Curiae* Do Not Support Dismissal .......................16

         4.     The Motion Misstates Applicable Law On Damages ...................................17

     C.     The Amended Complaint Sufficiently Pleads a CFAA Claim .............20

         1.     Impermissible Password Sharing As Alleged In the Amended Complaint Violates the CFAA's Prohibition Against "Unauthorized Access"..............20

             a.     Binding Ninth Circuit Precedent In *Nosal II* Establishes That CCDH's Alleged Conduct Violated the CFAA .................................21

             b.     The Motion's "Terms of Use" Arguments Lack Merit.....................24

         2.     Defendants Caused The Requisite Harm .......................................25

         3.     The Amended Complaint Sufficiently Pleads CFAA Violations .................26

     D.     The Amended Complaint Sufficiently Pleads Claims For Intentional Interference With Contractual Relations And Inducing Breach of Contract .................................28

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1.  The Amended Complaint Adequately Alleges That Defendants Caused Brandwatch to Breach Its Agreements With X Corp. ................................... 29

2.  The Amended Complaint Pleads Actionable Damages ................................. 31

E.  The Amended Complaint Adequately Pleads A Claim Against Doe Defendants ..... 31

F.  If The Court Were to Grant the Motion, Leave to Amend Is Appropriate ............... 32

VI.  CONCLUSION ................................................................................................................. 33

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Defense Fund v. Wasden*,
   878 F.3d 1184 (9th Cir. 2018) ...................................................................16

*Cariveau v. Halferty*,
   83 Cal. App. 4th 126 (2000) .....................................................................16

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991).................................................................7, 8, 15, 18

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   449 F. Supp. 3d 1024 (W.D. Wash. 2020)...............................................26

*eBay Inc. v. Digital Point Solutions, Inc.*,
   608 F. Supp. 2d 1156 (N.D. Cal. 2009) ...................................................28

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ...................................................................32

*Facebook, Inc. v. Holper*,
   2022 WL 17167958 (N.D. Cal. Sept. 27, 2022) .....................................9, 26

*Facebook, Inc. v. MaxBounty, Inc.*,
   274 F.R.D. 279 (N.D. Cal. 2011)................................................................28

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978)...................................................................................16

*Frangipani v. Boecker*,
   64 Cal. App. 4th 860 (1998) .....................................................................19

*Glancy v. Carl Zeis, Inc.*,
   2015 WL 7755995 (C.D. Cal. Nov. 30, 2015).........................................13

*Hall v. FCA US LLC*,
   2022 WL 1714291 (9th Cir. May 27, 2022) ..........................................8, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   639 F. Supp. 3d 944 (N.D. Cal. 2022) ...................................................8, 14

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978).......................................................................................15

*Intel Corp. v. Via Techs, Inc.*,
   2001 WL 777085 (N.D. Cal. Mar. 20, 2001)............................................13

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

*Jordan-Benel v. Universal City Studios, Inc.*,
   859 F.3d 1184 (9th Cir. 2017) ................................................................................11

*King v. Facebook, Inc.*,
   572 F. Supp. 3d 776 (N.D. Cal 2021) ......................................................................19

*Kovalenko v. Kirkland & Ellis LLP*,
   2023 WL 5444728 (N.D. Cal. Aug. 23, 2023) ....................................................7, 11

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ................................................................................10

*McPhearson v. Michaels Co.*,
   96 Cal. App. 4th 843 (2002) ...................................................................................16

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) ................................................................................10

*Merino v. County of Santa Clara*,
   2019 WL 2437176 (N.D. Cal. June 11, 2019) ......................................................9, 31

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) ...............................................................8, 15

*Multiven v. Cisco*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) ...................................................................28

*Nat'l Abortion Fed'n v. Ctr. for Medical Progress*,
   2018 WL 5879786 (N.D. Cal. Nov. 7, 2018) ......................................................8, 18

*NetApp, Inc. v. Nimble Storage, Inc.*,
   41 F. Supp. 3d 816 (N.D. Cal. 2014) ...........................................................9, 27, 28

*NovelPoster v. Javitch Canfield Grp.*,
   140 F. Supp. 3d 954 (N.D. Cal. 2014) ....................................................................26

*Oasis West Realty, LLC v. Goldman*,
   51 Cal. 4th 811 (2011) ...........................................................................................12

*Oracle Am., Inc. v. Service Key, LLC*,
   2012 WL 6019580 (N.D. Cal. Dec. 3, 2012) ..........................................................28

*Oracle Am., Inc. v. TERiX Computer Co.*,
   2014 WL 31344 (N.D. Cal. Jan. 3, 2014) ...............................................................28

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) ..........................................................................................28

*Picketfence Inc. v. R.R. Donnelley & Sons Co.*,
   2007 WL 9811030 (N.D. Cal. Nov. 6, 2007) ..........................................................13

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*,
   890 F.3d 828 (9th Cir. 2018) ...............................................................................7, 12

*Planned Parenthood Fed'n of Am. v. Newman*,
   51 F.4th 1125 (9th Cir. 2022) .........................................................................8, 18, 19

*Prager Univ. v. Google, LLC*,
   951 F.3d 991 (9th Cir. 2020) ......................................................................................14

*Rice v. Cmty. Health Ass'n*,
   203 F.3d 283 (4th Cir. 2000) ......................................................................................19

*Sandvig v. Sessions*,
   315 F. Supp. 3d 1 (D.D.C 2018) ................................................................................16

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*,
   6 Cal. 5th 59 (2018) ...................................................................................................14

*since early 2021. Ryanair DAC v. Booking Holdings Inc.*,
   636 F. Supp. 3d 490 (D. Del. 2022)..............................................................9, 14, 22, 28

*Smith v. Super. Ct.*,
   2018 WL 6072806 (N.D. Cal. Nov. 16, 2018) ...........................................................15

*Sonoma Cnty. Ass'n of Retired Employees v. Sonoma Cnty.*,
   708 F.3d 1109 (9th Cir. 2013) ..............................................................................9, 32

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ................................................................................31, 32

*Spanish Broadcasting Sys. v. Grupo Radio Centro LA, LLC*,
   2016 WL 11741137 (C.D. Cal. May 23, 2016) ....................................................9, 28, 29

*Spartan Capital Sec., LLC v. Vicinity Motor Corp.*,
   2023 WL 4004116 (N.D. Cal. June 13, 2023) .......................................................12, 23

*Stepping Stones Group, LLC v. Amethod Public Schools*,
   2023 WL 7602353 (N.D. Cal. Nov. 13, 2023) ......................................................10, 23

*Sw. Airlines Co. v. Fare-Chase, Inc.*,
   318 F. Supp. 2d 435 (N.D. Tex. 2004) .......................................................................14

*U.S. v. Nosal ("Nosal II")*,
   844 F.3d 1024 (9th Cir. 2016) .....................................................................8, 21, 22, 25

*United Nat'l Maintenance, Inc. v. San Diego Convention Ctr., Inc.*,
   766 F.3d 1002 (9th Cir. 2014) ....................................................................................29

*Van Buren v. United States*,
   593 U.S. –, 141 S. Ct. 1648 (2021)...............................................................8, 24, 25

- v -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

*Wang v. Wal-Mart Real Estate Bus. Trust*,
153 Cal. App. 4th 790 (2007) ...................................................................................7, 11

*Weingard v. Harland Fin. Solutions, Inc.*,
2012 WL 3763640 (N.D. Cal. Aug. 29, 2012) ..................................................8, 23

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*,
2022 WL 844152 ..............................................................................................29

*Zemel v. Rusk*,
381 U.S. 1 (1965)...........................................................................................8, 15

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................................... *passim*

**Statutes**

18 U.S.C. § 1030...............................................................................2, 9, 20, 25, 27

Cal. Civ. Proc. Code § 425.16(b)(1) ..............................................................10

**Rules**

Fed. R. Civ. P. 8 ........................................................................9, 18, 27, 29

Fed. R. Civ. P. 9 ...............................................................................9, 27, 28

Fed. R. Civ. P. 12 ........................................................................... *passim*

Fed. R. Civ. P. 15 .........................................................................9, 32

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    Plaintiff X Corp. submits this opposition to the Center for Countering Digital Hate, Inc.'s

2    ("CCDH US") and Center for Countering Digital Hate Ltd.'s ("CCDH UK," with CCDH US,

3    "CCDH") Motion to Dismiss and Anti-SLAPP Motion to Strike (Dkt. 47) (the "Motion").[1]

4    ## I.    **INTRODUCTION**

5    This case is not about CCDH's speech.  It is about Defendants' audacious breaches of their

6    legal obligations.  CCDH—whose history is rife with efforts to silence those it disagrees with—now

7    ironically tries to shirk accountability and cloak its illegal conduct in purported free speech

8    protections that have no application to the claims in this case.

9    CCDH's misdirection and mischaracterizations aside, the claims actually alleged in the

10   Amended Complaint are not about the lawfulness of any public statements, but about CCDH's

11   unlawful and improper *access of X Corp.'s data*.  And as to those claims, the thrust of the Motion's

12   key arguments—asking the Court to make merits-based decisions at the pleading stage on disputed

13   factual issues—cannot save CCDH.  The Amended Complaint is sufficiently pleaded, such that X

14   Corp. is entitled to progress to the discovery phase, where it can develop evidence that seeks to hold

15   CCDH to account for the conduct it and ECF try so desperately to shield from public view.

16   Although CCDH has made numerous false assertions about X, the claims asserted in the

17   Amended Complaint are not premised on or grounded in the truth or falsity of the Defendants' alleged

18   speech.  That is not an element of any of the Amended Complaint's claims, and, as even the Motion

19   acknowledges, X Corp. has not asserted any defamation claim.[2]  X Corp.'s claims here very clearly

20   seek redress for flagrantly unlawful acts committed by all Defendants *before* CCDH could have

21   engaged in any allegedly protected activities, and that the Defendants knowingly undertook in

22   concert with the intent to cause serious harm to X Corp.  That course of conduct exists independently

23   from CCDH's purported speech-related activities and, simply because CCDH later chose to speak,

---

[1] Defendant Stichting European Climate Foundation ("ECF," with CCDH, "Defendants") also joined CCDH's motion as to the Second, Third, and Fourth causes of action.

