Roberta A. Kaplan*
John C. Quinn*
Matthew J. Craig (SBN 350030)
Amit Jain*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
mcraig@kaplanhecker.com
ajain@kaplanhecker.com
* admitted pro hac vice

*Attorneys for Defendants Center for
Countering Digital Hate, Inc. and
Center for Countering Digital Hate Ltd.*

[ADDITIONAL COUNSEL ON SIGNATURE PAGE]

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| X CORP.,<br><br>               Plaintiff,<br><br>    v.<br><br>CENTER FOR COUNTERING DIGITAL HATE, INC., et al.,<br><br>               Defendants. | Case No. 3:23-cv-03836-CRB<br><br>**DEFENDANTS CENTER FOR COUNTERING DIGITAL HATE, INC. AND CENTER FOR COUNTERING DIGITAL HATE LTD.'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND ANTI-SLAPP MOTION TO STRIKE**<br><br>Date: February 23, 2024<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor<br>Judge: Hon. Charles R. Breyer |

1

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................................... 2

III.    ARGUMENT ............................................................................................................... 3

        A.    Controlling Anti-SLAPP Precedent, Ignored by X Corp., Puts This Case
              Squarely Within the Statute's Scope ................................................................ 3

        B.    X Corp. Fails to State a Claim for Breach of Contract (Count 1) ...................... 4

              1.    X Corp. ignores the relevant language of its Terms of Service .................. 4

              2.    Enforcement would contravene public policy, and X Corp. fails to
                    offer a single countervailing policy concern that applies to its
                    claims ........................................................................................................ 5

              3.    X Corp.'s claimed damages are doubly barred ........................................... 6

        C.    X Corp. Fails to State a Claim Under the CFAA (Count 2) ................................... 9

              1.    X Corp. still cannot allege access "without authorization" ......................... 9

              2.    X Corp. has not pleaded the requisite technological loss ............................ 12

              3.    X Corp.'s pleading still does not specify the relevant CFAA
                    subsection .................................................................................................. 13

        D.    X Corp. Fails to State a Claim in Tort (Counts 3 and 4) ........................................ 13

        E.    X Corp. Fails to State Any Claim Against the Doe Defendants ............................ 15

IV.     CONCLUSION ........................................................................................................... 16

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                                    **Page(s)**

3

4

*A.C.C.S. v. Nielsen*,
   No. 18 Civ. 10759, 2019 WL 7841860 (C.D. Cal. Sept. 17, 2019).....................................13

5

6

*Andrews v. Sirius XM Radio Inc.*,
   932 F.3d 1253 (9th Cir. 2019)..........................................................................................12

7

*AtPac, Inc. v. Aptitude Sols., Inc.*,
   730 F. Supp. 2d 1174 (E.D. Cal. 2010)...............................................................10, 11, 12

8

9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................11, 15

10

11

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991).........................................................................................................5, 8

12

13

*Davies v. Grossmont Union High Sch. Dist.*,
   930 F.2d 1390 (9th Cir. 1991)..............................................................................................5

14

15

*Dreni v. PrinterOn Am. Corp.*,
   486 F. Supp. 3d 712 (S.D.N.Y. 2020)...............................................................................13

16

17

*El Omari v. Buchanan*,
   No. 20 Civ. 2601, 2021 WL 5889341 (S.D.N.Y. Dec. 10, 2021)......................................12

18

19

*Erlich v. Menezes*,
   981 P.2d 978 (Cal. 1999) ....................................................................................................7

20

21

*Facebook, Inc. v. Holper*,
   No. 20 Civ. 6023, 2022 WL 17167958 (N.D. Cal. Sept. 27, 2022)....................................12

22

23

*Facebook, Inc. v. Power Ventures*,
   844 F.3d 1058 (9th Cir. 2016)...........................................................................................10

24

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (4th Cir. 1999)...............................................................................................8

25

26

*Frangipani v. Boecker*,
   75 Cal. Rptr. 2d 407 (Cal. Ct. App. 1998) ..........................................................................7

27

*Hamilton v. Juul Labs, Inc.*,
   No. 20 Civ. 3710, 2020 WL 5500377 (N.D. Cal. Sept. 11, 2020)........................................4

28

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022)............................................................................ 12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................................ 12

*Kelly v. Worth Holdings, LLC*,
    No. 17 Civ. 2466, 2017 WL 4156186 (N.D. Cal. Sept. 18, 2017)..................... 14

*King v. Facebook Inc.*,
    599 F. Supp. 3d 901 (N.D. Cal. 2022) ................................................................. 9

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
    102 P.3d 257 (Cal. 2004) ..................................................................................... 7

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
    No. 19 Civ. 1279, 2019 WL 3859035 (N.D. Cal. Aug. 16, 2019)...................... 4

*Modden v. Ticketfly LLC*,
    No. 18 Civ. 6450, 2019 WL 4738237 (N.D. Cal. Sept. 27, 2019)...................... 9

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    No. 15 Civ. 3522, 2015 WL 5071977 (N.D. Cal. Aug. 27, 2015)...................... 9

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    No. 15 Civ. 3522, 2018 WL 5879786 (N.D. Cal. Nov. 7, 2018)........................ 9

*Neitzke v. Williams*,
    490 U.S. 319 (1989).............................................................................................. 1

*Nowak v. Xapo, Inc.*,
    No. 20 Civ. 3643, 2020 WL 6822888 (N.D. Cal. Nov. 20, 2020)...................... 13

*Oracle Am., Inc. v. Serv. Key, LLC*,
    No. 12 Civ. 790, 2012 WL 6019580 (N.D. Cal. Dec. 3, 2012) ......................... 13

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    402 F. Supp. 3d 615 (N.D. Cal. 2019) ................................................................. 8

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
    51 F.4th 1125 (9th Cir. 2022).............................................................................. 8

*Rice v. Cmty. Health Ass'n*,
    203 F.3d 283 (4th Cir. 2000)................................................................................ 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sandvig v. Sessions*,
     315 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................... 5

*SecureInfo Corp. v. Telos Corp.*,
     387 F. Supp. 2d 593 (E.D. Va. 2005) .................................................................. 10

*Soo Park v. Thompson*,
     851 F.3d 910 (9th Cir. 2017) ............................................................................... 15

