IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

X CORP.,

           Plaintiff,

    v.

CENTER FOR COUNTERING
DIGITAL HATE, INC., et al.,

           Defendants.

Case No.  23-cv-03836-CRB

**ORDER GRANTING CCDH
MOTION TO DISMISS AND
STRIKE**

Sometimes it is unclear what is driving a litigation, and only by reading between the lines of a complaint can one attempt to surmise a plaintiff's true purpose.  Other times, a complaint is so unabashedly and vociferously about one thing that there can be no mistaking that purpose.  This case represents the latter circumstance.  This case is about punishing the Defendants for their speech.

Plaintiff X Corp., the social media company formerly known as Twitter, has brought suit against Defendants Center for Countering Digital Hate, Inc. ("CCDH U.S."), Center for Countering Digital Hate Ltd. ("CCDH U.K.") (together, "CCDH"), Stichting European Climate Foundation ("ECF"), and Does (collectively, "Defendants"), alleging that CCDH undertook "a series of unlawful acts," one of which involved ECF's help, "designed to improperly gain access to protected X Corp. data."  FAC (dkt. 10) ¶ 1.  X Corp. alleges that CCDH then "cherry-pick[ed]" users' posts from that data in order to "falsely claim" in reports and articles that "it had statistical support showing" that the X Corp. platform "is overwhelmed with harmful content."  Id.  X Corp. insists that CCDH did so in order to push "a contrived narrative to call for companies to stop advertising on

X," and that CCDH succeeded, causing X Corp. "at least tens of millions of dollars" in "lost . . . advertising revenues and other costs." Id. ¶¶ 2, 5.  CCDH moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and moves to strike pursuant to California's anti-SLAPP statute, California Civil Procedure Code § 425.16. MTD&S (dkt. 47).[1]  As explained below, the Court GRANTS the motion.

## I.    BACKGROUND

### A.    Factual Allegations[2]

#### 1.    The Parties

X Corp. is a corporation organized under the laws of the State of Nevada, with a principal place of business in San Francisco, California.  FAC ¶ 7.  X Corp. provides a real-time social media platform ("the X platform") to its users, who can share ideas through public posts.  Id.  Elon Musk took over Twitter in late October of 2022.  See Rob Wile, "A timeline of Elon Musk's takeover of Twitter," NBC News (Nov. 17, 2022), nbcnews.com/business/business-news/twitter-elon-musk-timeline-what-happened-so-far-rcna57532 (hereinafter Wile Timeline).  Twitter changed its name to "X" in July of 2023. See Irina Ivanova, "Twitter is now X.  Here's what that means," CBS News (July 31, 2023), https://www.cbsnews.com/news/twitter-rebrand-x-name-change-elon-musk-what-it-means/ (adding, "'Twitter was acquired by X Corp both to ensure freedom of speech and as an accelerant for X, the everything app,' the company's owner, billionaire Elon Musk, recently said.").

CCDH U.S. is a non-profit corporation organized under the laws of Washington, D.C., with its principal place of business there as well.  Id. ¶ 8.  It created an account on the X (then Twitter) platform in 2019.  Id.  CCDH U.K. is a non-profit organization formed under English law and headquartered in London, England.  Id. ¶ 9.  CCDH U.S. and CCDH U.K. are affiliated corporate entities.  Id.  CCDH prepares and publishes

---

[1] A second motion, filed by ECF, see ECF Mot. (dkt. 49), is addressed in a separate order.
[2] For the purposes of this motion, this order accepts as true the allegations from the complaint, and construes them in the light most favorable to X Corp.  See W. Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).

United States District Court
Northern District of California

reports and articles about organizations and individuals who post on social media platforms "on widely debated topics, included COVID-19 vaccinations, reproductive healthcare, and climate change." Id. ¶ 17.  It then makes those reports "publicly available and free." Id.  X Corp alleges that CCDH's reports use "flawed methodologies to advance incorrect, misleading narratives," cherry-picking data and labeling as "hate speech" content that does not conform to its views. Id. ¶ 18.  X Corp. maintains that "CCDH's reports and articles, coupled with its demands to entirely remove certain users from platforms, are transparent efforts to censor viewpoints that CCDH disagrees with, and reveal CCDH's goal of leaving on the platforms only viewpoints that CCDH supports." Id. ¶ 20.  Indeed, X Corp. alleges that CCDH is an "activist organization[] masquerading as [a] research agenc[y]." Id. ¶ 1.

ECF is a non-profit foundation formed under Dutch law and headquartered in The Hague, Netherlands.  Id. ¶ 10.

Doe defendants are "presently unknown supporters and funders [of CCDH] who have, among other things, directed, instructed, acted as agents of or in concert with, conspired with, and/or who have participated in meaningful ways in CCDH's and ECF's unlawful conduct." Id. ¶ 6.  X Corp. alleges that "a United States Senator" referred to CCDH as a "[f]oreign dark money group," and further alleges that X Corp. will further amend the complaint once it ascertains the Doe defendants' true names.  Id.

## 2.    The Dispute Between the Parties

X Corp. alleges that CCDH has created "faulty narratives regarding X Corp. and the X service, with the express goal of seeking to harm X Corp.'s business by driving advertisers away from the platform." Id. ¶ 25.  It continues: "To enable and facilitate those efforts, CCDH has engaged in a series of unlawful acts to secure data regarding X that CCDH could then mischaracterize in its reports and articles alongside calls for companies not to advertise on X." Id.  The dispute between the parties involves two separate means by which CCDH acquired X Corp. data, and three publications in which CCDH made use of that data.

3

United States District Court
Northern District of California

### a.    CCDH "Scraping" Data from X Corp. Itself

The first means by which CCDH took X Corp. data involves "scraping" data from X Corp. directly.

As a user of the X platform, CCDH necessarily agreed to X Corp.'s Terms of Service ("ToS") when it created a new account in 2019.  Id. ¶¶ 8, 53.  The ToS provided that "'scraping the Services without the prior consent of Twitter is expressly prohibited.'"  Id. ¶ 53.[3]  The ToS did not define "scraping."  See ToS.  However, scraping generally means "extracting data from a website and copying it into a structured format, allowing for data manipulation or analysis."  See hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1186 n.4 (9th Cir. 2022) (hereinafter "hiQ 2022 Circuit opinion"); see also hiQ Labs, Inc. v. LinkedIn Corp., 639 F. Supp. 3d 944, 954 (N.D. Cal. 2022) (hereinafter "hiQ 2022 district opinion) (defining "scraping" as "a process of extracting information from a website using automated means").

In its February 9, 2023 report, discussed below, CCDH states: "'[t]o gather tweets from each of the ten reinstated accounts, [CCDH's] researchers used the social media web-scraping tool SNScrape, which utilizes Twitter's search function to enable data collection.'"  FAC ¶ 77.  X Corp. alleges that CCDH scraped the X platform "on numerous occasions, including before preparing its February 9, 2023 report," and that X Corp. never gave CCDH permission to do so.  Id.

### b.    CCDH Accessing Data from Brandwatch

The second means by which CCDH took X Corp. data involves a company called Brandwatch.  Brandwatch, "a trusted partner of X," and notably not a defendant in this case, "provides SaaS products[4] that enable its customers to conduct brand monitoring on

---

[3] This provision specified that users "may not . . . access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited)."  Kaplan Decl. Ex. A (dkt. 48-1) ("ToS") at 6–7.
[4] SaaS means "software as a service."  See What is SaaS Business Intelligence?,

social media, customer research on opinions and trends, campaign planning and campaign effectiveness measurement, competitive analysis and risk management, influencer identification and market research, and audience segmentation and analysis." FAC ¶ 28. Brandwatch had contracts with X Corp. and with ECF, both of which are relevant here. Id. ¶¶ 29, 35.

### i.      Relevant Brandwatch Agreements

X Corp. entered into a contract with Brandwatch on May 1, 2020, called the "Master License Agreement" ("the MLA"). Id. ¶ 29. Pursuant to the MLA, Brandwatch could access certain data regarding X Corp., referred to as "'Licensed Materials,'" which included posts on the X platform, in order "to enable Brandwatch's customers to use its SaaS products to analyze posts and X/Twitter users." Id. X Corp. would stream its Licensed Materials from its servers, "including in California," to "servers used by Brandwatch [] located in the United States, which Brandwatch's applications accessed to enable [its] users with login credentials to analyze the data." Id. In the MLA, Brandwatch agreed that it would "'not attempt to (and will not allow others to): . . . copy, sell, lease, sublicense, distribute, redistribute, syndicate, create derivative works or assign or otherwise transfer or provide access to, in whole or in part, the Licensed Material to any third party.'" Id. ¶ 31. Brandwatch further agreed to keep "Twitter Content" secure. Id.

ECF was a subscriber to Brandwatch's applications, and therefore also had a series of contracts with Brandwatch. Id. ¶ 35. X Corp. alleges that Brandwatch's terms of service, to which ECF must have agreed, must be similar to the ones publicly available at https://www.brandwatch.com/legal/terms-and-conditions/. Id. Brandwatch provided ECF with login credentials, which enabled ECF to log into Brandwatch's applications to access the Licensed Materials. Id. ¶ 36. X alleges that ECF's agreement with Brandwatch prevented ECF from selling, reselling, licensing, sublicensing, or otherwise making the Brandwatch service "available to anybody other than its Users" and from distributing

---

WiseGeek, http://wisegeek.net/what-is-saas-business-intelligence.htm (last visited 2/3/2024).

United States District Court
Northern District of California

"Supplier Data to any non-User for any reason other than Customer's (or User's) business purpose." Id. ¶ 37.  ECF further agreed "that it would ensure that its user ID and password to use the Brandwatch applications were kept confidential" and that it would "'not share Customer Data with any other customer or third parties.'"  Id.[5]

### ii.    CCDH Access to Brandwatch Using ECF Login

CCDH has never been a customer of Brandwatch.  Id. ¶ 39.  X Corp. alleges that ECF knew that CCDH was not authorized to access the Licensed Materials or Brandwatch, and knew that CCDH wanted to access the Licensed Materials "to prepare its purported 'research' reports and call for censorship and attacks on X Corp."  Id. ¶ 38.  X Corp. alleges that "on several occasions since at least early 2021," ECF agreed to share its Brandwatch login credentials with CCDH "to enable CCDH's illegal access to the X Corp. data."  Id.  CCDH U.K. allegedly instructed CCDH U.S. to secure ECF's login credentials and helped CCDH U.S. determine how to use Brandwatch applications to search X Corp. data and "how to mischaracterize that data in the CCDH reports."  Id.  CCDH then allegedly "accessed the Licensed Materials improperly and without authorization."  Id. ¶ 41.

X Corp. further alleges that CCDH knew as of March 2021 that X Corp. and Brandwatch are parties to agreements that "prohibit Brandwatch from allowing third parties to, among other things, access, distribute, create derivative works from, or otherwise transfer the Licensed Materials."  Id. ¶ 42.[6]  X Corp. also alleges that "CCDH

---

[5] CCDH has submitted Brandwatch Service Terms dated October 15, 2022, see Kaplan Decl. Ex. C (dkt. 48-3), Brandwatch Service Terms dated August 8 or 9, 2021, see Kaplan Decl. Ex. D (dkt. 48-4), Brandwatch Service Terms dated April 15, 2019, see Kaplan Decl. Ex. E (dkt. 48-5), and Brandwatch Service Terms dated April 21, 2023, see Kaplan Decl. Ex. F (dkt. 48-6), all of which, it asserts, are incorporated by reference in the Complaint, see Kaplan Decl. ¶¶ 4–7.  X Corp. does not seem to dispute that the complaint incorporates these documents.

[6] See also id. ¶ 91 ("Defendants knew, based on their experience in CCDH purporting to analyze data associated with social media platforms . . . that for Brandwatch to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of the Brandwatch Agreements from providing access to unauthorized parties, or allowing any unauthorized parties to access that data.").

knew that . . . ECF's agreement with Brandwatch prohibited ECF from, among other things, sharing its login credentials [or] any of the Licensed Materials with CCDH." Id. Despite that alleged knowledge, X Corp. alleges, CCDH "induced and conspired with ECF to provide CCDH U.S. with its login credentials in violation of [X Corp.'s agreements with Brandwatch] and in violation of ECF's agreement with Brandwatch." Id. ¶ 43.  "CCDH then impermissibly and without authorization accessed the Licensed Materials on several occasions." Id.

### c.    CCDH's Use of the Data

Notwithstanding X Corp.'s claim at the motion hearing that "data security . . . is what this case is about," see Tr. of 2/29/24 Hearing (dkt. 74) at 12:11, the complaint does not stop at allegations of CCDH's allegedly unauthorized access of X Corp. data.  It goes on to allege that CCDH "used limited, selective, and incomplete data . . . that CCDH then presented out of context in a false and misleading manner in purported 'research' reports and articles." FAC ¶ 43 (emphasis added).  The complaint includes extensive allegations about these publications, which X Corp. contends are based on "flawed 'research' methodologies," and which "present an extremely distorted picture of what is actually being discussed and debated" on the X platform, in order to "silence" speech with which CCDH disagrees.  See id. ¶¶ 17–20.  Specifically, X Corp. highlights three publications.

