United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| X CORP., | Case No. 23-cv-03836-CRB |
| Plaintiff, | |
| v. | **ORDER GRANTING ECF MOTION TO DISMISS** |
| CENTER FOR COUNTERING DIGITAL HATE LTD. & STICHTING EUROPEAN CLIMATE FOUNDATION, | |
| Defendant. | |

Plaintiff X Corp., the social media company formerly known as Twitter, has sued Defendants Center for Countering Digital Hate, Inc. ("CCDH U.S."), Center for Countering Digital Hate Ltd. ("CCDH U.K.") (together, "CCDH"), Stichting European Climate Foundation ("ECF"), and Does (collectively, "Defendants") in connection with CCDH's actions "to improperly gain access to protected X Corp. data," and then use that data in publications critical of X Corp. FAC (dkt. 10) ¶ 1. Both CCDH and ECF have filed motions—CCDH moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and moves to strike pursuant to California's anti-SLAPP statute, California Civil Procedure Code § 425.16, see MTD&S (dkt. 47), and ECF moves to dismiss pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, see Mot. (dkt. 49). The Court addresses CCDH's motion in a separate order. This order pertains to ECF's motion only. For the reasons described below, the Court GRANTS ECF's motion to dismiss on both grounds.

United States District Court
Northern District of California

## I.     BACKGROUND

The Court includes a lengthier background section in its order adjudicating CCDH's motion and will not repeat it here.  The most relevant facts[1] pertaining to this motion are as follows.

### A.     Parties

X Corp. is a corporation organized under the laws of the State of Nevada, with a principal place of business in San Francisco, California.  FAC ¶ 7.  X Corp. provides a real-time social media platform ("the X platform") to its users, who can share ideas through public posts.  Id.

CCDH U.S. is a non-profit corporation organized under the laws of Washington, D.C., with its principal place of business there as well.  Id. ¶ 8.  CCDH U.K. is a non-profit organization formed under English law and headquartered in London, England.  Id. ¶ 9.  CCDH U.S. and CCDH U.K. are affiliated corporate entities.  Id.  CCDH prepares and publishes reports and articles about organizations and individuals who post on social media platforms "on widely debated topics, included COVID-19 vaccinations, reproductive healthcare, and climate change."  Id. ¶ 17.  It then makes those reports "publicly available and free."  Id.  X Corp. alleges that CCDH's reports use "flawed methodologies to advance incorrect, misleading narratives," cherry-picking data and labeling as "hate speech" content that does not conform to its views.  Id. ¶ 18.  X Corp. maintains that "CCDH's reports and articles, coupled with its demands to entirely remove certain users from platforms, are transparent efforts to censor viewpoints that CCDH disagrees with, and reveal CCDH's goal of leaving on the platforms only viewpoints that CCDH supports."  Id. ¶ 20.  Indeed, X Corp. alleges that CCDH is an "activist organization[] masquerading as [a] research agenc[y]."  Id. ¶ 1.

ECF is a non-profit foundation formed under Dutch law and headquartered in The Hague, Netherlands.  Id. ¶ 10.

---

[1] For the purposes of this motion, the Court accepts as true the allegations from the complaint, and construes them in the light most favorable to X Corp.  See W. Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).

**B.      CCDH Improperly Accessing Data from Brandwatch**

The dispute between X Corp. and ECF is based on help that ECF provided to CCDH in order to access X Corp. data held by a company called Brandwatch. Brandwatch, "a trusted partner of X," and notably not a defendant in this case, "provides SaaS products[2] that enable its customers to conduct brand monitoring on social media, customer research on opinions and trends, campaign planning and campaign effectiveness measurement, competitive analysis and risk management, influencer identification and market research, and audience segmentation and analysis." Id. ¶ 28. Brandwatch had contracts with X Corp. and with ECF, both of which are relevant here. Id. ¶¶ 29, 35.

X Corp. entered into a contract with Brandwatch on May 1, 2020, called the "Master License Agreement" ("the MLA"). Id. ¶ 29. Pursuant to the MLA, Brandwatch could access certain data regarding X Corp., referred to as "'Licensed Materials,'" which included posts on the X platform, in order "to enable Brandwatch's customers to use its SaaS products to analyze posts and X/Twitter users." Id. X Corp. would stream its Licensed Materials from its servers, "including in California," to "servers used by Brandwatch [] located in the United States, which Brandwatch's applications accessed to enable [its] users with login credentials to analyze the data." Id. Brandwatch agreed that it would "'not attempt to (and will not allow others to): . . . copy, sell, lease, sublicense, distribute, redistribute, syndicate, create derivative works or assign or otherwise transfer or provide access to, in whole or in part, the Licensed Material to any third party.'" Id. ¶ 31. Brandwatch further agreed to keep "Twitter Content" secure. Id.

ECF was a subscriber to Brandwatch's applications, and therefore also had a contract with Brandwatch. Id. ¶ 35. X Corp. alleges that Brandwatch's terms of service ("Brandwatch ToS"), to which ECF must have agreed, must be similar to the ones publicly available at https://www.brandwatch.com/legal/terms-and-conditions/. Id. Brandwatch provided ECF with login credentials, which enabled ECF to log into Brandwatch's

---

[2] SaaS means "software as a service." See What is SaaS Business Intelligence?, WiseGeek, http://wisegeek.net/what-is-saas-business-intelligence.htm (last visited 2/3/2024).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

applications to access the Licensed Materials.  <u>Id.</u> ¶ 36.  X alleges that ECF's agreement with Brandwatch prevented ECF from selling, reselling, licensing, sublicensing, or otherwise making the Brandwatch service "available to anybody other than its Users" and from distributing "Supplier Data to any non-User for any reason other than Customer's (or User's) business purpose."  <u>Id.</u> ¶ 37.  ECF further agreed "that it would ensure that its user ID and password to use the Brandwatch applications were kept confidential" and that it would "'not share Customer Data with any other customer or third parties.'"  <u>Id.</u>[3]

CCDH has never been a Brandwatch customer.  <u>Id.</u> ¶ 39.  X Corp. alleges that ECF knew that CCDH was not authorized to access the Licensed Materials (or Brandwatch), and knew that CCDH wanted to access those materials "to prepare its purported 'research' reports and call for censorship and attacks on X Corp."  <u>Id.</u> ¶ 38.  X Corp. alleges that "on several occasions since at least early 2021," ECF agreed to share its Brandwatch login credentials with CCDH "to enable CCDH's illegal access to the X Corp. data."  <u>Id.</u>  CCDH U.K. allegedly instructed CCDH U.S. to secure ECF's login credentials and helped CCDH U.S. determine how to use Brandwatch applications to search the X Corp. data and "how to mischaracterize that data in the CCDH reports."  <u>Id.</u>  CCDH then allegedly "accessed the Licensed Materials improperly and without authorization."  <u>Id.</u> ¶ 41.

