# EXHIBIT A

quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7364

WRITER'S EMAIL ADDRESS
alexspiro@quinnemanuel.com

July 20, 2023

VIA EMAIL: INFO@COUNTERHATE.COM

Imran Ahmed
Chief Executive Officer
Center for Countering Digital Hate

Re:     False and Misleading Claims About Twitter

Dear Mr. Ahmed:

I write on behalf of my client X Corp., which operates the Twitter platform. It has come to our attention that you and your organization, the Center for Countering Digital Hate, ("CCDH"), have made a series of troubling and baseless claims that appear calculated to harm Twitter generally, and its digital advertising business specifically. CCDH regularly posts articles making inflammatory, outrageous, and false or misleading assertions about Twitter and its operations, which CCDH holds out to the general public as supported by "research." CCDH fixes this label on its outlandish conclusions about Twitter despite failing to conduct (or even attempt) anything resembling the rigorous design process, analytical procedures, or peer review that a reasonable person would expect to accompany research product published by any reputable organization.

For example, last month CCDH posted an article claiming that "Twitter Fails to Act on 99% of Twitter Blue Accounts Tweeting Hate."[1]  This claim was purportedly based on "[n]ew research show[ing] that Twitter fails to act on 99% of hate posted by Twitter Blue subscribers, suggesting that the platform is allowing them to break its rules with impunity and is even algorithmically boosting their toxic tweets."[2]  Review of the article reveals that this "research" was limited to tasking CCDH staff to report 100 individual tweets as violations of Twitter's rules, and then check whether those tweets had been removed or otherwise actioned four days later.[3]

---

[1]  https://counterhate.com/research/twitter-fails-to-act-on-twitter-blue-accounts-tweeting-hate/#about
[2]  Id.
[3]  Id.

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

CCDH's claims in this article are false, misleading, or both, and they are not supported by anything that could credibly be called research. The article provides no methodology for its selection or testing of tweets, no baseline for Twitter's enforcement time frame, and no explanation as to why the 100 chosen tweets represent an appropriate sample of the nearly 500 million tweets sent per day from which to generalize about the platform's content moderation practices. And despite purporting to conclude that Twitter favors Twitter Blue subscribers by allowing them to "break its rules with impunity," the article provides no evidence of differing treatment in content moderation actions against Twitter Blue subscribers and non-subscribers, and indeed reflects no effort to conduct any testing to support this claim, which appears under its headline. The article cites no sources other than different, similarly threadbare posts on CCDH's own website, and fails to identify the qualifications of any of the researchers who worked on the article.[4] In other words, the article is little more than a series of inflammatory, misleading, and unsupported claims based on a cursory review of random tweets.

This article leaves no doubt that CCDH intends to harm Twitter's business by driving advertisers away from the platform with incendiary claims. The text concludes with commentary from you accusing Elon Musk of "allowing hate to prosper on [Twitter], all with the tacit approval of the advertisers who remain on his platform."[5] In another example published just this week, CCDH's Director of Research, Callum Hood, is quoted as stating that "[Elon] Musk is not keeping his promises to advertisers, and their ads are appearing next to really harmful content." Aisha Counts et al., *Harmful Content Has Surged on Twitter, Keeping Advertisers Away*, Time (July 19, 2023, 6:50 AM), https://time.com/6295711/twitters-hate-content-advertisers/. That same article notes that "[a]dvertisers have said they left Twitter because of concerns over harmful content"— the very concerns CCDH's misleading claims appear calculated to promote.

Twitter takes its commitment to free speech, the enforcement of its rules and policies protecting users, and its strong relationships with its advertising partners all extremely seriously. Despite CCDH's status as a tax exempt 501(c)(3) organization in the United States, we have reason to believe that your organization's operations—and thus its campaign to drive advertisers off Twitter by smearing the company and its owner—are supported by funding from X Corp.'s commercial competitors, as well as government entities and their affiliates. To the extent that CCDH is passing off as impartial "research" material that is in fact being funded in support of an ulterior agenda, your representations are all the more misleading, while reporting of the CCDH's true economic motives and agenda is imperative.

---

[4] *Id.*

[5] *Id.*

3

Accordingly, we are investigating whether CCDH's false and misleading claims about Twitter are actionable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. Please be advised that Twitter will employ any and all legal tools at its disposal to prevent false or misleading claims from harming its users, platform, or business.

Sincerely,

*/s/ Alex Spiro*

Alex Spiro