[2] The Motion makes much of X Corp.'s decision not to file a defamation claim in this case.  That is not relevant to this dispute and has no bearing on the truth or falsity of CCDH's "reporting," which X Corp. has explained relies on flawed methodologies to paint a false and misleading narrative aimed at advancing CCDH's own interests.  (CCDH has tellingly not filed a defamation claim against X Corp. either.)  Indeed, the fact that X Corp. has not brought a defamation claim only highlights that CCDH's invocations of free speech are a red herring designed to distract the Court from X Corp.'s well-pleaded claims.

does not enable it to wash away its wrongdoing and liability.

Essentially, CCDH's Motion asks this Court to approve its vigilantism because it was in furtherance of an ideological cause. But vigilantism, no matter what the underlying motivation, erodes the rule of law. The Court should not disregard the specifically and sufficiently pleaded allegations of the Amended Complaint, nor should it improperly make factual determinations at the pleading stage, to approve of such conduct.

Here, the Amended Complaint sufficiently pleads its claims against CCDH, all of which are premised on ECF and CCDH engaging in a concerted course of conduct that was undertaken knowingly and intentionally to harm X Corp. All of which are also outside the scope of California's Anti-SLAPP statute, such that CCDH cannot invoke that statute to absolve itself of illegal conduct that is separate, independent, and severable from any purportedly protected and speech-related activities in which CCDH engaged.

Specifically, and as alleged in the Amended Complaint, CCDH US breached its contractual and legal obligations in two independent ways: (1) CCDH US scraped data from the X platform ("X") in violation of the terms of service ("ToS") it *agreed to* with X Corp.; and (2) CCDH conspired with ECF to improperly share login credentials to access a secured database without authorization, when all Defendants knew of the contractual limitations on such access applicable to ECF and Runtime Collective Ltd., T/A Brandwatch ("Brandwatch").

X Corp. seeks to recover for the harm that Defendants' intentional wrongdoing caused it to suffer. This allegation is not in serious dispute. CCDH US's February 9, 2023 report *admits* to scraping X to obtain data for the report. Because it cannot retract its admission, CCDH instead focuses on strained alternative readings of the ToS, an appeal to public policy that ignores the facts and context in which this dispute arises, and a damages argument that conflicts with both the allegations of X Corp.'s Amended Complaint (Dkt. 10), and the rest of CCDH's own Motion. Each increasingly contrived argument also goes to the factual merits of X Corp.'s claim—not the adequacy of its pleading—and is inappropriate for a motion to dismiss.

Additionally, CCDH, along with ECF, violated a federal statute, the Computer Fraud and Abuse Act ("CFAA"), intentionally interfered with contractual relations, and induced a breach of

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

contract by conspiring to access non-public data without authorization. Contrary to CCDH's arguments, Defendants' activities are a violation of the CFAA for which X Corp. pleads specific technological harm. And CCDH's and ECF's wrongful acts additionally interfered with and induced breach of the Brandwatch Agreements. CCDH's defense here too ignores both the pleading and controlling case law and asks the Court to rule on the merits of the claim without the benefit of discovery. Stripped of its misplaced First Amendment narrative, CCDH's Motion fails to raise any basis for dismissal, and should be denied in its entirety.

For the reasons set forth below, CCDH's arguments must fail.

## II.    STATEMENT OF ISSUES

1.    Whether the Amended Complaint's state law claims, which seek to hold CCDH liable for its unauthorized access to data, are subject to California's anti-SLAPP statute?

2.    Whether the Amended Complaint sufficiently pleads that CCDH US breached its agreement with X Corp. by scraping the X platform for data?

3.    Whether the Amended Complaint sufficiently pleads that CCDH and ECF violated the CFAA by conspiring to and accessing X Corp.'s non-public, protected data?

4.    Whether the Amended Complaint sufficiently pleads that CCDH and ECF induced Brandwatch to breach its contract with X Corp., or interfered with Brandwatch's contract with X Corp. by causing Brandwatch to fail to keep X Corp.'s non-public data secure?

## III.   FACTUAL BACKGROUND

X Corp. filed the Amended Complaint on August 7, 2023. Am. Compl., ECF 10. It alleges that CCDH has a history of using flawed methodologies to prepare reports about online content, and then using those reports to gather support for its public calls to deplatform people who disagree with CCDH's viewpoints on widely debated topics, such as climate change. Am. Compl., ¶¶ 3–4, 17–24. The Amended Complaint alleges that, in approximately 2022, CCDH turned its focus to X Corp., and undertook efforts to prepare similarly incorrect reports that could support its calls for companies to stop advertising on X. *Id.*, ¶¶ 25–26; 41.

Here, however, the Amended Complaint's claims against ECF and CCDH are not premised

- 3 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

1    on the falsity of any statements in CCDH's reports.   Am. Compl., ¶¶ 73–99.   The Amended

2    Complaint does not assert any claim for defamation.   *Id.*

3    The crux of the Amended Complaint's claims against the Defendants is founded squarely on

4    the Defendants' wrongful conduct leading up to CCDH's release of a particular report, dated

5    February 9, 2023.   Am. Compl., ¶¶ 73–99.   The Amended Complaint's claims are based on the

6    Defendants' course of conduct that resulted in CCDH gaining unauthorized access to non-public data

7    that X Corp. licensed to Brandwatch, and on CCDH US breaching its agreement with X Corp. by

8    scraping data from the X platform.   *Id.*

9    As alleged in the Amended Complaint, X Corp. partners with Brandwatch to provide

10   enterprise social listening tools to its customers.[3]   Am. Compl., ¶ 28.   Two agreements govern their

11   relationship: a May 1, 2020 Master License Agreement (the "2020 MLA") and a 2023 Twitter

12   Customer Order Form (the "2023 Order Form," together with the 2020 MLA, the "Brandwatch

13   Agreements").   Those Agreements give Brandwatch access to certain non-public data regarding X

14   (the "Licensed Material").   *Id.*, ¶ 30.   In turn, Brandwatch's customers, via secure Brandwatch login

15   credentials, can access that protected data to, for example, analyze posts on X for consumer response

16   to a new product or promotional campaign.   *Id.*   Only those with login credentials provided by X

17   Corp. and/or Brandwatch can do this, and the servers containing the Licensed Materials—which are

18   located in the United States—are secured.   *Id.*, ¶ 39.   Further, both Brandwatch Agreements with X

19   Corp. forbid Brandwatch from, among other things, copying, selling, leasing, sublicensing,

20   distributing, redistributing, syndicating, or otherwise transferring or providing access to the Licensed

21   Materials to third parties.   *Id.*, ¶¶ 31, 33.

22   At all relevant times, ECF was a Brandwatch subscriber and was provided login credentials

23   to access the Brandwatch applications.   Am. Compl., ¶ 36.   ECF could use its login credentials to

24   access the Licensed Materials, which were streamed from X Corp.'s servers in California to servers

25   used by Brandwatch in the United States.   *Id.*   As a condition of receiving that access, ECF agreed to

26

27   ---

[3] Among other things, Brandwatch's products enable brand monitoring, customer research on opinions and trends,
28   campaign planning and campaign effectiveness measurement, competitive analysis and risk management, influencer
     identification and market research, and audience segmentation and analysis.   Am. Compl., ¶ 28.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

the Brandwatch terms of service. *Id.*, ¶ 35. Those terms of service, consistent with the Brandwatch Agreements, prohibit ECF from providing third parties with unauthorized access to the Licensed Materials. *Id.*, ¶ 37. They prohibit ECF from making the Brandwatch applications available to anyone outside of ECF, including by prohibiting ECF from sharing its login credentials or data obtained via the Brandwatch applications. *Id.* The terms of service also require ECF to ensure that its user ID and password to the Brandwatch applications are kept confidential. *Id.*

ECF intentionally disregarded those obligations. Am. Compl., ¶ 38. Beginning in at least March 2021, ECF shared its login credentials to the Brandwatch applications with CCDH. *Id.*, ¶ 41. ECF did this knowing that it was prohibited from sharing those credentials, and that CCDH intended to use those credentials to access non-public data on protected servers located in the United States. *Id.*, ¶¶ 41–43]. ECF further shared its login credentials knowing how CCDH intended to use that non-public data, i.e., to ultimately seek support for calls to companies to stop advertising on X. *Id.*

CCDH, for its part, and as demonstrated by its conduct, knew about the series of agreements protecting access to the non-public Licensed Materials. Am. Compl., ¶ 38. The Licensed Materials were non-public (*Id.*, ¶ 39), kept on X Corp.'s protected servers in the United States (*Id.*, ¶ 29), and something that CCDH—which was not a Brandwatch subscriber—wanted access to but knew it could not get without accessing the protected Brandwatch applications via ECF's login credentials (*Id.*, ¶ 39). It follows that CCDH, as a supposed "research" organization that regularly relies on social media as a source of data collection, plausibly knew of ECF's publicly-available agreement with Brandwatch, which prohibited ECF from sharing its login credentials or data from the Brandwatch applications with third parties (*Id.*, ¶¶ 35, 38), and plausibly knew that X Corp.'s agreements with Brandwatch required Brandwatch to keep X Corp.'s data non-public and protected from all but Brandwatch's customers (*Id.*, ¶ 38).

CCDH wanted access to the Licensed Materials to prepare its "reports and articles with [its] desired narratives," and induced and conspired with ECF to provide CCDH with ECF's login credentials to the Brandwatch applications to access those Licensed Materials. *Id.*, ¶ 43. CCDH engaged in these acts intentionally and with the intent to harm X Corp. *Id.*

Additionally, CCDH breached its agreement with X Corp. to secure further data that CCDH

- 5 -

sought to use in their February 9, 2023 report.  Am. Compl., ¶ 52.  CCDH US is a registered user of X and, as part of registering to use the platform, voluntarily agreed to X's ToS.  *Id.*, ¶ 53.  The ToS provide that "scraping the Services [i.e., X] without the prior consent of [X Corp.] is expressly prohibited."  *Id.*  Despite that, CCDH US has admitted that, "[t]o gather tweets from each of the ten reinstated accounts, [CCDH's] researchers used the social media ***web-scraping*** tool ***SNScrape***, which utilizes [X's] search function to enable data collection."  *Id.*, ¶ 54 (emphasis added).  The tool's name even includes the word "Scrape."  X Corp. believes, including based on CCDH US's own admission, and discovery will show, that CCDH US has scraped X multiple times since 2021 in violation of the ToS.  *Id.*, ¶ 55.  Moreover, the Amended Complaint alleges "CCDH engaged in its unlawful scraping with the intent to improperly obtain data that would be used to cause X Corp. to lose significant advertising revenues."  *Id.*, ¶ 78.