*Spangenberg v. Spangenberg*,
     126 P. 379 (Cal. Ct. App. 1912) ............................................................................. 6

*Sprewell v. Golden State Warriors*,
     266 F.3d 979 (9th Cir. 2001) ............................................................................... 11

*Sprewell v. Golden State Warriors*,
     275 F.3d 1187 (9th Cir. 2001) ............................................................................. 11

*Sprint Sols, Inc. v. Pac. Cellupage Inc.*,
     No. 13 Civ. 7862, 2014 WL 3715122 (C.D. Cal. July 21, 2014) ........................ 13

*Tri-Continent Int'l Corp. v. Paris Sav. & Loan Ass'n*,
     16 Cal. Rptr. 2d 508 (Cal. Ct. App. 1993) .......................................................... 14

*United States v. Nosal*,
     844 F.3d 1024 (9th Cir. 2016) ...................................................................... 10, 11

*Van Buren v. United States*,
     141 S. Ct. 1648 (2021) ......................................................................................... 12

**Constitutional Provisions**

Cal. Const. art. I, § 2 ..................................................................................................... 5

U.S. Const. amend. I ............................................................................................ 1, 5, 15

**Statutes**

18 U.S.C. § 1030(a)(4) ................................................................................................ 13

Cal. Civ. Code § 1667 .................................................................................................... 6

Cal. Civ. Proc. Code § 425.16 ................................................................................. 1, 3

**Rules**

Fed. R. Civ. P. 8 ............................................................................................................. 16

Fed. R. Civ. P. 9 ................................................................................................... 2, 6, 13

Fed. R. Civ. P. 12 ..................................................................................................... 1, 4

Fed. R. Civ. P. 15 ........................................................................................................... 16

**Other Authorities**

14 Cal. Jur. 3d Contracts § 171 .......................................................................................... 6

Lora Kolodny, *Elon Musk Claims Advertisers Are Trying to 'Blackmail' Him, Says 'Go F---Yourself'*, CNBC (Nov. 29, 2023) .......................................................................... 16

## I.    INTRODUCTION

X Corp.'s opposition brief only confirms that its SLAPP suit must be stricken or dismissed. At bottom, X Corp. seeks to hold the CCDH Defendants liable for the way advertisers reacted to non-defamatory speech about publicly-available content on X Corp.'s platform. Because X Corp. cannot identify anything the CCDH Defendants said that was actually false, and because it does not want to invite discovery on the truth about the content on its platform, X Corp. concocted—and its opposition now attempts to defend—claims that are riddled with legal deficiencies. Basic legal principles, from contract canons to pleading standards, from First Amendment rules to anti-SLAPP policies, stand firmly in opposition to X Corp.'s gambit. X Corp. tries to sidestep all of these obstacles by ignoring or misstating CCDH's dismissal arguments, imagining different allegations, relying on inapposite precedent, or conjuring up a mountain's worth of slippery slopes. In reality, no one asks this Court to "approve . . . vigilantism . . . in furtherance of an ideological cause," immunize "[h]acking into the ACLU's computer servers," sanction "[s]tealing books from the library," or allow individuals to "give out [a] company's passwords to any malicious actor with impunity." Opp. 2, 16, 25, Dkt. 62. X Corp.'s refusal to engage with its own allegations, and to wrestle with the fundamental flaws in its legal theories, underscores its failure to state a claim here.

X Corp.'s tactics should be seen for what they are. Under these circumstances, allowing X Corp. to proceed to discovery (or to replead)—and thus impose significant cost on the small nonprofits that deigned to criticize X Corp.—would run counter to the policy underlying California's anti-SLAPP statute and our Constitution's First Amendment. Indeed, in a SLAPP suit like this one, the litigation is itself the punishment. *See* Cal. Civ. Proc. Code § 425.16(a) ("[C]ontinued participation in matters of public significance . . . should not be chilled through abuse of the judicial process."); *accord Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989) ("Rule 12(b)(6) . . . streamlines litigation by dispensing with needless discovery and factfinding."). And every day this suit remains pending, its intended chilling effect spreads. Pursuant to the anti-SLAPP statute and Rule 12(b)(6), applying settled precedent to the actual pleadings and documents incorporated by reference, this Court should strike or dismiss the Amended Complaint in its entirety and with prejudice.

## II.      SUMMARY OF ARGUMENT

X Corp.'s attempt to avoid application of California's anti-SLAPP statute altogether ignores (and is at odds with) governing precedent, which holds that newsgathering of the type alleged here is protected activity and makes clear that X Corp.'s speech-infused damages, too, are a necessary element of its state-law claims.

With respect to Count 1 (breach of contract), X Corp.'s strained reading of its ToS is both unreasonable and implausible under California law. X Corp. ignores several key sources of public policy that bar enforcement in this context in any event, and notably fails to identify a single countervailing interest in enforcement relevant to its allegations. And, by relying heavily on a contrived distinction between measurable and intangible damages, X Corp. all but concedes that it has not pleaded legally cognizable damages under Rule 9(b), state contract law, or constitutional speech provisions.

X Corp.'s efforts to complicate matters on Count 2 (CFAA) also fail. Its inability to allege a direct revocation of the Brandwatch access that ECF authorized dooms its claim; it cannot make out any violation of the Brandwatch terms that are incorporated into its pleading; and its reliance on *additional* terms that are *not* incorporated does not alter the analysis. Moreover, X Corp.'s arguments about CFAA damages rely on outdated caselaw, and its belated attempt to specify a CFAA subsection cannot re-amend its complaint or rectify its failure to plead fraud with specificity.

Next, X Corp. concedes that Counts 3 and 4 (in tort) rise and fall together, but it declines to address its fatal inability to allege that the CCDH Defendants induced or caused any act, omission, or other change in Brandwatch's behavior. Nor does it succeed in shoring up its insufficient allegations of disruption or breach, knowledge or intent, and cognizable damages.

Finally, X Corp. does not even respond to its failure to state a claim against the Doe Defendants, focusing instead on a distinct legal issue that Defendants did not raise.