### i.    March 24, 2021 Report

The first publication, from March 24, 2021, is a report called "The Disinformation Dozen," which focused on twelve high-profile individuals who opposed COVID vaccinations.  Id. ¶ 21.  It is publicly available on CCDH's website.  Id. (citing https://counterhate.com/research/the-disinformation-dozen/).  And it asserts that "[j]ust twelve anti-vaxxers are responsible for almost two-thirds of anti-vaccine content circulating on social media platforms."  Id.  X Corp. alleges that an unnamed social media platform criticized the report as "creating a 'faulty narrative' without 'any evidence.'"  Id. ¶ 22.  CCDH states in the March 24, 2021 report that it "collected this sample using Brandwatch, an enterprise social listening tool, to extract anti-vaccine tweets posted

between 1 February and 16 March 2021 based on text analysis." Id. ¶ 45.

### ii.   November 10, 2022 Article[7]

The second publication, from November 10, 2022, is an article called "Fact check: Musk's claim about a fall in hate speech doesn't stand [up] to scrutiny." Id. ¶ 46. It is publicly available on CCDH's website. Id. (citing https://counterhate.com/blog/fact-check-musks-claim-about-a-fall-in-hate-speech-doesnt-stand-up-to-scrutiny/). And it purports to contradict Elon Musk's claim that hate speech on the X platform had declined, stating that based on its "analysis of data from the social media analytics tool Brandwatch," "the week in question saw an uptick in the amount of hateful language being tweeted." See CCDH, "Fact check" (Nov. 22, 2022) https://counterhate.com/blog/fact-check-musks-claim-about-a-fall-in-hate-speech-doesnt-stand-up-to-scrutiny/). The article specifies that "[d]ata was collected using Brandwatch, which includes original tweets, retweets and quote retweets." Id.

### iii.   February 9, 2023 Report

The third publication, from February 9, 2023, is a report called "Toxic Twitter," which concludes that Twitter was generating millions of dollars in advertising revenue from previously banned accounts. See FAC ¶ 49 (citing https://counterhate.com/research/toxic-twitter/); Kaplan Decl. Ex. B (dkt. 48-2) ("Toxic Twitter" report). The report is publicly available on CCDH's website. Id. It states that Musk "has reinstated tens of thousands of accounts, including neo-Nazis, white supremacists, misogynists and spreaders of dangerous conspiracy theories," and that "just ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter." Toxic Twitter at 3. X Corp. alleges that the report "expressly calls for companies to stop

---

[7] The complaint also discusses a November 2, 2021 report called "The Toxic Ten," about ten climate-change-denying posters, which it contends is flawed, see id. ¶¶ 23–24; however, the complaint does not discuss that report as one involving improperly accessed data, see id. ¶¶ 39–55 (only discussing the March 24, 2021 report, November 10, 2022 article, and February 9, 2023 reports for this point).

advertising on X based on its incorrect implications . . . that hate speech viewed on X is on the rise." FAC ¶ 50.

The Toxic Twitter report involves both types of data collection at issue in the complaint. X Corp. alleges that "to obtain data that it needed for and mischaracterized in its February 9, 2023 report, CCDH again improperly accessed data that X Corp. provided to Brandwatch," citing "several data points for which non-public Brandwatch sources are quoted." FAC ¶ 51; but see Toxic Twitter at 17 (citing Brandwatch, 22 February 2022, https://www.brandwatch.com/blog/how-much-do-social-media-ads-cost-on-facebook-instagram-twitter-and-linkedin/).[8] X Corp. further alleges that CCDH admits in the February 9, 2023 report that it "'used the social media web-scraping tool SNScrape, which utilizes Twitter's search function to enable data collection.'" FAC ¶ 54.

### d.    Harm to X Corp.

X Corp. alleges that CCDH "widely disseminates its articles and 'research' reports for free," id. ¶ 65, and that CCDH's publications "have attracted attention in the press, with media outlets repeating CCDH's incorrect assertions that hate speech is increasing on X," id. ¶ 56. X Corp. alleges that CCDH's publications have "caused significant financial harm to X Corp., including via lost advertising revenues." Id. ¶ 66. Specifically, at least eight "companies who advertised on X on an ongoing basis immediately paused spending" after viewing CCDH's publications, and at least five companies "planning on running future campaigns" paused those plans after viewing CCDH's publications. Id. ¶¶ 67–68. Other companies have allegedly identified the CCDH publications as a barrier "to reactivating their paid advertising campaigns on X." Id. ¶ 69. X Corp. "estimates that it has lost at least tens of millions of dollars in lost revenues" as of the date of the amended complaint, "with those amounts subject to increasing as time goes on." Id. ¶ 70. It accuses CCDH of being the but-for and proximate cause of its lost revenues, because "CCDH's conduct to obtain that data (which it then distorted) was necessary for CCDH to make its

---

[8] This is the only citation to Brandwatch that the Court observes in the February 9, 2023 report.

allegations against X Corp . . . regarding hate speech and other types of content on X."  Id. X Corp. also alleges additional losses of over $5,000 caused by internal investigations to look into CCDH's unauthorized data access, as well as attorneys' fees.  Id. ¶ 71.

### B.    Procedural History

X Corp. brought suit on July 31, 2023.  See Compl. (dkt. 1).  X Corp. amended its complaint on August 7, 2023.  See FAC.  The complaint now includes causes of action for (1) breach of contract, in connection with the ToS, against CCDH U.S.; (2) breach of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, in connection with the Brandwatch data, against all Defendants; (3) intentional interference with contractual relations, as to Brandwatch's agreement with X Corp., against all Defendants; and (4) inducing breach of contract, as to Brandwatch's agreement with X Corp., against all Defendants.  See id.

CCDH moves to dismiss pursuant to Rule 12(b)(6) and moves to strike pursuant to California's anti-SLAPP statute.  MTD&S.  The motion is fully briefed, see MTD&S, Opp'n (dkt. 62), Reply (dkt. 65), and the Court has received amicus briefs from (1) Public Participation Project, in support of CCDH, see PPP Br. (dkt. 55-1), and (2) the American Civil Liberties Union Foundation of Northern California, Electronic Frontier Foundation, and Knight First Amendment Institute at Columbia University, also in support of CCDH, see ACLU Br. (dkt. 52-1).  The Court held a motion hearing on Thursday, February 29, 2024.  See Tr. of 2/29/24 Hearing.

## II.    LEGAL STANDARD

### A.    Anti-SLAPP

California's anti-SLAPP statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is "subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Cal. Code Civ. Proc. § 425.16(b)(1).  The statute facilitates "the early

dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." <u>Club Members for an Honest Election v. Sierra Club</u>, 45 Cal. 4th 309, 315 (2008). "[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the [Rule 12(b)(6)] standard." <u>Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress</u>, 890 F.3d 828, 834 (9th Cir. 2018).

**B.      Rule 12(b)(6)**

Under Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. The Court may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Godecke v. Kinetic Concepts, Inc.</u>, 937 F.3d 1201, 1208 (9th Cir. 2019) (cleaned up). A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (cleaned up). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. <u>Id.</u> (citing <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007)). When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." <u>Usher v. City of Los Angeles</u>, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. Proc. 15(a)(2). A court may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the

1    movant, repeated failure to cure deficiencies by amendment previously allowed, undue

2    prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of

3    amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

4    **III.  DISCUSSION**

5          CCDH argues that California's anti-SLAPP statute applies to the three California

6    causes of action.[9]  MTD&S at 8–9.  It then argues that X Corp. fails to state a claim as to

7    each cause of action, and so the Court should either strike (in the case of the three

8    California causes of action) or dismiss (in the case of the CFAA cause of action) them. Id.

9    at 9–26.  Finally, CCDH argues that the Complaint fails to state a claim as to the Doe

10   defendants. Id. at 26–27.  This order addresses each argument in turn.

11         **A.     Anti-SLAPP**

12         CCDH moves to strike the California causes of action pursuant to the anti-SLAPP

13   statute.  MTD&S at 8–9.  A moving defendant must, at the first step, make a prima facie

14   showing that the state law claims "arise from any act in furtherance of the person's right of

15   petition or free speech" "in connection with a public issue."  Cal. Code Civ. Proc. §

16   425.16(b)(1); Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261 (9th Cir. 2013).  If the

17   defendant makes that showing, the court then considers whether the plaintiff has, at the

18   second step, demonstrated "a reasonable probability" of prevailing on the merits of its

19   claims.  In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268,

20   1273 (9th Cir. 2013) (quoting Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003)).  This

21   order will now address the first step: whether CCDH has made the required prima facie

22   showing.  This order will go on to address the second step on a claim-by-claim basis,

23   applying a 12(b)(6) standard.  See Planned Parenthood Fed'n of Am., Inc., 890 F.3d at

24   834.

25              **1.     "In Furtherance of"**

26         CCDH's writing of reports and articles about X Corp.—writing the complaint

27

28   _____

     [9] "[T]he anti-SLAPP statute does not apply to federal law causes of action."  Hilton v.
     Hallmark Cards, 599 F.3d 894, 901 (9th Cir. 2010).

United States District Court
Northern District of California

references over and over, see, e.g., FAC ¶¶ 1, 3–4, 12, 17–24, 38, 41, 43–52, 54–60, 62, 65–70, 77–78, 84–85, 92, 96, 98—unquestionably constitutes an act "in furtherance of" CCDH's free speech rights.  See Hilton, 599 F.3d at 904 (producing a birthday card is conduct in furtherance of free speech rights).  CCDH also makes a compelling case that gathering the data used in its publications is also an act in furtherance of its free speech rights.  See MTD&S at 8–9.  "Because newsgathering is part and parcel of [reporting the news], newsgathering likewise constitutes protected activity."  Iloh v. Regents of Univ. of Cal.. 94 Cal. App. 5th 947, 956–57 (2023).  "Reporting the news usually requires the assistance of newsgathering, which therefore can be construed as undertaken in furtherance of the news media's right to free speech."  Lieberman v. KCOP Television, Inc., 110 Cal. App. 4th 156, 166 (2003); see also Taus v. Loftus, 40 Cal. 4th 683, 713 (2007) ("conducting an investigation" was "unquestionably . . . conduct in furtherance of [the] right of free speech").  CCDH obtained X Corp. data in order to use that data in its reports and articles.  See FAC ¶ 70 ("CCDH's conduct to obtain that data (which it then distorted) was necessary for CCDH to make its allegations against X Corp. and X regarding hate speech and other types of content on X."), id. ¶¶ 44–55 (describing the two reports and one article at issue in this case).  Accordingly, the acquisition of X Corp. data was newsgathering in furtherance of CCDH's protected rights.

Moreover, it is irrelevant for the purposes of satisfying CCDH's burden at the first step if CCDH did its newsgathering improperly.  In Navellier v. Sletten, 52 P.3d 703, 712 (Cal. 2002), the plaintiffs noted that the anti-SLAPP statute took aim at lawsuits that chilled the "valid exercise" of free speech rights, and argued that the statute did not apply where the petitioning activity at issue "was not 'valid.'"  The court disagreed, explaining that "any claimed illegitimacy of the defendant's act is an issue which the plaintiff must raise and support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case."  Id. (internal quotation marks omitted).  Likewise, in Smith v. Payne, No. C 12-01732 DMR, 2012 WL 6712041, at *4 (N.D. Cal. Dec. 26, 2012), the court rejected the plaintiffs' argument that they needed

13

discovery of "'the precise nature of pre-publication acts constituting [the defendant's] conduct toward [p]laintiffs' to show that his motives in allegedly trespassing on private property and assaulting them 'had nothing to do with furtherance of the exercise of constitutional right of petition or free speech.'"  Judge Ryu explained: "To the extent that [the plaintiffs] seek such discovery to show that [the defendant's] actions . . . were not performed in connection with newsgathering, but for some other, sinister motive, such an argument 'confuses the threshold question of whether the SLAPP statute [potentially] applies with the question whether [the plaintiffs have] established a probability of success on the merits.'"  Id. (quoting Birkner v. Lam, 156 Cal. App. 4th 275, 284 (2007)).  X Corp.'s argument that "parties to a contract cannot disregard the terms of their agreements, or governing statutory law, simply by invoking the mere pursuit of contemplated, alleged protected speech," see Opp'n at 11, therefore misses the mark.  If CCDH's conduct breached a contract or violated a law, that is an issue for the second step of the anti-SLAPP analysis, where X Corp. bears the burden.

### 2. "Arising from"

In addition, X Corp.'s claims arise from protected conduct.

To determine whether a claim or claims arise from protected activity, courts are to look to "the conduct that constitutes the specific act of wrongdoing challenged by the plaintiff."  Jordan-Benel v. Universal City Studios, Inc., 859 F.3d 1184, 1190 (9th Cir. 2017).  "A defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant."  Sansoe v. Ford Motor Co., 668 Fed. Appx. 718, 719 (9th Cir. 2016) (quoting People ex rel. Fire Ins. Exch. v. Anapol, 211 Cal. App. 4th 809 (2012)).  In addition, "the mere fact an action was filed after protected activity took place does not mean it arose from that activity."  City of Cotati v. Cashman, 29 Cal. 4th 69, 76–77 (2002).

In Jordan-Benel, the plaintiff was a screenwriter who alleged that defendant production companies' failure to compensate and credit him for a script constituted a

United States District Court
Northern District of California

breach of contract. Id. at 1187, 1189.  The defendants brought an anti-SLAPP motion, arguing that the contract claim arose from their free-speech activity of producing a film. Id. at 1190.  The Ninth Circuit agreed with the plaintiff, concluding that the specific wrongful act that gave rise to the claim was the failure to pay.  Id.  The court explained that even if the cause of action was triggered by protected activity—the release of the film—that does not mean that the action arose from it: "even if a defendant engages in free speech activity that is relevant to a claim, that does not necessarily mean such activity is the basis for the claim."  Id.; see also Martinez v. Metabolife Internat., Inc., 113 Cal. App. 4th 181, 187 (2003) ("[W]hen the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.").