X Corp. further alleges that CCDH knew as of March 2021 that X Corp. and Brandwatch are parties to agreements that "prohibit Brandwatch from allowing third parties to, among other things, access, distribute, create derivative works from, or otherwise transfer the Licensed Materials."  <u>Id.</u> ¶ 42.  X Corp. also alleges that "CCDH knew that . . . ECF's agreement with Brandwatch prohibited ECF from, among other things, sharing its login credentials [or] any of the Licensed Materials with CCDH."  <u>Id.</u>  Despite that alleged knowledge, X Corp. alleges, CCDH "induced and conspired with ECF

---

[3] CCDH has submitted Brandwatch Service Terms dated October 15, 2022, <u>see</u> Kaplan Decl. Ex. C (dkt. 48–3), Brandwatch Service Terms dated August 8 or 9, 2021, <u>see</u> Kaplan Decl. Ex. D (dkt. 48–4), Brandwatch Service Terms dated April 15, 2019, <u>see</u> Kaplan Decl. Ex. E (dkt. 48–5), and Brandwatch Service Terms dated April 21, 2023, <u>see</u> Kaplan Decl. Ex. F (dkt. 48–6), all of which it asserts are incorporated by reference in the complaint, <u>see</u> Kaplan Decl. ¶¶ 4–7.

to provide CCDH U.S. with its login credentials in violation of [X Corp.'s agreements with Brandwatch] and in violation of ECF's agreement with Brandwatch."  Id. ¶ 43.  "CCDH then impermissibly and without authorization accessed the Licensed Materials on several occasions."  Id.

### C.    CCDH's Use of the Data

X Corp. complains not only that CCDH improperly accessed its data, but that it "used limited, selective, and incomplete data . . . that CCDH then presented out of context in a false and misleading manner in purported 'research' reports and articles."  Id.  The complaint includes extensive allegations about these publications, which X Corp. contends are based on "flawed 'research' methodologies," and which "present an extremely distorted picture of what is actually being discussed and debated" on the X platform, in order to "silence" speech with which CCDH disagrees.  See id. ¶¶ 17–20.

### D.    Harm to X Corp.

X Corp. alleges that CCDH "widely disseminates its articles and 'research' reports for free," id. ¶ 65, and that those publications "have attracted attention in the press, with media outlets repeating CCDH's incorrect assertions that hate speech is increasing on X." Id. ¶ 56.  X. Corp. alleges that CCDH's publications have "caused significant financial harm to X Corp., including via lost advertising revenues."  Id. ¶ 66.  Specifically, at least eight "companies who advertised on X on an ongoing basis immediately paused spending" after viewing CCDH's publications, and at least five companies "planning on running future campaigns" paused those plans after viewing CCDH's publications.  Id. ¶¶ 67, 68. Other companies have identified the CCDH publications as a barrier "to reactivating their paid advertising campaigns on X."  Id. ¶ 69.  X Corp. "estimates that it has lost at least tens of millions of dollars in lost revenues" as of the date of the amended complaint, "with those amounts subject to increasing as time goes on."  Id. ¶ 70.  It accuses CCDH of being the but-for and proximate cause of its lost revenues, because "CCDH's conduct to obtain that data (which it then distorted) was necessary for CCDH to make its allegations against X Corp. . . . regarding hate speech and other types of content on X."  Id.  X Corp. also

alleges additional losses of over $5,000 caused by internal investigations to look into CCDH's unauthorized data access, as well as attorneys' fees.  Id. ¶ 71.

### E.  Procedural History

X Corp. brought suit on July 21, 2023.  See Compl. (dkt. 1).  X Corp. amended its complaint on August 7, 2023.  See FAC.  The complaint now includes causes of action for (1) breach of contract, in connection with X Corp.'s Terms of Service ("ToS"), against CCDH only; (2) breach of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, in connection with the Brandwatch data, against all Defendants; (3) intentional interference with contractual relations, as to Brandwatch's agreement with X Corp., against all Defendants; and (4) inducing breach of contract, as to Brandwatch's agreement with X Corp., against all Defendants.  See id.

ECF moves to dismiss.  See Mot.  The motion is fully briefed, see Opp'n (dkt. 61); Reply (dkt. 66), and a motion hearing took place on Thursday, February 29, 2024, see Tr. of 2/29/24 Hearing (dkt. 74).

## II.    DISCUSSION

ECF moves to dismiss pursuant to Rule 12(b)(2), for lack of personal jurisdiction, and Rule 12(b)(6), for failure to state a claim.  See Mot.  While ECF makes some of its own arguments in support of the 12(b)(6) motion, it also joins in CCDH's motion as to the three causes of action that X Corp. brings against ECF.  See id. at 2, 14–15.  For the reasons stated in the Court's order adjudicating CCDH's motion, the Court GRANTS dismissal pursuant to Rule 12(b)(6), and does not grant X Corp. leave to amend.  The Court now turns to ECF's alternate basis for dismissal, lack of personal jurisdiction.

### A.    Legal Standard

Under Rule 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction.  "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995).

A prima facie showing is established if the plaintiff produces admissible evidence that, if believed, would be sufficient to establish personal jurisdiction.  See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d. 1122, 1129 (9th Cir. 2003). "[U]ncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor."  Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010).  However, "bare bones assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden."  Swartz v. KPMG LLP, 476 F.3d 756, 766 (9th Cir. 2007). Additionally, conclusory allegations or "formulaic recitation of the elements" of a claim are not entitled to the presumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009). "Nor is the court required to accept as true allegations that are . . . unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

In assessing whether personal jurisdiction exists, the court is not limited to a plaintiff's complaint and may consider evidence presented in affidavits or order discovery on jurisdictional issues.  Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).  Although all uncontroverted allegations are taken as true, a court may not "assume the truth of allegations in a pleading which are contradicted by affidavit."[4]  Id. at 1284.  Here, ECF has submitted a declaration in support of its motion, while X Corp. has not.  See Després Decl. (dkt. 49-1).

## B.  Personal Jurisdiction

Under the Due Process Clause, "a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'"  Ford Motor Co. v. Mont. Eighth

---

[4] Declarations and affidavits are functional equivalents in this context.  See LNS Enters. LLC v. Cont'l Motors, Inc., 22 F.4th 852, 858 (9th Cir. 2022) (citing 28 U.S.C. § 1746).

Judicial Dist. Ct., 592 U.S. 351, 352 (2021) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316–17 (1945)). This inquiry "has long focused on the nature and extent of 'the defendant's relationship to the forum State.'" Id. (quoting Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017)). And that focus has resulted in "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." Id.

A federal court may exercise general jurisdiction over a defendant only if the defendant is "essentially at home" in the forum state. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). The parties agree that general jurisdiction does not apply here. See Mot. at 4; Opp'n at 6–7.

This order addresses X Corp.'s arguments[5] that this Court has specific jurisdiction over ECF because: (1) there is nationwide jurisdiction over ECF pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure; and (2) based on ECF's contacts with California.[6] Then, this order addresses whether X Corp. should be allowed to conduct jurisdictional discovery.

### 1. Nationwide Jurisdiction

X Corp.'s first argument is that the Court can exercise personal jurisdiction over ECF through nationwide jurisdiction. See Opp'n at 7. Under Rule 4(k)(2), personal jurisdiction is proper where (1) the claim against the defendant arises under federal law, (2) the defendant is not "subject to the personal jurisdiction of any state court of general jurisdiction," and (3) the federal court's exercise of jurisdiction comports with due process. Holland Am. Line Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 461–62 (9th Cir. 2007). "The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal

---

[5] In its briefing, X Corp. had also argued that ECF had waived its jurisdictional challenge due to a forum selection clause in the ToS. See Opp'n at 5. X Corp. withdrew that argument at the motion hearing as it was unsupported by the relevant ToS. See Tr. at 2/29/24 Hearing at 52:8–16.

[6] It is not entirely clear whether X Corp. contends that there is personal jurisdiction based on ECF's contacts with California; this order briefly addresses that issue, as ECF did, see Mot. at 5 ("ECF Did Not Purposefully Direct Any Alleged Activities at California or the U.S."), out of an abundance of caution.

jurisdiction analysis with one significant difference: rather than considering contacts between the [defendants] and the forum state, we consider contacts with the nation as a whole." Id. at 462.