CCDH queried and assessed the improperly scraped data from X and the unlawfully accessed Licensed Materials.  Am. Compl., ¶ 43.  It cherry-picked from the hundreds of millions of posts made each day on X, and used the data to falsely claim that it had statistical support showing X is overwhelmed by harmful content, and to lend false legitimacy to that assertion.  *Id.*, ¶ 78.  CCDH used its deeply flawed, purported "findings" in its February 9, 2023 report and called for companies to stop advertising on X.  *Id.*, ¶ 56.  Major news outlets picked up on that.  *Id.*, ¶ 56.

As a direct and proximate result, at least eight organizations, including large, multinational corporations that have historically run paid advertising on X, immediately paused advertising spend (Am. Compl., ¶ 67), others halted plans for future advertising campaigns (*Id.*, ¶ 68), and others pointed to CCDH's November 10, 2022 "report" as a barrier to reactivating campaigns (*Id.*, ¶ 69).  X Corp. has thus lost at least tens of millions of dollars in revenues.  *Id.*, ¶ 70.  X has spent considerable resources investigating and remediating CCDH's unauthorized access to the data.  *Id.*, ¶ 71.  Most fundamentally, and fulfilling CCDH's goal, X Corp. has been harmed in its mission to establish X as an open marketplace for the exchange of ideas, free from censorship.  *Id.*, ¶ 72.

The Amended Complaint asserts several claims based on the foregoing: (i) breach of contract against CCDH US for scraping X; (ii) violation of the CFAA against all Defendants; (iii) intentional interference with contractual relations against all Defendants; and (iv) inducing breach of contract

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    against all Defendants.  Am. Compl., ¶¶ 73–99.

2    **IV.    SUMMARY OF ARGUMENT**

3         The standard applicable to both of CCDH's motions is that which governs under Federal Rule

4    of Civil Procedure ("Rule") 12(b)(6)–dismissal is appropriate only if the allegations, accepted as true

5    and construed in the light most favorable to X Corp., fail to state a claim that is plausible on its face.

6    *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

7    CCDH's motions, and its myriad arguments, fail under that standard as to each of X Corp.'s claims.[4]

8         **A.    Anti-SLAPP**

9         The Amended Complaint's allegations challenge CCDH's conduct in unlawfully scraping X

10   for data, and in gaining unauthorized access to the Licensed Materials via impermissible use of ECF's

11   login credentials to the Brandwatch applications.   The Amended Complaint does not assert a

12   defamation claim, nor does any claim hinge on the falsity of any statement.  *Kovalenko v. Kirkland*

13   *& Ellis LLP*, 2023 WL 5444728, at *3 (N.D. Cal. Aug. 23, 2023).  An anti-SLAPP analysis focuses

14   on specific conduct the claim is challenging, not collateral activity, *Wang v. Wal-Mart Real Estate*

15   *Bus. Trust*, 153 Cal. App. 4th 790 (2007), and the conduct challenged here is not protected speech

16   because it is a challenge to CCDH's *access to* X data, not to CCDH's later decision to publish a

17   report that mischaracterized the data it unlawfully accessed.  *Cohen v. Cowles Media Co.*, 501 U.S.

18   663, 679-70 (1991).

19        Even if the anti-SLAPP statute applies (which it does not), the Amended Complaint's

20   allegations still establish a probability that X Corp. will prevail on its claims as described below.

21        **B.    Breach of Contract**

22        X Corp.'s breach of contract claim alleges CCDH US agreed under the ToS not to scrape X,

23   but then admitted to using "web-scraping tool SNScrape" to do just that.  X Corp.'s allegations and

24   interpretation of the ToS are plausible and sufficient under Rule 12(b)(6).  CCHD's arguments

25   nonetheless ask the Court to conclude disputed factual matters, i.e., whether CCDH US's activities

26   constitute "scraping" under the ToS.  They, along with amici's arguments, ask the Court to conclude

27

28   _____
     [4] X Corp.'s opposition is compliant with the Court's order that it be no more than 35 pages, exclusive of, among other
     things, a summary of argument as is required here.  ECF 44.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

as a matter of law that scraping is "good" so as to invalidate the ToS's anti-scraping provision on purported public policy grounds. These factual arguments cannot be resolved on a motion to dismiss. *Hall v. FCA US LLC*, 2022 WL 1714291, at *1 (9th Cir. May 27, 2022).

CCDH's and amici's arguments are also incorrect. Invalidating contractual prohibitions on scraping would disregard Ninth Circuit case law recognizing harms caused by scraping. *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 954 (N.D. Cal. 2022). It would ignore case law establishing that "[t]he right to speak and publish does not carry with it the unrestricted right to gather information," *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), and that the First Amendment cannot be applied to relieve CCDH US of its private contractual obligations to X Corp. *Cohen*, 501 U.S. at 679-70; *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1251 (N.D. Cal. 2022). CCDH's arguments that X Corp. does not allege cognizable damages also fails because it ignores that X Corp. seeks damages for tangible, economic loss, i.e., lost advertising revenue, not intangible "reputational" harm. *Planned Parenthood Fed'n of Am. v. Newman,* 51 F.4th 1125, 1134 (9th Cir. 2022); *Nat'l Abortion Fed'n v. Ctr. for Medical Progress*, 2018 WL 5879786, at *6 (N.D. Cal. Nov. 7, 2018).

## C. CFAA

X Corp.'s CFAA claim is sufficiently pleaded based on allegations that ECF impermissibly shared its login credentials with CCDH to access protected servers containing non-public data, which CCDH otherwise could not access. *U.S. v. Nosal ("Nosal II")*, 844 F.3d 1024, 1037-38 (9th Cir. 2016). CCDH's argument that it was a permissible "User" of ECF's login credentials extends beyond the pleadings (*Weingard v. Harland Fin. Solutions, Inc.*, 2012 WL 3763640 at *2 (N.D. Cal. Aug. 29, 2012)), and is wrong. ECF's agreements with Brandwatch that it has shared, explicitly exclude third parties from the scope of the term "User" and separately specify that "Users" can access protected data only for "internal purposes," which CCDH clearly exceeded.

CCDH's other CFAA-related arguments also fail. X Corp.'s CFAA claim is not premised on CCDH breaching any contract, but rather on its accessing X Corp. data without authorization. *Van Buren v. United States*, 593 U.S. –, 141 S. Ct. 1648, 1660 (2021). The Amended Complaint sufficiently pleads cognizable loss, i.e., more than $5,000 in costs in investigatory efforts to ascertain the nature and scope of CCDH's unauthorized access, employee resources and time, and attorney

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

fees to aid those investigations. *Facebook, Inc. v. Holper*, 2022 WL 17167958, at *8 (N.D. Cal. Sept. 27, 2022). It more than satisfies Rule 8's applicable notice pleading standard (*NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 833 (N.D. Cal. 2014)), in specifying that CCDH violated CFAA §§ 1030(a)(4) and (b). And it even satisfies Rule 9(b)'s heightened pleading standard if it applied (which it does not) by alleging that CCDH misrepresented itself as an authorized user of ECF's account *on multiple occasions since early 2021*. *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 507 (D. Del. 2022).

**D.**      **Intentional Interference with Contractual Relations and Inducing Breach**

X Corp. permissibly pleads claims for both intentional interference with contractual relations and inducing breach of contract. *Spanish Broadcasting Sys. v. Grupo Radio Centro LA, LLC*, 2016 WL 11741137 (C.D. Cal. May 23, 2016). It alleges CCDH—as a supposed "research" organization reliant on social media as a source of data collection, and which went to great lengths to secure ECF's login credentials to access non-public data—would have known that X Corp. only provided Brandwatch with access to the Licensed Materials under an agreement that required Brandwatch to ensure the data remained secure. CCDH then, as an unauthorized user of ECF's login credentials, impermissibly accessed that data, causing Brandwatch to breach its agreement with X Corp. and X Corp. to suffer tangible, economic loss, all as described above. CCDH's contrary arguments ask for factual determinations, ignore well-pleaded allegations, and must fail for these reasons.

**E.**      **Doe Defendants and Leave to Amend**

X Corp. has pleaded factual bases to believe there are unknown persons or entities that have participated in and supported ECF's and CCDH's unlawful efforts, including statements to that effect from a United States Senator. There is no basis for dismissing the Doe Defendants before X Corp. can conduct discovery in efforts to identify them, and CCDH has not shown otherwise. *Merino v. County of Santa Clara*, 2019 WL 2437176 at *12 (N.D. Cal. June 11, 2019).

X Corp.'s claims are properly pleaded but, if the Court is inclined to grant any part of CCDH's motions, X Corp. should be given leave to amend, consistent with Rule 15(a)'s presumption in favor of doing so. *Sonoma Cnty. Ass'n of Retired Employees v. Sonoma Cnty.*, 708 F.3d 1109, 1118 (9th Cir. 2013). Based on X Corp.'s ongoing investigation, it can further allege, among other things, that

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

1  ECF knew it was impermissibly sharing its login credentials with CCDH, apologized when

2  Brandwatch confronted it, and blamed a "rogue" actor within ECF.

3  **V.    ARGUMENT**

4          In asking the Court to jump straight to the merits of X Corp.'s claim without any discovery,

5  the Motions all but ignore the applicable legal standard.  Because CCDH's Motion to Strike raises

6  only legal challenges, the Rule 12(b)(6) standard applies to both its traditional Motion to Dismiss

7  and Anti-SLAPP Motion. Mot. 5–6 (citing *Planned Ctr. for Med. Progress*, 890 F.3d at 834).  Thus,

8  the legal standard applicable here is that dismissal "is appropriate only where the complaint lacks a

9  cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v.*

10  *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

11         The Court must "accept factual allegations in the complaint as true and construe the pleadings

12  in the light most favorable to [X Corp.]."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

13  1025, 1031 (9th Cir. 2008).  The Court must deny the Motion unless it finds that the Amended

14  Complaint has failed to state a claim that is plausible on its face.  *Stepping Stones Group, LLC v.*

15  *Amethod Public Schools*, 2023 WL 7602353 (N.D. Cal. Nov. 13, 2023).  "A claim is facially plausible

16  when a plaintiff pleads 'factual content that allows the court to draw the reasonable inference that the

17  defendant is liable for the misconduct alleged.'"  *Id.*, at *1.