1   **III.    ARGUMENT**

2       **A.    Controlling Anti-SLAPP Precedent, Ignored by X Corp., Puts This Case
3             Squarely Within the Statute's Scope**

4       X Corp. argues that California's anti-SLAPP statute does not apply because the company's

5   claims arise from "illegal access of data," as opposed to speech. Opp. 10. This artifice, of course,

6   is the foundation of its whole case. But the anti-SLAPP statute is not so easily evaded. Each of X

7   Corp.'s state-law claims arises from *both* the CCDH Defendants' protected newsgathering

8   activities "in furtherance of" their speech, Cal. Civ. Proc. Code § 425.16(b)(1), *and* the protected

9   speech this newsgathering enabled, bringing this case doubly within the statute's scope.

10      *First*, X Corp. itself alleges that "CCDH's conduct to obtain . . . data . . . was necessary for

11  CCDH to make its allegations against X Corp." AC ¶ 70. As a result, the data access constituted

12  protected newsgathering activity under controlling state precedent interpreting this state statute—

13  none of which X Corp. even mentions. *See* Mot. 8-9, Dkt. 47 (collecting cases). And of course, X

14  Corp.'s allegation of illegality in the newsgathering is immaterial to the first step of the analysis.

15  *See id.* Similarly, X Corp.'s concern that the anti-SLAPP statute could offer any "would-be

16  speaker" "immun[ity]" from contractual obligations, Opp. 11, is not legitimate. At this stage, the

17  question is only whether the statute applies at all.

18      *Second*, X Corp.'s claims also arise from protected speech. The parties agree that the

19  "question is whether the challenged allegations supply a necessary element of a claim." *Id.* at 12

20  (internal quotation marks omitted). And X Corp.'s opposition does not dispute that cognizable

21  damages are a necessary element of its state-law claims. Yet the damages it pleads were triggered

22  by the CCDH Defendants' protected speech. *See, e.g.*, AC ¶¶ 78, 92, 98. X Corp.'s odd statement

23  that "[i]f CCDH carried out all the same illegal activities, but stopped just short of publishing the

24  February 9, 2023 report, X Corp. would maintain the very same . . . claims," Opp. 11, at best reflects

25  its readiness to pursue baseless claims: X Corp. alleges no damages that it could possibly trace to

26  the CCDH Defendants if they had never spoken at all.[1]

27  _____

28  [1] X Corp.'s statement also ignores other, pre-2023 speech to which its pleading attributes advertiser
    losses. *See, e.g.*, AC ¶ 68.

**B.     X Corp. Fails to State a Claim for Breach of Contract (Count 1)**

**1.     X Corp. ignores the relevant language of its Terms of Service**

As CCDH's opening brief made clear, CCDH US's alleged conduct did not violate the ban on "scraping" in X Corp.'s adhesive ToS for at least three reasons: (1) the ToS presents the concept of "scraping" in comparison to "access[ing] or search[ing] the Services . . . through [X Corp.'s] currently available, published interfaces," which even according to X Corp.'s pleading is what happened here; (2) the ToS did not effect a clear waiver of CCDH US's speech rights, as California law would require; and (3) all of this is reinforced by the rule that ambiguities in contracts— particularly in form contracts like this—be construed against their drafters. *See* Mot. 10-13.

X Corp. does not grapple with these arguments, or the legal principles underpinning them, and does not even acknowledge the key language in its ToS. *See* Opp. 12-13. Nor can it identify even one "scraping" case that survived the pleading stage with allegations like those here. *See id.* Instead, X Corp.'s opposition points to a contractual provision about "crawling," *id.* at 13—even though CCDH US has not made any argument about "crawling." And it claims that CCDH US advocates for "allow[ing] a party to breach contracts and be absolved of all civil liability." *Id.* at 16. This ignores CCDH US's actual argument, which is merely that California law "indulge[s] every reasonable presumption against a waiver" of constitutional speech rights. Mot. 11.

X Corp. also leans on the Rule 12(b)(6) standard, highlighting its eagerness to get to discovery. *See* Opp. 12-13. But "[u]nless extrinsic evidence is involved, the interpretation and construction of a written contract present only questions of law, within the province of the court," that are "properly reached on a 12(b)(6) motion to dismiss." *Microsoft Corp. v. Hon Hai Precision Indus. Co.*, No. 19 Civ. 1279, 2019 WL 3859035, at *5 (N.D. Cal. Aug. 16, 2019) (internal quotation marks omitted); *see also, e.g.*, *Hamilton v. Juul Labs, Inc.*, No. 20 Civ. 3710, 2020 WL 5500377, at *5 (N.D. Cal. Sept. 11, 2020) (similar). Here, California law and the ToS itself show that X Corp.'s reading is unreasonable as a matter of law. Indeed, X Corp. does not dispute that in its view, CCDH US would be liable for "at least tens of millions of dollars," AC ¶ 79, even if it had *manually* cut and pasted public data, *see* Mot. 10. That is not a reasonable construction of a generic

1   prohibition on "scraping."[2] Instead, X Corp.'s massively (and conveniently) overbroad
2   construction is precisely the sort of legally implausible interpretation that warrants dismissal.

3                   **2.    Enforcement would contravene public policy, and X Corp. fails to offer**
4                        **a single countervailing policy concern that applies to its claims**

5        X Corp.'s contract claim independently fails because the enforcement it seeks would, as a
6   matter of law, contravene the public policy embodied in several provisions of federal and state law.
7   *See* Mot. 13-15; Brief of Amici Curiae ACLU et al. ("ACLU Amicus") 4-15, Dkt. 52-1.

8        Tellingly, X Corp. does not even mention the California and federal statutes that reflect the
9   strong public policy against enforcement here. *See* Mot. 14 & n.11; ACLU Amicus 6-7. And while
10  it acknowledges the First Amendment and the Liberty of Speech Clause, all it has to say about them
11  is that the Court should ignore them because this suit is between private parties. *See* Opp. 14. But
12  "private speech prohibitions can still implicate the First Amendment when given the imprimatur of
13  state protection," including "through civil . . . law." *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 17
14  (D.D.C. 2018); *see, e.g.*, *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1399 (9th
15  Cir. 1991); *cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) ("[A]pplication of state rules
16  of law . . . in a manner alleged to restrict First Amendment freedoms constitutes 'state
17  action' . . . ."). This black letter principle does not, as X Corp. suggests, "absolve[]" a speaker "of
18  all civil liability" or immunize "[h]acking," "[s]tealing books," or breaking into the White House.
19  Opp. 15-16. It simply means that a multibillion-dollar company cannot use the courts to wield an
20  adhesive contract provision against a nonprofit's small-scale newsgathering of public third-party
21  content, using a platform's own search functionality, for research and reporting purposes, while
22  inflicting no direct harms. *See* Mot. 15.