   X Corp. argues that just as the production of the film was not the specific act that gave rise to the claim in Jordan-Benel, CCDH's publication of its articles and reports is not the specific act of wrongdoing at issue here.  See Opp'n at 10–11 ("CCDH's alleged 'speech' is not the wrong complained of—its wanton breach of contract and illegal access of data are.").  But even accepting that the conduct that forms the specific wrongdoing in the state law claims is CCDH's illegal access of X Corp. data, that conduct (scraping the X platform and accessing the Brandwatch data using ECF's login credentials) is newsgathering—and claims based on newsgathering arise from protected activity.  See Iloh, 94 Cal. App. 5th at 956–57.

   It is also just not true that the complaint is only about data collection.  See Reply at 3 (arguing that X Corp.'s contention that its "claims arise from 'illegal access of data,' as opposed to speech," is the "artifice" at "the foundation of [this] whole case.") (quoting Opp'n at 10).  It is impossible to read the complaint and not conclude that X Corp. is far more concerned about CCDH's speech than it is its data collection methods.  In its first breath, the complaint alleges that CCDH cherry-picks data in order to produce reports and articles as part of a "scare campaign" in which it falsely claims statistical support for the

position that the X platform "is overwhelmed with harmful content" in order "to drive advertisers from the X platform." See FAC ¶ 1.  Of course, there can be no false claim without communication.  Indeed, the complaint is littered with allegations emphasizing CCDH's communicative use of the acquired data.  See, e.g., id. ¶¶ 17–20 (reports/articles are based on "flawed 'research' methodologies," which "present an extremely distorted picture of what is actually being discussed and debated" on the X platform, in order to "silence" speech with which CCDH disagrees); id. ¶ 43 (CCDH "used limited, selective, and incomplete data from that source . . . that CCDH then presented out of context in a false and misleading manner in purported 'research' reports and articles."), id. ¶ 56 ("CCDH's reports and articles . . . have attracted attention in the press, with media outlets repeating CCDH's incorrect assertions that hate speech is increasing on X.").

X Corp. is correct that it has not brought a claim for defamation.  See Opp'n at 10; FAC.  It insists that that choice demonstrates that it is not really complaining about CCDH's speech.  Opp'n at 10.  CCDH argues that X Corp.'s decision not to include a defamation claim is evidence that X Corp. "cannot allege that the CCDH Defendants said anything knowingly false, nor does it wish to invite discovery on the truth about the content on its platform."  MTD&S at 2; see also ACLU Br. at 1 ("X Corp. attempts to disguise a nonviable defamation claim as a breach of contract claim to retaliate against a nonprofit that provided the public with information critical of X Corp.").  Whatever X Corp. could or could not allege, it plainly chose not to bring a defamation claim.[10]  As the Court commented at the motion hearing, that choice was significant.  Tr. of 2/29/24 Hearing at 62:6–10.  It is apparent to the Court that X Corp. wishes to have it both ways—

---

[10] At the motion hearing, X Corp. asserted that it was "not trying to avoid defamation" and claimed to have "pleaded falsity" in paragraph 50 of the complaint.  Tr. of 2/29/24 Hearing at 59:20–23.  In fact, paragraph 50 did not allege falsity, or actual malice, though it used the word "incorrect."  See FAC ¶ 50 ("incorrect implications . . . that hate speech viewed on X is on the rise" and "incorrect assertions that X Corp. 'doesn't care about hate speech'").  When the Court asked X Corp. why it had not brought a defamation claim, it responded rather weakly that "to us, this is a contract and intentional tort case," and "we simply did not bring it."  Tr. of 2/29/24 Hearing at 60:1–12; see also id. at 60:21–22 ("That's not necessarily to say we would want to amend to bring a defamation claim.").

United States District Court
Northern District of California

to be spared the burdens of pleading a defamation claim, while bemoaning the harm to its reputation, and seeking punishing damages[11] based on reputational harm.

For the purposes of the anti-SLAPP motion, what X Corp. calls its claims is not actually important. The California Supreme Court has held "that the anti-SLAPP statute should be broadly construed." Martinez, 113 Cal. App. 4th at 187 (citing Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 60 n.3 (2002)). Critically, "a plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a 'garden variety breach of contract [or] fraud claim' when in fact the liability claim is based on protected speech or conduct." Id. at 188 (quoting Navellier, 29 Cal. 4th at 90–92); see also Baral v. Schnitt, 1 Cal. 5th 376, 393 (2016) ("courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading"); Navellier, 29 Cal. 4th at 92 ("conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning. The anti-SLAPP statute's definitional focus in not the form of the plaintiff's cause of action[.]").

Collondrez v. City of Rio Vista, 61 Cal. App. 5th 1039 (2021), is a recent example of a court disregarding the name of a claim to assess its content. In that case, a former police officer brought suit for breach of contract and intentional interference with prospective economic advantage because his former employer disclosed information from his personnel file without giving him notice as required by contract. Id. at 1044–46. The court held that the claims nonetheless arose from protected speech, explaining that "we disregard [a claim's] label and instead examine its gravamen." Id. at 1051, 1048 (cleaned up). It then concluded that "the harmful act at the heart of the complaint, the act that

---

[11] If there is any question about the "punishing" part, X Corp. filed a similar suit, not before this Court, in November of 2023 against Media Matters, another non-profit media watchdog, for "reporting on ads from major brands appearing next to neo-Nazi content." PPP Br. at 10. Prior to doing so, Musk threatened a "thermonuclear lawsuit" against Media Matters. Id. (quoting Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 AM), https://twitter.com/elonmusk/status/1725771191644758037 [https://perma.cc/K8SZ-M33S]). Musk's post also claimed, remarkably, that the lawsuit was furthering X Corp.'s efforts "to protect[] free speech." See Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 AM), https://twitter.com/elonmusk/status/1725771191644758037 [https://perma.cc/K8SZ-M33S].

allegedly cost [the plaintiff] his [new job] and resulted in other economic and emotional harm, is the publication of his personnel information." Id. at 1049. Here, even though X Corp. did not include a cause of action explicitly premised on CCDH's speech, as in Collondrez, speech is a harmful act at the heart of the complaint.

X Corp. insists that that is not so, arguing that "CCDH's actions caused harm independent of any alleged protected activities." Opp'n at 11. It asserts that "[i]f CCDH carried out all the same illegal activities, but stopped just short of publishing the February 9, 2023 report, X Corp. would maintain the very same valid claims against it." Opp'n at 11; see also id. at 11–12 (citing Kovalenko v. Kirkland & Ellis LLP, No. 22-cv-5990-HSG, 2023 WL 5444728, at *3 (N.D. Cal. Aug. 23, 2023) ("The question is whether the challenged allegations 'supply a necessary element' of a claim.")). The Court disagrees— and not because it is impossible to imagine that X Corp. would have been motivated to bring suit had CCDH not spoken.

Each of the state law causes of action—breach of contract, intentional interference with contractual relations, and inducing breach of contract—require as an element a showing of damages. See Oasis W. Realty, LLC v. Goldman, 250 P.3d 1115, 1121 (Cal. 2011) ("the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.") (citing Reichert v. General Ins. Co., 68 Cal. 2d 822, 830 (1968)); United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002, 1006 (9th Cir. 2014) ("the elements for the tort of intentional interference with contractual relations are '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'") (quoting Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118 (1990)); Shamblin v. Berge, 166 Cal. App. 3d 118, 122–23 (1985) (inducement to breach a contract "requires that a plaintiff prove: '(1) he had a valid and existing contract [with a third party]; (2) . . . defendant had knowledge of the

18

contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by . . . defendant's unjustified or wrongful conduct; and (5) . . . damage[s] [were suffered as a result].'") (quoting <u>Dryden v. Tri-Valley Growers</u>, 65 Cal. App. 3d 990, 995 (1977)).

X Corp.'s many allegations about CCDH's speech do more than add color to a complaint about data collection—they are not "incidental to a cause of action based essentially on nonprotected activity."  <u>See</u> <u>Martinez</u>, 113 Cal. App. 4th at 187.  Instead, the allegations about CCDH's misleading publications provide the <u>only support</u> for X Corp.'s contention that it has been harmed.  <u>See</u> FAC ¶ 78 (breach of contract claim: alleging that CCDH "mischaracterized the data . . . in efforts to claim X is overwhelmed with harmful conduct, and support CCDH's call to companies to stop advertising on X. . . . As a direct and proximate result of CCDH's breaches of the ToS in scraping X, X has suffered monetary and other damages in the amount of at least tens of millions of dollars"); ¶¶ 92–93 (intentional interference claim: alleging that Defendants "intended for CCDH to mischaracterize the data regarding X in the various reports and articles . . . to support Defendants' demands for companies to stop advertising on X" and that "[a]s a direct and proximate result of Defendants intentionally interfering with the Brandwatch Agreements . . . X Corp. has suffered monetary and other damages of at least tens of millions of dollars"); ¶¶ 98–99 (inducing breach of contract claim: alleging that "X Corp. was harmed and suffered damages as a result of Defendants' conduct when companies paused or refrained from advertising on X, in direct response to CCDH's reports and articles" and that "[a]s a direct and proximate result of Defendants inducing Brandwatch to breach the Brandwatch Agreements . . . X Corp. has suffered monetary and other damages in the amount of at least tens of millions of dollars.").

The "at least tens of millions of dollars" that X Corp. seeks as damages in each of those claims is entirely based on the allegation that companies paused paid advertising on the X platform in response to CCDH's "allegations against X Corp. and X regarding hate speech and other types of content on X."  <u>See</u> <u>id.</u> ¶ 70.  As CCDH says, "X Corp. alleges

no damages that it could possibly trace to the CCDH Defendants if they had never spoken at all." Reply at 3. Indeed, X Corp. even conceded at the motion hearing that it had not alleged damages that would have been incurred if CCDH "had scraped and discarded the information," or scraped "and never issued a report, or scraped and never told anybody about it." See Tr. of 2/29/24 Hearing at 7:22–8:3. The element of damages in each state law claim therefore arises entirely from CCDH's speech. See Bonni v. St. Joseph Health Sys., 491 P.3d 1058, 1069–70 (Cal. 2021) ("a claim is subject to an anti-SLAPP motion to strike if its elements arise from protected activity.").

Accordingly, the state law claims arise from CCDH's actions—its newsgathering and writing of reports/articles—in furtherance of CCDH's free speech rights.

### 3.    "In Connection with a Public Issue"

Finally, CCDH's actions in furtherance of its free speech rights were in connection with a public issue. X Corp. alleges that CCDH uses its reports "to demand that platform providers kick the targeted users off of their platforms, thus silencing their viewpoints on broadly debated topics such as COVID-19 vaccines, reproductive healthcare, and climate change." FAC ¶ 3; see also id. ¶ 44 (March 24, 2021 CCDH report on anti-vaxxers), ¶ 46 (November 10, 2022 CCDH article on hate speech), ¶ 49 (February 9, 2023 CCDH report on hate speech), id. ¶ 72 ("X Corp. has been harmed in its mission to provide its users with a platform in which topics of paramount public concern can be discussed and debated free from the censorship efforts of activist organizations advancing narrow ideological agendas through deceitful means."). These reports implicate public issues. See Resolute Forest Prods., Inc. v. Greenpeace Int'l, 302 F. Supp. 3d 1005, 1025 (N.D. Cal. 2017) ("California courts have broadly construed public interest to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (internal quotation marks omitted); see also PPP Br. at 7 ("Public debate and interest on matters of disinformation and hate speech on social media platforms have been profound in recent years, including multiple congressional hearings and constant coverage by national media."). X Corp. does

20

1    not dispute this point.

2           The Court therefore concludes that CCDH has met its burden at the first step of the

3    anti-SLAPP analysis.  This order will therefore go on to assess whether X Corp. has

4    established that there is a probability that it will prevail on its claims.  See Cal. Code Civ.

5    Proc. § 425.16(b)(1).

6           **B.      Breach of Contract Claim**

7           The complaint's first cause of action is for breach of contract.  FAC ¶¶ 73–79.  To

8    state a claim for breach of contract, a plaintiff must allege (1) the existence of a contract,

9    (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

10   resulting damages to the plaintiff.  See Oasis W. Realty, 250 P.3d at 1121.

11          X Corp. alleges that X Corp. and CCDH U.S. are parties to the ToS, which

12   explicitly prohibits "'scraping the Services without the prior consent of Twitter.'"  FAC ¶¶

13   74, 75.  X Corp. further alleges that it fully performed its obligations, but that CCDH U.S.

14   violated the ToS by scraping the X platform, and that CCDH then "mischaracterized the

15   data it obtained by unlawfully scraping in its reports and articles, in efforts to claim X is

16   overwhelmed with harmful conduct, and support CCDH's call to companies to stop

17   advertising on X."  Id. ¶¶ 76–78.  X Corp. notes that CCDH's February 9, 2023 report

18   admits that "'[t]o gather tweets from each of the ten reinstated accounts, [CCDH's]

19   researchers used the social media web-scraping tool SNScrape, which utilizes Twitter's

20   search function to enable data collection.'"  Id. ¶ 77.  And X Corp. alleges that "[a]s a

21   direct and proximate result of CCDH U.S.'s breaches of the ToS in scraping X, X Corp.