There is no dispute here about the first two factors. See Mot. at 4, 12[7]; Opp'n at 6. The question is only whether this Court's exercise of jurisdiction would comport with due process. See Holland Am Line Inc., 485 F.3d at 461–62; see also Getz v. Boeing Co., 654 F.3d 852, 859 (9th Cir. 2011) (applying Rule 4(k)(2) as a federal long-arm statute). ECF argues that the Court does not have specific jurisdiction over it because "it has done nothing tied to [X Corp.'s] claims that specifically targeted and created a 'substantial connection' with" the United States. See Mot. at 5 (citing Walden v. Fiore, 571 U.S. 277, 286 (2014)).

Specific jurisdiction "covers defendants less intimately connected with a State" and "only as to a narrower class of claims." Ford Motor Co., 592 U.S. at 359. While general jurisdiction depends on the relationship between the defendant and the forum, specific jurisdiction depends on the relationship between "'the defendant, the forum, and the litigation.'" Walden, 571 U.S. at 284 (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 775 (1984)). "Although a nonresident's physical presence within the territorial jurisdiction of the court is not required," such a defendant must still have "'minimum contacts'" with the forum state "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. at 283 (quoting Int'l Shoe Co., 326 U.S. at 316).

The Ninth Circuit has "established a three-prong test for analyzing a claim of specific personal jurisdiction." Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004). In particular:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or

---

[7] But see Mot. at 12 (arguing that X Corp. "cannot state a claim against ECF under the [CFAA], which is the only federal claim at issue here, and the only potential basis for Rule 4(k)(2) jurisdiction."). The Court agrees that X Corp. fails to state a claim under the CFAA, but will proceed with the jurisdictional analysis assuming that the CFAA claim is viable, as an alternative basis for dismissal.

> resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

Id. (citing Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987)).  "The plaintiff bears the burden on the first two prongs," and once those are established, the defendant must show a "'compelling case' that the exercise of jurisdiction would not be reasonable." Ayla, LLC v. Alya Skin Pty. Ltd., 11 F.4th 972, 879 (9th Cir. 2021) (quoting Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quoting Schwarzenegger, 374 F.3d at 802).

For "suits sounding in tort," such as this one, see FAC ¶¶ 80–88, 89–93, 93–99; Mot. at 5 n.2, the Ninth Circuit applies the "purposeful direction analysis," AMA Multimedia, LLC v. Wanat, 970 F.3d 1201, 1208 (9th Cir. 2020) (quotation omitted).  This order will therefore discuss (a) whether ECF purposefully directed conduct at the U.S., (b) whether the claims against ECF arise out of or relate to ECF's forum-related activities, and (c) whether the exercise of jurisdiction over ECF comports with fair play and substantial justice.

### a.    Purposeful Direction

X Corp. argues that it has adequately alleged purposeful direction.  Opp'n at 7.

Purposeful direction, or the "effects test," requires that a defendant have "[i] committed an intentional act, [ii] expressly aimed at the forum state, [iii] causing harm that the defendant knows is likely to be suffered in the forum state." Schwarzenegger, 374 F.3d at 803 (citing Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002)).

### i.    Intentional Act

The first part of the purposeful direction test is whether ECF has committed an intentional act.  See id.  To satisfy the intentional act prong, "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting Schwarzenegger, 374 F.3d at 806).  "The threshold of what constitutes an intentional act is relatively low." AirWair Int'l Ltd. v. Schultz, 73 F.

1  Supp. 3d 1125, 1233 (N.D. Cal. 2014).

2      X Corp. alleges that ECF acted intentionally by sharing its login credentials with

3  CCDH while knowing that CCDH did not have access to Brandwatch applications, that

4  CCDH wanted access to those applications, and that Brandwatch's contract with ECF

5  prohibited ECF from sharing its login credentials.  See FAC ¶¶ 2, 11, 38, 85, 86.  X Corp.

6  also alleges that ECF knew that CCDH intended to use those login credentials unlawfully.

7  Id. ¶¶ 85–86.  ECF does not dispute that it shared its login credentials with CCDH.  See

8  Mot. at 6–7.  Therefore, the intentional act prong is satisfied.

9                           **ii.      Express Aim**

10      The second part of the purposeful direction test turns on whether ECF "expressly

11  aimed" its intentional acts at the forum.  See Schwarzenegger, 374 F.3d at 802.

12          The Law on Express Aiming

13      The express aiming inquiry centers on whether the defendant specifically targeted

14  the forum state.  See Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1143 (9th Cir. 2017)

15  (citing Walden, 571 U.S. at 284).  The Supreme Court has explained that the contacts

16  supporting purposeful direction "must be the defendant's own choice and not 'random,

17  isolated, or fortuitous.'"  Ford Motor Co., 592 U.S. at 359 (quoting Keeton, 465 U.S. at

18  774).  The defendant must have "reached out beyond its home—by, for example,

19  exploiting a market in the forum state."  Id. (quotations and alterations omitted).

20  Therefore, a defendant does not purposefully direct its activities at the forum state when

21  the unilateral activity of the plaintiff or a third party is all that connects the defendant to

22  the forum state.  See Walden, 571 U.S. at 284–85 (citing World-Wide Volkswagen Corp.

23  v. Woodson, 444 U.S. 286, 291–92, (1980)).  Rather, the focus is on the defendant's "own

24  contacts," i.e., "contacts that the 'defendant' himself creates with the forum state."  See id.

25  at 284 (emphasis in original) (internal quotations omitted) (quoting Burger King Corp. v.

26  Rudzewicz, 471 U.S. 462, 475 (1985)); see also Axiom Foods, Inc. v. Acerchem Int'l, Inc.,

27  874 F.3d 1064, 1070 (9th Cir. 2017) ("The Court made clear that we must look to the

28

United States District Court
Northern District of California

defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum.") (quoting Walden, 571 U.S. at 289).

Nor does a defendant purposefully direct its activities at the forum state merely by directing those activities at a person who happens to reside in the forum state, even if the defendant knows that the person resides there. See Walden, 571 U.S. at 285. Instead, "it is the defendant's conduct that must form the necessary connection with the forum State." Id. In Calder v. Jones, 465 U.S. 783, 790 (1984), the Supreme Court "made clear that mere injury to a forum resident is not a sufficient connection to the forum." Walden, 571 U.S. at 290. "Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." Id. Thus, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Id.

Courts are to focus on the defendant's actual contacts with the forum, and the "quality and nature" of those activities. See Hanson v. Denckla, 357 U.S. 235, 253 (1958) (emphasis added).

Analysis of the Parties' Positions on Express Aiming

X Corp. argues that ECF "actively and intentionally reached into this forum" by providing CCDH U.S. with ECF's login credentials, thereby enabling CCDH U.S.'s access to X Corp.'s non-public data on Brandwatch. See Opp'n at 8 (citing FAC ¶¶ 2, 11, 36, 38, 85–86). X Corp. also argues that because X Corp.'s non-public data is stored on Brandwatch servers in the United States, and because ECF sought to support CCDH's efforts to harm X Corp., "a U.S. entity," ECF's actions constitute express aiming into the United States. Id. Finally, X Corp. argues that ECF is "attempt[ing] to isolate a portion of . . . [ECF's] conduct, and present it out of context." Id. at 9. X Corp. repeated these points at the motion hearing. See Tr. of 2/9/24 Hearing at 46:25–47:17.