18         **A.    California's Anti-SLAPP Statute Is Inapplicable Here**

19         California's anti-SLAPP statute applies to claims "against a person arising from any act of

20  that person in furtherance of the person's right of petition or free speech under the United States

21  Constitution or the California Constitution in connection with a public issue."  Cal. Civ. Proc. Code

22  § 425.16(b)(1).  CCDH and the Public Participation Project (as an *amicus curiae*) argue that the Court

23  must apply the anti-SLAPP statute because the Amended Complaint purportedly challenges CCDH's

24  speech. Mot. 8–9; *Amicus* Brief in Support [Dkt. 55-1] ("Public Participation Brief").  Not so.

25         As CCDH is quick to point out, the Amended Complaint does *not* include a cause of action

26  for defamation.  CCDH's alleged "speech" is not the wrong complained of—its wanton breach of

27  contract and illegal access of data are. Am. Compl., ¶¶ 73–99.  Just as the hack of a computer system

28  results in greater harm if the information obtained is distorted and widely released to the public, that

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

CCDH ultimately manipulated and mischaracterized the data it obtained to widely publish the alleged reports increases X Corp.'s damages. *Id.* But CCDH's public "reports" do not give rise to X Corp.'s claims, nor even supply a necessary element to those claims. *Id.*

"The California Court of Appeal has interpreted the anti-SLAPP statute's 'arising from' language to mean that a claim is based on whatever conduct constitutes the 'specific act of wrongdoing' that gives rise to the claim. Put another way, a court focuses its anti-SLAPP analysis on the specific conduct that the claim is challenging." *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1190 (9th Cir. 2017); *Wang*, 153 Cal. App. 4th 790 (anti-SLAPP did not apply to breach of contract claim; "[t]he overall thrust of the complaint challenge[d] the manner in which the parties privately dealt with one another, on both contractual and tort theories, and d[id] not principally challenge the collateral activity of pursuing governmental approvals").

It is fantasy to claim that X Corp. seeks to hold CCDH liable for their "criticism of X's policies." Public Participation Brief at 12. The "specific act[s] of wrongdoing" include CCDH US's breach of the ToS it agreed to, CCDH's unauthorized access to data in violation of the CFAA, its tortious interference with the Brandwatch Agreements, and its intentional inducement of a breach of the Brandwatch Agreements. None challenges CCDH's speech.

Moreover, CCDH's actions caused harm independent of any alleged protected activities. X Corp. places independent value on its ability to protect its data, including protective measures such as the ban on scraping. And parties to a contract cannot disregard the terms of their agreements, or governing statutory law, simply by invoking the mere pursuit of contemplated, alleged protected speech. If they could, no agreement (including confidentiality agreements) or law (including anti-hacking laws) would be immune from the whims of a would-be speaker, or at least someone who places the importance of their own endeavors above the rule of law and interests of others.

CCDH's and its *amicus's* free speech argument falls apart under the facts of this case. If CCDH carried out all the same illegal activities, but stopped just short of publishing the February 9, 2023 report, X Corp. would maintain the very same valid claims against it. In such a posture—where the speech is at most merely collateral to the claim—California's anti-SLAPP statute cannot apply. *See Kovalenko*, 2023 WL 5444728, at *3 ("a claim may be struck only if the activity *itself* is the

- 11 -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.  The question is whether the challenged allegations 'supply a necessary element' of a claim" (emphasis added)).

For these reasons, California's Anti-SLAPP statute is inapplicable and CCDH's Motion to Strike thereunder should be denied.  And even assuming *arguendo* that California's Anti-SLAPP statute does apply here (which it does not), CCDH's Motion to Strike is subject to review under a Rule 12(b)(6) standard in any event, and should be denied for the same reasons as its Motion to Dismiss set forth below.  *See Ctr. for Med. Progress*, 890 F.3d at 834 (legal arguments under anti-SLAPP motion measured under Rule 12(b)(6) standard for sufficiency of the allegations).

## B. The Amended Complaint Sufficiently Pleads A Claim For Breach of Contract Against CCDH US

The Amended Complaint plausibly and sufficiently alleges: (1) the existence of a contract (the ToS); (2) that at all times X Corp. performed under the contract; (3) that CCDH US breached that contract by scraping data without consent; and (4) that X Corp. was damaged by the breach.  *See Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  CCDH's arguments and those of *amici* are little more than smoke and mirrors that bear little relation to the pleaded claims or to the applicable legal standard.

### 1. A Breach is Plausibly Alleged Because CCDH US Agreed Not to Scrape X and Has Admitted Scraping X

CCDH first argues that the ToS's express ban on scraping should exclude the activities in which CCDH US admits to having engaged, even though CCDH itself characterized its own activities as "scraping." Mot. 10.  CCDH's argument is untethered from the Amended Complaint's allegations, and fails on its face.

CCDH's proffered interpretation asks the Court to take it upon itself to parse "scraping" into ill-defined subsets of conduct the ToS nowhere contemplates.  Mot. 11.  CCDH's argument is untethered from the contractual terms, and, in any event, is wholly inappropriate for a motion to dismiss.  "In a breach of contract action, the non-moving party's interpretation of the contract need only be plausible to withstand a Rule 12(b)(6) motion." *Spartan Capital Sec., LLC v. Vicinity Motor*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

*Corp.*, 2023 WL 4004116, at *6 (N.D. Cal. June 13, 2023) (citations omitted); *see also Glancy v. Carl Zeis, Inc.*, 2015 WL 7755995, at *4 (C.D. Cal. Nov. 30, 2015).

The Amended Complaint's pleaded interpretation of the ToS is plausible (indeed, more than plausible). CCDH does not dispute the ToS expressly states "scraping the Services without the prior consent of [X Corp.] is expressly prohibited." Mot. 10; Am. Compl., ¶ 53. Nor does CCDH dispute the Amended Complaint alleges its admitted "use[] [of] the social media web-scraping tool SNScrape" constituted a breach of the terms of service. *Id.*, ¶ 54. That the "scraping" CCDH admits to is the same "scraping" contemplated by the ToS is a more than reasonable interpretation.

Completely ignoring the Rule 12(b)(6) standard applicable to its Motion, CCDH asks the Court to interpret the ToS such that the "scraping" CCDH US admits to performing is not, in fact, the same "scraping" contemplated by the agreement. CCDH bases its counterintuitive interpretation on the scale of CCDH US's activity (a question of fact), its claimed methodology (a question of fact), its supposed intended purpose (a question of fact), and its purported understanding of the contract at the time of entering into it (a question of fact). Mot. 11–14. CCDH's argument also incorrectly ignores that the then-operative ToS drew a distinction between prohibited "scraping" (which is what CCDH literally said it did), and "crawling" that was permitted "if done in accordance with the provisions of the robots.txt file." Request for Judicial Notice ("RJN"), Ex. 2. X Corp. is aware of no facts indicating that CCDH merely crawled its platform in compliance with X Corp.'s robots.txt file, let alone are any such facts pleaded in the Amended Complaint.

Setting aside the merit of any of CCDH's above arguments (and as X Corp. will show through discovery, there is none), it would be error for the Court to consider any such fact-intensive questions at this stage. *See e.g.*, *Hall*, 2022 WL 1714291, at *1 (district court erred in adopting party's proposed interpretation at the motion to dismiss stage where the contract was ambiguous and interpretation involved a question of fact); *see also Picketfence Inc. v. R.R. Donnelley & Sons Co.*, 2007 WL 9811030, at *2 (N.D. Cal. Nov. 6, 2007); *Intel Corp. v. Via Techs, Inc.*, 2001 WL 777085, at *6 (N.D. Cal. Mar. 20, 2001) ("[C]ontract-interpretation questions should not be resolved on a motion to dismiss"). All the Court needs to decide at this stage is whether X Corp.'s interpretation that "scraping" means "scraping" is plausible. It obviously is.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

### 2.      CCDH's Purported Concerns Regarding Public Policy Are Not Valid Bases for Dismissal

CCDH alternatively takes a slightly different approach to the same argument—again untethered to the allegations of the Amended Complaint—in claiming that the anti-scraping provision in the ToS violates public policy.

California courts have imposed a high bar to invalidating a contract on the basis of policy.  A contract is only unenforceable if it is either "contrary to an express provision of law" or "contrary to the policy of express law, though not expressly prohibited."  *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal.5th 59, 72 (2018).  Here, the interests CCDH alleges the anti-scraping provision violates are "speech principles underpinning the federal Free Speech Clause and the state Liberty of Speech Clause."  Mot. 14.  Such laws and policies "prohibit[] the government—not a private party—from abridging speech" (*Prager Univ. v. Google, LLC*, 951 F.3d 991, 996 (9th Cir. 2020) (YouTube's content moderation not subject to First Amendment scrutiny)), and CCDH fails to provide authority demonstrating that a private platform's regulation of activities on its site offends the First Amendment or California's equivalent.  In any event, and perhaps even more fundamentally, the ToS's limitation on unauthorized data-scraping activity is not a speech restriction at all.

There are important reasons why Internet platforms ban scraping.  As others have described in defense of similar contractual provisions, "scraping . . . is bad for [the platform] and its members: scraping burdens [the platform's] servers, inhibiting the site's performances, [and] scrapers may retain and sell members' deleted information, interfering with members' control over or expectations regarding their information."  *hiQ Labs, Inc..*, 639 F. Supp. 3d at 954.  It "greatly increase[s] the quantities of queries on the [] [w]ebsite, impair[s] the availability and/or usability of the [] website, and cause[s] the website's response times to deteriorate."  *Ryanair DAC*, 636 F. Supp. 3d at 503.  It can "interfere[] with [the plaintiff]'s use and possession of another's property."  *Sw. Airlines Co. v. Fare-Chase, Inc.*, 318 F. Supp. 2d 435, 442 (N.D. Tex. 2004).  X Corp., like others, has an interest in safeguarding the integrity of its users' data and of the platform itself.  It protects this interest, among other ways, by banning scraping in the ToS.