---

[2] In this regard, X Corp. complains that CCDH US's argument rests on purported "question[s] of fact." Opp. 13. But the Amended Complaint itself states that the purported "scraping" "utilize[d] Twitter's search function;" that it was "to obtain data for the [February 9, 2023] report;" and that the CCDH Defendants issue "reports and articles" that are "publicly available and free." AC ¶¶ 17, 27, 54. Moreover, X Corp.'s opposition does not dispute that the Court may consider the exhibits to the Declaration of Roberta A. Kaplan, including X Corp.'s operative ToS and the February 9, 2023 report, which are incorporated by reference and subject to judicial notice. *See* Mot. 4 n.5, 11; Dkt. 48 ¶¶ 2, 3; Dkt. 48-1; Dkt. 48-2. The Court needs no more to reach and decide the question.

1    Rather than engage seriously with these arguments, X Corp. dedicates most of its argument

2    to purported countervailing interests in enforcement. But while the concerns it identifies—server

3    burdens, data integrity issues, performance problems, and retention/sale of private information, *see*

4    Opp. 14, 17—may be the hallmarks of true, commercialized "scraping," *see* Mot. 13, they are not

5    in any way implicated by X Corp.'s pleading here, *see id.* at 15. The public policy doctrine presents

6    "a question of law to be determined *from the circumstances of each particular case.*" 14 Cal. Jur.

7    3d Contracts § 171 (emphasis added). In other words, X Corp.'s parade of horribles only confirms

8    that it cannot state a claim on the actual circumstances alleged.

9    Finally, in arguing that policy questions are best left to lawmakers, *see* Opp. 17, X Corp.

10   forgets that the California Legislature has defined, by statute, an unlawful contract to be one that is

11   "[c]ontrary to the policy of express law, though not expressly prohibited" or "[o]therwise contrary

12   to good morals," Cal. Civ. Code § 1667. And while X Corp. likewise asserts that public policy

13   analysis cannot be conducted on the pleadings, *see* Opp. 17, California courts have recognized for

14   more than a century that the public policy doctrine presents a "question of law," *Spangenberg v.*

15   *Spangenberg*, 126 P. 379, 382 (Cal. Ct. App. 1912). X Corp.'s eagerness to avoid public policy

16   analysis altogether—much like its effort to avoid application of the anti-SLAPP statute—only again

17   confirms that dismissal is warranted.

### 3.    X Corp.'s claimed damages are doubly barred

18

19   Separate and apart from its failure to allege any breach, X Corp.'s contract claim must be

20   stricken or dismissed because its alleged damages are legally barred under both state contract law

21   (which requires that special damages be foreseeable at the time of contracting and sufficiently

22   connected to the alleged breach) and constitutional protections (which forbid X Corp. from holding

23   CCDH US liable for third parties' reactions to its non-defamatory speech). *See* Mot. 15-18.

24   As an initial matter, X Corp. does not argue against applying Rule 9(g) to its claim for

25   special damages—yet it does not even attempt to satisfy that Rule's requirement of a specific

26   statement of any item of special damages. *See* Mot. 17. To the contrary, X Corp. musters only a

27   conclusory assertion that its pleading "satisf[ies] . . . Rule 8," Opp. 18, which is, obviously, an

28   incomplete argument about a different rule.

More fundamentally, X Corp. perceives an "about-face" in the CCDH Defendants' pointing out that X Corp.'s defamation-style damages are far removed from its concocted non-defamation claims. *Id.* But there is no inconsistency. In fact, these are two sides of the same coin: Because X Corp. seeks (impermissibly) to hold CCDH US liable for speech without asserting a defamation claim, it is forced to allege damages that are (impermissibly) attenuated from its claimed breach. Indeed, even X Corp. concedes that the supposed scraping "exists independently from [the] speech-related activities" that allegedly caused X Corp.'s losses. *Id.* at 1.

In all events, X Corp.'s opposition cannot overcome the state contract law principles and constitutional rules that block its damages theory. *First*, with respect to state contract law, X Corp.'s insistence that "scraping was a but-for and proximate cause of X Corp.'s losses," *id.* at 18, speaks to the causation standard in *tort*. Damages recoverable in *contract* are different: state contract law simply "do[es] not permit recovery for unanticipated injury." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 262 (Cal. 2004); *see* Mot. 15-16. In fact, this is a key "distinction between tort and contract." *Erlich v. Menezes*, 981 P.2d 978, 982 (Cal. 1999). And "[t]his limitation on available damages [in contract] serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." *Id.* X Corp. ignores this limitation altogether, because X Corp. cannot allege that CCDH US knew of potential advertiser losses at the time of contracting. *See* Mot. 16.

Instead, X Corp. argues that because it can quantify its reputational harms—which it characterizes as "specific," "measurable," "tangible," and "economic"—they are somehow categorically non-reputational. Opp. 18-19. But California contract law prohibits an award "*in the nature of* a recovery for damages to reputation." *Frangipani v. Boecker*, 75 Cal. Rptr. 2d 407, 410 (Cal. Ct. App. 1998) (emphasis added) (collecting cases). And for good reason: "Courts have universally rejected claims for damages for reputation in breach of contract actions" *both* because they "are too speculative *and* [because they] could not reasonably be presumed to have been contemplated by the parties when they formed the contract." *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 288 (4th Cir. 2000) (emphasis added). X Corp. has nothing to say on the latter rationale.

*Second*, X Corp. fails to reconcile its pleading with constitutional requirements. X Corp.

1    concedes that it does not attempt to establish the falsity of CCDH US's reporting (nor could it) and

2    that it does not assert a defamation claim. *See* Opp. 3-4. And so, in a futile effort to avoid the

3    constitutional bar to recovery of reputational damages in non-defamation cases, X Corp. resorts to

4    remarkable mischaracterizations of its allegations. X Corp., for example, selectively quotes the

5    Amended Complaint to claim that CCDH US's alleged scraping forced it to conduct investigations

6    and incur attorney's fees and other costs. *See id.* at 17-18. In reality, the Amended Complaint makes

7    it clear that these alleged damages have nothing to do with X Corp.'s contract claim; the crib-quoted

8    paragraph attributes these purported costs to CCDH's "access to data via Brandwatch," AC ¶ 71,

9    not any alleged scraping, which is what its contract claim purports to be about.