22   has suffered monetary and other damages in the amount of at least tens of millions of

23   dollars."  Id. ¶ 78.  The "at least tens of millions of dollars" of damages derives from

24   companies pausing paid advertising on the X platform in response to CCDH's "allegations

25   against X Corp. and X regarding hate speech and other types of content on X."  Id. ¶ 70.

26          CCDH argues that X Corp. fails to state a breach of contract claim, for three

27   reasons: (1) X Corp. has failed to adequately allege a breach; (2) if the ToS's anti-scraping

28   provision applies, it violates public policy; and (3) X Corp. has failed to adequately allege

United States District Court
Northern District of California

21

1    recoverable damages.  MTD&S at 9–18.  The Court concludes that CCDH's argument

2    about damages is persuasive, and does not reach CCDH's other arguments.

3            CCDH maintains that X Corp. fails to adequately allege damages resulting from

4    CCDH's alleged scraping of the X platform because: (a) under state contract law, X

5    Corp.'s lost advertising revenue is not recoverable; (b) constitutional law bars X Corp.

6    from using a non-defamation cause of action to recover reputational damages; and (c)

7    allowing this cause of action, in which X Corp. seeks tens of millions of dollars, to stand

8    would subject CCDH to "significant costs of enduring discovery and litigation . . . against

9    a well-resourced adversary with every incentive to impose crushing burdens on the CCDH

10   Defendants."  Id. at 15–18.  That last argument is emotional rather than legal; while the

11   Court is not blind to the David and Goliath dynamic here, the law does not bar big

12   companies from suing small nonprofits, so long as the suit is otherwise up to snuff.  This

13   order therefore addresses only CCDH's arguments based on state contract law and

14   constitutional law.

15                        **1.    State Contract Law**

16           CCDH's first argument about damages relies on state contract law.  Under state

17   contract law, when there is a breach, "the plaintiff is entitled to damages that are

18   equivalent to the benefit of the plaintiff's contractual bargain."  Lewis Jorge Constr.

19   Mgmt., Inc. v. Pomona Unified Sch. Dist.. 34 Cal. 4th 960, 967–68 (2004).  But a

20   plaintiff's damages "cannot . . . exceed what it would have received if the contract had

21   been fully performed on both sides."  Id. at 968 (citing Cal. Civ. Code § 3358).  "This

22   limitation of damages for breach of contract 'serves to encourage contractual relations and

23   commercial activity by enabling parties to estimate in advance the financial risks of their

24   enterprise.'"  Id. (quoting Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503,

25   515 (1994)).  While tort damages are intended to award a plaintiff for all injury suffered,

26   "[c]ontract damages are generally limited to those within the contemplation of the parties

27   when the contract was entered into or at least reasonably foreseeable by them at that time."

28   Erlich v. Menezes, 21 Cal. 4th 543, 550 (1999).  This is a key "distinction between tort and

United States District Court
Northern District of California

22

1    contract."  Id.

2         There are two types of contractual damages: "general damages (sometimes called

3    direct damages) and special damages (sometimes called consequential damages)."  Lewis

4    Jorge Constr. Mgmt., 34 Cal. 4th at 968.  General damages "flow directly and necessarily

5    from a breach of contract . . . or . . . are a natural result of a breach."  Id. (citing Cal. Civ.

6    Code § 3300).  X Corp.'s theory of damages—that CCDH violated the ToS by scraping the

7    X platform, that CCDH used the data that it scraped to publish deliberately misleading

8    publications criticizing X Corp., that those publications caused X Corp.'s advertisers to

9    pause spending, and that the pause in spending caused X Corp. to lose "at least tens of

10   millions of dollars" in revenue, see, e.g., FAC ¶¶ 70, 78[12]—do not flow directly and

11   necessarily from CCDH's breach of the ToS's scraping provision.  The question is whether

12   they constitute special damages.

13        "[S]pecial damages are those losses that do not arise directly and inevitably from

14   any similar breach of any similar agreement.  Instead, they are secondary or derivative

15   losses arising from circumstances that are particular to the contract or to the parties."

16   Lewis Jorge Constr. Mgmt., 34 Cal. 4th at 968.  They "are recoverable if the special or

17   particular circumstances from which they arise were actually communicated to or known

18   by the breaching party (a subjective test) or were matters of which the breaching party

19   should have been aware at the time of contracting (an objective test)."  Id. at 968–69.[13]

20              **a.     Knowledge at the Time of Contracting**

21   _____

22   [12] In its opposition brief, X Corp. asserts that it had further alleged that "CCDH's conduct
     forced X Corp. to 'conduct internal investigations,'" "'allocate[] significant employee
23   resources,'" and "'incur[] attorneys' fees.'"  Opp'n at 18 (citing FAC ¶ 71).  But those
     other sources of X Corp.'s damages appear in the complaint as allegations of harm caused
24   by "CCDH's unauthorized access to the [Brandwatch] data"—something not at issue in the
     first cause of action.  See FAC ¶ 71.
25   [13] The classic case discussing special damages is an 1854 English case called Hadley v.
     Baxendale, in which, "[a]fter Hadley's mill shut down because of a broken crankshaft, he
26   entered into a contract to have a new one built."  Id. at 969 (citing Hadley v. Baxendale
     (1854) 156 Eng.Rep. 145).  Hadley took the broken shaft to Baxendale, to deliver it to the
27   builder to use as a model.  Id.  When Baxendale did not deliver the shaft for seven days,
     Hadley sued Baxendale for lost profits.  Id.  The court held that Hadley's lost profits were
28   not recoverable, because Hadley had not communicated the special circumstance—that the
     mill could not operate without the shaft—to Baxendale.  Id.

United States District Court
Northern District of California

1        X Corp. agreed at the motion hearing that its damages had to be foreseeable at the

2   time of contracting.  See Tr. of 2/29/24 Hearing at 10:7–14.  But X Corp.'s complaint does

3   not allege that CCDH knew at the time of contracting, or should have known at the time of

4   contracting, that breach of the ToS's scraping provision would result in damages of "at

5   least tens of millions of dollars."  X Corp. alleges that "CCDH engaged in its unlawful

6   scraping with the intent to improperly obtain data that would be used to cause X Corp. to

7   lose significant advertising revenues."  FAC ¶ 78.  It alleges nothing about CCDH's intent

8   or knowledge when it agreed to the ToS in 2019.  This is a fatal flaw.

9        X Corp. argues that "the Motion . . . impermissibly demands that the Court engage

10  in a fact-intensive analysis without the benefit of any discovery to determine what CCDH

11  knew or could have known at the time of contracting and what CCDH knew or could have

12  known would result from its actions."  Opp'n at 18.  But cognizable damages are an

13  element of a breach of contract claim, and either they have been plausibly pled or they

14  have not.  See King v. Facebook, Inc., 572 F. Supp. 3d 776, 790 (2021) (dismissing a

15  claim for breach of contract in part because "much of the injury allegedly suffered . . . is

16  injury to reputation" and "this kind of injury is generally not compensable for a breach of

17  contract."); Modden v. Ticketfly LLC, No. 18-cv-6450-RS, 2019 WL 4738237, at *3

18  (N.D. Cal. 2019) ("Nowhere has Modden alleged that Ticketfly knew or should have

19  known about his special damages at the time of contracting.  Regardless of whether he has

20  shown the other elements, Modden has not sufficiently pled his damages.  The breach of

21  contract claim must therefore be dismissed.") (emphasis in original).  It is not facially

22  plausible that "CCDH could have known, [when] it accepted the ToS [in 2019], that (for

23  instance) the Twitter/X platform would abruptly change course to restore accounts that it

24  had banned for spreading hate speech, misogyny, and conspiracy theories . . . ; that the

25  CCDH Defendants would collect and review public posts on the platform to shed light on

26  these issues . . . and that the CCDH Defendants' subsequent reporting based on this data

27  would allegedly affect advertiser revenue to the tune of 'at least tens of millions of

28  dollars.'"  MTD&S at 16.

One might respond that CCDH—an organization that "prepare[s] and publish[es] what it refers to as 'research' reports and articles" about "organizations and individuals . . . who express viewpoints via social media platforms that differ from CCDH's own views on widely debated topics including COVID-19 vaccinations, reproductive healthcare, and climate change," FAC ¶ 17—could or should have known in 2019 that it was planning to report on objectionable posts on the X platform and encourage advertisers to flee. But when CCDH joined Twitter in 2019, id. ¶ 8, Twitter looked quite different. Elon Musk had not yet taken over and turned Twitter into the X platform. See Wile Timeline. The COVID pandemic (one of the subjects that the speech here concerned) had not yet occurred. See Derrick Bryson Taylor, "A Timeline of the Coronavirus Pandemic," N.Y. Times, March 17, 2021, http://nytimes.com/article/coronavirus-timeline.html. Twitter had "content-moderation policies . . . designed, among other things, to minimize the reach of harmful and misleading information." See O'Handley v. Padilla, 579 F. Supp. 3d 1163, 1172 (N.D. Cal. 2022). As late as January of 2022, this Court was still fielding lawsuits from right-leaning users arguing that Twitter's content-moderation policies discriminated against them. See, e.g., id., 579 F. Supp. 3d 1163.[14]

Indeed, the February 9, 2023 CCDH report that admitted scraping the X platform was about how Twitter had changed. The report states that Musk had declared a "general amnesty" for banned Twitter users in November of 2022, thereby reinstating "tens of thousands of accounts, including neo-Nazis, white supremacists, misogynists and spreaders of dangerous conspiracy theories." Toxic Twitter at 3. And it claimed that Twitter was generating millions of dollars in advertising revenue from the previously banned accounts. See id. Musk was not at the helm of Twitter reinstating previously banned accounts in 2019. Nor was it foreseeable that he would be.

---

[14] Interestingly, the plaintiff in that case, Rogan O'Handley, is behind one of the "ten reinstated accounts" highlighted in CCDH's Toxic Twitter report. See Toxic Twitter at 4 ("Rogan O'Handley, a Hollywood former entertainment lawyer turned far-right conspiracy theorist, who has been criticized for fanning the flames of vaccine conspiracies in the wake of the NFL athlete Damar Hamlin's heart attack.").

1   At the motion hearing, the Court observed that "it's a very different thing to say"

2   that CCDH understood the terms of the ToS in 2019 than it is to say that CCDH

3   "understood that actually X Corporation would start allowing all of these people back on,

4   which was different from the policy that was in place at the time that they entered the

5   [ToS]." Tr. of 2/29/24 Hearing at 13:2–8. X Corp. responded that "the policies do say

6   they're subject to change, and users, when they stay on the platform, agree to the

7   subsequent policy." Id. at 14:24–15:1. This argument does not save the breach of contract

8   claim, for at least three reasons. First, the FAC alleges that the time of contracting was

9   2019—it does not allege that CCDH agreed to subsequent versions of the ToS. See FAC ¶

10   8. Second, the argument that "it is foreseeable that we might change our policy" would

11   work an absurd extension of the law, essentially eliminating the requirement of

12   foreseeability altogether. Any change of policy would be foreseeable because it is always

13   foreseeable that policy can change. Unsurprisingly, X Corp. offers no legal support for

14   that reasoning. Third, the argument that logging back into the Twitter/X platform

15   constitutes a reaffirmation of the ToS (and therefore that the Court must assess

16   foreseeability at a later point in time than 2019) fails because it appears that the ToS in

17   effect at the time of the February 9, 2023 report was in place from June 10, 2022 to May

18   18, 2023, and June 10, 2022 predated Musk's purchase of Twitter. See Tr. of 2/29/24

19   Hearing at 29:3–14; see also Kaplan Decl. Ex. A; see also X, Previous Terms of Service,

20   https://twitter.com/en/tos/previous (listing one version dated June 10, 2022 and a next

21   version dated May 18, 2023). So there does not appear to have been a reaffirmation of the

22   ToS at the time when Musk was changing the platform's policies and reinstating "tens of

23   thousands of anti-Semites and white supremacists and other people to the platform." See

24   Tr. of 2/29/24 Hearing at 29:11–13.

25   Accordingly, X Corp. has not plausibly pleaded that CCDH had knowledge at the

26   time of contracting in 2019 of the "tens of millions of dollars" X Corp. now seeks in

27   connection with advertisers' decisions to pause spending in response to CCDH's February

28   9, 2023 report.

26

United States District Court
Northern District of California

### b.     Reputation Damages

Another reason that the damages X Corp. seeks—"at least tens of millions of dollars" of lost revenue that X Corp. suffered when CCDH's reports criticizing X Corp. caused advertisers to pause spending, see FAC ¶ 70—are problematic is that X Corp. has alleged a breach of contract but seeks reputation damages.  Of course, the main problem with X Corp.'s theory is that the damages alleged for the breach of contract claim all spring from CCDH's speech in the Toxic Twitter report, and not its scraping of the X platform.  See Reply at 7 ("Because X Corp. seeks (impermissibly) to hold CCDH U.S. liable for speech without asserting a defamation claim, it is forced to allege damages that are (impermissibly) attenuated from its claimed breach.").  One way we know that this is true is that if CCDH had scraped the X platform and never spoken, there would be no damages.  Cf. ACLU Br. at 12. ("Had CCDH U.S. praised rather than criticized X Corp., there would be no damages to claim and therefore no lawsuit.").  Again, X Corp. conceded this point at the motion hearing.  See Tr. of 2/29/24 Hearing at 7:22–8:3.