ECF's response is that the act of sharing its Brandwatch login with CCDH was not aimed at the United States, and that if it was aimed anywhere, it was the U.K., "where

United States District Court
Northern District of California

1    Brandwatch [U.K.'s] services were provided under its English law-governed agreement

2    with ECF."  Mot. at 6.  ECF supports its argument with several points, which the Court

3    will now address.

4         First, ECF argues that "nothing about [X Corp.'s] central theory of ad-revenue

5    damages constitutes the purposeful targeting of California or the U.S., as opposed to

6    furthering the publishing of CCDH's globally available reporting."  Id.  ECF rightly notes

7    that providing access to information is not enough to confer jurisdiction in any state where

8    that information is available.  See id. (citing AMA Multimedia, 970 F.3d 1201 (court could

9    not exercise personal jurisdiction over the operator of an adult website because it lacked a

10   "forum specific focus") and Westbrook v. Paulson, No. 2:20-cv-1606, 2021 WL 963486,

11   at *1 (W.D. Wash. Mar. 15, 2021) (court could not exercise personal jurisdiction over the

12   operator of a YouTube Channel because (1) the defendants did not rely on Washington

13   information for their content, (2) their content did not refer to Washington, and (3) there

14   were no activities directed at a "large number" of citizens in Washington)).  As the Ninth

15   Circuit held in Mavrix Photo, Inc. v. Brand Technologies, Inc., 647 F.3d 1218, 1231 (9th

16   Cir. 2011), "[n]ot all material placed on the Internet is, solely by virtue of its universal

17   accessibility, expressly aimed at every state in which it is accessed."  Furthermore,

18   "[m]aintenence of a 'passive website,' i.e., one that 'does little more than make

19   information available to those who are interested in it,' . . . cannot satisfy the express

20   aiming prong."  Sec. Alarm Fin. Enterprises, L.P. v. Nebel, 200 F.Supp. 3d 976, 985 (N.D.

21   Cal 2016) (citing Mavrix, 647 F.3d at 1229).  To the extent that ECF's activities facilitated

22   reporting on CCDH's website, see FAC ¶ 38, that content was available everywhere, and

23   X Corp. has not alleged that those articles targeted a specific forum, cf. Calder, 465 U.S.

24   783 (publication of an article did target the forum because defendant had reached out to the

25   forum residents for sources, the article concerned forum activities of forum residents, the

26   content of the article had a forum focus, and a large proportion of copies were sold in the

27   forum); Mavrix, 647 F.3d, 1218 (personal jurisdiction over a website operator where the

28   website had a California-specific focus centered on celebrity entertainment and sought out

13

and achieved substantial viewership in California).

Second, ECF contradicts X Corp.'s allegation that ECF shared its login credentials with CCDH U.S., see FAC ¶ 38, pointing to evidence that ECF facilitated CCDH's Brandwatch access by communicating with an individual named Callum Hood "at the email address info@counterhate.com," Mot. at 6.  ECF asserts via declaration that Callum Hood "is based in the UK and employed by CCDH U.K."  Déprés Decl. ¶¶ 13–14; Exs. D, E.  Accordingly, ECF argues that its actions were aimed at the U.K., and not the U.S. Mot. at 7.  X Corp. responds that ECF "tellingly does not state that ECF never provided its login credentials to CCDH [U.S.]" and that "[t]hat omission is telling."  Opp'n at 9.  The Court disagrees.  ECF provided evidence that it shared login credentials with CCDH U.K., and that is the only evidence before the Court on this point.  See Gofron v. Picsel Techs., Inc., 804 F. Supp. 2d 1030, 1037 (N.D. Cal. 2011) ("Conflicts in the evidence are resolved in the plaintiff's favor only if the plaintiff submits admissible evidence").

Third, ECF argues that "even if it had provided a login to an individual or organization based in the U.S., that insubstantial act cannot confer jurisdiction over a foreign party for any and all later acts taken by the recipient of that login."  Mot. at 7.  ECF argued in its briefing, and reiterated at the motion hearing, that "[t]he smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise."  Mot. at 10–11 (quoting Ins. Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1271 (9th Cir. 1981) (citation omitted)[8]; Tr. of 2/29/24 Hearing at 50: 5–7. ECF relies on Burger King's holding that "specific jurisdiction cannot lie 'solely as the result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or of the 'unilateral activity of another party or third person.'"  Mot. at 7 (quoting 471 U.S. at 475).  While it is true that the unilateral acts of a third party like CCDH cannot give the Court jurisdiction over ECF, ECF's own actions could.  See Burger King, 471 U.S. at 475 n.18 ("even a single act can support jurisdiction" "so long as it creates a substantial connection with the forum.").  The

---

[8] In Insurance Company of North America, 649 F.2d at 1271, the Ninth Circuit made this point in the context of the "reasonableness" prong of the personal jurisdiction inquiry.

14

United States District Court
Northern District of California

1    question is how substantial ECF's actions were.

2        Express aiming analysis turns on the contacts the "defendant [itself] creates with the

3    forum State." Walden, 571 U.S. at 284 (internal quotation marks omitted).  It is hard to

4    see the sharing of login credentials alone as enough to create a relationship to the forum

5    state. See id.  X Corp. tried to sidestep this point at the motion hearing, arguing that ECF's

6    sharing of its Brandwatch login credentials is "enough" for the Court to exercise

7    jurisdiction because "[i]t is what enabled a large part of the conduct we complain of."  See

8    Tr. of 2/29/24 Hearing at 56:5–7.  But that expansive view of jurisdiction—that there is

9    jurisdiction over a defendant so long as it played any role in a causal chain that eventually

10   leads to a plaintiff's harm—misses the point that it is ECF's contacts with the forum that

11   matter.  See Walden, 571 U.S. at 284.  In addition, ECF did not share the login credentials

12   to U.S.-based website or to a specific server in the U.S., but to the Brandwatch platform

13   generally.  See FAC ¶ 38.  This generalized access does not show a "meaningful"

14   connection between ECF and the forum.  See Walden, 571 U.S. at 290.

15       When asked at the motion hearing whether there was a case supporting its position,

16   X Corp. cited to Alejandro Fernandez Tinto Pesquera, S.I. v. Fernandez Perez, No. 20-cv-

17   02128-LHK, 2021 WL 254193, at *1 (N.D. Cal. Jan 26, 2021).  Tr. of 2/29/24 Hearing at

18   57:9, 11–17.  But Fernandez Perez involved very different facts.  In that case, Judge Koh

19   found that the defendant, a Spanish individual, had expressly aimed his conduct at the

20   forum state by sending a cease and desist letter[9] into the forum and reporting to the Ohio

21   Division of Liquor Control that the plaintiff was wrongly using a trademark.  Id. at *10.

22   Furthermore, Judge Koh cited to Pakootas v. Teck Cominco Metals, Ltd., 905 F.3d 565,

23   577 (9th Cir. 2018), which explained that express aiming is "'something more' than 'a

24

---

25   [9] Judge Koh recognized that "'[a] cease and desist letter is not in and of itself sufficient to
26   establish personal jurisdiction over the sender of the letter.'" Fernandez Perez, 2021 WL
     254193, at *9 n.5 (citing Yahoo! Inc. v. La Ligue Contre Le Racisme Et Antisemitisme,
27   433 F.3d 1199, 1208 (9th Cir. 2006)).  The letter in Yahoo! was not "'abusive, tortious, or
     otherwise wrongful'" and could not be the basis for jurisdiction, whereas the plaintiffs in
28   Fernandez Perez had alleged that the cease and desist letter was the intentional interference
     with contract that formed the basis of the suit.  Id.

foreign act with foreseeable effects in the forum state.'" <u>Id.</u>  As the Court commented at the motion hearing, ECF's action (sharing its login information so that CCDH could access an English company's service) is not nearly as substantial a connection with this forum as sending a cease and desist letter to interfere with the plaintiff's contract and affirmatively contacting the Ohio Division of Liquor Control.  <u>See</u> Tr. of 2/29/24 Hearing at 57:18–58:2.  It is very much "a foreign act" that might have had foreseeable effects in this forum.  <u>See</u> <u>Fernandez Perez</u>, 2021 WL 254193, at *10.