While CCDH and others may wish that platforms did not prohibit scraping, platforms'

- 14 -

decisions to do so is *not* a restriction on speech.  It is long settled that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information."  *Rusk*, 381 U.S. at 17.  As the United States Supreme Court explained in *Rusk*:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.  For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.

*Rusk*, 381 U.S. at 16–17; *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) ("no basis for the claim that the First Amendment compels others—private persons or governments—to supply information").

That CCDH may ultimately wish to incorporate into a public statement data that it obtains in breach of contract via scraping does not clothe its wrongful action in the garb of protected speech or render X Corp.'s otherwise valid contract provision unenforceable.  *See Cohen*, 501 U.S. at 669-70 (First Amendment did not protect press from promissory estoppel claim where newspapers promised to keep source's name confidential, but breached that obligation; it is "beyond dispute that '[t]he publisher of a newspaper has no special immunity from the application of general laws.  He has no special privilege to invade the rights and liberties of others'"); *see also Smith v. Super. Ct.,* 2018 WL 6072806, at * 1 (N.D. Cal. Nov. 16, 2018) (citing *Cohen* to find that "Smith cannot now invoke the First Amendment to wriggle out of his contractual duties").

This Court has already considered—and rejected—similar arguments that contract provisions limiting certain platform access are unenforceable on First Amendment grounds.  In *Meta Platforms v. BrandTotal*, BrandTotal argued that a contract provision banning users from collecting data using unauthorized automated means impermissibly burdened interests in free speech and the flow of information.  *Meta Platforms, Inc.*, 605 F. Supp. 3d at 1251 (N.D. Cal. 2022).

In that case, as here, BrandTotal's "general interest in [the] free flow of information [was] defined too vaguely to support setting aside a contract regarding means of access without a showing that the courts or legislature have determined that interest outweighs the competing interest in enforceability of contracts under comparable circumstances."  *Id*. at 1252.

CCDH does not provide any reason for the Court to reverse course, and the Motion's

- 15 -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

arguments and authorities are inapposite. None of the Motion's authorities, which involve criminal laws, stand for the proposition that the First Amendment allows a party to breach contracts and be absolved of all civil liability vis-à-vis another private (non-governmental counterparty) because the breaching party later made statements stemming from its earlier breach. *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 17–18 (D.D.C 2018) (appellants sought to invoke the First Amendment to avoid *criminal prosecution* for scraping publicly available information, but did not seek immunity from "private consequences, such as a website banning them or deleting their accounts"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) (in assessing *state criminal statute* that prohibited any business from contributing to expending money to influence political referenda that did not materially affect the business, recognizing that "First Amendment … prohibit[s] government from limiting the stock of information from which members of the public may draw"); *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1189 (9th Cir. 2018) (assessing *criminal law* prohibiting making audio and visual recordings of an agricultural facility).

### 3. The Arguments of *Amici Curiae* Do Not Support Dismissal

The American Civil Liberties Union Foundation of Northern California, Electronic Frontier Foundation, and Knight First Amendment Foundation re-urge many of the same policy arguments in their separately filed Brief of *Amici Curiae* ("ACLU Brief," Dkt 52-1).

First, *amici* (like CCDH), confuse a limitation on the ability to gather information with a limitation on the ability to speak. ACLU Amicus at 4–5. As discussed above, if all activity in the interest of gaining knowledge constituted protected "speech," there is little that could not be characterized to fall within the First Amendment's ambit. Hacking into the ACLU's computer servers would be protected by the First Amendment. Stealing books from the library (or files from a government office) would be protected by the First Amendment. None of that is protected speech. The cases to which *amici* cite all address wildly different circumstances, and are inapplicable here. ACLU Amicus at 5; *Cariveau v. Halferty*, 83 Cal. App. 4th 126, 132-37 (2000) (agreement not to speak on securities violations contravened specific securities laws and regulations by hiding disclosure of registered broker's wrongdoing to regulator); *McPhearson v. Michaels Co.*, 96 Cal. App. 4th 843, 850-51 (2002) (finding that individual could be a percipient witness, but could not

testify about settlement terms subject to confidentiality provision).

Second, *amici* confusingly cite case law on the high bar to defamation claims, ignoring that no such claim has been pleaded here.  ACLU Amicus 5–7.

And third, *amici*, again like CCDH, disregard the security and other concerns that platforms seek to protect.  *Amici* wish to characterize scraping as an unassailable "good"—a tool so valuable that the Court should invalidate an otherwise enforceable agreement to protect its use.  ACLU Amicus Brief at 7–11.  But, as discussed above, this is simply not the case.  Scraping not only threatens site performance, but, equally also the security of the personal data of the platform's users.  A user may publish something with the expectation it can be removed and deleted or its distribution will be limited to friends and those who specifically search out their content, only to have those expectations subverted by the unauthorized use of data scrapers.

Moreover, the thrust of *amici's* policy argument—that the "good" CCDH can purportedly accomplish via scraping outweighs any interest a platform might have in prohibiting scraping—is riddled with fact and value questions that are best left to a legislature, and that in all events cannot be resolved on the pleadings.  *Amici*'s arguments essentially rest on their assumptions that "scraping" in general, or at least by certain organizations they favor, is, in fact, beneficial to society, that CCDH US is one such preferred organization, and that any scraping by such organizations outweighs any harm to platforms and users.  But those are assumptions of disputed fact (including concerning CCDH's intent in violating the ToS and the harm it caused in doing so), embedded with value judgments that courts are ill-equipped to resolve, which in all events cannot be established as a matter of law on the pleadings, as CCDH and *amici* would urge the Court to do.

### 4.    The Motion Misstates Applicable Law On Damages

CCDH US argues that X Corp. does not sufficiently allege recoverable damages to maintain its claim for breach of contract.  Again, CCDH US ignores the relevant standard, which requires X Corp. to merely plausibly allege its claim.  X Corp. has more than satisfied that standard.

The Amended Complaint pleads with specificity that, as a result of CCDH's unlawful conduct, including CCDH US's breach of the ToS, companies that advertised on X paused advertising spending (Am. Compl., ¶ 67), paused future plans for advertising (Am. Compl., ¶ 68),

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

1    and paused plans to reactivate advertising campaigns (Am. Compl., ¶ 69).  It alleges that "CCDH

2    engaged in its unlawful scraping with the intent to improperly obtain data that would be used to cause

3    X Corp. to lose significant advertising revenues."  *Id.*, ¶ 78.  It further alleges that CCDH's conduct

4    has forced X Corp. to "conduct[] internal investigations in efforts to ascertain the nature and scope

5    of CCDH's unauthorized access to data," "allocate[] significant employee resources and time to

6    participate and assist in those investigations," and "incur[] attorneys' fees and other costs in aid of

7    those investigations and in enforcing the relevant agreements." Am. Compl., ¶ 71.

8        These allegations satisfy the pleading requirements under Rule 8, to sufficiently plead

9    damages in connection with a claim for breach of contract.

10        The Motion does an about-face from the rest of its briefing and argues that CCDH's speech—

11    which for all other purposes CCDH conflates with its data scraping conduct—is too attenuated from

12    CCDH's improper data access for damages to be recoverable.  Mot. at 16–17.  This is at odds with

13    the rest of the Motion's argument, and is incorrect.  Without being able to scrape X's data, CCDH

14    would not have been able to make the claims about that data that caused advertisers to pause or reduce

15    advertising on the platform.  The scraping was a but-for and proximate cause of X Corp.'s losses.

16    CCDH disagrees, but the Motion again impermissibly demands that the Court engage in a fact-

17    intensive analysis without the benefit of any discovery to determine what CCDH knew or could have

18    known at the time of contracting and what CCDH knew or could have known would result from its

19    actions.  Such inquiries are properly reserved for a motion for summary judgment or trial.

20        The Motion then jumps to the bold proposition that "courts have resoundingly rejected

21    reputational damages in contract actions." Mot. 16.  But that does not square with the tangible,

22    economic losses that X Corp. actually alleges, e.g., lost advertising revenue.  *See Cohen*, 501 U.S. at

23    671 (damages sought not for "injury to his reputation or his state of mind," but rather "for breach of

24    a promise that caused [plaintiff] to lose his job and lowered his earning capacity"); *Newman*, 51 F.4th

25    at 1134 (where defendants breached confidentiality agreements by secretly recording and releasing

26    discussions, damages were for economic loss in the form of increasing security to address those

27    incursions); *see also Nat'l Abortion Fed.*, 2018 WL 5879786, at *6 ("line demarking permitted

28    damages from purely reputational damages (that stem only from truthful, non-misleading publication

of material) … cannot be determined on a motion to dismiss").

CCDH's authorities on this point are inapposite.  CCDH presents a truncated quote from *King v. Facebook* that it claims "not[es] 'legions of cases' holding that 'damages are not recoverable for . . . injury to reputation resulting from breach of contract.'"  Mot. 16 (citing *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 790 (N.D. Cal 2021)).  But that case dealt with a plaintiff's claim for emotional damages stemming from the deactivation of her Facebook account and associated loss of certain photos.  *King*, 572 F. Supp. 3d at 790.  And in full, the quote on which the Motion relies reads, "[t]he invariable rule is pronounced by a legion of cases that damages are not recoverable for mental suffering or injury to reputation resulting from breach of contract."  *Id*. (rejecting alleged emotional distress damage).  By contrast, the damages alleged in the Amended Complaint are economic, not psychological, in nature.

*Frangipani* and *Rice* likewise are inapposite.  Mot. 16; *Frangipani v. Boecker*, 64 Cal. App. 4th 860, 864-65 (1998) (damages to credit score by initiation of foreclosure not recoverable); *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 287–88 (4th Cir. 2000) (court should have required showing loss of identifiable professional opportunities for plaintiff to seek recovery of consequential damages).