10          As for the constitutional bar itself, X Corp.'s sole rebuttal is (once again) an assertion that

11   its "tangible, economic losses" are somehow exempt from this rule. Opp. 18. But X Corp. never

12   explains why core constitutional protections would turn arbitrarily on whether harm to a plaintiff's

13   reputation from a defendant's speech happens to have manifested in a way where the dollars and

14   cents can easily be counted before a complaint is filed. It is therefore unsurprising that X Corp.'s

15   purported distinction collides with applicable precedent: courts have, in fact, repeatedly barred

16   recovery of "tangible, economic losses," *id.*, when such losses were caused by third parties'

17   reactions to protected speech, *see, e.g., Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

18   *Progress*, 402 F. Supp. 3d 615, 645 (N.D. Cal. 2019) (precluding damages based on specific and

19   quantifiable "grants for security enhancements to affiliates," "costs of repairing and protecting [a

20   plaintiff's] website after hacking," "costs of repairing and protecting online appointment systems,"

21   and so on), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125 (9th

22   Cir. 2022); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 511, 522-23 (4th Cir. 1999)

23   (similarly holding that damages for "lost sales" and "diminished stock value" stemming from a

24   news broadcast were "precluded" as unlawful "reputational damages from publication").[3]

---

[3] *Cohen v. Cowles Media Co.* is not to the contrary. *See* Opp. 18. As the United States Supreme
Court emphasized in that case, Cohen did not seek to "avoid the strict requirements for establishing
a libel or defamation claim," and the issue was whether Cohen could obtain damages specifically
and directly connected to the breach of a promise to keep his identity confidential. 501 U.S. 663,
671 (1991). Here, by contrast, X Corp. seeks damages arising from speech that is distinct from the
alleged conduct that X Corp. points to as giving rise to CCDH US's breach.

Finally, X Corp. resorts again to urging this Court to "reserve[]" its application of these settled legal principles for "summary judgment or trial." Opp. 18. But because cognizable damages are a necessary element of a contract claim under California law—a principle that X Corp. does not dispute—courts in this District routinely dismiss such claims where, as here, all damages alleged are unrecoverable as a matter of law. *See, e.g.*, *King v. Facebook Inc.*, 599 F. Supp. 3d 901, 910-11 (N.D. Cal. 2022), *aff'd*, No. 22-15602, 2023 WL 5318464 (9th Cir. Aug. 18, 2023); *Modden v. Ticketfly LLC*, No. 18 Civ. 6450, 2019 WL 4738237, at *2-3 (N.D. Cal. Sept. 27, 2019). Resisting this result, X Corp. quotes an unpublished district court decision to suggest that the *constitutional* line between recoverable and unrecoverable damages cannot be drawn on a motion to dismiss. *See* Opp. 18-19 (quoting *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15 Civ. 3522, 2018 WL 5879786, at *5 (N.D. Cal. Nov. 7, 2018)). But that statement was limited to the circumstances before that court, which confronted a complaint in which *both* recoverable and unrecoverable damages were pleaded, and deferred the process of sorting them out until later. *See Nat'l Abortion Fed'n*, 2018 WL 5879786, at *5 n.6; *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15 Civ. 3522, 2015 WL 5071977, at *7 (N.D. Cal. Aug. 27, 2015) ("But the damages in this case are *not* limited to those from publication . . . and thus cannot be dismissed as a matter of law."). That situation is obviously a far cry from the categorically unrecoverable reputational damages that X Corp. seeks on its contract claim here.

### C.  X Corp. Fails to State a Claim Under the CFAA (Count 2)

#### 1.  X Corp. still cannot allege access "without authorization"

Despite evidence that disproves any notion of subterfuge by the CCDH Defendants in the alleged Brandwatch access, *see* Dkt. 49-5, X Corp. doubles down on its argument that by using a Brandwatch login via ECF, the CCDH Defendants committed a federal hacking crime. Even setting the contrary evidence aside, X Corp. fails to state a CFAA claim, both because the access alleged here falls short of the sort of breaking and entering that the CFAA criminalizes, and because the alleged access was perfectly consistent with Brandwatch's terms in any event. *See* Mot. 19-21.

X Corp.'s kitchen-sink opposition does not rebut either point. *First*, X Corp. argues that the CFAA categorically prohibits accessing "an entirely protected database" absent express permission

1    from the owner. Opp. 21. That is incorrect. As X Corp. concedes, ECF (a Brandwatch subscriber)

2    gave CCDH permission to use its subscription, *see* AC ¶ 38, and as a matter of settled precedent,

3    that third-party permission, absent a revocation by Brandwatch, sufficed to render the access

4    authorized under CFAA, *see, e.g.*, *Facebook, Inc. v. Power Ventures*, 844 F.3d 1058, 1067 (9th Cir.

5    2016) (where defendant reasonably could have thought third-party consent sufficed to allow access,

6    notwithstanding contrary terms, "it did not initially access [the plaintiff's] computers 'without

7    authorization' within the meaning of the CFAA"); *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp.

8    2d 1174, 1182 (E.D. Cal. 2010) (defendant was authorized to access licensed materials when it

9    received permission by a licensee, even if the access was in violation of licensing agreement);

10   *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608-09 (E.D. Va. 2005) (same).[4]

11          X Corp. insists that its allegations "establish an even clearer CFAA violation than in *Nosal*

12   *II*" because the defendant in *Nosal II* had previously been granted access, whereas "CCDH has

13   *never* been a customer of Brandwatch." Opp. 22 (citing *Nosal II*, 844 F.3d at 1031); *accord* Opp.