CCDH's reputation damages argument is another way of saying that the damages X Corp. suffered when advertisers paused their spending in response to CCDH's reporting was not a foreseeable result of a claimed breach.  There is certainly support for that point. See Frangipani v. Boecker, 64 Cal. App. 4th 860, 865–66 (1998) ("The invariable rule is pronounced by a legion of cases that damages are not recoverable for . . . injury to reputation resulting from breach of contract") (internal quotation marks omitted; cleaned up); see also Rice v. Cmty. Health Ass'n, 203 F.3d 283, 287–88 (4th Cir. 2000) (reputational damages "universally rejected" for breach of contract because they are "too speculative and could not reasonably be presumed to have been contemplated by the parties when they formed the contract.").

X Corp. argues that this reputation argument is inapposite because X Corp. did not suffer amorphous reputational damages, but "tangible, economic losses . . . e.g., advertising revenue."  Opp'n at 18 (citing Cohen v. Cowles Media Co., 501 U.S. 663, 671 (1991); Planned Parenthood Fed'n of Am., Inc. v. Newman, 51 F.4th 1125, 1134 (9th Cir.

United States District Court
Northern District of California

2022); <u>Nat'l Abortion Fed'n v. Ctr. for Medical Progress</u>, No. 15-cv-3522-WHO, 2018 WL 5879786, at *6 (N.D. Cal. Nov. 7, 2018))[15]; <u>see also</u> Opp'n at 19 (the FAC "pleads specific and measurable harm").  But even if X Corp. can quantify its reputational harms (and "at least tens of millions of dollars" is not terribly specific or measured), it has not plausibly alleged that such harm was "contemplated by the parties when they formed the contract."  <u>See</u> <u>Rice</u>, 203 F.3d at 288.

### c.   "Specifically Stated"

One last reason that the breach of contract claim fails to adequately allege special damages is that Rule 9(g) of the Federal Rules of Civil Procedure requires that "[i]f an item of special damage is claimed, it must be specifically stated."  Fed. R. Civ. P. 9(g).  "A specific statement of special damages requires not just the total lump sum, but a statement of the specific items which make up the lump sum."  <u>City & Cnty. of S.F. v. Tutor-Saliba Corp.</u>, No. 02-5286 CW, 2005 WL 645389, at *17 (N.D. Cal. March 17, 2005).  Here, X Corp. does not attempt to identify the specific items that make up the lump sum of "at least tens of millions of dollars."  <u>See</u> FAC ¶ 70.  Indeed, the "at least tens of millions of dollars" amount is the same amount X Corp. alleges as to all three state law claims, even though the first cause of action is about CCDH's scraping of the X platform, and the third and fourth causes of action are about CCDH accessing X Corp. data held by Brandwatch. <u>See</u> <u>id.</u> ¶¶ 78, 93, 99.

This deficiency in the pleading, which X Corp. ignores in its opposition brief, <u>see</u> Opp'n at 18 ("These allegations satisfy the pleading requirements under Rule 8"); Reply at 6 (deeming this "an incomplete argument about a different rule"), is fixable in one sense. In an amended complaint, X Corp. could probably come up with a list of advertising revenues that it lost out on, and that add up to "tens of millions of dollars."  But in another sense, it would be hard for X Corp. to tie those losses back to CCDH's alleged scraping, as opposed to CCDH's speech based on that scraping, or CCDH's accessing of the

---

[15] X Corp. cites to a number of cases involving constitutional law in response to CCDH's arguments under state contract law.  The Court will address these cases in the next section.

1    Brandwatch data, or its speech based on the Brandwatch data, or the speech of other X

2    Corp. critics, or other things happening in the market.[16]

3          For all of these reasons, the complaint fails to allege recoverable damages for the

4    breach of contract under state contract law.

5                            **2.    Constitutional Law**

6          CCDH's second argument about damages relies on constitutional law—specifically,

7    the principle that the First Amendment bars plaintiffs from using non-defamation causes of

8    action "to avoid the strict requirements for establishing a . . . defamation claim."  MTD&S

9    at 17 (citing cases, including <u>Cohen</u>, 501 U.S. at 671).  That principle arose out of the

10   Supreme Court's holding in <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 56 (1988), that

11   a public figure could not recover publication damages on a non-defamation claim without

12   showing actual malice.  This order will discuss some of the relevant cases before applying

13   their holdings to this case.

14                          **a.    Relevant Case Law**

15                             **i.    Cohen**

16         In <u>Cohen</u>, decided just a few years after <u>Hustler Magazine</u>, a confidential source

17   brought suit for breach of contract and misrepresentation against newspaper publishers

18   after the publishers—having promised the source confidentiality—published his name.

19   501 U.S. at 665–66.  "The same day the stories appeared, Cohen was fired by his

20   employer."  <u>Id.</u> at 666.  The Supreme Court concluded that Cohen had <u>not</u> brought his

21   contract claim "to avoid the strict requirements for establishing a libel or defamation

22   claim."  <u>Id.</u> at 671.  Cohen could not have brought a defamation claim because the

23   information the publishers had disclosed was true.  <u>Id.</u>[17]  The Court also rejected the idea

24

25   [16] <u>See, e.g.</u>, Reply at 16 (noting that "X Corp. has now carried out [its threat to bring suit]
     against yet another social-media-monitoring nonprofit, <u>see</u> <u>X Corp. v. Media Matters for</u>

26   <u>Am.</u>, No. 23 Civ. 1175 (N.D. Tex), all while engaging in conduct that plainly refutes its
     own theory of harm in both cases, <u>see, e.g.</u>, Lora Kolodny, <u>Elon Musk Claims Advertisers</u>

27   <u>Are Trying to 'Blackmail' Him, Says 'Go F---Yourself,'</u> CNBC (Nov. 29, 2023).").
     [17] At the motion hearing, X Corp. seemed to argue that the cases where courts have found

28   that a plaintiff was making an end-run around a libel or defamation claim are "cases where
     the Court said you couldn't have brought a defamation claim."  Tr. of 2/29/24 Hearing at

United States District Court
Northern District of California

that Cohen was "seeking damages for injury to his reputation or his state of mind," holding that he was seeking damages for "breach of a promise that caused him to lose his job and lowered his earning capacity." Id. (distinguishing Hustler Magazine).

### ii. Food Lion

The Fourth Circuit wrestled with both Hustler Magazine and Cohen in Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 522 (4th Cir. 1999). In that case, Food Lion, a grocery store, had been the subject of an undercover investigation about its food handling practices. Id. at 510–11. Food Lion brought suit against the news network that aired the video. Id. at 511. It sought to recover "broadcast (publication) damages for matters such as loss of good will, lost sales and profits, and diminished stock value." Id. The Fourth Circuit recognized that "an overriding (and settled) First Amendment principle precludes the award of publication damages in this case." Id. at 522. It held that Food Lion had "attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts" but that "[t]his is precluded by [Hustler Magazine]." Id. It further explained that "What Food Lion sought to do . . . was to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim," which was "an end-run around First Amendment strictures." Id.

### iii. Planned Parenthood and National Abortion Federation

Two recent cases decided by Judge Orrick, Planned Parenthood and National Abortion Federation, illustrate a district court's conscientious analysis of this same issue.

In Planned Parenthood, 402 F. Supp. 3d at 632–33, defendants, who were part of a group called the Human Capital Project (HCP), infiltrated Planned Parenthood conferences

---

62:13–18. The Court does not know what cases X Corp. had in mind, as it did not cite any, but Cohen is an example of the opposite. One of the reasons the Court held that Cohen was not making an end-run around a defamation claim is that he could not have brought a defamation claim. See Cohen, 501 U.S. at 671.

and facilities "to surreptitiously record conversations with the conference attendees" and staff.  Judge Orrick, at summary judgment,[18] assessed defendants' argument that "the First Amendment . . . precludes any award of . . . damages . . . because plaintiffs' damages flow solely from the actual or feared response of third parties to the publication of the HCP videos."  Id.  at 641–42.  He then noted that the defendants, relying on Food Lion, argued that the damages the plaintiffs were seeking also "stem[med] from the public's reaction (or feared or expected reaction) to the contents of the HCP videos and should have been sought through a defamation claim."  Id. at 642.  Judge Orrick recognized that it was "difficult" given the lack of a defamation claim "to draw the line between impermissible defamation-like publication damages that were caused by the actions and reactions of third parties to the HCP videos and permissible damages that were caused by [defendants'] breaches of contract" and other acts.  Id. at 643 (emphasis in original).  He concluded that some of the damages the plaintiffs were seeking were "more akin to publication or reputational damages that would be barred by the First Amendment" but that others were "economic damages that are not categorically barred."  Id. at 644.  He also explained that "[t]hose that fall in the latter category"—the permissible damages—"result not from the acts of third parties who were motivated by the contents of the videos, but from the direct acts of defendants—their intrusions, their misrepresentations, and their targeting and surreptitious recording of plaintiffs' staff."  Id. at 644–45 (emphasis in original).

The Ninth Circuit later affirmed that decision, stating that "two categories of compensatory damages permitted by the district court, infiltration damages and security damages, were awarded by the jury to reimburse Planned Parenthood for losses caused by Appellants' violations of generally applicable laws."  Newman, 51 F.4th at 1134.  The

---

[18] At the motion to dismiss stage, Judge Orrick had held that "the First Amendment does not impose heightened standards on plaintiffs' tort claims as long as plaintiffs do not seek reputational damages . . . stemming from the publication conduct of defendants."  Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, No. 16-cv-236-WHO (Order on Motions to Dismiss and Strike, dkt. 124) (Sept. 30, 2016) at 36 (emphasis in original).  He concluded that "discovery will shed light on the nature of the damages for which plaintiffs seek recovery" and that the issue "is more appropriately addressed at summary judgment or trial."  Id.

court deemed Appellants "incorrect in arguing that the infiltration and security damages awarded by the jury are impermissible publication damages." Id.  The court declared that the infiltration and security damages were "for economic harms suffered by Planned Parenthood, not the reputational or emotional damages sought in Hustler Magazine." Id.  It continued by explaining that Planned Parenthood could have recovered its infiltration and security damages "even if Appellants had never published videos of their surreptitious recordings.  Regardless of publication, it is probable that Planned Parenthood would have protected its staff who had been secretly recorded and safeguarded its conferences and clinics from future infiltrations." Id.

In Judge Orrick's related case, National Abortion Federation, 2018 WL 5879786, at *1, the defendants allegedly "used false identification and a 'phony' corporation to" get into National Abortion Federation (NAF) conferences and meetings.  The defendants argued in support of a motion to dismiss that "because NAF ha[d] not asserted a defamation claim, its claim for 'damages' stemming from all remaining causes of action are barred by the First Amendment." Id. at *5.  Judge Orrick stated that "[t]he line demarking permitted damages from purely reputational damages (that stem only from truthful, non-misleading publication of material), as I noted in the Planned Parenthood case, cannot be determined on a motion to dismiss." Id.  He then commented that the defendants had "mischaracterize[d] the FAC as only seeking damages caused by the publication of the recordings and the resulting actions of third parties." Id. at *6.  And he explained that just because the plaintiff had "only learned of the infiltration after publication began does not mean the damages are from the publication." Id.  He continued: "At least some of the damages pleaded are the result of the infiltration and would have been incurred even if none of the recordings were published and [the plaintiff] learned of the infiltration through some other means." Id.

The Ninth Circuit also affirmed Judge Orrick's National Abortion Federation decision, holding that the plaintiff had "frame[d] its theory of damages as compensation for non-reputational harm—namely its increased expenditures on security measures—

United States District Court
Northern District of California

which is a cognizable theory of damages." <u>National Abortion Fed'n v. Ctr. for Med. Progress</u>, No. 18-17195, 793 Fed. Appx. 482, 485 (9th Cir. Nov. 15, 2019) (citing <u>Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress</u>, 735 F. App'x 241, 247 (9th Cir. 2018)).

### b.    Takeaways from Relevant Case Law

In both <u>Planned Parenthood</u> and <u>National Abortion Federation</u>, Judge Orrick held that plaintiffs <u>could</u> recover damages based directly on the defendant's breach (the infiltration and security losses that they suffered from the defendants' entering and filming in their facilities) without running afoul of <u>Hustler Magazine</u>.  <u>See Planned Parenthood</u>, 402 F. Supp. 3d at 644–45; <u>National Abortion Federation</u>, 2018 WL 5879786, at *5–6. Such damages would have existed regardless of the publication of the inflammatory videos.  <u>See Newman</u>, 51 F.4th at 1134.  Judge Orrick held that the plaintiffs <u>could not</u> recover reputational damages that stemmed from publication—specifically, "acts of third parties who were motivated by the contents of the" publication.  <u>See Planned Parenthood</u>, 402 F. Supp. 3d at 644–45.