X Corp. also maintained that the sharing of a password with knowledge that the password would be used to harm a U.S. company is enough to confer jurisdiction.  Tr. of 2/29/24 Hearing at 57: 9, 11–17.  But the Supreme Court has expressly rejected the notion that jurisdiction can be conferred from the mere knowledge that Plaintiff resides in the forum state.  <u>See</u> <u>Walden</u>, 571 U.S. at 290 ("Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state.").  In its briefing, X Corp. also relied on <u>WhatsApp, Inc. v. NSO Grp. Tech. Ltd.</u>, to argue that ECF's conduct was "clearly directed at the forum."  Opp'n at 8, 472 F. Supp. 3d 649, 672–73 (N.D. Cal. 2020).  But <u>WhatsApp</u> is distinguishable because the defendant there sought out plaintiffs' California-based servers to "transmit malicious code" onto them.  <u>Id.</u>  Here, there is no support for the notion that ECF specifically sought out any particular servers within the forum, much less transmitted any code onto them.

Fourth, ECF argues that even if it had provided CCDH with access "to Brandwatch for the explicit purpose of harming [X Corp.]," this still would not constitute express aiming.  Mot. at 7.  ECF reiterates that "[t]he relationship between the defendant and the forum state 'must arise out of contacts that the defendant [itself] creates with the forum state.'"  <u>Id.</u> (citing <u>Walden</u>, 571 U.S. at 284) (internal quotation marks omitted).  It also argues that "allegations of aiming at [X Corp.] are not the same as aiming at California or the U.S."  Mot. at 7.  X Corp. suggests that its own ties to the forum are enough to confer jurisdiction because ECF targeted X Corp.  <u>See</u> Opp'n at 9.

1    The express aiming analysis does not focus on the plaintiff's connection to the

2   forum.  See Walden, 571 U.S. at 284.  In Picot v. Weston, 780 F.3d 1206, 1209 (9th Cir.

3   2015), for example, a contract dispute arose between a resident of Michigan and a resident

4   of California.  In analyzing whether the California district court had jurisdiction over the

5   Michigan-based defendant, the Ninth Circuit observed that the defendant's "allegedly

6   tortious conduct" arose from actions he took in Michigan—"without entering California,

7   contacting any person in California, or otherwise reaching out to California."  Id. at 1215.

8   The court further held that the California-based plaintiff's injury "was entirely personal to

9   him and would follow him wherever he might choose to live or travel," and so there was

10   no specific jurisdiction.  Id.  X Corp.'s alleged injuries would likewise follow X Corp.

11   wherever it went.  See FAC ¶ 38.  The Court will not conclude that there is express aiming

12   based on X Corp.'s connection to the forum.

13    Fifth, ECF challenges X Corp.'s assertion that ECF's conduct "was aimed at the

14   U.S. because data provided by Brandwatch was 'stored, among other places, on protected

15   servers in the United States.'"  Mot. at 8 (quoting FAC ¶ 26).[10]  ECF maintains that the

16   allegation that Brandwatch's data was stored "among other places, on protected U.S.

17   servers in the United States" is a concession that the Defendants' access of data on

18   Brandwatch servers was not directed at the U.S. specifically.  Id. (emphasis in original).  It

19   further argues that "there is no allegation or evidence to show that ECF intended to target

20   any U.S.-based Brandwatch servers, as opposed to providing authorized access to

21   Brandwatch generally, irrespective of the location of any servers."  Id.  X Corp. argues that

22   ECF's provision of login credentials to CCDH U.S. "to enable CCDH's unlawful access to

23   non-public data on protected U.S. servers[] with the intent to support CCDH's" conduct in

24

25   _____

26   [10] At the motion hearing, X Corp. suggested that the Brandwatch data was stored on X
Corp.'s servers.  See Tr. of 2/29/24 Hearing at 28:16–20.  That is not what the complaint
alleges.  See FAC ¶¶ 83, 86, 29.

27

28

1    harming X Corp "show[s that] ECF's connection to the U.S. was not passive or

2    fortuitous."  Opp'n at 8.

3          The mere location of servers cannot establish personal jurisdiction, contrary to X

4    Corp.'s suggestion at the motion hearing.  See Tr. of 2/29/24 Hearing at 58: 5–8 (arguing

5    that there is jurisdiction based on ECF's "targeting servers and setting off the chain of

6    events that they knew would harm a U.S. corporation").[11]  See Browne v. McCain, 612

7    F.Supp.2d 1118, 1124 (C.D. Cal. 2009) (holding that the court did not have personal

8    jurisdiction over a defendant because the location of YouTube servers in California was

9    not enough to show express aim);  Prevail Legal v. Justin Gordon, et al., 20-cv-07173-BLF

10   2021 WL 1947578, at *5 (N.D. Cal. May 14, 2021) (holding that it was "random" that the

11   server hosting Plaintiff's software code happened to be in California even through

12   principal place of business was in Santa Clara, California); Hungerstation LLC v. Fast

13   Choice LLC, No. 19-CV-05861-HSG, 2020 WL 137160, at *1 (N.D. Cal. Jan 13, 2020)

14   (holding that Saudi Arabia-based defendants that used "their then-valid [software]

15   credentials to wrongfully access, copy, and steal . . . repositories of copyrighted and

16   proprietary source code" were not subject to personal jurisdiction because if the party hosts

17   its data with a Silicon Valley company, the Northern District of California would always

18   have jurisdiction, "even when that company is not a party to the litigation"); see also

19   Republic of Kazakhstan v. Ketebaev, No. 17-CV-00246-LHK, 2017 WL 6539897, at *7

20   (N.D. Cal. Dec. 21, 2017) ("The mere fact that Google—the company that owns the

21   servers—is headquartered in California is not enough to establish that Khrapunov, a

22   Kazakh citizen who resides in Switzerland, expressly aimed his alleged conduct at

23   California.").  Indeed, even if ECF knew that CCDH accessed Brandwatch servers, and

24   even if those servers were located in the United States, ECF's express aiming must consist

25   of more than the knowledge that X Corp.'s principal place of business is in California.  See

26

27   _____

     [11] In its opposition brief, X Corp. insists that it is not asserting "that the mere location of
28   servers can establish personal jurisdiction."  Opp'n at 9 n.6.

1    *Walden*, 571 U.S. at 285 (holding that there must be a stronger and more deliberate

2    connection to the forum than that mere knowledge).

3          ECF's facilitating of CCDH's access to servers that happen to be in the United

4    States is not a connection with the forum created by ECF's own conduct.  See *id.*  Rather,

5    it is the kind of "random, isolated, or fortuitous" connection that does not establish express

6    aiming.  See *Keeton*, 465 U.S. at 774.