CCDH ignores a similar distinction between injury to "reputation or state of mind" and economic harm drawn by the very First Amendment cases on which its Motion relies, and it again distorts the holdings of those cases by selectively excerpting quotations stripped of context.  Mot. 17.  CCDH, for example, misleadingly cites *Newman* to suggest that the Ninth Circuit has held that damages are only recoverable for harms that would have been suffered "even if [a defendant] had never published" their speech.  Mot. 17 (citing *Newman*, 51 F.4th at 1134).  The Ninth Circuit set no such bright-line rule.  The Ninth Circuit, citing *Cohen*, merely rejected the defendants' argument that plaintiff needed to show malice to recover damages "related to truthful publications."  *Id.*

The Amended Complaint pleads specific and measurable harm directly arising from CCDH's wrongful conduct in the form of lost advertising revenue and in resources spent to address the security breach.  It alleges that the harm was not merely foreseeable but intentional.  There is no basis for dismissal on the pleadings.

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

C.      **The Amended Complaint Sufficiently Pleads a CFAA Claim[5]**

With regard to X Corp.'s CFAA claim, the Motion first asks the Court to engage with a series of "what if" propositions that it argues would absolve CCDH and ECF from liability if true.  The Motion also misstates or misapplies the applicable law on damages.  And finally, the Motion asserts—with only passing reference to either case law or the Amended Complaint—that a heightened pleading standard should apply to X Corp.'s claims and that X Corp. fails to meet such standard.  None of the Motion's arguments provides a basis for dismissal.

1.      **Impermissible Password Sharing As Alleged In the Amended Complaint Violates the CFAA's Prohibition Against "Unauthorized Access"**

The CFAA forbids "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access" to obtain "information from any protected computer." 18 U.S.C. § 1030(4).  A "protected computer" includes one "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030 (e)(2).  A private right of action is available to any person "who suffers damage or loss by reason of a violation of this section."  18 U.S.C. § 1030(g).

The Amended Complaint pleads, as relevant here, that: (i) CCDH violated the CFAA by knowingly and with intent to defraud, accessing a protected computer (Am. Compl., ¶ 82); and (ii) that by accessing the computer, obtained one or more things of value (*Id.*).  And as the Motion itself recounts, CCDH's unauthorized access consisted of: CCDH knowing that the Licensed Materials were located on servers to which CCDH did not have access; CCDH conspiring with ECF such that ECF would provide its login credentials to the Brandwatch applications to CCDH; ECF knowing that it was impermissible to share its login credentials with CCDH, knowing how CCDH intended to use those login credentials, and supporting CCDH's efforts; CCDH knowing it did not have permission to access the Brandwatch applications, even with ECF's login credentials; and, CCDH US, with support from CCDH UK, then using ECF's login credentials to access the Brandwatch applications and the Licensed Materials, all without authorization. Mot. 19 (citations omitted).  Indeed, the

---

[5] CCDH's anti-SLAPP Motion to Strike—which is only raised as to X Corp.'s state law claims—does not extend to X Corp.'s claims under the CFAA.  Mot. 8–9.

1    Licensed Materials are inaccessible without a Brandwatch account and password, and CCDH did not

2    merely access a section of an otherwise public database, but rather an entirely protected database of

3    analytics otherwise unavailable to it.  Am. Compl., ¶¶ 26, 42–43.

4        Those allegations establish a claim under the CFAA for unauthorized access.  *Nosal II*, 844

5    F.3d at 1037-38 (CFAA violation properly founded on impermissible password sharing, where

6    "former employees whose computer access was categorically revoked and who surreptitiously

7    accessed data owned by their former employer").

8        a.    **Binding Ninth Circuit Precedent In *Nosal II* Establishes**

9             **That CCDH's Alleged Conduct Violated the CFAA**

10       *Nosal II* is illustrative.  There, three employees (Nosal, Christian, and Jacobson) left

11   Korn/Ferry to start a competing business, and each of their employee-specific login credentials to

12   Korn/Ferry's systems were revoked.  *Nosal II*, 844 F.3d at 1031.  Nosal then asked Christian and

13   Jacobson to request that someone else still employed at Korn/Ferry (FH) provide them with his login

14   credentials, so they could query Korn/Ferry's systems for its proprietary data.  *Id.*  FH provided his

15   login credentials, and Christian and Jacobson used them on several occasions to access Korn/Ferry's

16   systems, run search queries and generate reports from its data.  *Id.*  All Korn/Ferry employees

17   contractually agreed not to share their individual passwords to access that system.  *Id.*

18       Nosal was charged with, among other things, violating the CFAA, and the Ninth Circuit in

19   *Nosal II* was asked to assess whether his conduct constituted accessing Korn/Ferry's systems

20   "without authorization."  *Nosal II*, 844 F.3d at 1034–35.  The Ninth Circuit confirmed that it did

21   indeed constitute a CFAA violation, as Korn/Ferry:

22           owned and controlled access to its computers, including the Searcher
             database, and it retained exclusive discretion to issue or revoke access
23           to the database.  By revoking Nosal's login credentials on December 8,
             2004, Korn/Ferry unequivocally conveyed to Nosal that he was an
24           'outsider' who was no longer authorized to access Korn/Ferry
             computers and confidential information, including Searcher.
25           Korn/Ferry also rescinded Christian and Jacobson's credentials after
             they left, at which point the three former employees were no longer
26           'insiders' accessing company information.  Rather, they had become
             'outsiders' with no authorization to access Korn/Ferry's computer
27           system.

28

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

- 21 -

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

1    *Id.* at 1035-36.  The Ninth Circuit went on to confirm that the applicable provisions of the CFAA as

2    applied in this way, i.e., to cover unauthorized password sharing to access protected data by someone

3    who is an "outsider," do not sweep in "arguably innocuous conduct, such as password sharing among

4    friends and family, inadvertently 'mak[ing] criminals of large groups of people who would have little

5    reason to suspect they are committing a federal crime.'"  *Id.* at 1038.  This is because the CFAA

6    requires wrongful intent for liability to attach.  *Id.*

7        The allegations here establish an even clearer CFAA violation than in *Nosal II*, where Nosal

8    at some point *had* been granted access by Korn/Ferry to its systems.  *Nosal II*, 844 F.3d at 1031.  The

9    Amended Complaint alleges that CCDH has *never* been a customer of Brandwatch, has *never* been

10   a party to the Brandwatch Agreements, has "*never* been provided with login credentials that would

11   enable them to permissibly access the data with authorization," and has *never* received consent from

12   X Corp. or Brandwatch, "in any form or in any way, to ... access[] the data that X Corp. provided to

13   Brandwatch under the Brandwatch Agreements."  *See*, *e.g.*, Am. Compl., ¶ 40 (emphasis added); *see*

14   *also Ryanair DAC*, 636 F. Supp. 3d at 508 (plaintiff sufficiently pleaded CFAA violation by alleging

15   unauthorized access to password-protected portion of otherwise public website; questions of nature

16   and scope of authorization were "factual questions appropriate for summary judgment").

17       Ignoring all of this, including the binding precedent of *Nosal II*, the Motion raises a series of

18   hypotheticals in efforts to query whether CCDH could have been "authorized" to access the

19   Brandwatch applications.  Those include, what if ECF's subscription contemplated multiple users?

20   Mot.  19–20.  What if CCDH was an authorized user within the terms of ECF's contract with

21   Brandwatch?  Mot. 20.  They extend far beyond the pleadings and to documents not in X Corp.'s

22   possession, and in any event prove far too much: by CCDH's logic, ECF, by becoming a Brandwatch

23   customer, was authorized to provide access to Brandwatch's (and by extension X Corp.'s) data, to

24   *anyone in the world*.   That defies common sense, would violate Brandwatch's agreement with X

25   Corp., and it would eviscerate Brandwatch's ability to generate revenue via agreements to license

26   access to its applications.

27       The Motion further offers up a counterintuitive contract interpretation.  Again extending

28   beyond the pleadings, the Motion cites an amendment to Brandwatch's terms.  Mot. 20.  The Motion

- 22 -

posits that, because Brandwatch allegedly added language to its Customer Agreement defining "User" as limited to individuals within the Customer's corporate group, such limitation could not have been present in the prior versions of the agreement that allegedly governed ECF at the time it conspired with CCDH.  But another reasonable interpretation is that the amendment only clarified the requirement that any sharing of information not extend to third parties, which requirement has always been mandated by Brandwatch's agreement with X Corp.  *Spartan Capital Securities, LLC*, 2023 WL 4004116, at *6 (pleadings only need to proffer plausible interpretation of contract).

That ECF was prohibited from sharing X Corp.'s data with CCDH is also shown by the very documents on which CCDH's argument relies, i.e., ECF's alleged agreement with Brandwatch.  ECF has submitted evidence that it agreed to, among others, Brandwatch's "Management Service Appendix … available at https://www.brandwatch.com/legal/management-service-appendix/."  ECF 49-4 at 3.  The Management Service Appendix in effect "prior to April 23, 2023" provides that "Users must be employees, consultants, contractors or agents of the specific Customer entity identified on the Order."  RJN, Ex. 1.  CCDH was none of those things to ECF.  Am. Compl., ¶ 40.

ECF's agreements with Brandwatch also provide ECF may share access to the Brandwatch applications only with ECF's "Users" "for their own internal use."  ECF 49-2 at 5 (Sec. 3.3.); ECF 49-3 at 10 (Sec. 3.2); ECF 49-4 at 5 (Sec. 3.2).  The uncontroverted allegations are that ECF shared its login credentials to enable a third party, CCDH, to access data it had no rights to in order to publish a report referencing the data.  Am. Compl., ¶ 85.  That is anything but for "internal use."

Regardless, CCDH's argument invites impermissible factual determinations, including which set of Brandwatch terms applied when ECF and CCDH engaged in their wrongful course of conduct.  The analysis under Rule 12(b)(6) is not a guessing game that could render a pleading insufficient on the basis of some premature, factual proffer on the merits that would not only contradict the well-pleaded allegations, but also could prove to be incorrect later.  The Court must accept X Corp.'s well-pleaded allegations as true and, if those well-pleaded facts support a plausible claim for relief, deny the Motion.  *Weingard, Inc.*, 2012 WL 3763640, at *2 (questions as to nature and scope of authorization under the CFAA and whether defendants' actions could be construed to exceed authorization are "factual questions appropriate for summary judgment"); *Stepping* Stones, 2023 WL

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- 23 -

7602353, at \*2 ("plaintiff need only plead enough facts to state a claim to relief that is plausible on its face").  What matters here is that the Amended Complaint plausibly and with specificity alleges that CCDH accessed the Licensed Materials without authorization, knowingly and with the intent to defraud.  *See*, *e.g.*, Am. Compl., ¶¶ 40, 82–86.