14   24-25 (arguing that "'more' than just [a] violation of [terms] is present" for the same reason). But

15   that gets the case backwards. *Nosal II* reaffirms that for voluntary account-sharing to violate the

16   CFAA, a clear and affirmative denial of access must have been communicated first. Thus, critical

17   in *Nosal II* was the fact that the employer "affirmatively," "particular[ly]," and "unequivocally"

18   told Nosal he was "categorically" barred from accessing the employer's systems, but Nosal did so

19   anyway. 844 F.3d at 1028, 1034-36, 1038. Similarly, in *Power Ventures*, only *after* Facebook had

20   "clearly notified" the defendant "of the revocation of access" through "an individualized cease-

21   and-desist letter" did the access became unauthorized under the CFAA; until that point, permission

22   by Facebook *users* rendered the access sufficiently authorized, even though it violated contractual

23   terms. 844 F.3d at 1067-69. Here, X Corp. does not and cannot allege that it or Brandwatch ever

24   communicated a revocation of access to the CCDH Defendants. Nor can X Corp. claim that any

25   _____

26   [4] X Corp. further resists the established principle that "a violation of the terms of use of a website—
     without more—cannot establish liability under the CFAA," *Power Ventures*, 844 F.3d at 1067, by
27   attempting to cabin it to CFAA claims involving "exceeding authorized access," *see* Opp. 24. But
     *Power Ventures* and *Nosal II* make clear that the principle applies equally to CFAA's "without
28   authorization" prong. *See Power Ventures*, 844 F.3d at 1067 n.3; *United States v. Nosal*, 844 F.3d
     1024, 1028 (9th Cir. 2016) ("*Nosal II*").

access was "surreptitious[]," *Nosal II*, 844 F.3d at 1038; rather, as it alleges, the CCDH Defendants used Brandwatch openly and discussed its use in free, public reports, *see* AC ¶¶ 45, 48; *AtPac*, 730 F. Supp. 2d at 1182 (rejecting CFAA claim where defendant did not "act covertly when it accessed [plaintiff's] server; it did so openly with its own log-in and with [a licensee's] express permission"). These circumstances render X Corp.'s doomsday scenarios entirely exaggerated. *See* Opp. 25.

      *Second*, X Corp.'s factual allegations fail to make out a violation of the Brandwatch terms in any event. *See* Mot. 19-20. X Corp. mischaracterizes this issue as a "series of hypotheticals" that "extend[s] far beyond the pleadings." Opp. 22, 23-24. But it does not dispute that the operative Brandwatch terms are incorporated by reference or subject to judicial notice; to the contrary, it affirmatively argues that this Court can consider Brandwatch's terms (including terms that, as explained below, are inapplicable to its allegations). *See* Dkt. 63 at 2-4. And this Court need not accept as true X Corp.'s "legal conclusion[s] couched as . . . factual allegation[s]," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), nor "allegations that contradict matters properly subject to judicial notice," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *as amended*, 275 F.3d 1187 (9th Cir. 2001). Accepting X Corp.'s nonconclusory factual allegations as true (insofar as they do not contradict the Brandwatch terms), this Court can easily conclude that because ECF authorized the CCDH Defendants to use its Brandwatch subscription, *see* AC ¶¶ 11, 38, and the governing terms defined "User[s]" as anyone ECF authorized to use the services "directly or indirectly," *e.g.*, Dkt. 48-3 at 1, CCDH was a Brandwatch "User," not a third party—and certainly not some unauthorized criminal hacker.

      In truth, it is X Corp. that reaches beyond its pleading to try to support its argument. For the first time, it points to a Brandwatch Management Service Appendix ("MSA") to argue that ECF could not authorize CCDH to use its account. *See* Opp. 23. But while the Amended Complaint quotes from and relies on the Brandwatch terms appended to the CCDH Defendants' motion, *see* AC ¶ 37, it never once quotes, cites to, or purports to rely on this MSA. Nor does the Amended Complaint suggest that ECF agreed to or was bound by the MSA (or that CCDH even ever saw it).[5]

---

[5] Indeed, the facts here would show that the MSA was incorporated only into an ECF Brandwatch order form dated January 2023, *see* Dkt. 49-4 at 3, not any preceding agreements between ECF and Brandwatch, *see* Dkt. 49-2, 49-3. The only CCDH report that X Corp. identifies after that date, *see*

1

2.       **X Corp. has not pleaded the requisite technological loss**

2

X Corp.'s attorney's fees and investigative costs "to ascertain the nature and scope of

3

CCDH's unauthorized access," AC ¶ 87, are not "loss[es]" within the CFAA's "narrow" definition

4

of that term, *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262 (9th Cir. 2019). X Corp.'s

5

response is many years outdated, based on the logic of pre-*Van Buren* cases that construed loss

6

"broadly." *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1111 n.8 (N.D. Cal. 2017). But

7

the Supreme Court in "*Van Buren* reviewed the statutory definitions of 'damage' and 'loss' and

8

concluded that [the CFAA's] civil remedies provision requires a showing of 'technological

9

harms—such as the corruption of files—of the type unauthorized users cause to computer systems

10

and data.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195 n.12 (9th Cir. 2022) (quoting

11

*Van Buren v. United States*, 141 S. Ct. 1648, 1659-60 (2021)). Yet X Corp. does not allege any loss

12

related to "impairment of or damage to [its] computer system." *AtPac*, 730 F. Supp. 2d at 1184. Its

13

costs from investigating a potential CFAA violation inflicting no such damage—involving a third

14

party's servers at that—do not suffice. *See* Mot. 21-22; *Van Buren*, 141 S. Ct. at 1660 (no "loss"

15

where conduct "did not impair the 'integrity or availability' of data, nor did it otherwise harm the

16

database itself"); *El Omari v. Buchanan*, No. 20 Civ. 2601, 2021 WL 5889341, at *14 (S.D.N.Y.

17

Dec. 10, 2021) ("investigation costs" unconnected "to any damage to [the] computer" insufficient).

18

In order to argue otherwise, X Corp. relies solely on an unopposed report and

19

recommendation granting a default judgment. *See* Opp. 8-9, 25-26 (citing *Facebook, Inc. v. Holper*,

20

No. 20 Civ. 6023, 2022 WL 17167958 (N.D. Cal. Sept. 27, 2022), *report and recommendation*

21

*adopted as modified*, 2022 WL 17169836 (N.D. Cal. Nov. 22, 2022)). But even assuming *Holper*

22

can be squared with binding Supreme Court and Ninth Circuit precedent, the losses in that case did

23

not arise merely from an investigation. The plaintiff expended resources responding to a violation

24

in multiple ways, including by disabling the defendant's accounts, blocking his access, and sending

25

him a cease-and-desist letter. *See Holper*, 2022 WL 17167958, at *2. By contrast, X Corp. alleges

26

only that it investigated a potential violation, apparently for purposes of litigation. It has alleged no

27

28

---

Opp. 4; AC ¶ 51, involves *public* data points taken from a still available Brandwatch blog post, *see*
Mot. 18 n.13—a point that X Corp. does not dispute.