This is consistent with <u>Food Lion</u>, where the plaintiff was trying to recover damages based on third parties' reactions to watching the news broadcast, <u>see Food Lion</u>, 194 F.3d at 522, and also with <u>Cohen</u>, although the latter is less obvious.  In <u>Cohen</u>, 501 U.S. at 671, even though Cohen's damages were based in part on the actions of a third party—the employer who fired him after seeing his identity revealed—the Court recognized that a defamation claim was unavailable to Cohen because the speech at issue was undeniably true, and that the damages represented "breach of a promise that caused him to lose his job and lowered his earning capacity."  The conduct that gave rise to the damages in <u>Cohen</u> <u>was</u> the publishers' speech: that speech is what breached the publishers' contract with Cohen and so it was not reputational.  <u>See id.</u>  The conduct that gave rise to the permissible damages in Judge Orrick's cases was the defendants' infiltration and security conduct—not the later publication of the videos, which would have given rise to impermissible reputational harm.

1  Judge Orrick found it "difficult" "to draw the line" in his cases "between

2 impermissible defamation-like publication damages that were caused by the actions and

3 reactions of third parties <u>to the HCP videos</u> and permissible damages that were caused by

4 [defendants'] breaches of contract" in part because there were so many different types of

5 damages claimed in those cases.  <u>See</u> <u>Planned Parenthood</u>, 402 F. Supp. 3d at 643–45

6 (listing the myriad categories of damages plaintiff sought) (emphasis in original).  Judge

7 Orrick determined that he was not well-positioned to sort those numerous types of losses

8 into permissible/impermissible buckets on a motion to dismiss.  <u>See</u> <u>Planned Parenthood</u>,

9 No. 16-cv-236-WHO (Order on Motions to Dismiss and Strike) at 36; <u>National Abortion</u>

10 <u>Federation</u>, 2018 WL 5879786, at *5.

### c.  Application Here

12  Here, X Corp. is not seeking some complicated mix of damages—some caused by

13 the reactions of third parties and some caused directly by the alleged breach.  The Court

14 can say, as a matter of law, whether the single type of damages that X Corp. seeks

15 constitutes "impermissible defamation-like publication damages that were caused by the

16 actions and reactions of third parties to" speech or "permissible damages that were caused

17 by [CCDH's] breaches of contract."  <u>See</u> <u>Planned Parenthood</u>, 402 F. Supp. 3d at 643.

18  The breach that X Corp. alleges here is CCDH's scraping of the X platform.  FAC ¶

19 77.  X Corp. does not allege any damages stemming directly from CCDH's scraping of the

20 X platform.[19]  X Corp. seeks <u>only</u> damages based on the reactions of advertisers (third

21 parties) to CCDH's speech in the Toxic Twitter report, which CCDH created after the

22 scraping.  <u>See</u> FAC ¶¶ 70, 78; <u>see also</u> ACLU Br. at 12 ("The damages X Corp. seeks . . .

23 are tied to reputational harm only, with no basis in any direct physical, operational or other

24 harm that CCDH U.S.'s alleged scraping activities inflicted on X Corp.").  That is just

25 what the Fourth Circuit disallowed in <u>Food Lion</u>, 194 F.3d at 522.  The speech was not the

26 breach, as it was in <u>Cohen</u>.  And X Corp.'s damages would not have existed even if the

_____

28 [19] This order will discuss in the following section X Corp.'s proposed amendment to the
complaint.

United States District Court
Northern District of California

1    speech had never occurred, as in <u>Newman</u>, 51 F.4th at 1134.  Here, there would be no

2    damages without the subsequent speech.  Accordingly, the Court can hold as a matter of

3    law that the damages alleged are impermissible defamation-like publication damages

4    caused by the actions of third parties to CCDH's report.

5         X Corp.'s main response to all of this is that it has alleged "tangible, economic

6    losses."  <u>See</u> Opp'n at 18 (citing <u>Cohen</u>, <u>Newman</u>, <u>National Abortion Federation</u>).  But that

7    is not the question.  <u>See</u> Reply at 8 ("X Corp. never explains why core constitutional

8    protections would turn arbitrarily on whether harm to a plaintiff's reputation from a

9    defendant's speech happens to have manifested in a way where the dollars and cents can

10   easily be counted before a complaint is filed.").  The "lost sales" in <u>Food Lion</u>, 194 F.3d

11   505, could presumably have been quantified.  Numerous quantifiable expenses in <u>Planned</u>

12   <u>Parenthood</u> (like "grants for security enhancements to affiliates experiencing increased

13   security threats as a result of CMP's videos") were disallowed.  <u>See</u> <u>Planned Parenthood</u>,

14   402 F. Supp. 3d at 645.  Judge Orrick properly drew the line not between tangible and

15   intangible losses, but between losses from direct harms and losses from reputational harms.

16   <u>See</u> <u>id.</u> at 644–45.  Drawing the same line here leads to the conclusion that the complaint

17   fails to allege recoverable damages for the breach of contract under constitutional law.

18        X Corp. therefore fails to state a claim for breach of contract.

19            **3.**     **Amendment**

20        The Court must next decide whether to allow X Corp. leave to amend its breach of

21   contract claim.  The Court is mindful that "[t]he anti-SLAPP statute was enacted to allow

22   early dismissal of meritless first amendment cases aimed at chilling expression through

23   costly, time-consuming litigation," <u>Metabolife Int'l, Inc. v. Wornick</u>, 264 F.3d 832, 839

24   (9th Cir. 2001), but also that "granting a defendant's anti-SLAPP motion to strike a

25   plaintiff's initial complaint without granting the plaintiff leave to amend would directly

26   collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment," <u>Verizon</u>

27   <u>Delaware, Inc. v. Covad Commc'ns Co.</u>, 377 F.3d 1081, 1091 (9th Cir. 2004).  To be clear,

28   the operative complaint here is not X Corp.'s "initial complaint"—X Corp. initially filed

1  suit on July 31, 2023, <u>see</u> Compl., and amended about a week later, adding ECF as a

2  defendant, <u>see</u> FAC.  Nevertheless, the Court agrees with X Corp. that it "is not as if [the

3  defendants] have been dragged through multiple, multiple rounds" of amendments.  <u>See</u>

4  Tr. of 2/29/24 Hearing at 34:8–18;[20] <u>but see</u> <u>Gardner v. Martino</u>, 563 F.3d 981, 991 (9th

5  Cir. 2009) ("Appellants had already filed the first amended complaint as a matter of right

6  and <u>Verizon</u> specifically held that a first amended complaint is subject to anti-SLAPP

7  remedies.") (citing <u>Verizon Del., Inc.</u>, 377 F.3d at 1091).

8       The question is whether X Corp. should receive leave to amend under Rule 15.  <u>See</u>

9  <u>Mahoney v. Meta Platforms, Inc.</u>, No. 22-cv-02873-AMO, 2024 WL 68550, at *5–6 (N.D.

10  Cal. Jan. 6, 2024) (holding that plaintiff failed to state a claim, but because amendment

11  was "not clearly futile," it was appropriate to defer consideration of defendant's anti-

12  SLAPP motion pending filing of amended complaint).  A court should "freely give leave"

13  to amend "when justice so requires."  Fed. R. Civ. Proc. 15(a)(2).  It may deny leave to

14  amend due to "undue delay, bad faith or dilatory motive on the part of the movant,

15  repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to

16  the opposing party by virtue of allowance of the amendment, [and] futility of amendment."

17  <u>Leadsinger</u>, 512 F.3d at 532.

18       The Court believes that amendment would be futile, and that X Corp.'s desire to

19  amend may well be based on a dilatory motive.

20       At the motion hearing, X Corp. argued for the first time that there were damages

21  that it had "not pleaded in the complaint," but could add upon amendment, "which [are] in

22  direct response to this scraping incident."  Tr. of 2/29/24 Hearing at 8:18–20.  X Corp.

23  described these damages as "dozens, if not over a hundred personnel hours across

24  disciplines such as engineering and security that were spent trying to figure out not only

25  what data was gained via access to the Brandwatch systems"—time not relevant to the

---

[20] At the motion hearing, CCDH responded, not unreasonably, that "[i]t's not exactly a[n] earth-shattering rule of law that contract damages have to be foreseeable and comport with the Constitution" and that, in "two shots at this," X Corp. had only pled publication damages.  <u>See</u> <u>id.</u> at 20:18–23.

breach of contract claim—"but what data was scraped, how it was done." Id. at 8:7–11.  It further referenced "anti-scraping measures implemented, again, at great expense from engineering time in tens of thousands, if not over a hundred thousand dollars to deal with this security risk that was identified via this incident." Id. at 8:21–24; see also id. at 9:3–6 ("I'm sure we had, from what I understand, cost for the servers dealing with the load of just receiving all these requests.  So expensive electricity cost at data centers, as well as loss of computing power.").

Damages stemming from X Corp.'s response to CCDH's alleged scraping—rather than advertisers' responses to CCDH's reports—do not present the same constitutional concerns that the current damage allegations do.  But they must still have been "within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time," under state contract law.  See Erlich, 21 Cal. 4th at 550.  The Court is unpersuaded that the proposed allegations clear that hurdle.  Fundamentally, neither of the two main reasons that X Corp. asserted for having to spend time and money responding to CCDH's alleged scraping—(a) "safety and security" and (b) harm to X Corp.—make very much sense.

### a.    Safety and Security

First, X Corp. argued that it needed to expend resources responding to CCDH's alleged breach in order to safeguard its users' data.  Over and over again, X Corp. played up its obligation to "keep [its users'] data safe," Tr. of 2/29/24 Hearing at 7:13–14, called scraping a "security risk," id. at 8:23–24, and declared that this case was "about" "the importance of data security," id. at 12:10–11; see also id. at 14:9–10 (arguing that the CCDH report acknowledging scraping "raised a potential security issue"); id. at 35:13–15 ("we put up anti-scraping measures to stop this kind of thing so that users feel as if their data is safe."); id. at 39:22–24 ("This is about the security of data and whether or not we're going to honor ways that people try to keep it safe contractually and otherwise.").

While security and safety are noble concepts, they have nothing to do with this case.  The Toxic Twitter report stated that CCDH had used the SNScrape tool, "which utilizes

United States District Court
Northern District of California

Twitter's search function," to "gather tweets from" "ten reinstated accounts," resulting in a "dataset of 9,615 tweets posted by the accounts." Toxic Twitter at 17. There is no allegation in the complaint, and X Corp. did not assert that it could add an allegation, that CCDH scraped anything other than <u>public tweets that ten X platform users deliberately broadcast to the world</u>.[21] No private user information was involved—no social security numbers, no account balances, no account numbers, no passwords, not even "gender, relationship status, ad interests etc." <u>See</u> <u>Meta Platforms, Inc. v. BrandTotal Ltd.</u>, 605 F. Supp. 3d 1218, 1273 (2022).

When asked why the collecting of public tweets implicates users' security interests, X Corp. insisted that "this all goes to control over your data," and that users expect that they will be able to take down their tweets later, or to change them—abilities they are robbed of when the "data" is scraped. <u>See</u> Tr. of 2/29/24 Hearing at 40:17–24. But even assuming that it is "very important" to a user that he be able to amend or remove his pro-neo-Nazi tweets at some point after he has tweeted them, <u>see id.</u> at 40:24–25, a user can have no expectation that a tweet that he has publicly disseminated will not be seen by the public before that user has a chance to amend or remove it. While scraping is one way to collect a user's tweets, members of the public could follow that user and view his tweets in their feeds, or use the X platform's search tool (as SNScrape did) and view his tweets that way.

X Corp.'s assertion that the scraping alleged here violates a user's "safety and security" in his publicly disseminated tweets is therefore a non-starter. CCDH would not, and should not, have foreseen at the time of contracting that X Corp. would need to expend money to address "safety and security" issues following the scraping of ten users' public tweets.

---

[21] While the Court recognizes that technically, who sees a post might "depend[] on the privacy settings," <u>see</u> Tr. of 2/29/24 Hearing at 40:9–16, that is a red herring here. The whole reason that CCDH wrote about <u>these ten users</u> is that a large audience viewed their tweets. <u>See</u> Toxic Twitter at 3 ("The analysis shows that the ten accounts have already amassed 2.5 billion tweet impressions"). It is not a reasonable inference that these ten users had selected privacy settings that limited their posts to friends and family.

### b.     Harm to X Corp.

Second, X Corp. argued that it was entitled to expend resources responding to CCDH's scraping because that scraping might have caused harm to X Corp.'s systems.  X Corp. maintained that it was entitled to "dive in and understand what was done, how it was done, what data was taken, whether there was any damage," and to conduct "a large investigation and then remedial action," Tr. of 2/29/24 Hearing at 9:16–20, adding that "[i]t is well known in this space that if you scrape," the scrapee will need to investigate and "put up anti-scraping measures," id. at 35:9–14.  X Corp. conceded that it is not able to prevent scraping "100 percent" of the time, but stated that it can make scraping more difficult, and should be compensated for trying to do so.  Id. at 35:21–36:7.[22]  The problem with this argument is that it is at odds with what X Corp. has alleged.

Although social media platforms do not like it, scraping, for various ends, is commonplace.  See, e.g., ACLU Br. at 7 ("Researchers and Journalists Use Scraping to Enable Speech in the Public Interest and Hold Power to Account."); see also id. at 8–9 (collecting sources); Andrew Sellars, "Twenty Years of Web Scraping and the Computer Fraud and Abuse Act," 24 B.U. J. Sci. & Tech. L 372, 375 (2018) ("Web scraping has proliferated beneath the shadow of the [CFAA]."); hiQ 2022 Circuit opinion, 31 F.4th at 1202 ("HiQ points out that data scraping is a common method of gathering information, used by search engines, academic researchers, and many others.  According to hiQ, letting established entities that already have accumulated large user data sets decide who can scrape that data from otherwise public websites gives those entities outsized control over how such data may be put to use . . . the public interest favors hiQ's position."); see also id. at 1186 ("LinkedIn blocks approximately 95 million automated attempts to scrape data every day").