7          Individual Targeting

8          Finally, X Corp. argues that ECF individually targeted X Corp. by providing ECF's

9    login credentials to CCDH U.S., knowingly enabling CCDH's unauthorized access to

10   Brandwatch on protected U.S. servers, and enabling CCDH's larger plan to harm X Corp.

11   through calls to stop advertising on the platform.  Opp'n at 9–10.  ECF responds that the

12   Supreme Court has rejected the "plaintiff-focused" individualized targeting theory upon

13   which X Corp. relies.  Reply at 6.  X Corp. insists that individual targeting is still "a viable

14   basis for establishing personal jurisdiction."  Opp'n at 9.

15         Individualized targeting is where a defendant "'engaged in wrongful conduct

16   targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'"

17   *Axiom Foods*, 874 F.3d at 1069 (quoting *Washington Shoe Co. v. A-Z Sporting Goods*

18   *Inc.*, 704 F.3d 668, 675 (9th Cir. 2012)).  In *Axiom Foods*, 874 F.3d at 1070, the Ninth

19   Circuit held that "individualized targeting may remain relevant to the minimum contacts

20   inquiry, [but] it will not, on its own, support the exercise of specific jurisdiction."  The

21   court explained that rather than allowing a "plaintiff's contacts with the defendant and

22   forum to drive the jurisdictional analysis," courts are to "look to the defendant's 'own

23   contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a

24   forum."  *Id.* (quoting *Walden*, 571 U.S. at 289).  And it reiterated that a plaintiff must

25   comply with *Walden*, which requires a defendant's "knowledge of [the plaintiffs'] 'strong

26   forum connections,' plus the 'foreseeable harm' the plaintiffs suffered in the forum."  *Id.*

27   1069–70 (quoting *Walden*, 571 U.S. at 289) (internal quotations omitted).

28         Looking at ECF's "'own contacts' with the forum," see *Axiom Foods*, 874 F.3d at

United States District Court
Northern District of California

1070, the only connections that X Corp. alleges are ECF's alleged sharing of login information for data that was stored on U.S. servers and ECF's solicitation of donations from California donors.  FAC ¶ 38; 10.  As to the sharing of login information, this connection cannot confer personal jurisdiction because the mere knowledge that a plaintiff lives in a particular place is not enough to establish express aiming.  See Axiom Foods, 874 F.3d at 1069–70; see also Walden, 571 U.S. at 285.  As to the solicitation of donations, merely receiving generalized donations from California donors, and not aiming any activity at the forum specifically, cannot confer jurisdiction.  See Wang v. Thomson, No. 14-cv-02388-BLF, 2014 WL 7272479, at *3 (N.D. Cal. Dec. 19, 2014).

X Corp. cites to three cases in support of individualized targeting.  See Opp'n at 9–10 (citing Reflex Media, Inc. v. Chan, No. SACV 16-795-JFW (JEMx), 2020 WL 6694316, at *5 (C.D. Cal. Oct. 30, 2020); InfoSpan, Inc. v. Emirates NBD Bank PJSC, No. SACV 11-1062 JVS (aNx), 2014 WL 12700983, at *5 (C.D. Cal. Apr. 10, 2014); Brayton Purcell, 606 F.3d at 1129).  None warrant a different conclusion.

In Reflex Media, Inc., the court found that the defendant, a company operating a dating website, was "deliberately target[ing] its advertising" by "select[ing] markets in the United States, including Los Angeles and San Francisco."  2020 WL 6694316, at *5.  The defendant's company had employees based in California, over 3,900 users within California, and sustained advertising efforts to secure those employees and users in California.  Id.  Here, there are no allegations that ECF has any such connections to California or the U.S. generally.  InfoSpan, Inc., also involves connections to the forum state that are much more extensive than the ones found here.  2014 WL 12700983, at *5. In InfoSpan, a defendant stole intellectual property from a company in California and, in the process, visited the forum state, communicated with the victim company in a variety of ways, and copied the plaintiff's source code onto flash drives directly from servers in California.  Id.  Again, ECF had no such contacts here.  Finally, X Corp. cites Brayton Purcell, 606 F.3d at 1129, however that case was explicitly abrogated by Axiom Foods, 874 F.3d at 1070 ("Following Walden, we now hold that while a theory of individualized

targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what <u>Walden</u> requires").  X Corp.'s individual targeting argument is therefore not persuasive.

Accordingly, the Court holds that X Corp. has not adequately alleged that ECF expressly aimed its activities at the United States.  ECF's alleged connections are much too "random, isolated, or fortuitous."  <u>See</u> <u>Keeton</u>, 465 U.S. at 774.

### iii.    Foreseeable Harm

The third part of the purposeful direction test is whether ECF knew that its intentional act would cause harm in the forum.  <u>See</u> <u>Schwarzenegger</u>, 374 F.3d at 803.

The focus of the inquiry "is not the magnitude of the harm, but rather its foreseeability."  <u>Lindora, LLC v. Isagenix Int'l, LLC</u>, 198 F.Supp.3d 1127, 1141 (S.D. Cal. 2016).  For jurisdictional purposes, a corporation incurs economic loss in the forum of its principal place of business.  <u>See</u> <u>CollegeSource, Inc. v. AcademyOne, Inc.</u>, 653 F.3d 1066, 1079 (9th Cir. 2011).  "If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state."  <u>Yahoo!</u>, 433 F.3d at 1207.

Here, X Corp.'s damage allegations are that ECF knowingly provided CCDH with its Brandwatch login information so that CCDH could publish articles harmful to X Corp.'s reputation and advertisers would pause spending on the X platform, causing X Corp. "at least tens of millions of dollars" in ad revenue loss.  FAC ¶¶ 7, 36–38, 70. Considering that X Corp. is based in the U.S. and has its principal place of business in California, <u>see</u> FAC ¶ 7, it is foreseeable that the brunt of the harm would be felt in the United States and in California specifically.  Therefore, X Corp. has met the foreseeable harm prong.

Although X Corp. adequately satisfied the intentional act and foreseeable harm prongs, it did not satisfy the express aiming prong.  Accordingly, X Corp. has not established purposeful direction.

### b.    Arise Out of Or Relate To

1     X Corp. next argues that it has adequately alleged that its claims arise out of ECF's

2  contacts with the United States.  See Opp'n at 10–11 (citing Ford Motor Co., 592 U.S. at

3  352 (quoting Bristol-Myers, 582 U.S. at 262)).

4     Claims "arise out of" the defendant's contacts with the forum state when there is a

5  causal connection between the contacts and the claims.  See Bristol-Myers, 582 U.S. at

6  255.  Claims that do not "arise out of" the defendant's contacts may nonetheless "relate to"

7  those contacts.  Ford Motor Co., 592 U.S. at 362.  "The 'arises out of or relates to'

8  standard requires a connection, relationship, or nexus between the plaintiff's claims and

9  the defendant's contacts with the forum."  Bluestar Genomics v. Song, No. 21-CV-04507-

10  JST, 2024 WL 54701, at *7 (N.D. Cal. Jan 4, 2024).

11     ECF argues that the FAC's "core actions relating to ECF occurred in Europe and

12  the [U.K.]," and that the agreement between Brandwatch and ECF is between a Dutch and

13  U.K. entity.  Mot. at 9–10.  X Corp. responds that "[b]ut-for ECF sharing its login

14  credentials with CCDH [U.S.], CCDH would have been unable to access X Corp.'s

15  protected data and harm X Corp."  Opp'n at 11.  X Corp. complains that ECF's arguments

16  that its actions occurred in Europe, that the "only connection to the U.S. forum is X Corp.