**b.      The Motion's "Terms of Use" Arguments Lack Merit**

The Motion argues that CCDH, in obtaining the Licensed Materials without authorization, could breach only the Brandwatch terms, not the CFAA.  Mot. 20.  That is without merit.

X Corp. does not dispute that, as a general legal principle, "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA."  Mot. 20 (quoting *Power Ventures, Inc.*, 844 F.3d at 1067).  But X Corp.'s CFAA claim is not based on a mere violation of Brandwatch's website's terms of use.[6]  The Amended Complaint asserts a CFAA claim against CCDH based on its knowing, intentional, and wrongful efforts to obtain ECF's login credentials to the Brandwatch applications, and to use them to access the Brandwatch applications (protected servers and nonpublic data contained thereon) without authorization.  Am. Compl., ¶¶ 40, 82-86.

The Motion appears to conflate distinct concepts.  The law on which it relies, i.e., that "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA," pertains to contractual terms to which the defendant is a party, and pertains to circumstances where the CFAA claim is premised on allegations that the "defendant exceed[s] authorized access *solely* by violating an access restriction contained in a contractual agreement or term of service with an Internet service provider or website."  *Van Buren*, 141 S. Ct. at 1662 (emphasis added).  Those are not the circumstances here, where the Amended Complaint alleges no CCDH entity is a party to the Brandwatch Agreements.  Am. Compl., ¶ 40.

Also, "more" than just the violation of the Brandwatch Agreements is present here.  *Van Buren*, 141 S. Ct. at 1660.  This is not a situation where CCDH was authorized to access X Corp.'s data, but merely did so in a manner that did not comply with X Corp.'s or Brandwatch's terms of service.  No CCDH entity was ever authorized by X Corp. or Brandwatch to access X Corp.'s

---

[6] X Corp.'s CFAA claim is also premised on separate conduct from that underlying its claim that CCDH US's scraping activity violated X Corp.'s ToS.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

confidential, password-protected data *at all*, and CCDH circumvented those restrictions by obtaining the password to that data from ECF.  As the Supreme Court explained in *Van Buren*, "liability under [the CFAA] stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Id.* at 1658-59.  Here, X Corp.'s and Brandwatch's gates were down as to CCDH.  CCDH was *not allowed to access* Brandwatch's computer systems, and doing so violated the CFAA.  Am. Compl.,  ¶¶ 84-85.

This "gates-up-or-down reading also aligns with the CFAA's prohibition on password trafficking" (*Van Buren*, 141 S. Ct. at 1659, n. 9), and adopting the Motion's incorrect argument that there can be no CFAA violation because ECF breached its contract would gut the CFAA.  It would, for example, mean that "an employee could undermine the company's ability to control access to its own computers by willy nilly giving out passwords to anyone outside the company—former employees whose access had been revoked, competitors, industrious hackers or bank robbers who find it less risky and more convenient to access accounts via the Internet rather than through armed robbery." *Nosal II*, 844 F.3d at 1037.  It would similarly mean that a consulting firm with access to a company's sensitive financial data or customer records could give out the company's passwords to any malicious actor with impunity.  That is not only untenable, but it cuts squarely against *Nosal II*, where the Ninth Circuit recognized the viability of a CFAA claim against Nosal for impermissibly using an authorized user's login credentials, in contravention of that authorized user's contract with Korn/Ferry. *Id.* at 1038.

The Amended Complaint sufficiently pleads a CFAA claim.

### 2. Defendants Caused The Requisite Harm

To support a private cause of action under the CFAA, a plaintiff must show "damage" or "loss."  "Damage" includes "any impairment to the integrity or availability of data, a program, a system, or information."  "Loss" includes, among other things, "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense." 18 U.S.C. § 1030(g).

Courts interpreting the statute, including the United States Supreme Court, have observed that the CFAA focuses on "technological harms." *Van Buren*, 141 S. Ct. at 1660.  Costs to investigate

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

and stop alleged violations of the CFAA are cognizable damages.  *See Holper*, 2022 WL 17167958 at *8 (such costs met CFAA's $5,000 threshold).  The Amended Complaint pleads just such damages, including "amounts expended attempting to conduct internal investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to data, significant employee resources and time to participate and assist in those investigations, and attorneys' fees in aid of those investigations and in enforcing the relevant agreements."  Am. Compl., ¶ 87.

The Motion ignores all of this.  It argues that the Amended Complaint has failed to plead damages by highlighting *other* categories of damages that courts have accepted as sufficient technological harm—corruption of data, data restoration cost, interruption of service.  Mot. 22 (citations omitted).  The conclusion is a non-sequitur.  Upholding one instance of an alleged damage as sufficiently "technological" does not exclude all other possible such harms, and the Motion fails to refute the holdings from cases such as *Holper*, recognizing that costs of efforts to investigate and stop unauthorized access are cognizable losses under the CFAA.

The Motion also cites one case out of context in attempting to argue that X Corp.'s CFAA claim can be dismissed because the Amended Complaint does not "'allocate the alleged losses between' cognizable and non-cognizable."  Mot. at 22 (citing *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1030 (W.D. Wash. 2020)).  There, the plaintiff's allegations failed to specify when losses were incurred between 2017 and 2018, and the court had concluded that, as a matter of law, no CFAA violation occurred until after June 6, 2018.  *Domain Name Comm'n Ltd.*, 449 F. Supp. 3d at 1030.  It was thus unclear if the purported losses allocable to post-June 6, 2018 cleared the $5,000 threshold; the court did not, however, require the plaintiff to plead a specific dollar amount for each category of loss alleged.  *See also NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 963-964 (N.D. Cal. 2014) (denying motion to dismiss where defendants attempted to impermissibly challenge the accuracy of alleged losses under the CFAA).

There is no question that the Amended Complaint here alleges the requisite harm.

### 3.    The Amended Complaint Sufficiently Pleads CFAA Violations

The Motion's final argument in seeking dismissal of the Amended Complaint's CFAA claim is made in a cursory three sentences, and argues that the Amended Complaint lacks the requisite

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

specificity because it does not specify the CFAA subsection(s) that were violated.  Mot. 22–23.  That argument, which harkens back to the days of "code-pleading" that the Federal Rules of Civil Procedure rejected, ignores the plain language of the Amended Complaint's allegations.

The Amended Complaint satisfies its pleading burden under Rule 8, by including specific allegations that provide CCDH with clear notice of the alleged violations.  First, the Amended Complaint alleges that "Defendants, except ECF, have violated the CFAA by knowingly, and with intent to defraud X Corp., accessing a protected computer, without authorization, and by means of such conduct further the fraud and obtained one or more things of value."  Am. Compl., ¶ 82.  That tracks almost verbatim the language of § 1030(a)(4) which states that it is a violation of the CFAA to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value."  18 U.S.C. § 1030(a)(4).  The Amended Complaint goes on to even include citations to another CFAA subsection, i.e., "ECF and CCDH conspired under 18 U.S.C. § 1030(b)." Am. Compl., ¶ 85.  There can be no serious doubt that these allegations provide clear notice of violations of specific provisions of the CFAA.  The Motion even acknowledges this, recognizing that the Amended Complaint asserts a CFAA claim under § 1030(a)(4).  Mot. 22–23.

The Motion also argues that the § 1030(a)(4) claim should be dismissed for purportedly not meeting the heightened pleading standard for fraud.  Mot. 22–23.  That is wrong.

As an initial matter, the Amended Complaint need only satisfy Rule 8's notice pleading standard, i.e., plead facts sufficient to enable the court to draw the reasonable inference that CCDH is liable for the misconduct alleged.  *See NetApp, Inc.*, 41 F. Supp. 3d at 833.  In the context of X Corp.'s CFAA claim, that requires pleading that CCDH gained "unlawful access" to the Licensed Materials.  *Id.*  The Amended Complaint does precisely that (Am. Compl., ¶¶ 82, 85-86), and is sufficiently pleaded.  *NetApp, Inc.*, 41 F. Supp. 3d at 833 (CFAA claim sufficiently pleaded where plaintiff alleged defendants stopped working for plaintiff, but continued to impermissibly use login credentials to access plaintiff's system).

Rule 9(b), by contrast, requires that for claims alleging fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  But that

- 27 -

pleading standard is not invoked simply because the CFAA requires an "intent to defraud;" "'fraud' under the CFAA only requires a showing of unlawful access" and "there is no need to plead the elements of common law fraud." *NetApp, Inc.*, 41 F. Supp. 3d at 833 (declining to apply Rule 9(b) standard to CFAA claim); *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011); *Multiven v. Cisco*, 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010); *Oracle Am., Inc. v. TERiX Computer Co.*, 2014 WL 31344, at *4 (N.D. Cal. Jan. 3, 2014).   Indeed, Rule 9(b)'s heightened pleading standard applies to a CFAA claim only if the claim relies on a course of conduct that was purportedly fraudulent in the common law sense.  *Oracle Am., Inc. v. Service Key, LLC*, 2012 WL 6019580, at *6 (N.D. Cal. Dec. 3, 2012) (Rule 9(b) applied as CFAA allegations relied on fraudulent course of conduct, i.e., fraudulent inducement and fraudulent trafficking of passwords).  That is not the case here, as the Amended Complaint's CFAA claim is neither grounded in nor sounds in fraud.  *NetApp, Inc.*, 41 F. Supp. 3d at 833.

Even assuming *arguendo* that Rule 9(b) applies (which it does not), the Amended Complaint meets that standard.  The Amended Complaint alleges the who (CCDH), the what (misrepresenting itself as an authorized user of an ECF account), the where (through the Brandwatch interface), and the when (as early as 2021 and on multiple occasions since).  Am. Compl.,  ¶¶ 39–55.  This is sufficient.  *See Ryanair*, 636 F. Supp. 3d at 507 (collecting cases).  Other "details regarding the defendants' alleged conduct . . . are likely to be peculiarly within the defendants' knowledge or control and obtainable only in discovery."  *Id.*

The Amended Complaint's CFAA claim is sufficiently pleaded.