1   measure to address any technological harms—understandably so, since it does not even own the

2   servers it complains about, and their actual owner (Brandwatch) is not a party to this case.

3       Moreover, X Corp. does not dispute (and thus concedes) that attorney's fees to enforce its

4   agreements with Brandwatch do not qualify as cognizable "loss" under the CFAA. *See* Mot. 22

5   (collecting cases); *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 736 (S.D.N.Y. 2020). While

6   X Corp. insists it can rely on those noncognizable losses to meet CFAA's $5,000 threshold, *see*

7   Opp. 26, that is obviously incorrect, *see Sprint Sols. Inc. v. Pac. Cellupage Inc.*, No. 13 Civ. 7862,

8   2014 WL 3715122, at *6 (C.D. Cal. July 21, 2014).

9       **3.    X Corp.'s pleading still does not specify the relevant CFAA subsection**

10      Having failed to specify in its Amended Complaint what statutory provision it claims the

11  CCDH Defendants have violated, X Corp. attempts to re-amend its claim on the fly with the

12  argument that parts of its pleading track the language of 18 U.S.C. § 1030(a)(4). Opp. 27. This is

13  too little, too late. A "plaintiff's 'statements in his opposition brief cannot amend the Complaint.'"

14  *A.C.C.S. v. Nielsen*, No. 18 Civ. 10759, 2019 WL 7841860, at *7 (C.D. Cal. Sept. 17, 2019).

15      As for Rule 9(b), although some district courts have differed, *see* Opp. 27-28, many have

16  correctly held that a claim under § 1030(a)(4)—which expressly requires "intent to defraud" and

17  conduct "further[ing] the intended fraud"—sounds in fraud. *See, e.g.*, *Nowak v. Xapo, Inc.*, No. 20

18  Civ. 3643, 2020 WL 6822888, at *3 (N.D. Cal. Nov. 20, 2020) (applying Rule 9(b) to CFAA claim);

19  *Oracle Am., Inc. v. Serv. Key, LLC*, No. 12 Civ. 790, 2012 WL 6019580, at *6 (N.D. Cal. Dec. 3,

20  2012) ("Rule 9(b) plainly applies to section 1030(a)(4)'s requirement that the defendant's acts

21  further the intended fraud."). And X Corp. does not explain how allegations about open use of a

22  voluntarily shared account, *see* AC ¶¶ 38, 45, 48, could possibly suffice to plead a claim of fraud

23  in accordance with the Rule 9(b) standard.

24      **D.    X Corp. Fails to State a Claim in Tort (Counts 3 and 4)**

25      As for its tort claims, X Corp. concedes that inducing breach of contract is a "narrower"

26  "species of intentional interference." Opp. 28-29. And it does not point to any alleged interference

27  other than alleged breach. Accordingly, as pleaded here, the claims rise or fall together. *See*

28  Mot. 23. And because X Corp. fails to plead essentially all the requisite elements—inducement or

1  causation, an underlying breach, the CCDH Defendants' knowledge and intent, and cognizable

2  damages—both claims must be stricken or dismissed. *See id.* at 23-26.

3          X Corp.'s responses to this don't work. It attempts to brush aside its most glaring

4  deficiency—its failure to allege that the CCDH Defendants caused or induced anything at all—as

5  "nonsensical." Opp. 30. But it is X Corp.'s theory that makes no sense. X Corp. alleges that

6  Brandwatch breached its obligations not to "allow others to . . . transfer . . . access to . . . Licensed

7  Material" and to "keep 'Twitter Content' secure." AC ¶ 31. But its pleading nowhere alleges that

8  the CCDH Defendants caused or induced Brandwatch to do (or not do) anything at all. To the

9  contrary, X Corp. explicitly alleges that Brandwatch did not even know about the CCDH

10 Defendants' supposed misconduct until after the fact. *See* AC ¶ 41. Thus, if the CCDH Defendants'

11 access to Brandwatch was indeed unauthorized, and if the information they gathered was "Licensed

12 Material" or "Twitter Content," then any failure by Brandwatch to *secure* the relevant data, and not

13 to *allow* others to access it, was a necessary precondition, not a consequence. *See* AC ¶ 31.

14         Unsurprisingly, X Corp. fails to identify a case in which a claim for interference or

15 inducement survived dismissal without any allegation that the defendant caused or induced the

16 plaintiff's counterparty to undertake any act or omission. In fact, X Corp.'s bizarre assertion that

17 "the access is the breach," Opp. 30, drives the nail into the coffin: by dispensing with the

18 requirement that Defendants caused any change in the behavior of the actual contracting parties, X

19 Corp. confirms that it is trying to hold Defendants liable for purportedly breaching contracts that

20 they were not parties to (and did not even see). *But see, e.g.*, *Tri-Continent Int'l Corp. v. Paris Sav.

21 & Loan Ass'n*, 16 Cal. Rptr. 2d 508, 511 (Cal. Ct. App. 1993) (a plaintiff "cannot assert a claim for

22 breach of contract against one who is not a party to the contract"); *Kelly v. Worth Holdings, LLC*,

23 No. 17 Civ. 2466, 2017 WL 4156186, at *8 (N.D. Cal. Sept. 18, 2017) (same).

24         X Corp.'s other arguments are similarly flawed. X Corp. again argues that CCDH was not

25 a Brandwatch "User" and any argument to the contrary would "dispense with the *requirement* . . .

26 that the Court accept X Corp.'s pleaded allegations as true." Opp. 30. But this is incorrect—the

27 Court need not accept X Corp.'s formulaic and conclusory allegations, particularly when routine

28 consideration of incorporated documents refutes them. *See* Section C.1, *supra*; Mot. 6.