---

[22] At times, it seemed as if X Corp. was suggesting that whenever a user breaches any term within X Corp.'s nineteen-page ToS, X Corp. is entitled to spend money to prevent further breaches of that term, and then to be compensated for that expenditure.  That is not the law.  If it was, then a plaintiff could state a claim merely by alleging the existence of a contract, its performance, and the defendant's breach; there would be no separate requirement of proving foreseeable damages.  But there is such a requirement.  See Oasis W. Realty, 250 P.3d at 1121; Erlich, 21 Cal. 4th at 550.

Some scraping activity can be harmful not only to the users of a website but also to the website itself. See, e.g., hiQ 2022 district opinion, 639 F. Supp. 3d at 954 (scraping can burden servers and inhibit a website's performance); Ryanair DAC v. Booking Holdings Inc., 636 F. Supp. 3d 490, 503 (D. Del. 2022) (scraping can "greatly increase[] the quantifies of queries" on a website, "impair[] the . . . availability and/or usability" of a website, "and cause [a] website's response times to deteriorate."). Scraping can harm a website because a bot "can make many requests automatically and much more rapidly than any human could," "request[ing] a huge amount of data from the target's server." See Compulife Software Inc. v. Newman, 959 F.3d 1288, 1299 (11th Cir. 2020). X Corp. has another case pending in this district, not before this Court, involving allegations of that kind of scraping. See X Corp. v. Bright Data Ltd., No. 23-cv-3698-WHA, First Amended Complaint (dkt. 36) (N.D. Cal. July 26, 2023) ¶ 1 (defendant "scrapes and sells millions of records from X Corp.'s X platform"), ¶ 98 (such actions "have diminished the server capacity that X Corp. can devote to its legitimate users, and thereby injured X Corp. by depriving it of the ability to use its personal property"), ¶ 102 (alleging "damage in the form of impaired condition, quality, and value of its servers, technology infrastructure, services, and reputation"); see also X Corp. v. John Doe 1, No. DC-23-09157, Original Petition (Tex. Dist. Ct., Dallas Co., July 6, 2023) ¶¶ 21–22, 24 (alleging "widespread unlawful scraping," "flooding Twitter's sign-up page with automated requests," "severely tax[ing] X Corp.'s servers," "impair[ing] the user experience for millions of X Corp." users).

This is not such a case. Here, CCDH is alleged to have used Twitter's own search tool to collect 9,615 public tweets from ten Twitter users, see FAC ¶ 77; Toxic Twitter at 17, and then to have announced that it did so in a public report, see id. Assuming for present purposes that this conduct amounts to the "scraping" barred by the ToS,[23] the extent of CCDH's scraping was not a mystery. As CCDH asked at the motion hearing,

---

[23] CCDH argues that it does not. See MTD&S at 10–13.

United States District Court
Northern District of California

1  "What CCDH did and the specific tweets that it gathered, what tool it used, how it used

2  that tool and what the results were are documented explicitly in its public report.  So what

3  is it that they're investigating?"  Tr. of 2/29/24 Hearing at 22: 3–7.  Nor was this the kind

4  of large-scale, commercial scraping—as in hiQ, as alleged in Bright Data—that could

5  conceivably harm the X platform or overburden its servers.  It is not plausible that this

6  small-scale, non-commercial scraping would prompt X Corp. to divert "dozens, if not over

7  a hundred personnel hours across disciplines," see Tr. of 2/29/24 Hearing at 8:7–11, of

8  resources toward the repair of X Corp.'s systems.  Nor would such expenditures have been

9  foreseeable to CCDH in 2019.  In 2019, if CCDH had thought about the no-scraping

10 provision in the ToS at all, it would have expected X Corp. to incur damages only in

11 response to breaches of that provision that could actually harm the X platform.  It would

12 not have expected X Corp. to incur damages in connection with a technical breach of that

13 provision that involved the use of Twitter's search tool to look at ten users and 9,615

14 public tweets.

15      It is clear to the Court that if X Corp. was indeed motived to spend money in

16 response to CCDH's scraping in 2023, it was not because of the harm such scraping posed

17 to the X platform, but because of the harm it posed to X Corp.'s image.  CCDH's data

18 collection allowed it to claim knowledge of what was occurring on the X platform in a

19 cumulative sense.  According to CCDH, its scraping revealed that X Corp. was generating

20 millions of dollars in advertising revenue from previously banned accounts.  See FAC ¶

21 49; Kaplan Decl. Ex. B.  X Corp.'s desire to keep entities like CCDH from drawing such

22 unflattering conclusions about the X platform is entirely reasonable from a business point

23 of view.  But that motivation would not have been foreseeable to CCDH in 2019.  In 2019,

24 CCDH would not have understood, and should not have understood, that Twitter would

25 wish to prevent scraping in order to keep cumulative information about the platform from

26 the public view.[24]  CCDH would certainly not have known that Twitter would change

27

28 _____

[24] CCDH framed this point thusly at the motion hearing: "the notion that CCDH . . . should
have foreseen Twitter's costs in better hiding white supremacist content on the platform is

United States District Court
Northern District of California

1    course on some of its content-moderation policies, reinstating what CCDH later described

2    as "tens of thousands of accounts, including neo-Nazis, white supremacists, misogynists

3    and spreaders of dangerous conspiracy theories," see Toxic Twitter at 3, and then desire to

4    shield the financial ramifications of that policy shift from the public.  That is the kind of

5    theoretical, speculative harm that California contract law rejects.  See Erlich, 21 Cal. 4th at

6    550.

7         Neither the "safety and security" rationale, nor the "harm to X Corp." rationale for

8    X Corp. spending time and money in response to CCDH's scraping make any sense given

9    the scraping alleged in this case.  Such damages simply were not foreseeable when CCDH

10   entered into the ToS in 2019.  Accordingly, allowing X Corp. to amend in order to add the

11   proposed new allegations about damages in connection with its response to CCDH's

12   scraping would be futile.

13        The Court notes, too, that X Corp.'s motivation in bringing this case is evident.  X

14   Corp. has brought this case in order to punish CCDH for CCDH publications that criticized

15   X Corp.—and perhaps in order to dissuade others who might wish to engage in such

16   criticism.[25]  Although X Corp. accuses CCDH of trying "to censor viewpoints that CCDH

17   disagrees with," FAC ¶ 20, it is X Corp. that demands "at least tens of millions of dollars"

18   in damages—presumably enough to torpedo the operations of a small nonprofit—because

19   of the views expressed in the nonprofit's publications, see, e.g., id. ¶¶ 1, 3–4, 5, 12, 17–24,

20   38, 41, 43–52, 54–60, 62, 65–70, 77–78, 84–85, 92, 96, 98; see also PPP Br. at 1 ("X

21   Corp. . . . seeks to silence critique rather than to counter it.").  If CCDH's publications

22   were defamatory, that would be one thing, but X Corp. has carefully avoided saying that

23   they are.

24

25   utterly implausible as a matter of law."  Tr. of 2/29/24 Hearing at 36:8–11.
     [25] "A recent survey of 167 academics and researchers found that over 100 studies about X
26   Corp. have been diverted, stalled, or canceled, with over half of those interviewed citing a
     fear of being sued by X Corp. over their findings or data."  ACLU Br. at 14 (citing Sheila
27   Dang, "Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs
     Legal Fears," Reuters (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-
28   restructuring-curtailsdisinformation-research-spurs-legal-fears-2023-11-06).

1    Given these circumstances, the Court is concerned that X Corp.'s desire to amend

2    its breach of contract claim has a dilatory motive—forcing CCDH to spend more time and

3    money defending itself before it can hope to get out from under this potentially ruinous

4    litigation.  See PPP Br. at 2 ("Without early dismissal, the free speech interests that the

5    California legislature sought to protect will vanish in piles of discovery motions.").  As

6    CCDH argued at the motion hearing, the anti-SLAPP "statute recognizes that very often

7    the litigation itself is the punishment."  Tr. of 2/29/24 Hearing at 33:12–34:5.  It would be

8    wrong to allow X Corp. to amend again when the damages it now alleges, and the damages

9    it would like to allege, are so problematic, and when X Corp.'s motivation is so clear.

10    Accordingly, the Court STRIKES the breach of contract claim and will not allow X

11    Corp. to add the proposed new allegations as to that claim.

12    **C.    Violation of CFAA[26]**

13    The complaint's second cause of action is for violation of the CFAA.  See FAC ¶¶

14    80–88.  "Congress enacted the CFAA in 1984 primarily to address the growing problem of

15    computer hacking."  United States v. Nosal, 676 F.3d 854, 858 (9th Cir. 2012) ("Nosal I").

16    Under the CFAA, a party may be subject to liability if it "intentionally accesses a computer

17    without authorization or exceeds authorized access, and thereby obtains . . . information

18    from any protected computer."  18 U.S.C § 1030(a)(2)(C).[27]  Courts are to interpret this

19    prong of the statute narrowly, as the CFAA "is primarily a criminal statute" and is

20    interpreted similarly across criminal and civil cases.  See LVRC Holdings LLC v. Brekka,

21    581 F.3d 1127, 1134 (9th Cir. 2009).  A private right of action is available to "[a]ny person

22    who suffers damage or loss by reason of a violation of this section."  18 U.S.C. § 1030(g).

23    X Corp. alleges that "Defendants, except ECF, have violated the CFAA by

24    knowingly, and with intent to defraud X Corp., accessing a protected computer, without

---

[26] Again, the CFAA cause of action is not subject to the motion to strike because it is federal.  See Hilton, 599 F.3d at 901 ("[T]he anti-SLAPP statute does not apply to federal law causes of action.").

[27] A "protected computer" includes essentially any computer connected to the Internet.  See hiQ 2022 Circuit opinion, 31 F.4th at 1195; 18 U.S.C. § 1030(e)(2).

United States District Court
Northern District of California

authorization, and by means of such conduct furthered the fraud and obtained one or more things of value." FAC ¶ 82. It alleges that X Corp. provided non-public data to Brandwatch, which Brandwatch stored on a protected computer "accessible to only those with login credentials." Id. ¶ 83. It alleges that Defendants other than ECF "were never validly given login credentials," knew that the data was secured by the Brandwatch Agreements, and knew that they did not have authorization to access it, but nonetheless "conspired with ECF[] to share its login credentials." Id. ¶ 84. It continues: "Defendants other than ECF then accessed that data without authorization" in order to mischaracterize the data in CCDH publications. Id. It further alleges that ECF and CCDH conspired to violate the CFAA so that CCDH could access X Corp.'s data, and, in knowing violation of X Corp.'s agreements with Brandwatch and ECF's agreements with Brandwatch, ECF gave CCDH its login credentials. Id. ¶ 85. X Corp. finally alleges that it suffered a loss of over $5,000 as a result of the violations, including money spent on internal investigations, employee resources and time to assist in those investigations, and attorneys' fees. Id. ¶ 87.

CCDH argues that X Corp. fails to state a claim for violation of the CFAA because (1) X Corp. has not adequately alleged that CCDH accessed the Brandwatch data "without authorization"; (2) X Corp. has not adequately alleged loss; and (3) X Corp. has failed to specify which CFAA subsection was violated. MTD&S at 19–23. The Court concludes that CCDH's argument about loss is persuasive, and does not reach CCDH's other arguments.

A civil claim under the CFAA requires "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); Andrews v. Sirius XM Radio Inc., 932 F.3d 1253, 1262 (9th Cir. 2019). The CFAA "defines 'loss' as 'any reasonable cost to any victim, including the cost of responding to an offense, conducting a damages assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.'" Andrews, 932 F.3d at 1262 (quoting 18 U.S.C. § 1030(e)(11)).

44

CCDH argues that X Corp.'s loss allegations are inadequate because they are not losses from technical harms.  MTD&S at 21.  That is indeed a requirement under the CFAA, as the Supreme Court held in Van Buren v. United States, 141 S. Ct. 1648, 1659–60 (2021).  The Court explained that "[t]he term 'loss' . . . relates to costs caused by harm to computer data, programs, systems, or information services."  Id.  Despite X Corp.'s suggestion at the motion hearing that only damages must relate to "damage to the system," see Tr. of 2/29/24 Hearing at 26:9–24, the Court in Van Buren stated that both damages and loss under the CFAA "focus on technological harms—such as the corruption of files— of the type unauthorized users cause to computer systems and data," Van Buren, 141 S. Ct. at 1660.  It observed that "[l]imiting 'damage' and 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of hacking.'"  Id. (quoting Royal Truck & Trailer Sales & Serv., Inc. v. Kraft, 974 F.3d 756, 760 (6th Cir. 2020)).  The Ninth Circuit recognized this required showing of "technological harms" in the hiQ case.  See hiQ 2022 Circuit opinion, 31 F.4th at 1195 n.12 (quoting Van Buren, 141 S. Ct. at 1659–60).