17  being a U.S. entity," and that "CCDH's conduct cannot be imputed to ECF" are

18  "unsupported" and "ignore the uncontroverted allegations that now must be taken as true."

19  Opp'n at 11.  But a court may not "assume the truth of allegations in a pleading which are

20  contradicted by affidavit," Data Disc., 557 F.2d at 1284, and not all of X Corp.'s

21  allegations are uncontroverted.  ECF's evidence shows that ECF shared its login

22  credentials with CCDH U.K., and so the relevant intentional act involved a U.K. entity.

23  See Després Decl. ¶¶ 13–14.

24     Further, the connection to the forum state must be "analyzed with regard to the

25  defendant's contacts with the forum itself, not with persons residing there."  See Walden,

26  571 U.S at 277.  ECF's sharing of login information is not connected to the United States,

27  other than that X Corp. is located there.  Therefore, X Corp.'s claims against ECF do not

28  arise out of or relate to ECF's contacts with the forum state.  See Bristol-Myers, 582 U.S.

United States District Court
Northern District of California

22

1    at 255.

2              c.    **Fair Play and Substantial Justice**

3         Finally, X Corp. argues that the exercise of jurisdiction over ECF would be

4    reasonable.  Opp'n at 11.

5         ECF bears the burden of showing that the exercise of jurisdiction would be

6    unreasonable.  See Ayla, 11 F.4th at 983.  To carry its burden, ECF must "present a

7    'compelling case' that the exercise of jurisdiction would be unreasonable and therefore

8    violate due process."  See id. at 983–84 (citing Boschetto, 539 F.3d at 1016) (internal

9    citations omitted).  Courts use seven factors to evaluate whether jurisdiction would be

10   reasonable:

11

12               [i] the extent of the [defendant's] purposeful interjection into the
                 forum state; [ii] the burden on the defendant of defending in the
13               forum; [iii] the extent of conflict with the sovereignty of the
                 defendant's state; [iv] the forum state's interest in adjudicating
14               the dispute; [v] the most efficient judicial resolution of the
                 controversy; [vi] the importance of the forum to the plaintiff's
15               interest in convenient and effective relief; and [vii] the existence
                 of an alternative forum.

16   Paccar Intern., Inc. v. Commercial Bank of Kuwait, S.A.K., 757 F.2d 1058,

17   1065 (9th Cir. 1985).

18

19              i.    **The Extent of Purposeful Interjection**

20        Under the "purposeful interjection" factor, courts examine how extensive the

21   defendant's contacts are in the forum state.  See Harris Rutsky, 328 F.3d at 1132.  This

22   factor weighs in favor of defendants when the defendant's contacts are attenuated.  See id.

23        ECF argues initially that X Corp. cannot establish that ECF's conduct was

24   purposefully directed at the U.S. because its "Brandwatch contract was made with a [U.K.]

25   entity."  See Mot. at 11.  This argument is unconvincing because X Corp.'s allegation

26   against ECF is its wrongful sharing of login credentials with CCDH, not ECF's entering

27   into a contract with Brandwatch.

28        ECF next argues that "even if ECF purposefully contacted the U.S., such alleged

23

contacts were 'very limited.'" Id. (quoting Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1490 (9th Cir. 1993)). This point is more convincing. As previously discussed, ECF did not conduct activities that were ongoing and substantial such that its activities could be determined to be purposeful interjection. Therefore, this factor weighs in ECF's favor.

### ii.    Burden of the Defendant

Next, the Court considers the burden of the defendant of litigating in the forum state. Courts have recognized that foreign defendants face a "unique [burden]" when they must defend themselves "in a foreign legal system" that should be given "significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Shields v. Federation of Internationale de Natation, 419 F.Supp.3d 1188, 1211 (N.D. Cal. 2019) (citing Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal., 480 U.S. 102, 114 (1987). However, this factor does not weigh heavily because "modern advances in communications and transportation have significantly reduced the burden of litigating in another forum." Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 608 (9th Cir. 2018) (quoting Sinatra v. Nat'l Enquirer, Inc. 854 F.2d 1191, 1199 (9th Cir. 1988)).

ECF argues that the burden of litigating in California is great because ECF is incorporated in the Netherlands and has no employees in the U.S. See Mot. at 11. It adds that it would be a burden for its witnesses, all of whom live in Europe, to travel to California. See id. X Corp. argues that the burden to X Corp. of litigating in a foreign forum would be just as inconvenient, because X Corp.'s witnesses and evidence are largely based in California. See Opp'n at 12.

This factor also weighs in ECF's favor because ECF exclusively operates in Europe while X Corp. is a global company with offices in both Europe and the U.S. See Després Decl. ¶ 5; Mot. at 6 n.3.

### iii.    Conflict with Sovereignty of Defendant's State

Next, the Court assesses whether asserting personal jurisdiction would pose a conflict with the sovereignty of a foreign state. See Paccar, 757 F.2d at 1065. One of the

24

goals of the minimum contacts analysis is "to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." Id. (quoting World-Wide Volkswagen, 444 U.S. at 292). "Although litigation against a foreign corporation 'creates a higher jurisdictional barrier than against a citizen from a sister state because important sovereignty concerns exist,'" all of X Corp.'s claims are under federal law or California law. See Ayla, 11 F.4th at 984 (citing Sinatra, 854 F.2d at 1199). Thus, it is unlikely that X Corp.'s claims will undermine English sovereignty. This factor weighs in favor of X Corp.

### iv.    Forum State's Interest

"The forum state has a substantial interest in adjudicating the dispute of one of its residents who alleged injury due to the tortious conduct of another." CE Distrib., LLC v. New Sensor Corp., 380 F.3d 1107, 1112 (9th Cir. 2004). ECF argues that California's interest in adjudicating the suit is slight because X Corp. is incorporated in Nevada, therefore California has no greater interest simply because X Corp.'s headquarters is in California. See Mot. at 12. X Corp. responds that both California and the United States have strong interests in protecting residents who are tortiously injured by foreign defendants. See Opp'n at 13.

If X Corp.'s allegations are taken as true, and tortious conduct did occur in the U.S. or California, then those forums could have a strong interest in adjudicating the dispute. This factor weighs in favor of X Corp.

### v.    Most Efficient Judicial Resolution

This factor determines the most efficient judicial resolution based on the location of evidence and witnesses. See Freestream, 905 F.3d at 609. But this factor is "no longer weighed heavily given the modern advances in communication and transportation." Harris Rutsky, 328 F.3d at 1133 (quoting Panavision Int'l v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998)).

ECF argues that California is not the most efficient forum because the most important evidence and witnesses are in Europe or England. See Mot. at 12. Further, it

argues that the English or Dutch court system would be better suited to resolve claims around these foreign entities, especially considering that the ECF contract with Brandwatch contains a forum selection clause and choice of law provisions that call for a resolution of any dispute in a U.K forum.  Id.  X Corp. argues that this forum can most efficiently resolve the dispute because the location of the suit is neutral and X Corp. will be put in a similar position to ECF if asked to litigate in the Netherlands or the U.K.  See Opp'n at 13.

As discussed above, X Corp. is not in a similar position to ECF.  ECF exclusively operates in Europe, whereas X Corp. is a "global product" with offices in both Europe and the U.S.  See Després Decl. ¶ 5; Mot. at 6 n. 3.  Furthermore, Brandwatch would presumably also have witnesses and evidence, and it is located in Europe.  See Després Decl. ¶ 3, ¶ 10 Ex. A.  Accordingly, the most efficient judicial resolution would be in Europe.  This factor weighs in favor of ECF.