### D. The Amended Complaint Sufficiently Pleads Claims For Intentional Interference With Contractual Relations And Inducing Breach of Contract

Though inducing a breach of contract is a species of intentional interference, they are distinct claims, frequently pleaded in unison.  *See*, *e.g.*, *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990) ("cause of action for interference with contractual relations is distinct" from action for inducing breach of contract); *Spanish Broadcasting Sys.*, 2016 WL 11741137) (bringing both claims).  Consistent with Rule 8, "[t]he Ninth Circuit's general rule is that plaintiffs may plead

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

alternative claims, even if those claims are inconsistent." *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 2022 WL 844152, at \*7 (citing Fed. R. Civ. P. 8 "[s]pecifically, Rule 8 states that a claim for relief must contain 'a demand for relief sought, *which may include relief in the alternative or different types of relief*'") (emphasis in original).  Contrary to Defendants' suggestion otherwise, there is nothing improper about X Corp. having pleaded both intentional interference with contractual relations and inducing breach of contract.

The elements for intentional interference are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *United Nat'l Maintenance, Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).  "A plaintiff need not allege an actual or inevitable *breach* of contract in order to state a claim for disruption of contractual relations; rather, unlike the tort of inducing breach of contract, intentional interference with contractual relations requires only proof of *interference*." *Spanish Broadcasting*, 2016 WL 11741137, at \*3 (emphasis added).

Inducement of breach is narrower and requires "more than mere disruption," and the distinction between inducement of breach of contract and intentional interference is that inducement requires an "actual breach." *Id.* at \*7.

The Amended Complaint adequately pleads each element of both of these distinct claims.

### 1.     The Amended Complaint Adequately Alleges That Defendants Caused Brandwatch to Breach Its Agreements With X Corp.

As alleged in the Amended Complaint, the 2020 MLA provided that Brandwatch will "not attempt to (*and will not allow others to*) . . . copy, sell, lease, sublicense, distribute, redistribute, syndicate, create derivative works of assign *or otherwise transfer or provide access to, in whole or in part, the Licensed Material to any third party*." Am. Compl., ¶ 31 (emphasis added).  In turn, the MLA defines "Licensed Material" as including "[X] Content," i.e., "any and all content, media, information and data (and copies and derivate works thereof) made available to Customer through the [X] Technology or by other means authorized by [X]." *Id.*, ¶ 31.

The 2020 MLA requires that Brandwatch keep X Corp.'s content "secure."  Am. Compl., ¶

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

31.   The 2023 Order Form between X Corp. and Brandwatch forbids Brandwatch from allowing others to provide access to the Licensed Materials to third parties.  *Id.*, ¶ 33.  The Amended Complaint alleges that ECF and CCDH conspired to provide CCDH (a third party) access to the Brandwatch "Licensed Material."  *Id.*, ¶¶ 38, 40–55.  This unlawful access caused Brandwatch to breach its agreement to "not allow others [ECF] to . . . provide access to, in whole or in part, the Licensed Material to any third party [CCDH]" and to keep X content "secure."  *Id.*, ¶¶ 93, 97.

CCDH's response to the pleaded allegations is a glib non-sequitur, i.e., that "the access did not cause the breach, the breach caused the access."  Mot. 24.  This is nonsensical—the access is the breach (or at least one of the breaches).

Defendants' only other apparent basis for claiming the Amended Complaint fails to allege a breach is through a wholly unsupported statement of fact—that "CCDH was not a 'third party,' but rather a 'User.'"  Mot 25.  That is incorrect for the reasons discussed in Section V.C.1.a above, and it again seeks to dispense with the *requirement* under the Federal Rules of Civil Procedure that the Court accept X Corp.'s pleaded allegations as true.  Defendants' unsupported factual allegations do not raise a basis for dismissal. *See* Sec. IV.C.1.a*., supra*.

Defendants' assertion that the Amended Complaint does not plausibly allege that CCDH had knowledge of the Brandwatch Agreements likewise fails.  Mot. 25.  CCDH knew Brandwatch had access to the non-public Licensed Materials, and went to great lengths to gain unauthorized access to what CCDH knew it could not obtain directly from X Corp.  Am. Compl., ¶¶ 29, 35, 38-39.  Given the non-public nature of the data and Brandwatch's public terms of service prohibiting subscribers from sharing login credentials or data obtained via the Brandwatch applications, there is a more-than plausible inference that CCDH knew X Corp. would have provided Brandwatch access to the Licensed Materials only pursuant to an agreement (i.e., the Brandwatch Agreements) that ensured restricted access to the data and that it remained protected.  It would defy common sense for CCDH— a supposed "research" organization that regularly relies on social media as a source of data collection—to believe that X Corp. would have simply provided Brandwatch access to the non-public Licensed Materials without an agreement that ensured restricted access and held Brandwatch responsible for ensuring the continued security of that data.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Emery LLP
Attorneys at Law
Los Angeles

Ultimately whether or not CCDH knew of the Agreements is a question for fact discovery. But for purposes here, it is far from implausible that CCDH would be aware of the standard terms of access to the Licensed Materials between platforms and their partners.

### 2.    The Amended Complaint Pleads Actionable Damages

The Amended Complaint alleges that, as a result of the Defendants interfering with, and inducing Brandwatch to breach, its agreements with X Corp., including in failing to secure X Corp.'s data from third parties, X Corp. suffered at least tens of millions of dollars in damages both in the form of lost advertising revenue and actions that it took—including internal investigations and allocation of employee resources—to address the security breach.   Am. Compl., ¶¶ 70–71. Defendants first argue that "constitutional principles" prohibit X Corp. from recovering such damages.  But as discussed in Section V.B.4, *supra*, this claim falls apart on inspection of the case law on which Defendants rely.

X Corp. pleads specific, quantifiable, economic harm arising from Defendants' actions, not mental anguish or intangible damage to "reputation."  It strains credulity to suggest that Brandwatch's failure to secure data is "utterly disconnected" from that harm.  X Corp. negotiated contracts with its partners with data security as a central tenet.  It recognized the harm that any lapse in such security might cause.  Among such foreseeable harms is that a third-party might obtain X Corp. data with the intent of using it to injure X Corp.  This is precisely what happened here.

### E.    The Amended Complaint Adequately Pleads A Claim Against Doe Defendants

"[W]here the identity of alleged defendants will not be known prior to the filing of a complaint … the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds."  *Soo Park v. Thompson*, 851 F.3d 910, 928 n.21 (9th Cir. 2017); *Merino*, 2019 WL 2437176, at *12 (same).  This is the case here.  X Corp. believes, in addition to conspiring with ECF, CCDH conspired with presently unknown supporters and funders who, among other things, "directed, instructed, acted as agents of or in concert with, conspired with, and/or [] participated in meaningful ways in CCDH's and ECF's unlawful conduct as alleged herein."  Am. Compl., ¶ 6.  X Corp.'s belief is informed, in part, based on statements of others—including a United

- 31 -

States Senator—that CCDH is funded by foreign organizations that may intend to inflict significant harm on X Corp. *Id.*, ¶¶ 62–63.  This goes well beyond a "formulaic recitation" of legal elements. Mot. 26.

Additionally, whether other actors were involved in CCDH's conspiracy with ECF are facts currently within the peculiar knowledge of the alleged conspirators but that will emerge through discovery.  Should facts emerge to name additional defendants, this Court can scrutinize those allegations at that time in considering whether to permit an amendment to X Corp.'s complaint.  To close the door on such a possibility at this time, however, would be premature.  *Soo Park*, 851 F.3d at 928 n.21.

### F.   If The Court Were to Grant the Motion, Leave to Amend Is Appropriate

Should the Court grant any portion of the Motion, it should grant X Corp. leave to amend. "Absent prejudice . . . there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  "Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment." *Sonoma Cnty. Ass'n of Retired Employees.*, 708 F.3d at 1118.  CCDH states no reason why it would be prejudiced by further amendment.  And its allegation that claims other than for CCDH US's breach of contract cannot be amended hinges on its unsupported assertion that CCDH was authorized to use Brandwatch's services.  This is a question of fact for discovery, not a basis for dismissal and certainly not a basis to deny leave to amend.

CCDH's suggestion that X Corp. should not be granted leave to amend because it already exercised an opportunity to amend is likewise without merit.  X Corp.'s amendment was not on the basis of any real or supposed deficiency in the pleadings.  It was based on the discovery of new facts that identified ECF as the entity that provided CCDH US with its login credentials to access the Licensed Materials.  As discovery unfolds, X Corp. may yet uncover additional facts requiring amendment, including the identities of Doe Defendants.  This is precisely why the Federal Rules of Civil Procedure contemplate freely granting leave as justice requires.  Fed. R. Civ. P. 15(a).

Indeed, it is X Corp.'s understanding based on its ongoing investigation (and X Corp. is in a position to include such allegations in its complaint) that ECF not only knew that it could not share

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

login credentials with CCDH, but when Brandwatch discovered that ECF had done that, ECF admitted to Brandwatch that it was improper, apologized, and tried to blame it on a purported "rogue" actor within its organization; and, that Brandwatch always interpreted its terms as prohibiting sharing a customer's of login credentials with third parties, and that any changes in Brandwatch's contractual terms in 2023 were merely intended to further underscore that point.

## VI.  CONCLUSION

For the reasons stated herein, X Corp. respectfully requests that the Court deny CCDH's Motion.

Dated: December 22, 2023              **MCDERMOTT WILL & EMERY LLP**

                                      By:   /s/ *J. Jonathan Hawk*
                                      _____

                                          J. Jonathan Hawk (SBN 254350)
                                          jhawk@mwe.com
                                          2049 Century Park East, Suite 3200
                                          Los Angeles, CA 90067-3206
                                          Telephone: (310) 277-4110
                                          Facsimile: (310) 277-4730

                                          Richard Salgado*
                                          richard.salgado@mwe.com
                                          Jordan Kazlow*
                                          jkazlow@mwe.com
                                          Lucas Hale*
                                          lhale@mwe.com
                                          2501 North Harwood Street, Suite 1900
                                          Dallas, TX 75201-1664
                                          Telephone: (214) 295-8000
                                          Facsimile: (972) 232 3098

                                          *Pro Hac Vice application to be submitted*

                                          **Attorneys for Plaintiff X Corp.**