1    Next, X Corp. insists that the CCDH Defendants somehow must have known of the relevant

2 terms of X Corp.'s contracts with Brandwatch, despite never having seen them. Opp. 30-31. But in

3 hopes of making this unreasonable inference seem reasonable, it again misdescribes its own

4 allegations. The Amended Complaint does not allege that the CCDH Defendants "went to great

5 lengths to gain unauthorized access" to Brandwatch, *id.* at 30; it alleges merely that ECF, a

6 Brandwatch customer, gave them login credentials, *see* AC ¶ 38. This does not provide a plausible

7 basis to infer the requisite knowledge of contract terms or any nefarious intent.

8    Finally, X Corp.'s tort damages still run headlong into the First Amendment, which bars the

9 defamation-style reputational damages X Corp. seeks here, regardless of whether they are

10 "measurable" or "specific." Opp. 19, 31; *see* Section B.3, *supra*. And as for state law, X Corp. fails

11 to address the attenuated causal chain or cite any authority supporting its seemingly boundless

12 conceptions of foreseeability and proximate cause. *Compare* Mot. 26, *with* Opp. 31. Moreover, X

13 Corp.'s last-ditch effort to tack its attorney's fees and investigatory costs onto its tort claims

14 (pleaded only on its CFAA claim) strains the causal chain even further, well past the breaking point.

15 *See* Opp. 31; *compare* AC ¶ 87, *with* AC ¶¶ 92-93, 98-99.

16    **E.    X Corp. Fails to State Any Claim Against the Doe Defendants**

17    To knock down one last strawman, X Corp. argues that it cannot be faulted for failing to

18 name the Doe Defendants prior to discovery. *See* Opp. 31-32. But that is not what CCDH has

19 argued. Rather, the issue is that X Corp. has not stated a claim against the Doe Defendants, named

20 or not. *See* Mot. 26; *Soo Park v. Thompson*, 851 F.3d 910, 928 n.21 (9th Cir. 2017) (discovery into

21 identities inappropriate where "complaint would be dismissed on other grounds").

22    The only specific support X Corp. can muster for its conclusory allegation that "CCDH is

23 acting . . . at the behest of and in concert with" the Doe Defendants "in the course and scope of

24 such agency and/or acting with the permission, consent, authorization or ratification of" the Doe

25 Defendants, AC ¶ 63, is one statement by an unnamed U.S. Senator, *see* Opp. 9, 31-32. But if

26 statements by politicians sufficed to state a claim, William Twombly would have made it past the

27 pleading stage, too. *See Twombly*, 550 U.S. at 592 (Stevens, J., dissenting) (noting that Twombly's

28 complaint quoted the concerns of "Members of Congress" regarding the conspiracy he alleged).

And the linchpin statement on which X Corp. relies—that "one United States Senator referred to CCDH as '[a] foreign dark money group,'" AC ¶ 62—does not suggest any conspiracy between the CCDH Defendants and their funders in any event, let alone supply the sort of factual allegations, tied to necessary elements, that could state a plausible claim against any of the Does.

*     *     *

Finally, this Court should not allow X Corp. a third opportunity to plead its SLAPP suit. *See* Mot. 27. Fighting against the obvious futility of further amendment, X Corp. reveals a newfound belief that ECF's authorization of Brandwatch access was effectuated by a "rogue" actor. Opp. 32-33. But that, too, is a red herring, even as to Counts 2-4: whether ECF's authorization was by a "rogue" employee has no bearing on the CCDH Defendants' knowledge or state of mind, the fact that Brandwatch never revoked access, or any of the pleading's other deficiencies. (X Corp.'s articulated "understanding" is also contradicted by ECF's own filing, which plainly shows Brandwatch and Brandwatch's "main point of contact at ECF" directly involved in facilitating CCDH's access. Dkt. 49-5 at 2.) Meanwhile, contrary to X Corp.'s claim that Defendants would suffer no prejudice from another amendment, the prejudice would be obvious: these small nonprofit research organizations would incur substantial costs in briefing and litigating further motions to dismiss and/or strike, all while the threat of similar litigation would continue to chill research and speech. *See* Mot. 27; Amicus Brief by Public Participation Project 9-11, Dkt. 55-1; ACLU Amicus 14. X Corp. has now carried out that threat against yet another social media-monitoring nonprofit, *see X Corp. v. Media Matters for Am.*, No. 23 Civ. 1175 (N.D. Tex.), all while engaging in conduct that plainly refutes its own theory of harm in both cases, *see, e.g.*, Lora Kolodny, *Elon Musk Claims Advertisers Are Trying to 'Blackmail' Him, Says 'Go F--- Yourself'*, CNBC (Nov. 29, 2023). The interests of justice not only do not support leave to amend; they call for an end to this baseless effort to silence honest criticism and punish critics. *See* Fed. R. Civ. P. 15(a).

## IV.    CONCLUSION

The Court should grant the undersigned Defendants' motion to strike Counts 1, 3, and 4 and grant the undersigned Defendants' motion to dismiss Count 2 with prejudice. Alternatively, the Court should dismiss the Amended Complaint in its entirety with prejudice.

1    Dated: January 10, 2024

2          New York, New York                    Roberta A. Kaplan*

3                                                 John C. Quinn*

                                                  Matthew J. Craig (SBN 350030)

4                                                 Amit Jain*

                                                  KAPLAN HECKER & FINK LLP

5                                                 350 Fifth Avenue, 63rd Floor

                                                  New York, NY 10118

6                                                 (212) 763-0883

                                                  rkaplan@kaplanhecker.com

7                                                 jquinn@kaplanhecker.com

                                                  mcraig@kaplanhecker.com

8                                                 ajain@kaplanhecker.com

9                                                 * admitted pro hac vice

10                                                Marc S. Williams (SBN 198913)

11                                                Neil S. Jahss (SBN 162744)

                                                  COHEN WILLIAMS LLP

12                                                724 South Spring Street, 9th Floor

                                                  Los Angeles, CA 90014

13                                                213-232-5160

                                                  mwilliams@cohen-williams.com

14                                                njahss@cohen-williams.com

15

                                                  *Attorneys for Defendants Center for*

16                                                *Countering Digital Hate, Inc. and Center for*

                                                  *Countering Digital Hate Ltd.*

17

18

19

20

21

22

23

24

25

26

27

28