X Corp. responds that "[c]osts to investigate and stop alleged violations of the CFAA are cognizable losses," but it cites only to an unopposed Report and Recommendation, and a distinguishable one.  See Opp'n at 26 (citing Facebook, Inc. v. Holper, No. 20-cv-6023-JCS, 2022 WL 17167958, at *8 (N.D. Cal. Sept. 27, 2022)).  In Holper, 2022 WL 17167958, at *8, in trying to meet the CFAA's damages threshold, Facebook pointed to its employees' "efforts to investigate and stop" the defendant's conduct.  Facebook's employees had disabled the defendant's accounts, blocked his access, and sent him a cease and desist letter.  Id. at *2.  Here, though, X Corp. employees did not disable CCDH's Brandwatch account, or block CCDH's Brandwatch access, and they could not "stop" CCDH from accessing Brandwatch, because X Corp. is not Brandwatch.

X Corp.'s losses in connection with "attempting to conduct internal investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to the data,"

see FAC ¶ 87, are not technological in nature.  The data that CCDH accessed does not belong to X Corp., see Kaplan Decl. Ex. A at 13 (providing that users own their content and grant X Corp. "a worldwide, non-exclusive, royalty-free license"), and there is no allegation that it was corrupted, changed, or deleted.  Moreover, the servers that CCDH accessed are not even X Corp.'s servers.  X Corp. asserted at the motion hearing that its servers "stream data to Brandwatch servers in response to queries from a logged in user" and so "you cannot say fairly it's not our systems."  Tr. of 2/29/24 Hearing at 28:16–20.  But that is not what the complaint alleges.  The complaint alleges that "X Corp. provided non-public data to Brandwatch" and "[t]hat data was then stored on a protected computer."  FAC ¶ 83; see also id. ¶ 86 ("the Licensed Materials were stored on servers located in the United States that Brandwatch used for its applications.  CCDH and ECF thus knew that, in illegally using ECF's login credentials and querying the Licensed Materials, CCDH was targeting and gaining unauthorized access to servers used by Brandwatch in the United States.") (emphasis added); id. ¶ 29 (Twitter would stream its Licensed Materials from its servers, "including in California," to "servers used by Brandwatch [] located in the United States, which Brandwatch's applications accessed to enable [its] users with login credentials to analyze the data.").[28]  It is therefore hard to see how an investigation by X Corp. into what data CCDH copied from Brandwatch's servers could amount to "costs caused by harm to computer data, programs, systems, or information services."  See Van Buren, 141 S. Ct. at 1659–60.

Additionally, it is impossible to see how attorneys' fees could amount to technological harm.  See Delacruz v. State Bar of Cal., No. 16-cv–6858-BLF, 2018 WL 3077750, at *8 (N.D. Cal. Mar. 12, 2018) ("legal expenses are not a cognizable loss under

---

[28] FAC ¶ 36 is a slightly closer fit to what X Corp. argued at the motion hearing, as it references both X Corp.'s servers and Brandwatch's servers, but it is vaguer than paragraphs 29, 83, and 86 about where the Licensed Materials were stored.  Even if the Licensed Materials were stored on the X Corp. servers and then streamed to Brandwatch servers whenever a Brandwatch user ran a query, X Corp. did not articulate how CCDH logging into the Brandwatch system using a Brandwatch subscriber's valid login information could cause technological harm to X Corp.'s server.

the CFAA") (citing <u>Wichansky v. Zowine</u>, 150 F. Supp. 3d 1055, 1071–72 (D. Ariz. 2015); <u>Nexans Wires S.A. v. Sark-USA, Inc.</u>, 319 F. Supp. 2d 468, 474–75 (S.D.N.Y. 2004)); <u>cf.</u> <u>Fraser v. Mint Mobile, LLC</u>, No. C 22-138 WHA, 2022 WL 2391000, at *2 (N.D. Cal. July 1, 2022) (fees to expert to trace stolen assets "were not related to remedying technological harms inflicted on the breached computer or system").

Loss incurred "not . . . to assess the breached system but to 'assess [one's] damages'" are not cognizable under the CFAA.  <u>See</u> <u>Fraser</u>, 2022 WL 2391000, at *2.  The Court will therefore dismiss the CFAA claim based on X Corp.'s failure to allege losses based on technological harms.  <u>See also</u> <u>NovelPoster v. Javitch Canfield Grp.</u>, 140 F. Supp. 3d 954, 964 (N.D. Cal. 2014) ("the majority of cases cited by defendants in which the court found an absence of CFAA-qualifying loss are summary judgment cases," but "[t]hose cases cited by defendants that do concern pleading motions involve situations where the plaintiff failed to allege that the defendant's conduct caused impairment of data or interruption of service.").

### D.    Tort Claims

The complaint's third and fourth causes of action are for intentional interference with contractual relations and inducing breach of contract, respectively.  Intentional interference with contractual relations "protects against intentional acts not necessarily resulting in a breach." <u>Shamblin</u>, 166 Cal. App. 3d at 122–23.  It "requires that a plaintiff prove: (1) he had a valid and existing contract with a third party; (2) defendant had knowledge of this contract; (3) defendant committed intentional and unjustified acts designed to interfere with or disrupt the contract; (4) actual interference with or disruption of the relationship; and (5) resulting damages." <u>Id.</u> at 123.  Inducement of a breach of contract "protects against intentional acts designed to produce an actual breach and requires that a plaintiff prove: (1) he had a valid and existing contract [with a third party]; (2) . . . defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by . . . defendant's unjustified or wrongful conduct; and (5) . . . damage[s] [were suffered as a

result." Id. (internal quotation marks omitted).  The two claims are "separate theories upon which the tort of interference with economic relations may be based." Id. at 122.

X Corp. alleges in support of its interference with contractual relations claim that "Defendants knew, based upon their experience in CCDH purporting to analyze data associated with social media platforms," that "for Brandwatch to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of [its contract with X Corp.] from providing access to unauthorized parties."  FAC ¶ 91.  X Corp. further alleges that "Defendants' conduct prevented Brandwatch from performing under [its contract with X Corp.]" because "Brandwatch failed to secure the data from X Corp. according to the terms of the agreements." Id. ¶ 93.  X Corp. alleges that "[a]s a direct and proximate result of Defendants intentionally interfering with [Brandwatch's contract with X Corp.], X Corp. has suffered monetary and other damages of at least tens of millions of dollars." Id.

X Corp. alleges in support of its inducing breach of contract claim that "Defendants knew, based on their experience in CCDH purporting to analyze data associated with social media platforms . . . that for Brandwatch to have access to X Corp. data for its SaaS products to analyze, X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of [its contract with X Corp.] from providing access to unauthorized parties, or allowing any unauthorized parties to access that data." Id. ¶ 96. X Corp. further alleges that "Defendants knew . . . that CCDH obtaining login credentials from a valid user such as ECF to access the data would cause Brandwatch to breach [its contract with X Corp.] by allowing an unauthorized third party . . . to gain access to the data without proper permissions or authorizations." Id. ¶ 97.  X Corp. alleges that it was harmed "as a result of Defendant's conduct when companies paused or refrained from advertising on X, in direct response to CCDH's reports and articles," and that "[a]s a direct and proximate result of Defendants inducing Brandwatch to breach [its contract with X Corp.], X Corp. has suffered monetary and other damages in the amount of at least tens of millions of dollars." Id. ¶¶ 98, 99.

CCDH argues as an initial matter that the two claims are redundant.  MTD&S at 23. They certainly are.  Inducing a breach of contract is a "species of intentional interference with contractual relations."  See 1-800 Contacts, Inc. v. Steinberg, 132 Cal. Rptr. 2d 789, 802 (Cal. Ct. App. 2003).  The difference is that an "interference" claim does not require a breach.  See Shamblin, 166 Cal. App. 3d at 123; see also Opp'n at 29 (interference claim is "narrower").  Here, because the only form of interference alleged is inducement of a breach, see FAC ¶¶ 93, 97, the claims allege the same thing.  Accordingly, they rise and fall together.

CCDH's arguments for dismissing the tort claims are that: (1) the complaint shows that CCDH did not cause a breach; (2) the complaint has failed to plausibly allege a breach; (3) the complaint has failed to plausibly allege CCDH's knowledge; and (4) the complaint fails to adequately allege damages.  MTD&S at 23–26.  The Court concludes that CCDH's arguments about causation and about damages are persuasive, and does not reach its other arguments.

### 1.  Causation

CCDH argues that X Corp. fails to allege that CCDH's conduct caused Brandwatch to breach its agreement with X Corp.  MTD&S at 23–24.  The Court agrees.  Both tort claims envision that the defendant has done something to "push[] a contracting party to act in a way that disrupts the contract."  Id. at 24 (citing Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc., 249 Cal. Rptr. 3d 122, 129 (Cal. Ct. App. 2019) (defendant induced counterparty to breach a nondisclosure agreement); Savage v. Pac. Gas & Elec. Co., 26 Cal. Rptr. 2d 305, 315 (Cal. Ct. App. 1993) (defendant persuaded plaintiff's employer to terminate employment agreement); SCEcorp v. Super. Ct. of San Diego Cnty., 4 Cal. Rptr. 2d 372, 373–74, 378 (Cal. Ct. App. 1992) (defendant forced counterparty to abandon merger)).

X Corp. does not allege that CCDH got Brandwatch to do anything at all.  X Corp. alleges that Brandwatch agreed to keep Twitter's content secure, FAC ¶ 31, that CCDH's "obtain[ing] access to and access[ing] the Licensed Materials improperly and without

authorization" was "unknown to Brandwatch . . . until recently," id. ¶ 41, and that CCDH's access "prevented Brandwatch from performing" because it meant that "Brandwatch failed to secure the data . . . according to the terms of the agreements," id. ¶ 93.  As CCDH argues, those allegations "show that any breach occurred independently of (and by necessity, before) [CCDH's] actions."  MTD&S at 24 (adding: "the access did not cause the breach, the breach caused the access.").

X Corp.'s response is that "the access is the breach."  Opp'n at 30.  In other words, Brandwatch agreed to keep the Licensed Materials secure, and by allowing CCDH to access the Licensed Materials, Brandwatch necessarily—and simultaneously—breached its agreement to keep the Licensed Materials secure.  The Court rejects that tortured reasoning.  Any failure by Brandwatch to secure the Licensed Materials was a precondition to CCDH's access.  In addition, to the extent that X Corp. maintains that CCDH need not have done anything to impact Brandwatch's behavior, then it is seeking to hold CCDH liable for breaching a contract to which it was not a party.  That does not work either.  See Tri-Continent Int'l Corp. v. Paris Sav. & Loan Ass'n, 16 Cal. Rptr. 2d 508, 511 (Cal. Ct. App. 1993) (a plaintiff "cannot assert a claim for breach of contract against one who is not a party to the contract.").

Causation is therefore one basis for striking the tort claims.

## 2.    Recoverable Damages

CCDH also argues that X Corp. fails to allege plausible damages because (a) the complaint fails to allege that any breach by Brandwatch proximately caused the damage that X Corp. seeks, and (b) the same constitutional principle that prohibits X Corp. from recovering publication damages on its contract claim prohibit it from recovering publication damages on its non-defamation tort claims.  See MTD&S at 25–26.

The Court agrees with CCDH's argument on constitutional grounds.  X Corp. cannot seek damages for the independent acts of third parties based on CCDH's speech.  Accordingly, the "at least tens of millions of dollars" that X Corp. seeks in connection with CCDH allegedly causing Brandwatch to breach its contract with X Corp. are

United States District Court
Northern District of California

impermissible.  See Planned Parenthood, No. 16-cv-236-WHO (Order on Motions to Dismiss and Strike) at 36 ("the First Amendment does not impose heightened standards on plaintiffs' tort claims as long as plaintiffs do not seek reputational damages (lost profits, lost vendors) stemming from the publication conduct of defendants.") (emphasis in original).[29]

Because the tort claims fails to allege a theory of causation that makes sense, and seek impermissible publication damages, the Court STRIKES them.[30]

### E.    Doe Defendants

CCDH's last argument is that X Corp. fails to state a claim against the Doe defendants.  MTD&S at 26.  X Corp. alleges that "one [unnamed] United States senator referred to CCDH as '[a] foreign dark money group,'" and that "[o]ther articles have claimed that CCDH is, in part, funded and supported by foreign organizations and entities whose directors, trustees, and other decision-makers are affiliated with legacy media organizations."  FAC ¶ 62.  It further alleges that "CCDH is acting . . . at the behest of and in concert with funders, supporters, and other entities."  Id. ¶ 63.  These allegations are vague and conclusory, and do not state a plausible claim against the Doe defendants.  See Iqbal, 556 U.S. at 678 (claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

## IV.    CONCLUSION

For the foregoing reasons, the Court STRIKES the breach of contract and tort claims, because CCDH has met its burden at the first step of the anti-SLAPP analysis, X Corp. has not established that there is a probability that it will prevail on those claims, and

---

[29] X Corp. suggests that it is also seeking damages based on "actions it took—including internal investigations and allocation of employee resources—to address the security breach."  Opp'n at 31 (citing FAC ¶¶ 70–71).  These tort claims do not reference that type of damage, instead using the "at least tens of millions of dollars" language that the complaint consistently attributes to the pause of advertiser spending, see FAC ¶¶ 93, 99, 5, 70.

[30] At the motion hearing, X Corp. did not identify any new allegations that it could add to the tort claims if given leave to amend.

United States District Court
Northern District of California

1   X Corp. has not satisfied the Court that amendment is appropriate under Rule 15.  The

2   Court also DISMISSES the CFAA claim for failure to adequately allege loss, and

3   DISMISSES the Doe defendants.

4         **IT IS SO ORDERED.**

5         Dated: March  25 , 2024



CHARLES R. BREYER
United States District Judge