### vi.    Plaintiff's Interest

The Ninth Circuit gives little weight to a plaintiff's interest in the forum.  See, e.g., Freestream, 905 F.3d at 609.  So, although it may be somewhat more expensive and inconvenient for X Corp. to litigate in another forum, the burden on X Corp. is relatively slight.  See Panavision, 141 F.3d at 1324.  In addition, Walden reinforces that the focus in asserting specific jurisdiction is on "the defendant, the forum, and the litigation."  571 U.S. at 284 (quoting Keeton, 465 U.S. at 775).  So, although this factor weighs in favor of X Corp., it does not sway the analysis in any significant way.

### vii.    Existence of an Alternative Forum

"[W]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable."  Ayla, 11 F.4th at 984 (quoting CollegeSource, Inc., 653 F.3d at 1066) (cleaned up).  ECF argues that X Corp. bears the burden of showing that there is no alternative forum, but that X Corp. cannot do so here because this forum has no jurisdiction over ECF.  See Mot. at 12.  X Corp. argues that neither the Netherlands nor the U.K. are appropriate forums because the dispute arises under U.S. federal law.  See Opp'n

at 13.

Although ECF "bears the ultimate burden of showing that the exercise of jurisdiction would be unreasonable, it is [X Corp.] who '[bears] the burden of proving the unavailability of an alternative forum.'" See Shields, 419 F.Supp.3d, 1212 (quoting Harris Rutsky, 328 F.3d at 1133–34). Here, while X Corp.'s claims do arise under federal and California tort law, X Corp. has made no such showing of unavailability, and an alternative forum exists in the U.K. or the Netherlands. This factor therefore weighs in favor of ECF.

Considered together, more of the factors weigh in favor of ECF than X Corp., which suggests that jurisdiction in California would be unreasonable for ECF.

Because this Court concludes that X Corp. has not adequately alleged purposeful direction or that the claims against ECF arise out of or relate to ECF's contacts with the United States, and because this Court concludes that jurisdiction over ECF would be unreasonable, this Court holds that X Corp. has not adequately alleged specific jurisdiction over ECF based on ECF's nationwide contacts.

### 2. Jurisdiction based on contacts with California

California's long-arm statute allows California courts to exercise jurisdiction on any basis consistent with the California and federal constitutions. See Cal. Civ. Proc. Code § 410.10; Daimler AG v. Bauman, 571 U.S. 117, 125 (2014) (California "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution."). The due process analysis is the same under California's long-arm statute as it is under Rule 4(k)(2), except that it involves ECF's contacts with California. See Schwarzenegger, 374 F.3d at 800–01.

X Corp.'s first set of allegations[12]  about ECF's contacts with California is that ECF "targets individuals and entities in California for donations to ECF, and receives millions of dollars in donations from California sources as a result of its solicitations directed towards this State." FAC ¶ 10. Frequent and direct solicitations of donations from

---

[12] X Corp. does not seem to make this argument in opposing ECF's motion. See generally Opp'n.

California could suggest the exploitation of a forum state's market.  See Ford Motor Co., 592 U.S. at 359.  However, if a defendant is merely operating a donation web page on its website, and no part of the web page relates to the conduct of the suit, the web page's mere existence cannot establish personal jurisdiction.  See Wang, 2014 WL 7272479, at *3.  X Corp. does not allege exactly how ECF solicited or collected donations from California donors.  Its conclusory language is not enough to show the kind of "sufficient connection" to California that would subject ECF to personal jurisdiction.  See Walden, 571 U.S. at 290.

X Corp.'s second set of allegations about ECF's contacts with California is that "ECF knew X Corp. kept the non-public data at-issue on its protected servers in California and, aware of that, enabled CCDH [U.S.] to obtain unauthorized access [to that data] and cause injuries ECF knew that CCDH intended."  Opp'n at 13– 14 (citing FAC at ¶¶ 36– 38).  However, as discussed above, the complaint alleges that the data was on Brandwatch's servers, not X Corp.'s.  See FAC ¶¶ 83, 86, 29.  Moreover, as discussed above, neither the accessing of U.S.-based servers, nor the accessing of non-California servers that store identical data to a California server can alone confer jurisdiction.  See Prevail Legal, 2021 WL 1947578, at *5.  Rather, the location of the servers is the kind of "random, isolated, or fortuitous" connection that does not establish express aiming.  See Keeton, 465 U.S. at 774.[13]

X Corp. has not adequately alleged specific jurisdiction over ECF based on its contacts with California.

Accordingly, the Court GRANTS the motion to dismiss for lack of jurisdiction.

**C. Jurisdictional Discovery**

X Corp. requests that, if the Court concludes that ECF is not subject to the Court's jurisdiction based on the current complaint, the Court allow X Corp. to take jurisdictional discovery and amend its complaint.  See Opp'n at 14.  This request is DENIED because

---

[13] Needless to say, X Corp.'s allegation that some of Brandwatch's servers were "located in the United States," see FAC ¶ 29, is not California-specific.

the complaint fails to state a claim, and also because—even if the complaint stated a claim—jurisdictional discovery is not warranted.

"A district court is vested with broad discretion to permit or deny discovery, and a decision 'to deny discovery will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant.'" Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1093 (9th Cir. 2003) (citing Hallett v. Morgan, 287 F.3d 1193, 1212 (9th Cir. 2002)).  "Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed."  Id. (citing Martel v. County of Los Angeles, 56 F.3d 993, 995 (9th Cir. 1995)). Discovery should "ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."  Id. (citing Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 540 (9th Cir. 1986)).  A refusal to grant jurisdictional discovery is not an abuse of discretion where "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction."  Id. (citing Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.24 (9th Cir. 1977)).

X Corp. argues that ECF has not denied that it knew of and intended to support CCDH's wrongful conduct, and that the lack of a denial should be the basis for jurisdictional discovery.  See Opp'n at 14.  X Corp. also argues that without jurisdictional discovery, it will not be able to ascertain ECF's communications with CCDH and the extent of their relationship.  Id.  However, the Court is unpersuaded that finding out more about ECF and CCDH's relationship would lead to a different conclusion as to jurisdiction. X Corp. has not alleged that ECF's contacts with CCDH go any further than sharing its Brandwatch login credentials so that CCDH could access Brandwatch's servers, some of which were in the United States.  FAC ¶ 86.  But ECF's accessing of servers alone cannot confer jurisdiction in the United States.  See Walden, 571 U.S. at 285 (the defendant's connection to the forum "must be the defendant's own choice and not 'random, isolated, or fortuitous'"); see also Prevail Legal, 2021 WL 1947578, at *5 (finding that it was

29

1    "random" that the server hosting Plaintiff's software code happened to be in California

2    even through their principal place of business was in Santa Clara, California).

3    Accordingly, "'further discovery would not demonstrate facts sufficient to constitute a

4    basis for jurisdiction.'" <u>See</u> <u>Laub</u>, 342 F.3d at 1093 (quoting <u>Wells Fargo & Co.</u>, 556 F.2d

5    at 430 n.24).

6    **III.    CONCLUSION**

7            For the foregoing reasons, the Court GRANTS ECF's Motion to Dismiss based on

8    failure to state a claim and the lack of personal jurisdiction.

9            **IT IS SO ORDERED.**

10       Dated: March  25 , 2024



11                                                            CHARLES R. BREYER
                                                              United States District Judge